UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. **07 CIV 9696**

PATRICIA ARTHUR, Derivatively on Behalf of MERRILL LYNCH & CO., INC.,

              Plaintiff,

    vs.

E. STANLEY O'NEAL, AHMASS L. FAKAHANY, GREGORY J. FLEMING, JEFFREY N. EDWARDS, CAROL T. CHRIST, ARMANDO D. CODINA, VIRGIS W. COLBERT, ALBERTO CRIBIORE, JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O. ROSSOTTI,

              Defendant(s).

    – and –

MERRILL LYNCH & CO., INC.,

              Nominal Defendant(s).

VERIFIED SHAREHOLDER'S
DERIVATIVE COMPLAINT



DEMAND FOR JURY TRIAL

Plaintiff, Patricia Arthur, derivatively on behalf of Merrill Lynch & Co., Inc.

("Merrill Lynch" or the "Company"), upon her personal knowledge, as to the allegations

pertaining to her, and belief as to all other allegations, based upon, amongst other things,

the investigations made by her attorneys, alleges the following:

## INTRODUCTION

*Merrill Lynch is a case study in "corporate misgovernance."*

> - James Post, Boston University School of Management
> professor and an expert on corporate governance and business
> ethics

1.     On October 24, 2007, Merrill Lynch officially became Wall Street's biggest

loser in the subprime crisis that is plaguing Wall Street's largest investment banks.

2.     Specifically, for the past several years, under the leadership of Merrill Lynch's

former chief executive, Stanley O'Neal, Merrill Lynch was the lead underwriter of billions of

dollars of Collateralized Debt Offerings ("CDOs") secured by risky subprime mortgages. As

the subprime market began to collapse over the past several years, most investment banks

reduced their exposure to CDOs. But not Merrill Lynch. O'Neal caused Merrill Lynch to

charge forward and become the world's leading underwriter of these risky investments.

3.     O'Neal did not act alone. Merrill Lynch's directors turned a blind eye to

O'Neal's imprudent strategy and completely abdicated their role of ensuring that Merrill

Lynch had adequately managed its risk exposure. Even worse, some of the defendants

named in this lawsuit intentionally caused Merrill Lynch to issue financial statements that

concealed the dangers Merrill Lynch faced as a result of its huge exposure to CDOs.

4.     The house of cards finally fell down on October 24, 2007 when O'Neal was

forced to announce that Merrill Lynch would write down more than $8 billion in the value of

its CDOs and other investments and would suffer a $2.2-billion loss in the third quarter of

fiscal year 2007 alone. This loss is the largest quarterly loss in the 93-year history of the

Company and even more write offs and losses are expected for the fourth quarter of 2007.

- 2 -

5.     How did Merrill Lynch's board punish O'Neal for this staggering loss? They ignored unanimous demand from Wall Street and Merrill Lynch's shareholders to fire O'Neal and instead allowed O'Neal to retire giving him an exorbitant severance package valued at more than $160 million.

6.     As explained below, the defendants named in this lawsuit breached their fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  Because a majority of Merrill Lynch's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Merrill Lynch to, among other things, recover the damages caused by the defendants' malfeasance.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over all claims asserted herein under 28 U.S.C. § 1332, as complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.

8.     Venue is proper in this Court because Merrill Lynch has its principal place of business in this District; Plaintiff's claims arose in this District; and Merrill Lynch has suffered and will continue to suffer harm in this District and is a citizen of New York.

## THE PARTIES

9.     Plaintiff Patricia Arthur is, and was at the time of the transaction of which Plaintiff complains, an owner and holder of Merrill Lynch common stock.  Plaintiff, who is a citizen of California, currently owns 1800 shares of Merrill Lynch stock.

- 3 -

10.     Nominal Defendant Merrill Lynch is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 222 Broadway, 17th Floor, New York, New York 10038. Merrill Lynch is a citizen of both New York and Delaware.

11.     Until his "retirement," Defendant E. Stanley O'Neal ("O'Neal") was a member of Merrill Lynch's board of directors since December 2001, the Chairman of the Board since 2003, and the Chief Executive Officer since 2002. Until recently, he was also the President and Chief Operating Officer since 2001. Upon information and belief, O'Neal is a citizen of New York.

