**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED

08 MAY 21  PM 8:56

U.S. DISTRICT COURT
S.D.N.Y.

| |
|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION |
| This Document Relates To: Derivative Action, 07cv9696 (LBS)(AJP)(DFE) |

Master File No.:
07cv9633 (LBS)(AJP)(DFE)

### VERIFIED CONSOLIDATED AND
### AMENDED SHAREHOLDERS' DERIVATIVE COMPLAINT

This is a shareholder's derivative action brought for the benefit of Nominal Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company") against the members of the Company's Board of Directors (the "Board) and executive officers named as defendants herein, seeking to recover on behalf of Merrill Lynch for their violations of state and federal law, including breaches of fiduciary duties, corporate mismanagement, waste of corporate assets and unjust enrichment.

### INTRODUCTION

*Merrill Lynch is a case study in "corporate misgovernance."*

> - James Post, Boston University School of Management professor and an expert on corporate governance and business ethics

1.      On October 24, 2007, Merrill Lynch officially became Wall Street's biggest loser in the subprime debacle.

2.      Specifically, for the past several years, under the leadership of Merrill Lynch's former chief executive, Stanley O'Neal, Merrill Lynch was the lead underwriter of billions of dollars of Collateralized Debt Offerings ("CDOs") secured by risky, under-collateralized subprime mortgages. As the subprime market began to collapse over the past several years, most

investment banks reduced their exposure to CDOs. But not Merrill Lynch. O'Neal caused Merrill Lynch to charge forward and become the world's leading underwriter of these risky investments.

3.      O'Neal did not act alone. Merrill Lynch's senior mismanagement supported and participated in the conduct with defendant O'Neal, and Merrill Lynch's directors approved in some instances, and turned a blind eye in other instance, O'Neal's imprudent strategy and completely abdicated their role of ensuring that Merrill Lynch had adequately managed its risk exposure. Even worse, some of the defendants named in this lawsuit intentionally and/or recklessly caused Merrill Lynch to issue financial statements that concealed the dangers Merrill Lynch faced as a result of its huge exposure to CDOs.

4.      The house of cards finally collapsed on October 24, 2007 when O'Neal was forced to announce that Merrill Lynch would write down more than $8 billion in the value of its CDOs and other investments and would suffer a $2.2 billion loss in the third quarter of fiscal year 2007 alone. This loss is the largest quarterly loss in the 93-year history of the Company and even more write offs and losses are expected.

5.      How did Merrill Lynch's Board punish O'Neal for this staggering loss? They ignored unanimous demand from Wall Street and Merrill Lynch's shareholders to fire O'Neal and instead allowed O'Neal to retire giving him an exorbitant severance package valued at more than $160 million.

6.      As explained below, the defendants named in this lawsuit breached their fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Because the majority of the members of Merrill Lynch's Board at the time

this suit was instituted approved the transactions giving rise to the claims herein, or are otherwise liable for those transactions due to their misfeasance and malfeasance, and that conduct resulted in the near collapse of Merrill Lynch, plaintiffs, Merrill Lynch shareholders, bring this action on behalf of Merrill Lynch to, among other things, recover the damages caused to Merrill Lynch by these defendants' misconduct.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein under 28 U.S.C. § 1332 as complete diversity exists between plaintiffs and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.  Furthermore, Plaintiffs' claims, including the contribution and indemnity claim, raise questions of federal law, and necessarily depend on the resolution of claims and issues governed exclusively by federal law.

8.      Venue is proper in this Court because Merrill Lynch has its principal place of business in this District, Plaintiffs' claims arose in this District, and Merrill Lynch has suffered and will continue to suffer harm in this District and is a citizen of New York.

## THE PARTIES

9.      Plaintiff Miriam Loveman owned Merrill Lynch common stock before and at the beginning of the Relevant Period, currently owns Merrill Lynch common stock, and has continuously held the stock.  Plaintiff, who is a citizen of Baltimore, Maryland, currently owns 2,000 shares of Merrill Lynch stock.

10.     Plaintiff Patricia Arthur owned Merrill Lynch common stock before and at the beginning of the Relevant Period, currently owns Merrill Lynch common stock, and has continuously held the stock for over twenty years.  Plaintiff, who is a citizen of California, currently owns 1,600 shares of Merrill Lynch stock.

3

11.     Plaintiff Operative Plasterers & Cement Masons Local 262 and Annuity Fund owned Merrill Lynch common stock before and at the beginning of the Relevant Period, currently owns Merrill Lynch common stock, and has continuously held the stock since August 2006.  Plaintiff, who is a citizen of New York, currently owns 2,015 shares of Merrill Lynch stock.

12.     Nominal defendant, Merrill Lynch, is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 4 World Financial Center, 250 Vesey Street, New York, NY 10080.  Merrill Lynch is a citizen of both New York and Delaware.

13.     Until his "retirement" from the Company on October 30, 2007, Defendant E. Stanley O'Neal ("O'Neal") was a member of Merrill Lynch's Board since December 2001, the Chairman of the Board since 2003, and the Chief Executive Officer since 2002.  Until recently, he was also the President and Chief Operating Officer since 2001.  Previously, Mr. O'Neal had been in charge of Capital Markets and a Managing Director in investment banking, heading the financing services group, which included the high yield finance, restructuring, real estate, project and lease finance, and equity private placement groups. Before joining Merrill Lynch, Mr. O'Neal was employed at General Motors Corporation in New York and Madrid. He held a number of financial positions at the company, including General Assistant Treasurer in New York, responsible for mergers, acquisitions and domestic financing activities. He was Director at BlackRock, Inc., a premier provider of global investment management, risk management and advisory services to institutional and retail clients around the world. Upon information and belief, O'Neal is a citizen of New York.

14.     Defendant Ahmass L. Fakahany ("Fakahany") has been Co-Chief Operating Officer of Merrill Lynch since May 2007 and its Co-President since May 16, 2007.  Mr.

Fakahany served as an Executive Vice President of Merrill Lynch, a General Partner of Merrill Lynch Funds since December 2002 until May 16, 2007 and Chief Administrative Officer and Vice Chairman since March 2005. Mr. Fakahany served as Chief Financial Officer of Merrill Lynch & Company Inc. from November 2002 to March 2005. Mr. Fakahany served as Chief Operating Officer for Global Markets and Investment Banking from October 2001 to November 2002; Senior Vice President and Finance Director from December 1998 to October 2001. He was instrumental in coordinating and integrating investment banking, debt, equity and securities services activities to optimize performance and profitability. Mr. Fakahany joined Merrill Lynch in 1987 and has held a number of global positions, including Senior Vice President and Finance Director for Merrill Lynch; Chief Financial Officer and Chief Administrative Officer for Corporate and Institutional Client Group (now GMI); Chief Administrative Officer of the Japan Region; Chief Financial Officer for the Asia Regions (Japan, Asia Pacific, Australasia); Japan Region Chief Financial Officer; and regional Controller for Europe, the Middle East and Africa (MLEMEA). Before joining Merrill Lynch, he held several senior finance positions with Exxon Corporation. Upon information and belief, Fakahany is a citizen of New York.