12.     Defendant Ahmass L. Fakahany ("Fakahany") is, and at all relevant times was, President and Chief Operating Officer ("COO") of Merrill Lynch. Upon information and belief, Fakahany is a citizen of New York.

13.     Defendant Gregory J. Fleming ("Fleming") is, and at all relevant times was, President and COO of Merrill Lynch. Upon information and belief, Fleming is a citizen of New York.

14.     Defendant Jeffrey N. Edwards ("Edwards") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Merrill Lynch. Upon information and belief, Edwards is a citizen of New York.

15.     Defendants O'Neal, Fakahany, Fleming and Edwards are sometimes collectively referred to in this Complaint as the "Officer Defendants". Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Merrill Lynch's quarterly reports, press releases and presentations to

- 4 -

securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded below.

16.     Defendant Carol T. Christ ("Christ") has been a member of Merrill Lynch's board of directors since 2007.   Upon information and belief, Christ is a citizen of Massachusetts.

17.     Defendant Armando M. Codina ("Codina") has been a member of Merrill Lynch's board of directors since 2005. Upon information and belief, Codina is a citizen of Florida.

18.     Defendant Virgis W. Colbert ("Colbert") has been a member of Merrill Lynch's board of directors since 2006. Upon information and belief, Cobert is a citizen of Wisconsin.

19.     Defendant Alberto Cribiore ("Cribiore") has been a member of Merrill Lynch's board of directors since 2003. Upon information and belief, O'Neal is a citizen of New York.

- 5 -

20.     Defendant John D. Finnegan ("Finnegan") has been a member of Merrill Lynch's board of directors since 2004. Upon information and belief, O'Neal is a citizen of New Jersey.

21.     Defendant Judith Mayhew Jonas ("Jonas") has been a member of Merrill Lynch's board of directors since 2006. Upon information and belief, Jonas is a citizen of the United Kingdom.

22.     Defendant Joseph W. Prueher ("Prueher") has been a member of Merrill Lynch's board of directors since 2001. Upon information and belief, O'Neal is a citizen of Virginia.

23.     Defendant, Ann N. Reese ("Reese") has been a member of Merrill Lynch's board of directors since 2004. Upon information and belief, O'Neal is a citizen of New York.

24.     Defendant, Charles O. Rossotti ("Rossotti") has been a member of Merrill Lynch's board of Directors since 2004. Upon information and belief, O'Neal is a citizen of Washington D.C.

25.     Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Prueher, Reese and Rossotti are sometimes collectively referred to in this Complaint as the "Director Defendants." By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Director

- 6 -

Defendants were and are required to act in furtherance of the best interests of the Company

and its shareholders so as to benefit all shareholders equally and not in furtherance of their

personal interest or benefit. As a result of these duties, the Director Defendants are obligated

to use their best efforts to act in the interests of the Company and shareholders to ensure that

no waste of corporate assets occurs. The Director Defendants, because of their positions of

control and authority as directors and/or officers of the Company, were able to and did,

directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## FACTUAL BACKGROUND

### Background of Merrill Lynch

26.    Merrill Lynch is one of the world's leading wealth management, capital

markets and advisory companies, with offices in 38 countries and territories and total client

assets of approximately $1.8 trillion.    Merrill Lynch offers a broad range of services to

private clients, small businesses, and institutions and corporations.

27.    As an investment bank, Merrill Lynch is a leading global trader and

underwriter of securities and derivatives across a broad range of asset classes and serves as a

strategic advisor to corporations, governments, institutions and individuals worldwide.

### O'Neal Takes the Helm at Merrill Lynch

28.    In 1986, Merrill Lynch hired Defendant O'Neal as a banker in its junk bond

department. Over the years, O'Neal rose through the ranks and became President and Chief

Operating Officer in July 2001.

29.    In December 2001, O'Neal joined Merrill Lynch's board of directors. A year

later -- following the burst of the "tech bubble" – he was named Chief Executive Officer of

- 7 -

the Company.  In order to reverse Merrill Lynch's tumbling profits, O'Neal was given a mandate to slash costs and implement fiscal discipline.  As one commentator put it, the assumption was that O'Neal "would be [an] effective leader[] for a new era of sobriety and careful management of risk.  That era lasted for about 12 months."