15.     Defendant Gregory J. Fleming ("Fleming") is, and at all relevant times was, President and Chief Operating Officer ("COO") of Merrill Lynch.  Mr. Fleming was the Executive Vice President from October 2003 to May 2007; President of GMI from August 2003 to May 2007; Chief Operating Officer of the Global Investment Banking Group of GMI from January 2003 to August 2003; Co-Head of the Global Financial Institutions Group of GMI from April 2001 to August 2003; Head of the United States Financial Institutions Group of GMI from June 1999 to April 2001; Managing Director of the Global Investment Banking Group of GMI

from February 1999 to October 2003. Upon information and belief, Fleming is a citizen of New York.

16.     Defendant Jeffrey N. Edwards ("Edwards") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Merrill Lynch.  Mr. Edwards was the Senior Vice President and Head of Investment Banking for Americas region from September 2004 to March 2005; Head of Global Capital Markets and Financing from August 2003 to September 2004; Co-Head of Global Equity Markets (covering trading, sales and origination activities) from October 2001 to August 2003; prior to that, in March 2000, appointed Co-Head of Global Equity Capital Markets. Upon information and belief, Edwards is a citizen of New York.

17.     Defendants O'Neal, Fakahany, Fleming and Edwards are sometimes collectively referred to in this Complaint as the "Officer Defendants."  Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Merrill Lynch's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded below.

18.     Defendants O'Neal, Fakahany, Fleming and Edwards are also sometimes collectively referred to in this Complaint as the "Insider Selling Defendants." The Insider Selling Defendants, while in possession of material, nonpublic information regarding the Company's true business prospects, improperly sold Merrill Lynch stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

19.     Defendant Carol T. Christ ("Christ") has been a member of Merrill Lynch's Board since 2007.  She is also the President of Smith College since June 2002 and was the Executive Vice Chancellor and Provost of University of California, Berkeley from 1994 to 2000. Upon information and belief, Christ is a citizen of Massachusetts.

20.     Defendant Armando M. Codina ("Codina") has been a member of Merrill Lynch's Board since 2005.  Mr. Codina is also the President and Chief Executive Officer of Flagler Development Group, a real estate investment, development, construction, brokerage and property management company since 2006.  He was also the Founder, Chairman and Chief Executive Officer of Codina Group, a real estate investment company, from 1979 until its merger with Flagler Development Group in 2006. Upon information and belief, Codina is a citizen of Florida.

21.     Defendant Virgis W. Colbert ("Colbert") has been a member of Merrill Lynch's Board since 2006.  He is also the Senior Advisor to Miller Brewing Company since 2006 and was the Executive Vice President of Worldwide Operations for Miller Brewing Company from 1997 to 2005.  Upon information and belief, Cobert is a citizen of Wisconsin.

22.     Defendant Alberto Cribiore ("Cribiore") has been a member of Merrill Lynch's Board since 2003.  He was the Founder and Managing Principal of Brera Capital Partners LLC, a private equity investment firm since 1997 and Co-President of Clayton, Dubilier & Rice, Inc., an

7

equity investment firm, from 1985 to 1997.  Before 1985, he had been a Senior Vice President at Warner Communications, where he was responsible for mergers, acquisitions and divestitures. He serves on the Boards of Directors of 2-10 Home Buyers Warranty, a risk-management company, and GAB Robins, which provides the world's most comprehensive network of loss adjustment, risk management and investigative services. Upon information and belief, Cribiore is a citizen of New York.

23.    Defendant John D. Finnegan ("Finnegan") has been a member of Merrill Lynch's Board since 2004.  Mr. Finnegan is the President and Chief Executive Officer of The Chubb Corporation since December 2002 and Chairman since December 2003. Mr. Finnegan previously had been Executive Vice President of General Motors Corporation and Chairman and President of General Motors Acceptance Corporation, a finance company and subsidiary of General Motors Corporation from May 1999 to December 2002. Upon information and belief, Finnegan is a citizen of New Jersey.

24.    Defendant Judith Mayhew Jonas ("Jonas") has been a member of Merrill Lynch's Board since 2006. She was the Vice Chair of the London Development Agency from 2000 to 2004 and a Special Advisor to the Chairman at Clifford Chance from 2000 to 2003.  Upon information and belief, Jonas is a citizen of the United Kingdom.

25.    Defendant Joseph W. Prueher ("Prueher") has been a member of Merrill Lynch's Board since 2001.  In 2001, he also became board member for New York Life Insurance Company, a Fortune 100 company and one of the largest insurance companies in the United States and the world. On the investment side, New York Life's affiliates provide institutional asset management and trust services. Upon information and belief, Prueher is a citizen of Virginia.

26.     Defendant Ann N. Reese ("Reese") has been a member of Merrill Lynch's Board since 2004.  She was a Principal of Clayton, Dubilier & Rice, Inc., an equity investment firm, from 1999 to 2000 and Executive Vice President and Chief Financial Officer of ITT Corporation, a hotel and leisure company, from 1995 to 1998. She is also a member of The Financial Accounting Standards Board, which operates under the oversight of the Financial Accounting Foundation, responsible for funding the activities of both the FASB and its counterpart for state and local government, the Governmental Accounting Standards Board. Upon information and belief, Reese is a citizen of New York.

27.     Defendant Charles O. Rossotti ("Rossotti") has been a member of Merrill Lynch's Board since 2004.  He was the Senior Advisor to The Carlyle Group, a private global investment firm since 2003 and the Commissioner of Internal Revenue at the Internal Revenue Service from 1997 to 2002. He was also the Founder, Chairman of the Board, President and Chief Executive Officer of American Management Systems, an international business and information technology consulting firm from 1970 to 1997.  He is also the Director of AES since 2003.  In addition, he is a member of the Boards of Directors of Adesso Systems Corporation, Liquid Engines, Inc., and Compusearch Systems, Inc.  Upon information and belief, Rossotti is a citizen of Washington D.C.

28.     Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Prueher, Reese and Rossotti are sometimes collectively referred to in this Complaint as the "Director Defendants." By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company,

as well as in the use and preservation of its property and assets. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.    The Officer Defendants, Insider Selling Defendants and Director Defendants are sometimes collectively referred to herein as the "Individual Defendants." Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

30.    Each of the Individual Defendants, by virtue of their positions as directors and/or officers of the Company, directly participated in the management of the Company, was directly involved in day-to-day operations of the Company at the highest levels and/or was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Such Defendants were involved in drafting, producing, reviewing, disseminating, approving, ratifying

and/or recklessly permitting the dissemination of the false and misleading statements and information herein. Defendants were aware or recklessly disregarded that false and misleading statements were being issued regarding the Company, and approved or ratified these statements. In addition, Defendants were in a position and had a duty to implement procedures and controls to prevent the false and misleading statements, but completely abdicated their oversight responsibilities to the Company by failing to do so.

## ALLEGATIONS

### The Rise and Fall of Subprime Mortgage Lending

31.    The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[1]

32.    Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.[2]

33.    Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the

---

[1]    *See Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

[2]    Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[3]

34.     In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").[4]

35.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.   Examples of typical subprime mortgages are: interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[5]   These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

---

[3]  *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[4]  *See* Ruth Simon, *Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005, at D1; *See also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

[5]  *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity,* Wall St. J., April 19, 2006, at D1 *and* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

36.    As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[6]

37.    Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.[7]

38.    Then housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.

39.    In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.[8]  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.[9]

40.    However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept

---

[6]  *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[7]  *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005.