30.    During his first year in charge, O'Neal cut jobs and costs and cut back Merrill's fixed-income business dramatically.  Critics say "O'Neal was so brutal as chief executive that Machiavelli called him cruel and Sun Tzu surrendered.  But O'Neal went too far.

31.    Indeed, while Merrill Lynch was cutting back, its competitors were pushing forward.  Firms like Goldman Sachs and Lehman Brothers were making big profits in fixed income forcing Merrill Lynch to scramble in order to catch up.

**O'Neal Causes Merrill Lynch to Become the Leading Underwriter of CDOs**

32.    In order to undue the damage his cost-cutting had done to Merrill Lynch's business, O'Neal caused Merrill Lynch to ramp up its investments in CDOs.  When O'Neal took the reigns at Merrill Lynch, the Company was a minor player in CDOs.  By the end of 2003, however, the Company had become the largest underwriter of the products in the world.  It retained the lead in 2004, 2005, and 2006. CDOs are essentially mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds. Specifically, after a loan is originated, it is often packaged up into an asset-backed security. These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers.  CDOs became very popular among fixed-income investors looking for

higher yields in a low-yield world. In 1995, there were hardly any. In 2006, CDOs worth more than $500 billion were issued.

33.     CDOs helped fuel the housing boom of the late 1990s and most of this decade. About 40% of CDO collateral is residential-mortgage-backed securities. Almost three quarters of that is secured by risky subprime and home-equity loans.

34.     When the housing bubble began to burst, rating agencies quickly began downgrading many CDOs. And while most brokerage firms began pulling back from the CDO market, Merrill Lynch did not.

35.     Instead, between 2006 and mid-2007, Merrill Lynch earned over $800 million in underwriting fees as the lead underwriter on 136 CDO deals with a dollar value of $93 billion. And because O'Neal's compensation was tied to the Company's performance, O'Neal received a total compensation of $48 million, $18.5 million of which was a cash bonus, in the year 2006 alone.

36.     Eager to earn his millions, O'Neal ignored the warnings of his own analysts. Indeed, in September 2006, Merrill Lynch's equity analysts warned clients that companies with subprime exposure could face lower earnings since demand for the debt could dissipate quickly as credit worsened.

37.     Ironically, Merrill Lynch's analyst made his recommendation at the same time the Company was buying subprime lender First Franklin Financial Corp. for $1.3 billion. The deal puzzled many analysts who did not understand why Merrill Lynch would be buying a subprime lender at a time when the subprime market was souring.

38.    As of June 2007, Merrill Lynch was holding $32 billion worth of hard-to-trade CDOs.  Over the next few months, Merrill Lynch worked feverishly to sell down that position.  Because of the credit-market meltdown, however, Merrill Lynch was able to unload only about half of its untenable position and wound up at the end of the 2007 fiscal third quarter still holding $15 billion in unattractive CDOs that have not been sold to investors.

**Defendants Cause Merrill Lynch to Issue False-and-Misleading Financial Statements**

39.    Between February and July 2007, the Director and Officer Defendants caused Merrill Lynch to issue at least three SEC filings painting a rosy picture of Merrill Lynch's finances.  Specifically:

40.    On February 26, 2007, Merrill Lynch filed its Form 10-K for fiscal 2006, which included results for the fourth quarter and full year 2006, and included the same financial results as previously reported.  The Form 10-K stated in part:

> During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including

both interest rate and credit derivatives, principal investing/real estate, and foreign exchange.

Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity-linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

41.    On April 19, 2007, Merrill Lynch issued its financial results for the first quarter

of 2007, in a release which stated in part:

Merrill Lynch today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion. Net revenues were up 24 percent from the prior-year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), and in all global regions. These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pretax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc.

- 11 -

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pretax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. . . .

**Global Markets & Investment Banking (GMI)**

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues,

which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

- GMI's first-quarter 2007 net revenues were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

  - Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

  - Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

  - Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

- Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first-quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

**Global Wealth Management (GWM)**

GWM generated strong revenue and pretax earnings growth in the first quarter of 2007. The growth was driven by Global Private Client (GPC), which increased its net revenues year over year for the 10th consecutive quarter, as well as by the contribution of Global Investment Management (GIM), including earnings from Merrill Lynch's investment in BlackRock. GPC continues to focus on delivering a superior product and service offering, positioning Merrill

- 13 -

Lynch financial advisors (FAs) as essential partners to their clients. GPC also continues to invest in technology to further enhance both the efficiency and effectiveness of the FA force, and to invest in growing the FA census globally.