[8]  *Id.*; *See also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee*, 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[9]  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks*, September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[10]
Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations
after their introductory "teaser" rate expired.   However, because housing prices were falling,
borrowers could not readily re-sell the property for a profit when they could not pay their
increased monthly payments, causing mortgage defaults to increase significantly.

41.    In 2006, subprime mortgage exposure grew even riskier as lenders originated a
large number of "liar loans" (no-documentation and low-documentation loans).   This practice
constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.[11]
Mortgage industry research reported in April 2006 revealed that 90% of borrowers had
overstated their incomes by 5% or more and had inflated their incomes by more than half in 60%
of the cases.[12]

42.    The recent subprime mortgage crisis began with mortgages that were loaned to
subprime borrowers, borrowers with low-rated credit history.   The loans were then packaged into
security and debt obligations and sold into commercial paper markets.   Mortgage backed
securities are generally sold as commercial instruments, such as bonds and CDOs.   When the
borrowers began to default on their mortgage payments, due to increasing interest rates,
investment banks, such as Merrill Lynch, began to feel the effects in the market for mortgage
backed securities.

---

[10]   *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind –
Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St.
J., Dec. 5, 2006.

[11]   Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

[12]   *Id.*

43.    Since 2006, the erosion of the market for securities linked to subprime mortgages has led to a global credit-market contraction. Holdings of CDOs as well as its high-risk home loans and bonds are among the types of securities that have been suffering the most. Merrill Lynch, being one of the largest underwriters of asset-backed CDOs last year has taken one of the biggest hits.

44.    The Individual Defendants caused or allowed Merrill Lynch to develop a scheme to conceal a tremendously risky subprime mortgage portfolio. Merrill Lynch used this portfolio as the collateral for debt instruments sold or held by the Company. During the Relevant Period, the Individual Defendants directed Merrill Lynch to acquire a large inventory of securities backed by mortgages made to subprime borrowers. These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

45.    In addition, Merrill Lynch also provided the initial financing in many instances which has helped create the subprime mortgage crisis in the first instance. Merrill Lynch provided warehouse lines of credit to subprime lenders, who do not normally service such loans, that enabled the subprime lenders to make these subprime loans to persons and entities with inadequate collateral and/or no ability to repay the mortgages . These subprime lenders then retained the servicing of the benefits of the loans or sold all of the loans off to intermediary financial institutions that did retain the serving of the loans. Those intermediaries, in turn, sold the balance of the instruments to financial institutions like Merrill Lynch. Merrill Lynch was then able to package these inadequately collateralized subprime loans, which its officers knew or with little inquiry, could determine, were made to borrowers with little or no ability to repay them, and sell them as CDOs or invest in them. Thus, management of Merrill lynch knew or

should have known that the loans were made to subprime borrowers, who were unlikely to be able to make their mortgage payments to the financial institution. Thus, by providing the warehouse lines of credit to subprime lenders to begin with, Merrill Lynch provided the seed money – at the very bottom of the mortgage market -- for lenders, many of which were no better than classic boiler room operations --  to continue to provide a steady stream of subprime loans to those who were unable to repay them.  Individual Defendants knew, or could have easily uncovered that these loans -- the foundation of Merrill Lynch's CDO underwriting and investment strategy -- were not credit-worthy since Merrill lynch's lending to subprime lenders and mortgage brokers made these subprime loans possible.

46.    As a supposed safeguard over the valuation of its financial instruments, the Company stated publicly its practices and procedures regarding risk management.  The Company's supposed internal controls to ensure appropriate valuations and adequate financial disclosures failed either through a deficient risk management structure or its lax implementation or both.  Merrill Lynch's flawed design to protect the firm from these types of overly aggressive investment and business strategies reflected the failures of the Individual Defendants at every turn to prevent the Company's eventual collapse and forced sale.

47.    Despite these material adverse circumstances, the Individual Defendants directed Merrill Lynch to issue a series of improper statements that proclaimed record growth.  The Individual Defendants have misled investors regarding the financial condition of Merrill Lynch and its exposure to risk in the subprime market by failing to disclose the risks created by its subprime lending activities.

## Background of Merrill Lynch

48.     Merrill Lynch is one of the world's leading wealth management, capital markets and advisory companies, with offices in 38 countries and territories and total client assets of approximately $1.8 trillion. Merrill Lynch offers a broad range of services to private clients, small businesses, and institutions and corporations.

49.     Merrill Lynch has operations primarily in the United States, Canada, Europe, the Middle East, Africa, the Pacific Rim, and Latin America.  The Company was founded in 1820 and is headquartered in New York, NY.

50.     As an investment bank, Merrill Lynch is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.

51.     The Company's Retail Wealth Management segment provides brokerage, investment advisory, and financial planning services.  This segment also offers commission and fee-based investment accounts, banking, cash management, and credit services, trust generational planning, retirement services, and insurance products to individuals, small to mid-sized businesses, and employee benefit plans.

## O'Neal Takes the Helm at Merrill Lynch

52.     In 1986, Merrill Lynch hired Defendant O'Neal as a banker in its junk bond department.  Over the years, O'Neal rose through the ranks and became President and Chief Operating Officer in July 2001.

53.     In December 2001, O'Neal joined Merrill Lynch's Board.  A year later -- following the burst of the "tech bubble" – he was named Chief Executive Officer of the Company.  In order to reverse Merrill Lynch's tumbling profits, O'Neal was given a mandate to

slash costs and implement fiscal discipline.  As one commentator put it, the assumption was that O'Neal "would be [an] effective leader[] for a new era of sobriety and careful management of risk.  That era lasted for about 12 months."

54.     During his first year in charge, O'Neal cut jobs and costs and cut back Merrill's fixed-income business dramatically.  Critics say "O'Neal was so brutal as chief executive that Machiavelli called him cruel and Sun Tzu surrendered."  But O'Neal went too far.

55.     Indeed, while Merrill Lynch was cutting back, its competitors were pushing forward.  Firms like Goldman Sachs and Lehman Brothers were making big profits in fixed income forcing Merrill Lynch to scramble in order to catch up.

**O'Neal Causes Merrill Lynch to Become the Leading Underwriter of CDOs**

56.     In order to undo the damage his cost-cutting had done to Merrill Lynch's business, O'Neal caused Merrill Lynch to ramp up its investments in CDOs.  CDOs are essentially mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds.  Specifically, after a loan is originated, it is often packaged up into an asset-backed security.  These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers.  CDOs became very popular among fixed-income investors looking for higher yields in a low-yield world.  In 1995, there were hardly any.  In 2006, CDOs worth more than $500 billion were issued.