- GWM's first-quarter 2007 net revenues were $3.4 billion, up 16 percent from the first quarter of 2006:

    - GPC's net revenues increased 11 percent to $3.1 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products. Transaction and origination revenues also increased, driven by new issue origination activity, and net interest revenues grew to a new record level.

    - GIM's net revenues increased 151 percent to $261 million, due primarily to revenues from Merrill Lynch's investment in BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment management companies and the business that creates alternative investment products for GPC clients.

- Pretax earnings for GWM in the first quarter of 2007 were $842 million, up 31 percent from the first quarter of 2006, driven by the growth in revenues. The pretax profit margin was 24.7 percent, up from 21.9 percent in the prior-year period, driven by the impact of the investment in BlackRock.

- Turnover among FAs, especially top-producing FAs, remained low. FA headcount reached 15,930 at quarter-end, as GPC continued to exercise discipline in recruiting and training high-quality FAs.

- Client assets in products that generate annuitized revenues ended the quarter at $633 billion, up 13 percent from the first quarter of 2006, and total client assets in GWM accounts were a record $1.6 trillion, up 10 percent. Net inflows of client assets into annuitized-revenue products were $16 billion for the first quarter, and total net new money was $16 billion.

- On January 29, 2007, Merrill Lynch announced that it had reached a definitive agreement to acquire First Republic Bank (NYSE: FRC), a private banking and wealth management firm focused on high-net-

worth individuals and their businesses, for approximately $1.8 billion in cash and stock.

42.   Attending a conference in London during the last week of June 2007, O'Neal

stated that problems in the subprime area were "reasonably well contained." O'Neal added

that, "There have been no clear signs it's spilling over into other subsets of the bond market,

the fix-income market and the credit market."

43.   On July 17, 2007, Merrill Lynch announced its financial results for the second

quarter of 2007, in a release which stated in part:

> Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.
>
> Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.
>
> Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

- 15 -

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

\*     \*     \*

**Merrill Lynch Investment Managers (MLIM)**

On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an

estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

*    *    *

### Income Taxes

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

### Share Repurchases

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

44.    The true facts, which were known by the Officer and Director Defendants but concealed from the investing public were as follows:

(a)    The Company was more exposed to CDOs containing subprime debt than it disclosed; and

(b)    The Company's Class Period statements were materially false due to their failure to inform the market of the extent of likely write downs in the Company's CDO portfolio due to the deteriorating subprime mortgage market which caused Merrill's portfolio to be impaired.

**Merrill Lynch is Forced to Write Down Over \$8 Billion in Bad Debt**

45.     On October 5, 2007, Merrill Lynch announced that it would be writing down the value of its CDOs by \$4.5 billion. Merrill Lynch further estimated that it would lose as much as 50 cents per share. The comment shocked analysts who had been expecting a profit of around \$2 a share.

46.     Then, just three weeks later, on October 24, Merrill Lynch admitted that its losses would actually total \$7.9 billion. In addition to a \$463 million write down on leverage-buyout commitments, Merrill Lynch's total write downs for 2007's third fiscal quarter were over \$8.3 billion. The Company also announced a loss of \$2.2 billion, or \$2.85 a share, for the quarter – nearly six times the size of the loss Merrill Lynch had predicted just three weeks earlier. Shares of Merrill Lynch fell \$3.80, or 5.7%, to \$63.32 following this announcement.

47.     During a conference call on October 24, O'Neal admitted that risk management had failed the firm, and that errors in judgment had allowed Merrill to amass an untenable \$32 billion position in CDOs. According to O'Neal, "We made a mistake." "Some errors in judgment were made in the business itself and within the risk management function." O'Neal also warned that further write downs were a possibility. Indeed, some analysts estimate the Company might have to write down those assets anywhere from \$4 billion to \$5 billion in the fiscal fourth quarter.

48.     As a result of this massive write off, Moody's Investor Service and other agencies have downgraded the firm's credit and debt ratings.