57.     CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets.  These assets are divided into different tranches: senior tranches, mezzanine tranches, and equity tranches.  Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to compensate for the added

default risk. But the system only works if the underlying asset backed securities held by the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once.[13]

58.     To the contrary, CDOs holding only subprime related investments (e.g., notes, bonds, and other instruments dependent on mortgages for their value) were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.[14]   Nonetheless, because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks securitizing CDOs.[15]

59.     When O'Neal took the reins at Merrill Lynch, the Company was a minor player in CDOs. Soon after O'Neal's ascension, Merrill Lynch undertook a dramatic transformation of its Fixed-Income, Currencies and Commodities ("FICC") business.   Specifically, the Company rapidly increased its CDO underwriting business, which resulted in the Company's ascent "from bit player to powerhouse in the lucrative business of bundling loans into salable securities."[16] Merrill Lynch leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.2 billion of deals, to the top Global underwriter of CDOs in 2004, 2005, and 2006. CDO

---

[13] *See* Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

[14] Merrill Lynch explained that the valuation of its CDO and subprime related securities "will also continue to be impacted by external market factors including default rates a decline in the value of the underlying property," *See* Merrill Lynch 2007 10-K.

[15] *See* FDIC Outlook, *A New Plateau for the U.S. Securitization Market, available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

[16] *See* Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

underwriting became an increasingly important profit center for Merrill Lynch, which earned $400 million in CDO underwriting profits in 2005.[17]

      60.    A May 2005 profile of Merrill Lynch in Credit U.S. magazine stated, in part, the following:

> [D]eals are priced almost weekly as Merrill Lynch solidifies its position as the world's top issuer of CDOs. In 2004, the country's third-largest investment bank priced $16.5 billion in deals, or almost 14% of the market total…
>
> Merrill Lynch did not always rule the market. Before Ricciardi and his team joined, it was their former employer CSFB that consistently took first prize. Merrill could barely make the top 10. Almost immediately after Ricciardi switched jobs in April 2003, taking a good portion of his group with him, CSFB started sliding and Merrill soared. Since then, Merrill has led the league tables quarter after quarter, gradually increasing its lead over the competition, while CSFB has slipped to eighth position.
>
> This year, with analysts expecting new CDO issuance around the world to rise 5–15% from last year's $120 billion, Ricciardi expects Merrill to issue 30–40% more than it did in 2004. Perhaps more importantly, Merrill's CDO revenues have jumped tenfold since Ricciardi and his team joined.
>
> "Collateralized debt obligations have been around since 1987, but annual issuance never exceeded $5 billion until 1996."
>
> "CDOs offer a handsome return—these days of up to 240 basis points over comparable corporate bonds—because the market is complex, opaque and illiquid."
>
> "High-yield CLOs and CBOs dominated the market until about 2001, when a corporate recession and a wave of defaults sent prices crashing. CDO issuance dropped from almost $68 billion to approximately $52 billion annually in 2001 and didn't pick up again for three years."
>
> "Today the clear favorites are CDOs backed by asset-backed securities, which make up about 55% of the total CDO issuance."
>
> "CDOs backed by ABS are generally safer than those backed by bonds because losses are filtered through the underlying securitization first."

---

[17] *See* Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, Wall St. J., Oct. 25, 2007.

"Luckily for Merrill Lynch, Ricciardi and his team started using asset-backed securities to collateralize CDOs early and have ridden the wave all the way to the top. 'Some of our success,' says Norell, 'lies in the fact that we just happened to start working on and developing something that turned out to be very popular.'"

In 1999, [Ricciardi's team at Prudential Securities] issued the first ABS CDO as it is defined today, backed by a diversified pool of residential mortgage-backed securities and home equity loans. "We thought ABS was excellent collateral for CDOs because asset-backed securities—particularly subordinate classes of, let's say, home equity loans—trade at much wider levels than corporates of the same rating," says Ricciardi. "It was our feeling that they trade at these wider levels not because they're of worse credit quality but because of technical reasons."

A year later, Ricciardi left Prudential for CSFB and took Harin De Silva with him. There they joined up with Norell, and the three helped CSFB become the largest issuer of CDOs. Then, in 2003, they headed for Merrill Lynch.

Up until 2003, Merrill Lynch barely had a presence in the CDO market, only pricing a couple of collateralized loan obligations a year. When Ricciardi joined he quickly ramped up the ABS and trust-preferred business and this year the firm plans to focus on further growing its CLO and synthetic CDO output.

ABS CDOs, backed mainly by residential mortgage-backed securities, have had a good run over the past few years as the housing market has rallied. ABS issuance rose from $27 billion in 2003 to $46 billion in 2004 alone, according to Standard & Poor's. But some analysts worry about the consequences on ABS CDOs if the real-estate market stalls. "The biggest thing is always the leverage in the CDO market. When the general high-yield bond market got hit, CBOs backed by high-yield bonds got hit even more," says Michiko Whetten, quantitative credit derivative analyst at Nomura Securities. "The same thing is concerning lots of market participants now, in that ABS CDOs have a very high exposure to the residential mortgage-backed securities market. So the fortunes of the ABS CDO market can go up and down with the housing market."

Whetten says ABS CDO spreads may have tightened too much, and like other analysts she expects ABS CDO issuance to be flat to slightly lower this year. Ricciardi says he expects ABS CDO issuance at Merrill Lynch to rise marginally.

These days, TruPS CDOs are being extended to more asset classes. Earlier this year Merrill Lynch was the first to issue a CDO backed by a pool of real-estate investment trust (Reit) TruPS: the $729 million Taberna Preferred Funding vehicle managed by Cohen Brothers. The deal had 10 investment-grade tranches, the most senior of which yielded 47 basis points over Libor.

"It's quite a process," says Ricciardi, who says it took about two years from when the idea was first hatched to execution. "It's a new product. You have to work

with the rating agencies, educate investors, educate the Reits so they'll issue the product." It took a while to convince the Reits to borrow through a vehicle they had never heard of before, and it took some effort to convince rating agencies to take a look at small institutions usually below their radar screens.

Ricciardi says he expects Reit trust preferreds to grow rapidly this year and next at least, although this asset class demonstrates one of the drawbacks of CDOs: there has to be underlying collateral to back them, and supply is limited. "It's not clear how much more capital Reits need. It is a more limited audience than banks. There are 10,000 banks, but there are only two or three hundred Reits," says Ricciardi. "At some point we're going to run out of guys to do this for."

This problem exists in other asset classes as well. "In ABS, the availability of assets has been a sticking point," says Norell. "There's a finite amount of them issued." Only about $10–12 billion in subordinate classes of home equity loans are issued annually, he says, putting a natural cap on CDO issuance.

But as Norell points out, the TruPS technology can be extended to any type of borrower who is too small to tap capital markets directly. And to mitigate any slowdown caused by lack of collateral, Wall Street has set its sights on synthetic CDOs, backed by the large and growing supply of credit default swaps.

Ironically, while one challenge is bringing investors on board, the other is keeping the masses away. "We need to continuously innovate," says Norell. "We don't necessarily want everything to be too simple and universally accepted by everyone, because then the relative increase in yield to investors who do want to take the time to understand complex product is going to be difficult to find."

Norell points out that collateralized debt obligations carry handsome yields compared with corporate bonds of the same rating because fewer people understand them. By the same token, ABS CDOs yield more than CLOs because people don't understand the mortgage-backed market as well as loans.