## It Takes an Egregious Act of Hubris by O'Neal Before the Board Decides to Show him the Door

49.     By any measure, O'Neal's tenure at Merrill Lynch was rocky at best. Since becoming chief executive in late 2002, Merrill Lynch's shares had an annual return of about 7 percent before dividends, compared with returns of 11 percent for Morgan Stanley and 24 percent for Goldman Sachs. Indeed, at the end of 2007's fiscal third quarter, Merrill Lynch's earnings per share were down 241% from the year before and the share price was down 34% from just a few months earlier in June 2007. These returns were far and away worse than those of any of Merrill Lynch's competitors.

50.     Incredibly, Merrill Lynch's flat performance and $8.3 billion in write downs were not, by themselves, enough for the Director Defendants to fire O'Neal. Rather, O'Neal had to attempt to accomplish a staggering breach of loyalty before he was shown the door.

51.     Specifically, on October 26, the *New York Times* reported that O'Neal had contacted one of Merrill Lynch's competitors, Wachovia Bank, about a potential merger. He did so without informing Merrill Lynch's board or obtaining its permission. Why did O'Neal makes such an overture to Wachovia? It wasn't because he thought it would be in the best interests of the Company. Rather, O'Neal stood to make $250 million in severance pay if there was a change in control of the Company.

52.     Upon publication of the *New York Times* article, rumors quickly spread that the board was incensed by his actions and that O'Neal was on his way out. Sure enough, just a few days later, on October 30, Merrill Lynch announced that O'Neal had retired, effective

immediately. Unbelievably, the Director Defendants gave O'Neal a severance package worth more than $160 million as a parting gift.

## DEMAND FUTILITY

53.     Plaintiff brings this action derivatively in the right and for the benefit of Merrill Lynch to redress damage suffered and to be suffered by Merrill Lynch as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, and abuse of control. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Merrill Lynch and its shareholders in enforcing and prosecuting their rights.

54.     Plaintiff has not made any demand on the present board of Directors of Merrill Lynch to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

### A Majority of the Board Faces a Substantial Threat of Liability

55.     Merrill Lynch's current board is made of up 11 directors. A majority of these those directors, if not all, face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand. As detailed by *Forbes.com*:

> Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for not catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion at the end of June just before the market started to crater.

56.     Defendants Jonas, Prueher, Reese, and Rossotti, are on Merrill Lynch's audit committee. The audit committee's role is one of oversight. It is responsible for ensuring the integrity of Merrill Lynch's financial statements. The audit committee completely failed to

- 20 -

fulfill its oversight role by allowing Merrill Lynch to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its over exposure to CDOs and subprime loans. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

57.     Defendants Cribiore, Finnegan, Reese and Rossotti are on Merrill Lynch's finance committee. Defendant Finnegan is the committee's chair. Amongst other things, the audit committee is responsible for overseeing Merrill Lynch's credit and market risk management. By allowing Merrill Lynch to take on billions of dollars in CDO debt -- most of which has already been written down or will be written down in the near future – the finance committee completely failed to fulfill its oversight responsibilities. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

58.     On information and belief, each of the Director Defendants approved an authorized O'Neal's severance package, which is valued at more than $160 million. In doing so, each of the Director Defendants wasted the Company's assets in that the severance package was exorbitant given the circumstances and given without consideration since the Company could have, and should have, terminated O'Neal's employment for cause. As such, each Director Defendant faces a substantial threat of personal liability for this reason as well.

**Given Their Close Ties to O'Neal, a Majority of the Board Would Not Vote to Approve This Lawsuit**

59.    With exception of Defendants Peters and Prueher, every person who was on Merrill Lynch's board when O'Neal was named chief executive has since retired. O'Neal has hand picked their successors. As such, Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Reese and Rossotti are so beholden to O'Neal that they would not pursue an action against him.

60.    In addition, O'Neal has close personal ties with many of the Director Defendants such that they would not vote to pursue an action against him. For example, *Forbes.com* reports that Defendant Finnegan and O'Neal are long time friends. Likewise, press reports have described Defendant Cribiore as close to O'Neal, and the *New York Times* has reported that in the late 1990s, Cribiore came close to recruiting O'Neal away from Merrill, to work at Brera Capital.