"If you polled a hundred capital markets participants about IBM, most people are going to have some opinion of it. But if you went to the same group and asked them about an Ameriquest or Countrywide triple-B mortgage security, very few people are going to have any idea of how to analyze it," says Norell. This complexity is what adds yield to ABS CDO products, he says, because demand is limited to a small pool of very specialized investors.

One undeniable source of risk, which helps contribute to the yield on CDOs, is the lack of a real secondary market. David Weeks, head of secondary trading at Merrill Lynch, says secondary market volumes in cash CDOs were under $30 billion in 2004. "Generally speaking we advise our investors that the products we sell them are buy-and-hold securities," says Norell. "Liquidity is tricky, and the

rule seems to be that it's never there when you really need it," he says, explaining that when a transaction performs poorly investors have a difficult time selling it.

But again, the same principal applies: if the market were to become too liquid, returns for investors might start to diminish, says Norell.

In this vein, many Wall Street players would like to keep the CDO market as opaque as possible to keep yields juicy.

61.    An August 30, 2005 Bloomberg's article entitled *Merrill, Citigroup Record CDO*

*Fees Earned in Top Growth Market* stated, in part, the following:

Merrill, the No. 2 U.S. securities firm by market value, and Citigroup, the biggest bank, sold a third of this year's $72 billion of U.S. collateralized debt obligations, data compiled by Bloomberg show. The CDO market more than doubled in the past five years…

"CDO fees usually equal about 1.5 percent to 1.75 percent of the size of a deal, bankers who arrange such sales say. That's more than triple the average 0.4 percent that banks charge to sell investment-grade bonds."
"About $290 billion is invested in U.S. CDOs, up from $125 billion at the end of 2000, according to the Bond Market Association…"

Synthetic CDOs are backed by credit-default swaps, which are contracts that allow investors to bet on a company's creditworthiness or get protection from default. Like insurance, buyers of the swaps pay an annual fee similar to a premium to protect a certain amount of debt against default for a specified number of years. In the event of a default, they are paid face value of the bonds or loans.

Cash CDO sales jumped 80 percent in the first seven months of 2005 from a year earlier, according to Merrill research. In July, 26 CDOs valued at $15.8 billion were priced. That same month, $1.6 billion of CDO "squareds," or those backed by other CDOs, were sold, almost equivalent to all of 2003 and 2004 combined, New York- based Merrill reported.

"It wasn't until the late 1990s that CDO issuance began in earnest, rising to $80 billion in 2000 from less than $5 billion in 1995, according to Moody's Investors Service…"

"…the lack of transparency has driven away some of the bond market's traditional investors."

Maxim Advisory LLC, the New York money manager, used Merrill last month to lead a $2 billion CDO called Jupiter High Grade CDO III Ltd. Backed by

residential mortgage-backed securities, credit-default swaps and other CDOs, it was Merrill's third assignment for Maxim since last year, helping the firm outpace Citigroup among underwriters.

"Since they are the No. 1 issuer, it gave us a sense of comfort in terms of execution,'' said Wing Chau, 38, a money manager at Maxim who oversees CDO investments."

"Merrill has handled $13.7 billion of dollar-denominated CDO sales so far this year, Bloomberg data show."

"Merrill … reaped fees of at least $100 million this year from selling CDOs, according to Bloomberg estimates. That's equal to about 15 percent of Merrill's debt underwriting revenue …in the first half of 2005."

The Jupiter deal was split into nine tranches, with ratings ranging from the highest possible, or AAA, to two notches below investment grade, or BB.

Investors receive annual yields ranging from 27 basis points above the benchmark London Interbank Offered Rate for the highest-ranking tranche to 270 basis points above Libor for the lowest-ranking slice, Chau said. A basis point is 0.01 percentage point.

``If you were to make a direct investment in a triple-A corporate, the Libor equivalent there would probably be something like Libor plus 17," Aladdin's Eggenschwiler said. ``That's where the pickup in yield is."

"The market has become more mainstream,'' said Chris Ricciardi, 36, Merrill's global head of structured credit products, who joined the firm in 2003 after three years at Credit Suisse First Boston. ``We anticipate strong CDO volume through the end of the year and into next year.''

So far this year, the most popular cash CDOs are those backed by assets such as commercial and residential mortgage-backed securities, including home equity loans and mortgage loans to individuals with patchy credit histories.

62.    In a November 15, 2005 speech at the Merrill Lynch Banking and Financial

Services Investor Conference, O'Neal, stated, in part, the following:

We'll also continue to invest in and upgrade mortgage finance and trading, derivatives, municipals, prime brokerage and portfolio trading. A key area, where we intend to dedicate resources, is in risk taking for the benefit of the firm across our trading and principal investing businesses. It's important for us to be able to take advantage of favorable trends across asset classes and provide the same opportunities to our clients. We've got the right people in place, as well as good

risk management and controls. We expect them to continue to draw more capital and generate more profits.

"I think it is not well understood that the areas we cut in 2001 are largely not the ones we're rebuilding now.... In CDO's, collateralized debt, we were almost non-existent in 2000 — ranked 13th. Today we're ranked number one."

63.     CDOs helped fuel the housing boom of the late 1990s and most of this decade. About 40% of CDO collateral is residential-mortgage-backed securities.  Almost three quarters of that is secured by risky subprime and home-equity loans.

### The Deterioration of the Subprime Mortgage and CDO Market

64.     Since subprime loans were vulnerable to falling home prices, all of Merrill Lynch's subprime related securities (e.g., residential mortgage backed securities (RMBS), CDOs and CDO squared securities)[18] had the same vulnerabilities.

65.     The sharp increase in defaults and falling home prices that started in 2005 eroded the value of all tranches of the RMBS and CDO securities that Merrill Lynch underwrote.  In turn, because RMBS yields were falling, the yields on the CDO bonds sank as well.[19]

66.     When the housing bubble began to burst, rating agencies quickly began downgrading many CDOs.  And while most brokerage firms began pulling back from the CDO market, Merrill Lynch did not.

67.     As the Wall Street Journal reported, "For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world.  But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging.  Many investors felt they had invested enough money in this

---

[18] A "CDO squared" is a CDO collateralized by securities issued by other CDOs.

[19] *See* Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market."[20]

68.    As early as July 11, 2005, a Pakistani publication, Dawn, made the following prescient analysis:

> The [US] regulatory regime cannot address risk management issues raised by the explosive growth of the collateralized debt obligation (CDO) industry. The US regulatory regime measures CDO transactions in terms of their book value and not their risk but a 2005 Morgan Stanley study has shown that during 2003-2004 the book value of CDO transactions represented only about 40 per cent of their risk adjusted value.

> Greenspan warns that "understanding the credit risk profile of CDO tranches poses challenges to even the most sophisticated market participant." CDOs have the potential to act as mechanisms for crisis transmission—investment banks, insurance companies, hedge funds and pension funds have large CDO holdings— and the regulatory regime is not equipped to deal with such a situation. This is becoming an increasingly important concern as interest rates rise in America.

69.    The Individual Defendants' continued push in CDO investments exposed Merrill Lynch to major risk of lower earnings amidst warnings from analysts that Companies with substantial subprime exposure could face significant financial problems should the subprime market collapse.    However, since the Officer Defendants' compensation was tied to the Company's financial performance, the Company ignored these warnings even though everyone else was downgrading.