## CAUSES OF ACTION
### FIRST CLAIM FOR RELIEF
**(Breach of Fiduciary Duties of Care, Loyalty and Good Faith)**

61.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

62.    As alleged in detail herein, O'Neal, and each of the Director Defendants, had a duty to Merrill Lynch and its shareholders to, amongst other things, ensure that the Company was operated in a diligent, honest and prudent manner.

63.    Plaintiff asserts this claim derivatively on behalf of Merrill Lynch against O'Neal and all of the Director Defendants.

- 22 -

64.    O'Neal and the Director Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Merrill Lynch and its stockholders by allowing the Company to assume over $32 million in risky CDOs, $7.8 billion of which has already had to be written down, with more write downs anticipated in the near future.

65.    Further, each of the Director Defendants, as well as the Officer Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

66.    By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

67.    Plaintiff and Merrill Lynch have no adequate remedy of law.

## SECOND CLAIM FOR RELIEF

### (Corporate Waste)

68.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

69.    Plaintiff alleges this cause of action on behalf of Merrill Lynch against O'Neal and the Director Defendants.

70.    O'Neal and each of the Director Defendants owes and owed to Merrill Lynch the obligation to protect Merrill Lynch's assets from loss or waste.

- 23 -

71.     O'Neal and the Director Defendants' failure to adequately evaluate and monitor Merrill Lynch's risk in the CDO market constituted a waste of Merrill Lynch's corporate assets and was grossly unfair to Merrill Lynch.  No person of ordinary, sound business judgment could conclude that O'Neal and the Director Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

72.     Further, the Director Defendants committed corporate waste by authorizing and approving O'Neal's exorbitant severance package.  There was no consideration for O'Neal's $160 million severance given that O'Neal was subject to termination for cause.

73.     By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

74.     Plaintiff and Merrill Lynch have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Director Defendants.

75.     Plaintiff and Merrill Lynch are therefore entitled to judgment against the Director Defendants as specified below.

### THIRD CLAIM FOR RELIEF

### (Against All Defendants for Abuse of Control)

76.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

77.     Defendant O'Neil's and the Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Merrill Lynch, for which they are legally responsible.

- 24 -

78.     As a direct and proximate result of these defendants' abuse of control, Merrill Lynch has sustained significant damages.

79.     As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## FOURTH CLAIM FOR RELIEF

### (Against All Defendants for Gross Mismanagement)

80.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

81.     By their allegations alleged herein, Defendant O'Neal and the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Merrill Lynch in a manner consistent with the operations of a publicly held corporation.

82.     As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Merrill Lynch has sustained significant damages in excess of $8 billion dollars.

83.     As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and in favor of Merrill Lynch against all of the Defendants as follows:

- 25 -

A.     Against all the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Merrill Lynch and its shareholders from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

a.     strengthening the board's supervision and oversight responsibilities and developing a system to ensure the board accurately manages the Company's risk potential;

b.     prohibiting and individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

c.     allowing the Company's shareholders to nominate at least one candidate for election to the board; and

d.     a policy of ensuring the accuracy of the qualifications of Merrill Lynch's directors, executives and other employees;

C.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 31, 2007                    LAW OFFICES OF T HOMAS G. AMON

                                           _____
                                           THOMAS G. AMON (TGA – 1515)
                                           500 Fifth Avenue, Suite 1650
                                           New York, NY 10110
                                           Telephone: (212) 810-2430
                                           Facsimile: (212) 810-2427

                                                   -and-

                                           JOHNSON BOTTINI, LLP

                                           FRANK J. JOHNSON
                                           FRANCIS A. BOTTINI, JR.
                                           BRETT M. WEAVER
                                           655 W. Broadway, Suite 1400
                                           San Diego, CA 92101
                                           Telephone: (619) 230-0063
                                           Facsimile: (619) 233-5535


                                           Attorneys for Plaintiff

## **VERIFICATION**

I, Patricia Arthur, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of Merrill Lynch at the times the misconduct complained of in the Verified Derivative Complaint for Breach of Fiduciary Duties ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of December, 2007 at _____, California.

_____

Patricia Arthur

## VERIFICATION

I, Patricia Arthur, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of Merrill Lynch at the times the misconduct complained of in the Verified Derivative Complaint for Breach of Fiduciary Duties ("Complaint") occurred.  Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of October, 2007 at Atherton, California.

_____
Patricia Arthur