70.    When demand for CDO securities waned in late 2005, the Individual Defendants were unwilling to give up the lucrative underwriting fees so they caused the Company to begin

---

[20]  Randal Smith & Jed Horowitz, *Merrill Takes $8.4 Billion Credit Hit*, WSJ, Oct. 25, 2007.

purchasing the AAA tranches of the CDO securities with its own capital.[21]  As reported in the financial press, Defendant O'Neal pushed this strategy of buying CDO securities with Merrill Lynch's own capital.  Executives who resisted, such as fixed income adviser Jeff Kronthal, were fired.[22]

71.    "Merrill took the top tranches onto its own balance sheet," said Scott Sprinzen, an analyst with S&P. "The amounts were staggering."[23]

72.    "That decision turned out to be one of the worst miscalculations in the annals of risk management."[24]  Ultimately, when credit markets tightened, the Company could not borrow sufficient cash to keep the CDOs afloat.[25,26]  "It's like me buying all those buildings out there just to get a little fee. It wouldn't make sense," a Merrill official stated in the financial press.[27]

---

[21]  Merrill Lynch's underwriting fees averaged 1.25% of its total deal volumes, or around $12.5 million for each $1 billion CDO.

[22]  *See* Gary Weiss, *The Taming of Merrill Lynch,* May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3.
[23]  *See* Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

[24]  The underwriter of a CDO issuance typically acts as a middleman by underwriting the CDO issuance for a fee, but does not retain a proprietary interest in the issued securities.

[25]  As described in detail below, Merrill Lynch's inability to liquidate the CDO securities it held on its balance sheet during the credit crisis, may also have led Merrill Lynch's to engage in various fraudulent activities.  The company has been sued for fraud and misrepresentation as underwriter for not disclosing the true nature of the underlying securities.  In addition, Merrill Lynch's has been accused of selling CDO securities to investors by hiding the fact that they were actually CDOs or other subprime related securities.

[26]  *See* Peter Eavis, *CDOs explained:  How these debt vehicles led to big losses at big banks -- and why there may be more to come*, Fortune, Nov. 26, 2007.

[27]  *See* Gary Weiss, *The Taming of Merrill Lynch,* May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3.

73.     In response to the decreased demand for CDOs, Mr. Ricciardi (then head of Merrill Lynch's CDO business) had budgeted for no growth in 2006 in mortgage CDOs before he left the Company in February 2006.

74.     But following Mr. Ricciardi's departure, Dow Kim (then head of markets and investment banking) sought to reassure the CDO group that Merrill Lynch remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs.

75.     Indeed, in 2006, Merrill Lynch sharply boosted its issuance of CDO securities to $44 billion, compared to $14 billion in 2005.  The Company's fees from CDOs jumped to more than $700 million in 2006.  Throughout 2006, Merrill Lynch continued taking additional CDO securities onto its own balance sheet.

76.     In September of 2006, Kenneth Bruce, Merrill Lynch's own analyst, warned the Individual Defendants that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Bruce specifically warned that an "asset fire-sale" could cause prices to fall.[28]

77.     In short, Merrill Lynch began purchasing the CDO securities that its customers were rejecting, despite the deterioration of the subprime and CDO markets and warnings from its own analyst that a subprime meltdown was imminent.

78.     Between 2006 and mid-2007, Merrill Lynch earned over $800 million in underwriting fees as the lead underwriter on 136 CDO deals with a dollar value of $93 billion.  And because O'Neal's compensation was tied to the Company's performance, O'Neal received a total compensation of $48 million, $18.5 million of which was a cash bonus, in the year 2006 alone.

---

[28] Al Yoon, *Merrill's Own Subprime Warnings Unheeded,* Reuters, Oct. 29, 2007.

79.     Eager to earn his millions, O'Neal ignored the warnings of his own analysts. Instead, Defendant O'Neal and the other Officer Defendants continued to push forward with the high-risk business strategy in order to boost the Company's earnings and increase their substantial executive compensation.

80.     A November 28, 2006 Bloomberg article entitled *Wall Street Leads Consolidation Of Subprime-Lending Business High-Risk Loan Defaults Open Door for Brokerages; 'Two Birds With One Stone'* stated the following:

> Wall Street thrives on risk, so what better investment these days than the subprime-mortgage business.
>
> Lenders that make home loans to buyers with troubled credit history sprinted ahead during the housing boom, only to see prospects wane as interest rates rose, home prices fell and borrowers had trouble making payments. With losses mounting and consolidation sweeping the industry, Wall Street, not the banking industry, is emerging as the consolidator.
>
> In the past three months, Morgan Stanley agreed to buy Saxon Capital Inc. for $706 million. Merrill Lynch & Co. struck a $1.3 billion deal to buy National City Corp.'s First Franklin lending unit, and Bear Stearns Cos. is buying the mortgage unit of ECC Capital Corp. for $26 million in cash. H&R Block Inc. recently disclosed it might sell its Option One lending unit, which last year made about $40 billion in loans.
>
> "Clearly the broker-dealers are leading the charge," says Matthew Howlett of Fox-Pitt, Kelton, an investment bank specializing in financial institutions.
>
> It may be because Wall Street firms have built large businesses creating asset-backed securities, including bundles of subprime loans, they sell to investors. Perhaps more important, asset-backed securities are a component in an even more profitable product Wall Street sells, collateralized-debt obligations, which are derivative securities whose value is tied to the underlying asset-backed security.
>
> "They need...to feed the CDO underwriting machine, and what better way to feed the machine than create more subprime assets," Mr. Howlett says. "They can kill two birds with one stone."
>
> CDOs, also known as CLOs, or collateralized loan obligations, are a way to repackage and transfer credit risk. Most asset-backed securities are priced in relation to the London interbank offered rate, or Libor. High-quality debt issues

are priced to yield Libor, or a few hundredths of a percentage point above it. Low-quality debt is priced one to two percentage points higher. Profiting on the difference between those rates is what is driving Wall Street investment banks to buy subprime lenders.

Here's how it works: Investment banks create CDO securities and sell them to investors at, for example, Libor plus seven-tenths of a percentage point. They also sell a smaller piece of equity in the deal to separate investors.

With the proceeds, the banks turn around and buy asset-backed securities that pay Libor plus 1.5 percentage points. The difference, eight-tenths of a point before expenses in this case, translates into a gain for those who purchase the equity portion of the CDOs. In addition, the investment banks borrow money against every dollar invested in the CDO, sometimes five, 10, or even 20 times the original investment, which can boost the return substantially.

Because CDOs are a type of derivative, they sidestep limits on investing in low-grade debt that many institutions face. That opens the CDO market to insurance companies and pension funds, among others. And because of their potential for double-digit returns, CDOs are a favorite among hedge funds.

The process can be very profitable for investment banks. Firms can pinch off a few cents of every $100 invested in the process in fees. "It's a very lucrative business for this industry," Mr. Howlett says.

The banks lump revenue from asset-backed securities and CDOs into larger business units. "Mortgage and CDO net revenues increased significantly when compared to the prior year," Samuel Molinaro, chief financial officer of Bear Stearns, told analysts during an earnings conference call in late September. Total revenue for its fixed-income business in the most recent quarter was up 19% over the same period the prior year.

The story was similar at Lehman Brothers Holdings Inc., which has snapped up eight mortgage firms in the U.S. and Europe in the past three years. Revenue in the investment firm's fixed-income origination business in the latest quarter was up 4% over the prior year. Lehman recently said its appetite for subprime lenders remained keen, even though it didn't emerge as a bidder in the past three months.

More lenders may come on the market, as subprime borrowers, many of whom pay adjustable interest rates, are unable to pay. Recently, lenders have even experienced defaults within the first few months of origination, so-called early payment defaults. But industry watchers say that won't deter Wall Street, which views the industry's problems as a buying opportunity.

"We're starting to see bigger deals now with Option One coming up for sale," says Mr. Howlett of Fox-Pitt, Kelton. "We think we will begin to see over the next 12 months even larger deals."

81.   A December 11, 2006 Bloomberg article, entitled *Mortgage Bonds, CDOs to Suffer Next Year, Fitch Says,* stated the following:

Mortgages, credit-card balances of risky borrowers and some other types of debt backing so-called structured-finance bonds will perform worse next year as the slowing U.S. housing market hurts consumers, Fitch Inc. said.

Higher delinquencies on mortgages and the effect of slower consumer spending pose risks to the debt's performance, said Fitch, a bond-rating firm in New York. More mortgage borrowers ``today than historically are sensitive to a slowdown'' in home- price appreciation because of the riskier loans taken out amid the high prices of recent years, Fitch said.

About a third of the structured-finance sectors, or 25 sectors, will experience worse performance in their underlying collateral next year, Fitch said in a report to clients today. The affected areas include bonds backed by so-called sub-prime, near-prime and prime mortgages; sub-prime credit-card balances; franchise loans; and small-business loans, Fitch said.

Fitch said its ratings outlook for sub-prime mortgage bonds is ``negative,'' with the expected number of its downgrades to exceed the number of upgrades next year. The outlook for prime and so-called Alt-A, or near-prime, mortgage bonds not issued by government-related companies is ``positive'' because of greater protection through structuring on recent issues.

Some sub-prime mortgage borrowers with adjustable-rate or interest-only loans will find it difficult to refinance into cheaper loans when their payments are due to increase, Fitch said. Delinquencies, which have risen 50 percent from last year, should climb another 50 percent next year, it said.

Mortgage Losses

Sub-prime mortgage and credit cards loans are generally defined loans given to borrowers with low credit scores, which usually reflects poor or limited debt repayment histories.

Cumulative losses on securitized sub-prime mortgages made this year will exceed 7 percent over the loans' lives, Fitch said in a separate statement today about the report. That would be the largest loss of any year.

Losses to date on sub-prime mortgages issued in 2000 are about 5.5 percent, the worst tally ever, according to Michael Youngblood, an analyst at Friedman Billings Ramsey Group Inc., an Arlington, Virginia-based investment bank. Youngblood has said this year's loans could have the highest losses ever.

Collateralized-Debt Obligations

U.S. diversified structured-finance collateralized-debt obligations, as well as CDOs backed by low-rated U.S. mortgage bonds, also will experience worse performance due to housing- market links, Fitch said. The company's ratings outlook for such debt is ``stable/negative'' and ``negative,'' respectively.

CDO issuance more than doubled in the first three quarters of the year to $322 billion from the year-ago period, according to the Securities Industry and Financial Markets Association.

CDOs are investment vehicles that buy bonds, loans and derivatives, and resell the cash flows in new debt, some of which has higher credit ratings. About 61 percent of the year- to-date total involved re-securitizations of other structured-finance bonds, according to the association.

All six types of global CDOs, which range from securitizations of investment-grade bonds to ones of loans used by buyout firms, will experience weaker asset performance next year, without negative ratings effects, Fitch said.

Performing Better

Ten structured finance sectors will experience better asset performance next year, according to Fitch. They include bonds backed by equipment leases or loans, and mortgages on apartment buildings, offices, and hotels. Fitch's outlook for the performance of assets behind 38 other sectors is "stable.''

Fitch's ratings outlook is ``positive'' for 18 sectors; "negative'' for ten, and stable for 44.

Asset-backed securities, which include sub-prime mortgage securities and credit-card bonds, have returned 5.2 percent this year, according to a Merrill Lynch & Co. index of total return. That would be the best full-year performance since 2001.

82.     In January 2007, to gain access to a larger number of subprime mortgages, Merrill Lynch purchased First Franklin, a mortgage company, for $1.3 billion.  This transaction catered specifically to subprime borrowers.    Ironically,  Merrill  Lynch's  analyst  made  his

recommendation at the same time the Company purchased First Franklin. As *Reuters* reported: "The First Franklin deal puzzled analysts because the market for subprime loans was souring in a hurry when the deal was announced. Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."[29]

83.    A February 12, 2007 Bloomberg article entitled *Merrill Loaded for Bear in Mortgage Market That Humiliated HSBC* stated, in part, the following:

"Merrill Lynch & Co. Chief Executive Officer Stanley O'Neal was willing to lose $230 million to catch Bear Stearns Cos. and the shakeout is just beginning."

Merrill is determined to capture a dominant share of trading in bonds backed by home loans, the fastest- growing debt market since 1995 and this year's most troubled. O'Neal's enthusiasm for mortgages to potentially delinquent borrowers coincides with the highest default rate in more than six years, a record contraction in demand for so-called subprime loans and descending bond prices.

Merrill already has bankrolled two home lenders that subsequently failed and purchased a third, First Franklin Financial Corp., for $1.3 billion, just before HSBC Holdings Plc disclosed that its bad-loan provisions increased 20 percent because of the unraveling U.S. subprime market.

New York-based Merrill, the third-largest securities firm by market value, isn't the only challenger to No. 1 Bear Stearns. Deutsche Bank AG, Morgan Stanley and Barclays Plc have bought or agreed to buy subprime lenders in the past six months, betting that a bigger presence in mortgages will produce more revenue from packaging the loans into bonds.

"Fees from securitizing debts including mortgages, auto loans, aircraft leases and credit-card receivables have almost tripled in the past five years to $5.6 billion, Bank of America Corp. analyst Michael Hecht estimates."

Merrill is counting on securitization to dispose of risky mortgages and avoid the headaches now plaguing HSBC, the world's third-largest bank. The London-based company on Feb. 7 increased the amount set aside for bad loans in 2006 to almost $10.6 billion, 20 percent more than analysts estimated, and shook up management in the U.S.

---

[29] Al Yoon, *Merrill's Own Subprime Warnings Unheeded,* Reuters, Oct. 29, 2007.

"The same day, New Century Financial Corp., the Irvine, California-based rival to HSBC in subprime mortgages, said the market has deteriorated so much that it expects to report a quarterly loss for the first time since 2001."

O'Neal, 55, agreed to buy First Franklin from Cleveland- based National City Corp. in September. Since then, home loans to borrowers with erratic credit records or burgeoning debt burdens have defaulted at a faster rate than during the U.S. recession in 2001, according to Arlington, Virginia-based Friedman Billings Ramsey Group Inc.

"So many mortgage lenders have failed in the past two months that a blogger in Georgia set up a Web site to track them and called it the ``Implode-o-Meter.'' His tally, illustrated with a mushroom cloud, stood at 20 as of Feb. 9 [2007]."

``We still have way too much capacity,'' said David Olson, president of Wholesale Access Mortgage Research & Consulting in Columbia, Maryland, and the former director of market research at Freddie Mac, the second-biggest financier of U.S. mortgages. ``That means a lot more firms have to go out of business.''

O'Neal's ambitions to take on Bear Stearns in mortgage bond underwriting and trading date back to at least 2002. That's when Merrill increased hiring in its mortgage department, said spokesman Bill Halldin. In May 2004, Merrill bought Wilshire Credit Corp., which handles billing and collections on subprime loans. In a speech in November 2005, O'Neal named ``mortgage finance and trading'' among his top priorities.

Merrill, which made more than three times as much money as Bear Stearns last year, took a stake in Ownit Mortgage Solutions Inc. in 2005 and bought many of the company's loans to securitize. Last year, Merrill began extending a $1.7 billion credit line to Middletown, Connecticut-based Mortgage Lenders Network USA, which in a decade had mushroomed from a seven-person firm to the nation's 15th-largest provider of subprime mortgages.

"With more than 8,500 financial institutions competing for mortgages, many began extending them to borrowers who might not have qualified previously."

``Too many firms got involved in making loans probably motivated in part by fees,'' Federal Reserve Bank of St. Louis President William Poole told reporters after a speech last week. ``They thought they could lay off the credit risk by securitizing and selling these off in the market.''

Ownit, based in Agoura Hills, California, filed for bankruptcy in December because it couldn't meet those repurchase obligations, and Merrill wrote down its $100 million investment in the fourth quarter. Merrill also has $93 million in unsecured claims, according to Ownit's bankruptcy filing. Last week, Mortgage

Lenders Network sought protection from creditors and said in court documents that it owes Merrill $36.5 million.

"By acquiring First Franklin and doing the lending itself instead of buying loans from other companies, Merrill can ensure that the mortgages it packages into bonds are sound."

"'Certainly, we recognized that there was the potential for volatility in the market in the short term,'' Merrill Chief Financial Officer Jeff Edwards said in a Jan. 18 interview. 'We think this is a very important long-term investment for us.'"

ACC Capital Holdings, the parent of Ameriquest Mortgage Co., announced plans in May to close all 229 of its retail branches and cut about 3,800 jobs. H&R Block Inc., the largest U.S. tax preparer, put its subprime mortgage unit up for sale in November and Sebring Capital Partners LP closed it doors in December.

Countrywide, the biggest U.S. mortgage lender and No. 1 underwriter of bonds backed by subprime or home-equity loans, last month reported its biggest earnings drop in seven quarters. The company said profit may decline this year because the housing slump is leading to more foreclosures and competition.

``That's the one [subprime] area across all businesses in all firms that is actually in a bit of trouble now,'' David Viniar, chief financial officer of New York-based Goldman Sachs Group Inc., the world's largest securities firm, said on a Feb. 8 conference call with investors. ``My view is that that market's going to get worse before it gets better.''

HSBC's troubles stem from its $15.5 billion purchase in 2003 of Household International Inc., then one of the largest U.S. lenders to consumers with poor credit. Beguiled by the high interest rates on subprime loans, HSBC erred by keeping many mortgages on its books instead of selling them to investors.

"Bear Stearns, the fifth-largest U.S. securities firm, reduced its purchases of subprime loans by half last year because of concerns over the decline in credit quality, President Warren Spector said on a conference call Feb. 9 [2007]."

Now Barclays, the U.K.'s third-biggest bank, is buying Regions Financial Corp.'s EquiFirst Corp. for $225 million, in part because the London-based bank can no longer count on buying subprime loans from First Franklin and other lenders controlled by its Wall Street rivals.

"Merrill Lynch buys First Franklin and a lot of the flow that would have gone to all the other firms goes away," said Michael Wade, head of U.S. asset securitization business for Barclays in New York. ``This business is here to stay. There's a need for the product.''"

> The average pretax profit margin from making and selling a subprime mortgage was 0.25 percent in the first half of 2006 and probably dropped in the last six months of the year, said Jim Cameron, an Atlanta-based partner at Stratmor Group, an industry consultant that runs profitability studies with the Mortgage Bankers Association. Three years ago, the margin was 1.5 percent.

84.     Indeed, by the spring of 2007, the collapse of the subprime lending industry was well underway. As of March 2007, more than two dozen subprime mortgage lenders had failed or filed for bankruptcy.[30] This signaled that the value of securities tied to subprime mortgages, including the CDO securities Merrill Lynch underwrote, would sharply decline in value especially given their illiquid nature.

85.     Nonetheless, Merrill Lynch underwrote $28 billion in mortgage CDO securities in the first half of 2007, a pace which would have exceeded the record-breaking $44 billion in CDO securities the Company underwrote in 2006. *See Merrill Lynch Quarterly Report* (Form 10-Q) (June 29, 2007) at 97.

86.     Reacting to this environment, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market in April 2007. Defendant O'Neal unequivocally dismissed those concerns. Defendant O'Neal's statements were both highly misleading and careless. As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.

> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed … and it's not consistent with what I would assess the state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007.

---

[30] *See* Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

87.    In fact, in May 2007, despite the deteriorating market for CDO and subprime related securities, Dow Kim stated that "we are growing our leading CDO business."[31]

88.    In late June of 2007, a steep rise in the default rates on subprime mortgages helped trigger the collapse of two subprime based Bear Stearns hedge funds.[32]

89.    During the summer of 2007, the credit crunch intensified and demand for CDOs completely stagnated.  When the predictions of a collapse in the housing market came to fruition, Merrill Lynch became one of the largest casualties.  In addition to the CDO securities that Merrill purchased, it "got stuck with subprime assets they had intended to eventually place in CDO entities.  In addition, as underwriters of the deals, some were also left with large amounts of CDO bonds they could no longer sell."[33]

90.    By the end of June 2007, Merrill Lynch had accumulated at least $43 billion in net exposure to CDO securities and subprime mortgages.  As commentators have acknowledged, Merrill Lynch was "sitting on rotting piles [of] highly suspect, thinly traded securities [sic] [that nobody wanted to touch]."[34]  Merrill Lynch withheld this information from the public until October 24, 2007 when it first disclosed its CDO and subprime related securities exposure.  *See* Form 8-K (Oct. 24, 2007).

---

[31]  *See* Greg Fleming and Dow Kim, *UBS 2007 Financial Services Conference*, May 14, 2007, *available at* http://files.shareholder.com/downloads/MER/98834184x0x100475/8009ea49-f245-4a26-b08d-140ceab31db1/UBS%20Conference0514_2007-Remarks.pdf.

[32]  *See* Michael M. Grynbaum, *Bear Stearns Profit Plunges 61% on Subprime Woes*, N.Y. Times, Sept. 21, 2007.

[33]  *See* Peter Eavis, *CDOs explained:  How these debt vehicles led to big losses at big banks -- and why there may be more to come*, Fortune, Nov. 26, 2007.

[34]  *See* Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims*, Fortune, Nov. 12, 2007.