Now analysts are questioning Merrill's risk management, while Moody's Investors Service and other agencies have downgraded the firm's credit and debt ratings. The bank still has $15.2 billion of exposure to CDOs, leaving analysts and investors wondering whether further write-downs may be needed.

"We got too big in this area," Chief Executive Stan O'Neal said during a conference call with analysts on Wednesday. "Primary mistakes were errors of judgment and understanding the nature of the risk and the markets changing for the securities," he added, according to a transcript of the call.

Merrill shares fell 5.8% to $63.22 on Wednesday, leaving them down almost a third so far this year. Earlier in the day, the bank's shares touched $61.40, their lowest level since late 2005.

CDOs are a bit like mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds. After a loan is originated, it's often packaged up into a so-called asset-backed security. These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers. The riskiest bits offer the highest yields, while the highest quality parts suffer losses last but pay lower interest rates.

CDOs became very popular among fixed-income investors looking for higher yields in a low yield world. In 1995, there were hardly any. Last year, more than $500 billion worth was issued.

In recent years, CDOs have bought some of the riskiest tranches of mortgage-backed securities (MBS), including those backed by subprime home loans, which are offered to less creditworthy borrowers.

That helped fuel the housing boom. About 40% of CDO collateral is residential MBS. Almost three-quarters of that is in subprime and home-equity loans, with the rest in higher-quality, prime home loans, according to a study earlier this year by Joseph Mason, an associate finance professor at Drexel University's business school, and Joshua Rosner, a managing director at research firm Graham Fisher & Co.

When subprime mortgage delinquencies surged this year, rating agencies began downgrading many MBS. That led to downgrades of several bits of CDOs, too. The subprime problem then grew into a global credit crisis. Demand for CDOs dried up as investors realized the higher yield that initially attracted them wasn't enough to offset risks they'd taken on, sometimes unwittingly.

This month, just one U.S. CDO worth $500 million has been sold through Oct. 18. That's down from 41 CDOs worth $17 billion in October 2006, according to Dealogic.

In September, 19 U.S. CDOs worth $6.9 million were issued, down from 68 worth $31.16 billion a year earlier, Dealogic data show. In February 2006, Ricciardi and his team left Merrill to join Cohen Brothers LLC, which specializes in financing small and medium-sized companies through CDO securitizations.

But Merrill kept expanding, ending the year as the top global CDO book runner, with almost 14% market share, according to Dealogic. Citigroup (C) was second with less than 9%, followed by Goldman Sachs (GS) and Wachovia (WB) .

At the start of 2007, some brokerage firms began pulling back from the CDO market, but Merrill didn't, according to Dick Bove, an analyst at Punk Ziegel & Co. "It was a classic mistake," Bove said. "Merrill saw an opportunity and charged forward. They thought they were beating out the competition and grabbing market share, but they weren't really because the others were pulling back."

The seeds of this mistake may have been sown at the start of the decade, when Merrill cut back its fixed-income business dramatically, Bove explained.

O'Neal realized in 2002 and 2003 that the firm may have cut too much. Firms like Goldman and Lehman were making big profits in fixed-income, so Merrill "scrambled" to rebuild, Bove recalled.

This process, and the expansion into CDOs, was part of a broader push by O'Neal to get Merrill to take more risks to generate profits that would support advisory businesses like investment banking, according to Ryan Lentell, an equity analyst at Morningstar.

"The firm was basically a stock trading house until he took over," Lentell said. But the cutbacks from the beginning of the decade may have damaged Merrill and led to the mistakes that have hurt it this year, Bove noted. "Other firms didn't cut back so dramatically, so they maintained continuity and an understanding of the cycles in the market," he said. "Merrill lost that maybe, when it cut back at the start of this decade. That may have been why they made this mistake."

166.    An October 25, 2007 Wall Street Journal article entitled *Pioneer Helped Merrill*

*Move Into CDOs* stated, in part, the following:

Merrill Lynch & Co. is reeling after a giant write-down in mortgage-related securities. But the job-hopping executive who made the firm a leader in this once-hot, now-troubled arena has moved on.

From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. But the value of many of the securities, known as collateralized debt

obligations, or CDOs, has tanked this summer and fall amid rising mortgage delinquencies.

Mr. Ricciardi liked to be called the grandfather of CDOs. Long before joining Merrill, he helped push Wall Street into risky new areas such as subprime mortgages, those made to home buyers with weak credit. Then he helped turn Merrill into the Wal-Mart of the CDO industry, before leaving behind a roughly $8 million annual paycheck to jump to a small firm that was a Merrill client.

Along the way, he lobbied both credit-rating firms and investors, talking up the safety and juicy returns of CDOs. He and his former Merrill colleagues churned these out frenetically during the height of the boom. Now that the market has soured, leading to billions of dollars in losses for CDO investors, those involved in the business face a growing legion of angry investors.

Merrill, which continued to expand its CDO business aggressively after Mr. Ricciardi left, now is the biggest casualty of the downturn after underwriting many troubled CDOs in the past year. In a conference call with investors yesterday, Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the CDO business: "The bottom line is, we got it wrong by being overexposed to subprime." Mr. O'Neal added that Merrill had misjudged the risk of many CDOs. "It turned out that both our assessment of the potential risk and mitigation strategies were inadequate," he said.

Mr. Ricciardi, 38 years old, has remained a booster of the CDO market. At a meeting this spring -- before the summer meltdown but amid cracks in the market -- he exhorted salesmen, traders and bankers at the small firm he had joined to push investors to buy more CDOs, according to people who were there. "These are the trades that make people famous," he told his troops at the firm, Cohen & Co., say attendees.

Mr. Ricciardi's role is emblematic of the drive that so often pushes Wall Street to extremes. Long after signs of housing troubles first emerged in mid-2005, he and his colleagues at Merrill were setting out to smash records by issuing ever more CDOs.

Annual issuance of CDOs, which was just $52 billion in 1999, hit $388 billion in 2006, according to research provider Dealogic. The sales of these instruments to investors world-wide brought vast new capital into the business of mortgages, helping recycle loans so lenders could lend more. Thus, the promoters of CDOs played a crucial role in fueling one of the most salient economic phenomena of this decade, the near-global housing boom.

The bundling of loans [by the late 1990s] into salable securities was already a common business, but a much simpler one. Fannie Mae and Freddie Mac, the big government-sponsored mortgage buyers, had long been doing this with ordinary

home loans. But as the government began to auction off huge collections of assets from failed S&Ls, Wall Street experimented with more exotic methods.

It bundled together pools of assets containing loans of many different types, ranging from credit-card debt to volatile aircraft leases. With these pools as backing, bankers issued new securities that had varying levels, or tranches, of risk and interest yield. Mr. Ricciardi was among pioneers who took this laboratory of debt repackaging a step further: Bundling the already exotic tranches together into new pools called CDOs.

All of these securities had high-risk tranches, the slices that would bear the brunt of any loan defaults. These often had low credit ratings and were hard to sell, despite their potentially high returns.

Mr. Ricciardi went an additional step in the business of bundling and rebundling, and created new CDOs out of these risky tranches. And the natural structure of a CDO -- whereby the impact of defaults falls first on the riskiest tranches -- made it possible for the safest tranches of even these CDOs to get top credit ratings. [Jump Start]

"It was really put in Chris's lap to figure out how to do it," says Joseph Donovan, who was Mr. Ricciardi's boss at the time. In late 1999, Prudential sold a complex CDO backed by a collection of other securities that, in turn, were backed by debts such as mobile-home loans, airplane leases, car loans and credit-card receivables.

Other Wall Street firms began creating similar CDOs, using subprime mortgages, commercial mortgages and various other kinds of debt as building blocks.

Boosting the CDO boom was a decline in interest rates around the world. This created demand from fixed-income investors who wanted higher interest. Corporate junk bonds provide high yields, but investors soured on them in the post-bubble years of 2001 and 2002 when defaults on corporate bonds spiked. With the housing market surging, mortgage securities seemed to many investors like a better bet. Mr. Ricciardi coached salespeople he worked with to stress that mortgage CDOs offered better interest rates than corporate bonds with similar ratings.

He was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group. A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings, but rarely got his way.

By the summer of 2001, Credit Suisse was selling at least one new CDO a month and vaulting up Wall Street's so-called underwriting league tables. In 2001 Credit

Suisse underwrote CDOs worth $12.5 billion, nearly double those of No. 2 Deutsche Bank AG, according to Dealogic.

Merrill, by contrast, had a minuscule presence. Its top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative, fast-growing businesses. His priorities included debt financing and derivatives, or instruments whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

Part of the strategy involved nurturing a new band of Wall Street professionals, people who help underwriters to create and market CDOs, and then babysit them after they're created. These professionals became known as CDO managers. It's the business Mr. Ricciardi's current firm, Cohen & Co., is in.

That firm is led by Daniel Cohen, a scion of a wealthy Philadelphia family. The firm specialized in providing financing to small and midsize financial firms, helping them issue securities. It was already a Merrill client, and Mr. Ricciardi had dealt often with Cohen & Co. while he was at Credit Suisse.

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

An industry newsletter, Private Placement Letter, quoted Mr. Ricciardi in early 2005: "The strategy has been to be a high-volume underwriter, with a focus on areas that are very popular." Every quarter, he taped underwriter rankings near Merrill's trading desk, highlighting in yellow the firm's top place.

Merrill salespeople scoured the globe for buyers of CDOs, selling pieces of them to a wide range of investors such as Woori Bank in Seoul, Korea, AXA SA of France, Uniqa Group of Austria and investment funds in Australia and Singapore. Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill over a $134 million investment made this spring in CDOs that Merrill underwrote between 2003 and 2006, while Mr. Ricciardi was still there.

These particular investments were known as auction-rate securities. They were marketed as short-term investments that the buyers could resell, if they wanted to,

in auctions run by Merrill. But this summer, as nervous investors began to shun almost anything connected to subprime mortgages, MetroPCS found it couldn't sell the CDOs it had bought, and it now expects to incur losses. Merrill says it believes it "acted appropriately in its dealing with MetroPCS and made the relevant and necessary disclosures to them."

Something similar had happened to some clients of Mr. Ricciardi's previous firm, Credit Suisse, not long after he left that firm. To appease angry clients, Credit Suisse repurchased some auction-rate securities created by Mr. Ricciardi's group between 2001 and 2003. The problem then was loans on manufactured housing, which defaulted in large numbers. After its repurchase of the CDOs, Credit Suisse sold them at a loss, people familiar with the matter said. Credit Suisse declined to comment.

At Merrill, Mr. Ricciardi courted clients at his country club, Sleepy Hollow, where Merrill held an annual August golf outing for money managers and investors, and Merrill's top brass. One regular at the outings was Ralph Cioffi, who managed two Bear Stearns Cos. hedge funds that invested heavily in Merrill Lynch CDOs. In a major casualty of the subprime mortgage turmoil this summer, the two Bear funds ended up losing as much as $1.6 billion of investors' money.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

When Mr. Ricciardi left in February of 2006, signs of trouble in the housing market were already abundant, as both home-price appreciation and home builders' orders slowed. Cohen & Co., aiming to go public, offered Mr. Ricciardi an equity stake if he came aboard. He had wanted a bigger job at Merrill that went beyond CDO underwriting. When it didn't come, he jumped to Cohen -- taking with him several Merrill bankers, salesmen and a technology expert.

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDOs at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs, say three people who heard him.

That year, Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDOs jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.

At Cohen & Co., Mr. Ricciardi got back in growth mode, beefing up the boutique firm's staff, investing in new technology, and cobbling together many CDOs backed by mortgages, corporate debt, and even loans to hospitals and nonprofits. In the 18 months after his early-2006 arrival, Cohen's assets under management

swelled to more than $40 billion from $10 billion. Mostly in conjunction with Merrill as underwriter, Cohen formed 25 new CDOs valued at more than $25 billion, many of which contained subprime mortgages, according to Dealogic data.

Tensions, however, were brewing between the two companies. Prior to 2006, Cohen was by far the biggest client of Merrill's CDO group, in one year contributing around a quarter of its profits. But there was some debate within Merrill over the large amount of financing it was extending to Cohen, and the risk Merrill took in the process.

A few months before he left Merrill for Cohen, Mr. Ricciardi had a heated discussion with another senior Merrill executive on the firm's trading floor. The other executive said it was risky for Merrill to underwrite every Cohen CDO. "Do we want to be the only bank doing Cohen deals?" the executive asked Mr. Ricciardi, according to people who were present. They say that Mr. Ricciardi shot back, "Yes, we do. Why do we want to have anything less than 100% market share?"

When Cohen accelerated its deal-making pace in 2006 and early this year, top Merrill managers decided to limit their exposure to Cohen-managed deals. Merrill was holding billions of dollars in mortgage bonds and other securities that were slated to go into CDOs, exposing the big investment bank to price fluctuations among these assets.

Mr. Cohen made personal phone calls to Merrill's Mr. Kim to try to persuade Merrill to finance more deals, according to people familiar with the situation. Merrill executives said they would do so only if Cohen & Co. agreed to bear a bigger chunk of the losses in case the securities the bank was holding for Cohen fell in value.

Cohen agreed, but also took some of its CDO business to other Wall Street firms, including Bear Stearns, Morgan Stanley, UBS AG and Wachovia Corp.

This summer's meltdown in subprime mortgages and related securities was swift, hurting Cohen as well as Merrill. Mr. O'Neal yesterday vowed to downsize Merrill's business in structured finance.

Cohen's hopes of going public look unlikely to be realized soon. Meanwhile, a publicly held real-estate investment trust that Cohen manages, Alesco Financial Inc., has seen its share price plunge. Last month it said it said it would not receive cash flows on a September payment date from two CDOs that contain securities backed by subprime home loans. Alesco declined to comment, as did Cohen & Co.

"Everybody was talking about the wonders of all the CDOs and the new innovations," says Stacey Nutt, the president of ClariVest Asset Management LLC in San Diego. They're discovering that these instruments have instead spread risk to parts of the financial system, such as hedge funds and foreign investors, that aren't regulated. "You end up with more risk than you had 15 years ago," Mr. Nutt says. "It's a very scary situation."

167.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure — and the financial press reported that the SEC was investigating reports that Merrill Lynch had engaged in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.

168.    The Company immediately denied that it had entered into such transactions.  On the same day the *Wall Street Journal* article appeared, Merrill Lynch issued a press release:

> The story is nonspecific and relies on unidentified sources. We have no reason to believe that any such inappropriate transactions occurred. Such transactions would clearly violate Merrill Lynch policy.[58]

169.    Five days later, on November 7, 2007, the Company issued its quarterly report on Form 10-Q for the third quarter signed by Defendant Edwards.  The securities filing did not address the *Wall Street Journal* article, but stated "[on] October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio.  Merrill Lynch is cooperating fully with the SEC in this matter."  Merrill Lynch Quarterly Report (Form 10-Q) (Sept. 30, 2007).

170.    A November 8, 2007 Reuters article announced that *Merrill reveals $6.3 billlion more in subprime-CDO exposure*:

> Merrill Lynch & Co Inc said on Wednesday its total exposure to risky collateralized debt obligations and subprime mortgages is $27.2 billion, or about $6.3 billion more than what the company disclosed late last month.

---

[58] *Merrill Lynch Responds to Wall Street Journal Story*, Business Wire, Nov. 2, 2007.

Merrill's larger figure is mostly because of a deeper level of disclosure surrounding its banking operations. For the first time, the world's largest brokerage disclosed $5.7 billion worth of exposure to U.S. subprime mortgages at Merrill Lynch Bank USA, a Utah-chartered industrial bank, and Merrill Lynch Bank & Trust Co., a full-service thrift.

Those operations file disclosures and financial statements with U.S. banking regulators, which have not required details on subprime exposure.

In addition, Merrill said its exposure to CDOs is now $15.82 billion, or about $600 million more than what the company revealed in its third-quarter earnings release on October 24. The figure is larger because a hedge against potential loss was terminated recently after a dispute with a counterparty, which Merrill declined to name.

CDOs and subprime mortgages were largely responsible for Merrill's $2.3 billion loss in the third quarter, the largest in the company's history. An $8.4 billion write-down, mostly related to subprime mortgages and CDOs, triggered the loss.

Analysts fear Merrill and other Wall Street banks will have to record further write-downs on their exposure because the market for CDOs and subprime mortgages remains in turmoil. Analysts at Citigroup estimate banks will take up to $64 billion more in write-downs, mostly from CDO-related exposure.

Mike Mayo, an analyst at Deutsche Bank, has estimated that Merrill's additional write-down could top $10 billion.

U.S. banks have had to slash the value of CDOs and subprime mortgages because they are linked to a rising tide of defaults on home loans given to borrowers with weak credit.

171.   On November 26, 2007, the *Wall Street Journal* issued a correction:

ON NOV. 2, the Journal published a page-one article on Merrill Lynch & Co. that was based on incorrect information that the firm had engaged in off-balance-sheet deals with hedge funds in a possible bid to delay the recognition of losses connected to the firm's mortgage-securities exposure. In fact, Merrill proposed a deal with a hedge fund involving $1 billion in commercial paper issued by a Merrill-related entity containing mortgage securities. In exchange, the hedge fund would have had the right to sell the mortgage securities back to Merrill after one year for a guaranteed minimum return. However, Merrill didn't complete the deal after the firm's finance department determined it didn't meet proper accounting criteria. In addition, Merrill says it has accounted properly for all its transactions with hedge funds.

*Corrections & Amplifications*, Wall St. J., Nov. 26, 2007.

172.    The correction apparently assuages doubts about Merrill Lynch's accounting for the $1 billion hedge-fund transaction previously reported, but it neither resolves the ongoing SEC inquiry into the Company's subprime mortgage portfolio nor mitigates the damage finally revealed on the Company's day of subprime reckoning.  In fact, it confirms that Merrill Lynch itself "proposed" the extraordinary hedge fund deal, designed to conceal its actual financial condition.

**Merrill Lynch Faces a Litany of Lawsuits Alleging Fraud and Misrepresentation**

173.    The Company has been accused repeatedly of using fraud and misrepresentation to find buyers for the CDO securities in an effort to limit the number of CDO securities it was forced to purchase as it continued its underwriting pace in 2007 despite the lack of buyers for these risky and illiquid securities.  Whether or not fraud can be proven, the allegations in these suits demonstrate that Merrill Lynch  sought to sell the risky CDOs and subprime securities without full disclosure to the buyers (for no rational buyer with full knowledge would have purchased them), and that these securities became unmarketable before October 2007.  Thus, the allegations of these suits provide more evidence that Merrill Lynch itself knew it was overexposed to these risky securities before the October disclosures.

174.    Merrill Lynch is under investigations by numerous federal and state authorities for fraud in the sales of CDO and subprime related securities.  For example, the Massachusetts secretary of state accused Merrill Lynch of fraud in a civil administrative proceeding over its sales of subprime-related debt to the City of Springfield, Massachusetts ("the City").

175.    In November 2006, Merrill Lynch was engaged as an investment advisor to the City.  According to the Complaint, Merrill Lynch understood that it was to invest the City's money only in safe-money-market-like investments that would protect the City's principal and as

authorized by City personnel.[59]   Instead, without disclosing the nature of these instruments, Merrill Lynch invested approximately $14 million of the City's funds in the securities of three highly illiquid "CDO squared."  The instruments appeared with other names on the City's account statements through June 2007, but were "quietly relabeled as CDOs in July."

176.    According to the complaint, shortly after the sale, the market value for CDOs backed by subprime markets began to plummet and the City's accounts began to lose money.  In September 2007, after the City requested that the CDOs be sold, they were informed that the auctions had failed, the CDOs could not be sold at any price close to their par value, and there were no buyers.

177.    In a letter dated November 29, 2007, James Mann, First Vice President and Assistant General Counsel of Merrill Lynch, disclaimed responsibility for these investments stating that the City made its own investment decisions.  Contradicting this disclaimer, in February 2008, Merrill Lynch agreed to buy back the securities at their original value of $13.9 million plus attorneys fees.[60]

178.    Similarly, Merrill Lynch was sued by MetroPCS Communications Inc. for fraud and misrepresentation connected with the sale of senior tranch CDO securities in May 2007.[61] MetroPCS hired Merrill Lynch as its investment advisor for its $134 million in cash reserves contingent upon compliance with MetroPCSs Investment Policy that specifically stated that

---

[59]  *See Respondents' Administrative Complaint* at 2, 3 and 9, In the Matter of L Merrill Lynch, et al.

[60]  Craig Karmin, *Merrill Buys Back CDOs it Sold to Springfield, Mass.,* Wall St. J, Feb. 1, 2008.

[61]  *See MetroPCS Communications, Inc. v. Merrill Lynch, et al*, No. 07-12430 (D. Dallas. Oct. 18, 2007).

"MetroPCS's risk tolerance is 'LOW' and that cash must, therefore, be invested to preserve capital and to provide liquidity."

179. MetroPCS claims that beginning in May 2007 -- well after the subprime mortgage market had started to show signs of distress:

- Merrill caused MetroPCS to begin purchasing highly risky CDO securities, which violated its investment policy.

- Merrill failed to disclose that the collateral backing many of these CDOs had wide ranging exposure to the subprime mortgage market.

- Merrill also failed to disclose that it had a conflict of interest in urging MetroPCS to continue to buy these CDO securities because Merrill was one of the largest underwriters and sellers of such securities and in fact "held significant investments of its own in CDO [securities] and related instruments with subprime exposure and thus stood to lose significantly if the market for such instruments weakened."

180. MetroPCS asserts that the investments violated its goal of holding only safe, liquid assets but that Merrill Lynch told MetroPCS that the securities were low-risk and highly liquid.

181. Finally, in *Luminent Mortgage Capital v. Merrill Lynch*, et al,, filed on December 24, 2007, the complaint alleges fraud against Merrill Lynch in the underwriting and sale of mortgage backed securities.[62]   Luminent purchased the mortgage backed securities on August 30, 2005. After doing its own due diligence to gather information about the underlying mortgage loans, Luminent discovered that a substantial portion of those loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans; that the characteristics of the portfolio as a whole did not comport with the information provided by Merrill Lynch.

---

[62] *See Luminent Mortgage Capital v. Merrill Lynch, et al*, No. 07-5423, (Pa. D. Dec. 24, 2007).

**Ongoing Concern About the Validity of Merrill Lynch's Financial Statements**

182.    Analysts continued to speculate that Merrill Lynch has not come clean regarding the full extent of its past misrepresentations and its exposure to subprime-backed securities and CDOs.  Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill Lynch.  It's not enough to say the CEO has gone, problem fixed."[63]

183.    Other commentators have noted, "Just think how much better warned investors would have been if those actual loss estimates had been made public.  And just think how useful it would be to know those loss estimates for distressed conduits the banks must deal with now."[64]

184.    A January 6, 2008 Wall Street Journal articled entitled *Wall Street Wizardry Amplified Credit Crisis* stated, in part, the following:

> In recent years, as home prices and mortgage lending boomed, bankers found ever-more-clever ways to repackage trillions of dollars in loans, selling them off in slivers to investors around the world. Financiers and regulators figured all the activity would disperse risk, and maybe even make markets safer and stronger.
>
> Norma CDO I Ltd., as its full name goes, is one of a new breed of mortgage investments created in the waning days of the U.S. housing boom. Instead of spreading the risk of a global home-finance boom, the instruments have magnified and concentrated the effects of the subprime-mortgage bust. They are now behind tens of billions of dollars of write-downs at some of the world's largest banks, including the $9.4 billion announced last week by Morgan Stanley.
>
> Norma illustrates how investors and Wall Street, in their efforts to keep a lucrative market going, took a good idea too far. Created at the behest of an Illinois hedge fund looking for a tailor-made bet on subprime mortgages, the vehicle was brought into existence by Merrill Lynch & Co. and a posse of little-known partners.

---

[63]    Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

[64]    Peter Eavis, *The Next Credit Scandal:  The Real Outrage Of The Credit Crunch Has Been In The Way Major Banks Disclosed Potential Losses. Now, There Are Billions More In Undisclosed Risk.* Fortune, Nov. 26, 2007.

In its use of newfangled derivatives, Norma contributed to a speculative market that dwarfed the value of the subprime mortgages on which it was based. It was also part of a chain of mortgage-linked investments that took stakes in one another. The practice generated fees for a handful of big banks. But, say critics, it created little value for investors or the broader economy.

"Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York structured-finance consultancy. "If you hold my risk and I hold yours, we can say whatever we think it's worth and generate fees from that. It's like...creating artificial value."

Only nine months after selling $1.5 billion in securities to investors, Norma is worth a fraction of its original value. Credit-rating firms, which once signed off approvingly on the deal, have slashed its ratings to junk.

The concept behind Norma, known as a collateralized debt obligation, has been in use since the 1980s. A CDO, most broadly, is a device that repackages the income from a pool of bonds, derivatives or other investments. A mortgage CDO might own pieces of a hundred or more bonds, each of which contains thousands of individual mortgages. Ideally, this diversification makes investors in the CDO less vulnerable to the problems of a single borrower or security.

The CDO issues a new set of securities, each bearing a different degree of risk. The highest-risk pieces of a CDO pay their investors higher returns. Pieces with lower risk, and higher credit ratings, pay less. Investors in the lower-risk pieces are first in line to receive income from the CDO's investments; investors in the higher-risk pieces are first to take losses.

But Norma and similar CDOs added potentially fatal new twists to the model. Rather than diversifying their investments, they bet heavily on securities that had one thing in common: They were among the most vulnerable to a rise in defaults on so-called subprime mortgage loans, typically made to borrowers with poor or patchy credit histories. While this boosted returns, it also increased the chances that losses would hit investors severely.

Also, these CDOs invested in more than simply subprime-backed securities. The CDOs held chunks of each other, as well as derivative contracts that allowed them to bet on mortgage-backed bonds they didn't own. This magnified risk. Wall Street banks took big pieces of Norma and similar CDOs on their own balance sheets, concentrating the losses rather than spreading them among far-flung investors.

"It is a tangled hairball of risk," Janet Tavakoli, a Chicago consultant who specializes in CDOs, says of Norma. "In March of 2007, any savvy investor would have thrown this...in the trash bin."

Norma was nurtured in a small office building on a busy road in Roslyn, on the north shore of New York's Long Island. There, a stocky, 37-year-old money manager named Corey Ribotsky runs a company called N.I.R. Group LLC. Mr. Ribotsky came not from the world of mortgage securities, but from the arena of penny stocks, shares that trade cheaply and often become targets of speculation or manipulation.

N.I.R. and its affiliates have taken stakes in 300 companies, some little-known, including a brewer called Bootie Beer Corp., lighting firm Cyberlux Corp. and water-purification company R.G. Global Lifestyles. Mr. Ribotsky's firms are in litigation in New York federal court with all three companies, which claim N.I.R. manipulated their share prices. Through its lawyer, N.I.R. denies wrongdoing and has accused the companies of failing to repay loans.

Mr. Ribotsky's firm attracted the attention of Merrill Lynch in 2005. The top underwriter of CDOs from 2004 to mid-2007, Merrill had generated hundreds of millions of dollars in profits from assembling and then helping to distribute CDOs backed by mortgage securities. For each CDO Merrill underwrote, the investment bank earned fees of 1% to 1.50% of the deal's total size, or as much as $15 million for a typical $1 billion CDO.

To keep underwriting fees coming, Merrill recruited outside firms, called CDO managers. Merrill helped them raise funds, procure the assets for their CDOs and find investors. The managers, for their part, choose assets and later monitor the CDO's collateral, although many of the structures don't require much active management. It was an attractive proposition for many start-up firms, which could earn lucrative annual management fees.

Mr. Ribotsky's entry into the world of CDO managers began at Engineers Country Club on Long Island. There, in 2005, he met Mitchell Elman, a New York criminal-defense lawyer who specializes in drunk-driving and drug cases. Mr. Elman introduced Mr. Ribotsky to Kenneth Margolis, then a high-profile CDO salesman at Merrill, according to people familiar with the situation. Mr. Elman declined to comment.

Mr. Margolis, who in February 2006 became co-head of Merrill's CDO banking business, played a key role in seeking out start-up firms to manage CDOs. He put Mr. Ribotsky in contact with a few people who had experience in the mortgage debt market. They included two former Wachovia Corp. bankers, Scott Shannon and Joseph Parish III, who left Wachovia and established their own CDO management firm.

Mr. Ribotsky decided to team up with Messrs. Shannon and Parish. "It sounded interesting and that's how we ventured into it," Mr. Ribotsky says. Messrs. Parish and Shannon declined to discuss specifics of Norma.

Together the trio set up a company called N.I.R. Capital Management, which over the next year or so took on the management of three CDOs underwritten by Merrill.

In 2006, Mr. Ribotsky says Merrill came to N.I.R. with a new proposition: One of the investment bank's clients, a hedge fund, wanted to invest in the riskiest piece of a certain type of CDO. Merrill worked out a general structure for the vehicle. It asked N.I.R. to manage it.

"It was already set up when it was presented to us," Mr. Ribotsky says. "They interviewed a bunch of managers and selected our team."

The CDO would be called Norma, after a small constellation in the southern hemisphere. According to people familiar to the matter, the hedge fund was Evanston, Ill.-based Magnetar, a fund that shared its name with a powerful neutron star. Magnetar declined to comment.

On Dec. 7, 2006, Norma was established as a company domiciled in the Cayman Islands. N.I.R., as its manager, would earn fees of some 0.1%, or about $1.5 million a year.

Norma belonged to a class of instruments known as "mezzanine" CDOs, because they invested in securities with middling credit ratings, averaging triple-B. Despite their risks, mezzanine CDOs boomed in the late stages of the credit cycle as investors reached for the higher returns they offered. In the first half of 2007, issuers put out $68 billion in mortgage CDOs containing securities with an average rating of triple-B or the equivalent -- the lowest investment-grade rating - - or lower, according to research from Lehman Brothers Holdings Inc. That was more than double the level for the same period a year earlier.

For Norma, N.I.R. assembled $1.5 billion in investments. Most were not actual securities, but derivatives linked to triple-B-rated mortgage securities. Called credit default swaps, these derivatives worked like insurance policies on subprime residential mortgage-backed securities or on the CDOs that held them. Norma, acting as the insurer, would receive a regular premium payment, which it would pass on to its investors. The buyer of protection, which was initially Merrill Lynch, would receive payouts from Norma if the insured securities were hurt by losses. It is unclear whether Merrill retained the insurance, or resold it to other investors who were hedging their subprime exposure or betting on a meltdown.

Many investment banks favored CDOs that contained these credit-default swaps, because they didn't require the purchase of securities, a process that typically took

91

months. With credit-default swaps, a billion-dollar CDO could be assembled in weeks.

In principle, credit-default swaps help banks and other investors pass along risks they don't want to keep. But in the case of subprime mortgages, the derivatives have magnified the effect of losses, because they allowed bankers to create an unlimited number of CDOs linked to the same mortgage-backed bonds. UBS Investment Research, a unit of Swiss bank UBS AG, estimates that CDOs sold credit protection on around three times the actual face value of triple-B-rated subprime bonds.

The use of derivatives "multiplied the risk," says Greg Medcraft, chairman of the American Securitization Forum, an industry association. "The subprime-mortgage crisis is far greater in terms of potential losses than anyone expected because it's not just physical loans that are defaulting."

Norma, for its part, bought only about $90 million of mortgage-backed securities, or 6% of its overall holdings. Of that, some were pieces of other CDOs mostly underwritten by Merrill, according to documents reviewed by The Wall Street Journal. These CDOs included Scorpius CDO Ltd., managed by a unit of Cohen & Co., a company run by former Merrill CDO chief Christopher Ricciardi. Later, Norma itself would be among the holdings of Glacier Funding CDO V Ltd., managed by an arm of New York mortgage firm Winter Group.

A Winter Group official said the company declined to comment, as did Cohen & Co.

Such cross-selling benefited banks, because it helped support the flow of new CDOs and underwriting fees. In fact, the bulk of the middle-rated pieces of CDOs underwritten by Merrill were purchased by other CDOs that the investment bank arranged, according to people familiar with the matter. Each CDO sold some of its riskier slices to the next CDO, which then sold its own slices to the next deal, and so on.

Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDOs. Rather than widely dispersing exposure to these mortgages, the practice circulated the same risk among a relatively small number of players.

By early 2007, Norma was ready to face the ratings firms. Different slices of CDOs get different ratings because some protect the others from losses to defaults. A "junior" slice might take the first $30 million in losses on a $1 billion CDO, while a triple-A "senior" slice would not be affected until losses reached $200 million or more.

But the system works only if the securities in the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once. Corporate bonds, for example, tend to have low correlation because the companies that issue them operate in different industries, which typically don't get into trouble simultaneously.

Mortgage securities, by contrast, have turned out to be very similar to one another. They're all linked to thousands of loans across the U.S. Anything big enough to trigger defaults on a large portion of those loans -- like falling home prices across the country -- is likely to affect the bonds in a CDO as well. That's particularly true for the kinds of securities on which mezzanine CDOs made their bets. Triple-B-rated bonds would typically stand to suffer if losses to defaults on the underlying pools of loans reached about 10%.

When rating companies analyzed Norma, though, they were looking backward to a time when rising house prices and easy credit had kept defaults on subprime mortgages low. Norma's marketing documents noted plenty of risks for investors but also said that CDO securities had a high degree of ratings stability.

Beyond that, rating firms say they had reason to believe that the securities wouldn't all go bad at once as the housing market soured. For one, each security contained mortgages from a different mix of lenders, so lending standards might differ from security to security. Also, each security had its own unique team of companies collecting the payments. Yuri Yoshizawa, group managing director at Moody's Investors Service, says the firm figured some of these mortgage servicers would be better than others at handling problematic loans.

In March, Moody's, Standard & Poor's and Fitch Ratings gave Norma their seal of approval. In its report, Fitch cited growing concern about the subprime mortgage business and the high number of borrowers who obtained loans without proof of income. Still, all three rating companies gave slices comprising 75% of the CDO's total value their highest, triple-A rating -- implying they had as little risk as Treasury bonds of the U.S. government.

Merrill and N.I.R. took Norma to investors. Together, they produced a 78-page pitchbook that bore Merrill's trademark bull. Inside were nine pages of risk factors that included standard warnings about CDOs. The pitchbook also extolled mortgage securities, which it noted "have historically exhibited lower default rates, higher recovery upon default and better rating stability than comparably rated corporate bonds."

Most importantly, though, Norma offered high returns: On a riskier triple-B slice, Norma said it would pay investors 5.5 percentage points above the interest rate at which banks lend to each other, known as the London interbank offered rate, or Libor. At the time, that translated into a yield of over 10% on the security -- compared with roughly 6% on triple-B corporate bonds.

Mr. Ribotsky says the selling required little effort, as Merrill drummed up interest from its network of contacts. "That's what they get their fees for," he says.

Norma sold some $525 million in CDO slices -- largely the lower-rated ones with higher returns -- to investors. Merrill declined to say whether it kept Norma's triple-A rated, $975 million super-senior tranche or sold it to another financial institution.

Many investment banks with CDO businesses -- Citigroup Inc., Morgan Stanley and UBS -- frequently kept or bought these super-senior pieces, whose lower returns interested few investors. In doing so, they bet that the top CDO slices, which typically comprised as much as 60% of the whole CDO, were insulated from losses.

By September, Norma was in trouble. Amid a steep decline in house prices and rising defaults on mortgage loans, the value of subprime-backed securities went into a free fall. As increasingly worrisome delinquency data rolled in, analysts upped their estimates of total losses on subprime-backed securities issued in 2006 to 20% or more, a level that would wipe out most triple-B-rated securities.

Within weeks, ratings firms began to change their views. In October, Moody's downgraded $33.4 billion worth of mortgage-backed securities, including those which Norma had insured. Those downgrades set the stage for a review of CDOs backed by those securities -- and then further downgrades.

Mezzanine CDOs such as Norma were the hardest hit. On Nov. 2, Moody's slashed the ratings on seven of Norma's nine rated slices, three all the way from investment-grade to junk. Fitch downgraded all nine slices to junk, including two that it had rated triple-A.

Other mezzanine CDOs, including some underwritten by other investment banks, have had worse performances. Around 30 are now in default, according to S&P. Norma is still paying interest on its securities. It is not known whether it has had to make payouts under the credit default swap agreements.

Ratings companies say their March opinions represented their best read at the time, and called the subprime deterioration unprecedented and unexpectedly rapid. "It's one of the worst performances that we've seen," says Kevin Kendra, a managing director at Fitch. "The world has changed quite drastically -- and our view of the world has changed quite drastically."

By mid-December, $153.5 billion in CDO slices had been downgraded, according to Deutsche Bank. Because banks owned the lion's share of the mezzanine CDOs, they bore the brunt of the losses. In all, banks' write-downs on mortgage investments announced so far add up to more than $70 billion.

For larger banks, holdings of mezzanine CDOs could account for one-third to three-quarters of the total losses. In addition to the $9.4 billion fourth-quarter write-down Morgan Stanley just announced it would take, Citigroup has projected its fourth-quarter write-down could reach $11 billion. UBS said this month it would take a $10 billion write-down after taking a $4.4 billion third-quarter loss.

Merrill, for its part, took a $7.9 billion write-down on mortgage-related holdings in the third quarter. Analysts expect it to write down a similar amount in the current quarter, which would represent the largest losses of any bank. News of the losses have led to the ouster of CEO Stan O'Neal and Osman Semerci, the bank's global head of fixed income. Mr. Margolis left this summer.

Mr. Ribotsky says he doesn't have plans to do any more CDOs at the current time. "Obviously, we're not happy about the occurrences in the marketplace," he says.

185.    On January 17, 2008, Merrill Lynch released the 2007 year-end financial results which included $23.2 billion in write-downs from CDO and subprime exposure.[65]    The Company's net loss from continuing operations for the fourth quarter was $10.3 billion, or $12.57 per diluted share.    In one quarter, Merrill Lynch lost more than its *record breaking* earnings of $7.5 billion for the *entire year* of 2006.    John Thain acknowledged that "the firm's earnings performance for the year is clearly unacceptable[.]"

186.    On January 17, 2008, during Merrill Lynch's Fourth Quarter 2007 Earnings Conference Call, John Thain addressed concerns about the $23.2 billion write-down, which was more than five times the initial write-down disclosed on October 5, 2007.    Thain was less than optimistic about Merrill Lynch's ability to recover some of the $23.2 billion losses and diverted questions about how Merrill Lynch ended up with such high levels of exposure to CDO and subprime securities and whether it failed to report this to its risk management systems. *See Merrill Lynch Q4 2007 Earnings Call Transcript*, January 17, 2008, at 8.    Thain ended the call stating that although there was very little trading by anyone in the CDO market in the fourth

---

[65]    *See Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing Operations of $8.6 Billion.*

quarter and that, moving forward, he intends to sell them and reduce Merrill Lynch's absolute position. *Id.* at 10.

187.    The day after the company released its fourth quarter earnings on January 18, Thain appeared on the "Nightly Business Report" on PBS and conveyed that Merrill Lynch did not have significant remaining exposure to subprime loans and does not expect any more changes from its asset based securities (which includes CDOs).[66]

188.    On February 25, 2008, Merrill Lynch released its 2007 10-K. The Power of Attorney for the preparation of the form was signed by Defendants Christ, Codina and Colbert. The Company provided greater detail on its previously disclosed $23.2 billion in write-down resulting from CDO and subprime related exposure. The majority of these write-downs were from Merrill Lynchs's exposure to CDO securities, which totaled $16.7 billion. In addition, the Company also wrote down $3.2 billion in related to U.S. sub-prime residential mortgage exposure, $2.6 billion in credit valuation adjustments related to Merrill Lynch's hedges with financial guarantors (mainly credit default swaps) related to its CDO securities, and $700 million related to subprime related securities in Merrill Lynch's U.S. banks investment securities portfolio. *See Merrill Lynch Annual Report* (Form 10-K) (Dec. 28, 2007), at 22.

189.    The Company also reported that its remaining net exposure related to CDO securities as $4.8 billion, which was based on Merrill Lynch's long exposure to CDO securities of $30.4 billion (post write-downs) less its $23.6 billion short exposure and less $2.0 billion for "secondary trading." *See* 2007 10-K, p. 36. The short position primarily consisted of hedges (such as credit default swaps), which involve risk of loss of capital based on the financial viability of the guarantor (many of which are non-investment grade companies). In fact, Merrill

---

[66]    *See* "One on One with Merrill Lynch CEO John Thain," *available at* http://www.pbs.org/nbr/site/onair/transcripts/080117_gharib/.

Lynch took $2.6 billion in write-downs from credit valuation adjustments in 2007 demonstrates that some hedging vehicles, such as credit default swaps introduce new risk of loss to Merrill Lynch's capital base. Put plainly, reports of net exposure are inadequate, if not misleading, when the hedges that contribute to the net exposure number are not working or are themselves fraught with credit risk.

190.    On March 5, 2008, Merrill Lynch issued a press release announcing that it is discontinuing mortgage origination at its First Franklin subsidiary and will explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin, due to the deterioration of the subprime lending market.[67] Merrill Lynch bought First Franklin in late 2006 for $1.3 billion. As recently as April of 2007, Merrill Lynch boasted of the contribution that First Franklin made to Merrill Lynch's business. The Company will spend $60 million to pay for severance and other real estate costs linked to unwinding First Franklin's operations.

191.    An April 16, 2008 Wall Street Journal article entitled *Merrill Upped Ante as Boom In Mortgage Bonds Fizzled* stated, in part, the following:

> On Thursday Merrill will report $6 billion to $8 billion in new write-downs, according to a person familiar with the matter. The latest would bring its total since October to more than $30 billion and mean that Merrill reports a third straight quarterly net loss, the longest losing streak in its 94-year history.
>
> Now the firm is readying a cost-saving plan that includes job cuts of 10% to 15% in some areas where business is off,
>
> [A] look at how [Merrill] got in so deep and its flawed efforts to recover sheds light on why the credit squeeze is proving so deep and persistent. Merrill aggressively continued to create new mortgage securities after doing so became riskier. Among those keenly interested in knowing what went wrong is the Securities and Exchange Commission, which is examining whether Merrill and

---

[67] *See Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_92707_92961.

other firms should have told investors sooner about the stumbling mortgage business last year.

When housing boomed earlier this decade, Merrill profited by turning mortgage-backed bonds into complex securities. Initially, it was well protected from credit risk in this underwriting. The protection frayed at the start of 2006. But Merrill kept playing the game.

By early 2007, as cracks in the housing and mortgage markets widened, Merrill again missed a chance to scale back. In fact, it revved up its production of complex debt securities -- despite a shortage of buyers for them -- in what turned out to be a misguided effort to limit its losses.

Its torrid underwriting loaded Merrill with exposure to mortgage securities, whose top credit rating provided scant protection when investors fled. Then Merrill made another fateful move: trying to hedge some of its massive mortgage risk through bond insurers whose strength was questionable.

[Merrill] has reduced its exposure to certain risky mortgage securities to $7.5 billion from $40.9 billion in June, mostly by writing down their value or paying another party to take on their credit risk.

Mr. Thain has increased the importance of weekly risk-management meetings by requiring the heads of trading businesses to attend and by having the top risk managers report directly to him. Since taking over in December, he also has reduced executives' incentive to swing for the fences by tying more of their pay to the firm's overall results and less to how businesses do individually.

The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005. As it repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc. An AIG unit bore the default risk of the CDOs' largest and highest-rated chunk, known as the "super-senior" tranche, normally sold to big investors such as foreign banks.

But AIG was keeping a close eye on the housing boom because it had another unit that made subprime loans, those to home buyers with weak credit. AIG did a review of the market. Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities.

Merrill was used to having to keep lots of mortgage bonds and pieces of CDOs on its books temporarily before selling them. But without a firm like AIG providing credit insurance, Merrill had to bear the risk of default itself.

Instead of scaling back its underwriting of CDOs, however, Merrill put the business in overdrive. It began holding on its own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload.

Merrill was able to hang onto the top spot in Wall Street's CDO-underwriting ranks. It generated $44 billion in CDOs in 2006 -- triple its 2004 output. Although not able to sell the bulk of the CDOs, it collected about $700 million for underwriting and trading these and other structured products. And its top ranking was considered in the calculation of executives' bonuses.

Risk controls at the firm, then run by CEO Stan O'Neal, were beginning to loosen. A senior risk manager, John Breit, was ignored when he objected to certain risks taken in underwriting Canadian deals, according to people familiar with the matter. Mr. Breit, then head of market-risk management, told colleagues he had never been overruled like that before, say former Merrill executives.

Merrill lowered the status of Mr. Breit's job in its hierarchy. Mr. Breit sent a letter of resignation to Merrill's chief financial officer saying the job was too important to be diluted that much, says someone familiar with the matter. He was given a different job outside of the risk-management group and stayed at Merrill.

Some managers seen as impediments to the mortgage-securities strategy were pushed out. An example, some former Merrill executives say, is Jeffrey Kronthal, who had imposed informal limits on the amount of CDO exposure the firm could keep on its books ($3 billion to $4 billion) and on its risk of possible CDO losses (about $75 million a day). Merrill dismissed him and two other bond managers in mid-2006, a time when housing was still strong but was peaking.

To oversee the job of taking CDOs onto Merrill's own books, the firm tapped Ranodeb Roy, a senior trader but one without much experience in mortgage securities. CDO holdings on Merrill's books were soon piling up at a rate of $5 billion to $6 billion per quarter. This led to an inside joke at Merrill. Mr. Roy is known as Ronnie. Some employees took to saying that if they couldn't find a specialized bond insurer, known as a "monoline," to take Merrill's risk on the deal, they could resort to a "Ronoline."

Mr. Roy, whom Merrill asked to leave five months ago, says he was simply following orders in loading the books with mortgage securities and that he objected to the practice. He is now at Morgan Stanley.

In August 2006, one Merrill trader fought back when managers pushed to have the firm retain $975 million of a new $1.5 billion CDO named Octans. In a meeting in the office of a risk manager, the trader argued against keeping the securities on the books.

The result was a heated phone conversation with Merrill's CDO co-chief, Harin De Silva, who was out of the office. Mr. De Silva urged the trader to accept the securities, while the trader said he didn't know enough about the CDO to feel comfortable doing that, say people familiar with the meeting. Mr. De Silva reasoned that Merrill would bear less risk by taking on the super-senior tranche because it had already found investors to take on the riskier slices. The alternative was to let the deal fall apart, which would leave Merrill holding the risk of all the securities that would have backed the CDO.

In the end, Mr. Roy's group took the $975 million of securities on the firm's books. That meant Merrill could complete the underwriting of the Octans CDO, a step that helped the firm hold its top rank in CDO underwriting and led to an estimated $15 million in fee revenue for the deal, according to people close to the situation. It's unclear whether Merrill took losses on the deal. The firm later paid Morgan Stanley to take on the credit risk of the securities through a swap transaction.

Pressures rose in early 2007 as the housing bubble lost air. Merrill set out to reduce its exposure, in an effort referred to innocuously as "de-risking."
It could have sold off billions of dollars' worth of mortgage-backed bonds that it had stockpiled with the intention of packaging them into more CDOs. But with the market for such bonds slipping, Merrill would have had to record losses of $1.5 billion to $3 billion on the bonds, says a person familiar with the matter.

"Instead, Merrill tried a different strategy: quickly turn the bonds into more CDOs."

Doing so was no longer a profitable enterprise. Demand was weakening for the lower-rated CDO slices, normally sold to risk-tolerant investors such as hedge funds. Often, Merrill could move these only at discounted prices that all but eliminated its profit.

Still, executives believed that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgage securities. And they wouldn't have to sell off their mortgage bonds at a loss.

"In the first seven months of 2007, Merrill created more than $30 billion in mortgage CDOs, according to Dealogic, keeping Merrill No. 1 in Wall Street underwriting for this type of security."

By June, the market for mortgage securities was weakening faster. Two Bear Stearns Cos. hedge funds that invested in them were being forced by creditors -- which included Merrill -- to sell securities. That set prices tumbling across the credit markets. One Merrill trader recalls Dale Lattanzio, then co-manager of Merrill's bond business, hustling around the firm's football-field-sized trading floor ordering his traders to "sell everything -- we're too long."

100

As the CDO business slid, Merrill's top managers embarked on a new plan, referred to as the "mitigation strategy." The aim was to find ways to hedge exposure through deals with bond insurers. This would reduce the size of write-downs Merrill would otherwise have to take.

"Through August, Merrill insured $3.1 billion of CDOs against losses in a series of transactions with bond insurer XL Capital Assurance Inc."

In August, Merrill proposed that XL insure about $20 billion more of its CDO exposure, according to papers XL filed in court after their relationship deteriorated. "Pick your size. It's a very nice deal for XL and a big help for ML," a Merrill salesman told an XL employee, according to the papers XL filed in federal court in New York. XL declined the additional business.

Merrill turned to another bond insurer, MBIA Inc. MBIA agreed to insure around $5 billion of the securities. But it wouldn't cover interest payments; it would only cover principal payments when they come due in more than 40 years.

Continuing to scramble, Merrill got a tiny insurer called ACA Financial Guaranty Corp. to insure about $6.7 billion of its CDOs. The problem was that ACA was poorly capitalized. It was insuring more than $60 billion of debt securities -- a third of which were mortgage-related -- yet had only about $400 million of capital and few other resources to cover claims.

Some other firms, including Lehman Brothers Holdings Inc., had already set aside reserves against their hedges with ACA, concerned that ACA would be unable to cover losses on the bonds it insured. Lehman wrote down its exposure to ACA during the first half of 2007.

Merrill's deals with the insurers helped it to show a reduction of about $11 billion in its CDO exposure in last year's third quarter. Coupled with CDO-related write-downs of $6.9 billion in the quarter, this brought Merrill's CDO exposure down to $15.8 billion, from $33.9 billion in June. The bond-insurer deals thus helped reduce Merrill's third-quarter net loss, although it was a still-hefty $2.3 billion.

Even so, the numbers were worse than Merrill had previously indicated. In a late-October conference call with investors, Mr. O'Neal said that "we got it wrong by being overexposed to subprime" and that "both our assessment of the potential risk and mitigation strategies were inadequate." Within days, he resigned as CEO.

In December, Standard & Poor's cut its financial-strength rating of ACA to junk level. That forced Merrill to write down its CDO hedge with ACA by $1.9 billion in the fourth quarter, leaving questions about why it had turned to such a thinly capitalized partner.

"XL Capital's agreement to insure Merrill CDOs is embroiled in litigation. XL sought to walk away from the deal, contending Merrill had violated the terms. Merrill sued last month to force XL to honor the agreement."

In a countersuit, XL said the purpose of the bond-insurance deal was simply to enable Merrill to report that its CDO exposure was lower. "Merrill Lynch undertook a rushed campaign to find parties willing to hedge or provide protection on its remaining CDO positions," the suit said. A spokesman for Merrill says XL "makes assumptions that are, very simply, wrong."

Merrill's new CEO, Mr. Thain, is seeking to regain investors' trust by upgrading the firm's risk controls. In one move, the firm in December rehired Mr. Kronthal, the risk-conscious bond executive Merrill had let go in 2006 when it was determined to increase its bet on CDOs. His new job: to help Merrill clean up its CDO mess.

192.    An April 16, 2008 Reuters article entitled *Merrill Lynch To Write Down Further*

*$6-8 Billion: Report* stated, in part, the following:

"Investment bank Merrill Lynch & Co (MER.N: Quote, Profile, Research) will announce $6 billion to $8 billion of asset write-downs in its first quarter results on Thursday, the Wall Street Journal reported on Wednesday, citing a person familiar with the matter."

"The latest write-downs would increase total debt losses since October to more than $30 billion, the paper said. The setbacks will contribute to a third straight quarterly net loss at Merrill, the longest losing streak in its 94-year history."

193.    An April 16, 2008 Smart Money article entitled *Major Indexes Climb 2%* stated,

in part, the following:

Merrill Lynch (MER: 46.50, +0.09, +0.19%) is expected to report a first-quarter writedown of between $6 billion and $8 billion when it releases earnings on Thursday, The Wall Street Journal reported, citing an anonymous source. A charge in that range would bring the sum of Merrill's writedowns since October to upwards of $30 billion. The firm is also planning to cut costs by slashing payrolls 10% to 15% in struggling divisions like bond finance, anonymous sources told The Journal. New initiatives by Chief Executive John Thain are intended to curb the firm's risk-taking behavior.

194.    On April 17, 2008, Merrill Lynch reported large losses related to subprime and

CDOs, which appear to contradict Thain's statements on the "Nightly Business Report" on

January 18, 2008. In its First Quarter Earnings Statement Merrill Lynch stated an additional $6.6

billion in write-downs from exposure to mortgages, CDOs and leveraged loans.[68] These results included about $4.5 billion of write-downs plus $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure. The current total write-downs related to CDO and subprime exposure is $30.8 billion.[69]

195.    The Merrill Lynch press release reporting the large losses stated, in part, the following:

> Merrill Lynch today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.
>
> In this challenging market environment, which continued to deteriorate during the quarter, first-quarter 2008 net revenues were $2.9 billion, down 69 percent from the prior-year period, primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super-senior ABS CDOs. To a lesser extent, net revenues were also impacted by net write-downs related to leveraged finance and residential mortgage exposures, which were offset by a net benefit of $2.1 billion, due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities. Excluding these write-downs, credit valuation adjustments and the net benefit related to long-term debt liabilities, net revenues were $7.4 billion, down 26 percent from the prior-year period.

---

[68] *See Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations of $1.97 Billion, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

[69]    Because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure. *See* Merrill Lynch Reports First Quarter 2008, April 17, 2008, 2007 10-K, pg. 117. *See also*, David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., April 21, 2008.

**Business Segment Review:**

**Global Markets and Investment Banking (GMI)**
GMI recorded net revenues of negative $690 million and a pretax loss of $4.0 billion for the first quarter of 2008, as the challenging market conditions resulted in net losses in Fixed Income, Currencies and Commodities (FICC) and weaker revenues in Equity Markets and Investment Banking from the prior-year period. GMI's first-quarter net revenues included a net benefit of approximately $2.1 billion (approximately $1.4 billion in FICC and $700 million in Equity Markets), due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities.

Net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $3.4 billion for the quarter, impacted primarily by net losses related to U.S. ABS CDOs and credit valuation adjustments related to hedges with financial guarantors. To a lesser extent, FICC was impacted by net write-downs related to leveraged finance and residential mortgage exposures. These net write-downs more than offset record net revenues in interest rate products and currencies for the quarter. Net revenues for the other major FICC businesses declined on a year-over-year basis, as the environment for those businesses was materially worse than the year-ago quarter.

U.S. ABS CDOs:

At the end of the first quarter of 2008, net exposures to U.S. ABS CDOs were $6.7 billion, up from $5.1 billion at the end of 2007 as a reduction of hedges more than offset $1.5 billion of net write-downs.

Financial Guarantors:

During the first quarter of 2008, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.0 billion, including negative $2.2 billion related to U.S. super-senior ABS CDOs.

The hedges with financial guarantors related to U.S. super-senior ABS CDOs declined to $10.9 billion, due to net gains on these hedges and the firm's decision to consider $1.1 billion notional amount of certain hedges with a highly rated financial guarantor as ineffective, which resulted in a write-off of $45 million. The net gains, coupled with the deteriorating environment for financial guarantors, resulted in credit valuation adjustments of negative $2.2 billion during the 2008 first quarter. As a result, the carrying value of these hedges related to U.S. super-senior ABS CDOs was $3.0 billion at quarter end.

Residential Mortgages:

Net exposures related to U.S. subprime residential mortgages declined during the first quarter of 2008 to $1.4 billion, primarily due to additional hedging, asset sales and net write-downs of $306 million during the quarter. Net exposures related to Alt-A residential mortgages increased to $3.2 billion, primarily due to asset purchases that were partially offset by $402 million of net write-downs during the quarter. Net exposures related to prime residential mortgages increased to $30.8 billion, due to new originations with GWM clients. Net exposures related to non-U.S. residential mortgages declined to $8.8 billion, primarily due to a whole loan securitization and net write-downs of $105 million, which were partially offset by asset purchases.

U.S. Banks Investment Securities Portfolio:

Within the investment securities portfolio of Merrill Lynch's U.S. banks, net pretax write-downs of $3.1 billion were recognized through other comprehensive income/(loss) (OCI) and $421 million through the income statement during the first quarter of 2008. At quarter end, the pretax OCI balance related to this portfolio was approximately negative $5.4 billion. This quarter's write-downs were primarily related to Alt-A residential mortgage-backed securities.

Leveraged Finance:

At the end of the 2008 first quarter, leveraged finance commitments were approximately $14 billion, down from approximately $18 billion at the end of 2007. Net write-downs related to these exposures were approximately $925 million during the first quarter of 2008.

Commercial Real Estate:

At quarter end, net exposures related to commercial real estate totaled approximately $21 billion, down from the end of 2007[3], as a number of asset sales during the quarter were partially offset by new originations from First Republic and foreign currency translations. These amounts exclude $4 billion of net exposures sold to GE Capital during the quarter. Net gains related to the firm's commercial real estate net exposures, excluding ML Capital, were $53 million during the first quarter of 2008.

Equity Markets net revenues declined 21 percent from the prior-year quarter to $1.9 billion, as increases from most client-related businesses were more than offset by declines from the principal-related businesses. Net revenues for financing and services and cash equity trading increased year over year, while equity-linked trading was down from its strong performance in the first quarter of 2007. The private equity business recorded negative net revenues of $207 million, down approximately $650 million from the prior-year quarter, and net revenues from the Strategic Risk Group and hedge fund investments declined approximately $450 million year over year.

Investment Banking net revenues were $805 million, down 40 percent from the strong performance in the 2007 first quarter, reflecting lower net revenues in debt and equity origination, as deal volumes for leveraged finance and initial public offerings significantly decreased this quarter from the high activity levels in the year-ago period. While revenues in strategic advisory also declined slightly from the year-ago quarter, the business showed strength, outperforming the decline in industry transaction volumes from the year-ago quarter levels.

196.   On April 17, 2008, John Thain held the Company's First Quarter 2008 Earnings Conference Call. He stated that "widening of credit spreads forced liquidations, high volatility, [and] the lack of market liquidity for many credit products [e.g., CDO and subprime related securities]." He also stated, "We are planning for a slower and more difficult next couple of months and probably next couple of quarters."[70]

197.   During the conference call discussing the results, John Thain stated, in part, the following:

> There's no question that the credit spread widening that occurred in this quarter impacted our inventories, particularly our ABS CDO inventory. You saw from the press release we had $1.5 billion of net write-downs on ABS CDOs, obviously much, much lower than the fourth quarter of last year. Just to give you an idea of how we were pricing those, we moved our cumulative loss assumptions on sub-prime mortgages from what was a range of 16% to 21% at the end of the fourth quarter, to a range of 19% to 24% at the end of the first quarter. And remember, at 24% that would mean that if half of the mortgages defaulted you would lose 48% of the value of the home. So very, very significant price declines. And just in terms of the average over the U.S. so far, year-over-year home prices are down about 11%. Although sub-prime in certain areas are down more than that.

> FICC revenues were a negative $3.4 billion as the business continued to face significant head winds due to our CDO monoline-related exposures which I'll detail in a minute. However the positive trading environment drove FICC revenues of $1.9 billion which exclude marks of $6.6 billion in fair value debt gains of $1.4 billion.

---

[70]   *See Merrill Lynch Q1 200 Earnings Call Transcript, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

The majority of the write-downs this quarter were related to the ABS CDOs and related monoline exposures, as John mentioned earlier.

198.    Thain also discussed moving their principal investing for subprime and CDO securities to third party funds but acknowledged that it is "not very likely [that they] will recover value. *Id.* Despite the fact that the Company's long exposure to CDO securities has decreased slightly from $30.4 billion at Dec. 30, 2007 to $26 billion at Mar. 28, 2008, the Company's *net* exposure actually increased from $4.8 billion as of December 30, 2007 to $6.7 billion as of March 28, 2008 due to the failure of its credit default swaps to effectively hedge against the risk of losses from Merrill Lynch's remaining long exposures to CDO securities.

199.    In fact, the financial press has reported that holders of CDO securities, such as Merrill Lynch, purchased credit default swaps for reasons apart from their stated objective (to hedge against the risk of loss to their CDO securities).  A BusinessWeek analysis explains that "the insurers' guarantees [i.e., the credit default swaps] turned out to be little more than a subprime shell game" because the "[i]nsurance turned out to be a sort of accounting arbitrage, allowing banks to take advantage of that different set of rules. By using it, they could offload the price risk to insurers' books to avoid suffering a hit to earnings if the bonds dropped in value."[71]

200.    "Bond insurance was an accounting strategy," says former ACA[72] (a large bond insurers that collapsed in December of 2007) chief Satz, now the founder of an online startup called BarterQuest. "It reduced banks' mark-to-market worries."[73]

---

[71] David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street used ACA to hide loads of subprime risk. It worked—until the tiny company collapsed,* BusinessWeek, Apr. 3, 2008.

[72] Merrill Lynch was one of ACA's largest clients.

201.    Credit default swaps offered banks another advantage: It allowed them to execute "a negative-basis trade," a strategy that essentially allows banks book profits on CDOs up front, even though they have not actually collected any money yet and might never do so.[74]

202.    Overall, CDOs boosted Merrill's profits and reduced the amount of capital it had to set aside on their books for the securities. That freed up money for the Company to funnel back into subprime securities. "The results of the game were bigger profits for banks, more money to continue cranking out securities built on risky subprime mortgages, and far less clarity about the banks' true exposure to the toxic investments."[75]

203.    An April 17, 2008 Gazette article entitled *Merrill Posts Big Loss, To Cut 2,900 Jobs* stated, in part, the following:

> Chief Executive John Thain is trying to turn the company around as it struggles with the aftermath of bad bets on subprime mortgages and repackaged debt. He is increasing the investment bank's business in emerging markets and cutting costs to help offset write-downs.
>
> Merrill Lynch reported losses, write-downs and reserve increases of $1.5 billion on collateralized debt obligations, $925 million on loans financing leveraged buyouts, $3.5 billion on an investment portfolio, more than $800 million on residential mortgages, and $3 billion for exposure to bond insurers.
>
> "Merrill Lynch's first-quarter net loss was $1.96 billion, compared with a year-earlier profit of $2.16billion."
>
> "Including preferred stock dividends, the loss was $2.14 billion, or $2.19 per share, and compared with a profit of $2.11 billion, or $2.26 a share, a year earlier."

---

[73]  David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street used ACA to hide loads of subprime risk. It worked—until the tiny company collapsed,* BusinessWeek, Apr. 3, 2008.

[74]  *Id.*

[75]  *Id.*

"The loss from continuing operations was $2.20 per share, wider than the analysts' average forecast of $1.96, according to Reuters Estimates."

"Net revenue declined 69 percent to $2.93 billion. Analysts expected $3.35 billion."

"The company had already recorded more than $24 billion of write-downs in prior quarters, spurring it to raise more than $12 billion of new capital. Thain said this month that he did not expect to raise more capital in the foreseeable future."

"A $2.1 billion benefit from widening credit spreads partly offset the write-downs and losses on risky assets."

"Merrill Lynch shares were down 2.2 percent at $43.91 in trading before the market opened."

"At Wednesday's close, Merrill Lynch's shares had fallen 16.4 percent year to date, compared with a roughly 25 percent decline in the Amex securities broker-dealer index."

204.    An April 17, 2008 Housing Wire article entitled Merrill *Posts Quarterly Loss, $4.3 Billion in Mortgage-Related Writedowns* stated, in part, the following:

"Despite this quarter's loss, Merrill Lynch's underlying businesses produced solid results in a difficult market environment," [Thain] said. "The firm's $82 billion excess liquidity pool has increased from year-end levels, and we remain well capitalized. In addition, our global franchise is positioned strongly for the future, and we continue to invest in key growth areas and regions."

Interestingly, Alt-A write-downs are now outpacing subprime write-downs — suggesting that while subprime mortgage-related losses remain significant, losses more generally tied to weakness in the overall mortgage market and a weakening economy are increasing. Merrill's net write-downs on Alt-A mortgages and related securities totaled just over $2 billion in Q1, while subprime net write-downs totalled a little over $1 billion. Merrill wrote off roughly $1.1 billion tied to Alt-A mortgages in the fourth quarter, by way of comparison.

Merrill saw its U.S. ABS CDO exposure jump to $6.7 billion in Q1, up from $5.1 billion one quarter earlier as a steep reduction in hedges more than offset $1.5 billion in writedowns — in plain English, this means that the firm is seeing its attempts to limit downside exposure fail at a rate that's actually greater than the large losses already being recorded.

In particular, Merrill took a $3.0 billion hit on a credit valuation adjustment tied to recent ratings downgrades of various monoline bond insurers — Merrill, like

many Wall Street firms, purchased credit default swaps from bond guarantors as protection for its CDO positions. The Wall Street bank said that it essentially was forced to write off some of its CDS contracts tied to one guarantor altogether, after deeming them "ineffective."

Moody's Investors Service said that it had placed Merrill Lynch on review for a possible downgrade after the earnings report Thursday morning. The rating agency cited "continued deteriorating conditions in the mortgage market and the increased expected losses on MER's portfolio of super-senior CDO's and related guarantor hedges as measured in Moody's stress tests."

205.     An April 17, 2008 Reuters article entitled *Merrill Lynch Posts Big Loss* stated, in

part, the following:

"Merrill Lynch & Co on Thursday posted a nearly $2 billion first-quarter loss, and said it plans to cut 4,000 jobs after suffering several billion dollars of write-downs for subprime
mortgages and other risky assets."

The job cuts cover about 10 percent of staff at the world's largest brokerage, excluding financial advisers and investment associates. Merrill Lynch said the job cuts will be targeted in markets and investment banking operations and in support areas. The company said it ended March with 63,100 employees overall.

Brazilian mining giant Vale has fired Merrill Lynch & Co Inc as one of two lead advisers on a potential $90 billion (45.5 billion pound) bid for Xstrata because the bank could not provide financing, a person familiar with the matter said on Monday. Including preferred stock dividends, the loss was $2.14 billion, or $2.19 per share, and compared with a profit of $2.11 billion, or $2.26, a year earlier. The loss from continuing operations was $2.20 per share. On that basis, analysts on average expected a loss of $1.96 per share, according to Reuters Estimates.

Net revenue declined 69 percent to $2.93 billion. Analysts expected revenue of $3.35 billion. Results reflected a $1.5 billion write-down related to collateralized debt obligations tied to asset-backed securities, and a $3 billion write-down linked mainly to so-called "super-senior" CDOs tied to assetbacked securities.

206.     An April 17, 2008 United Press International article entitled *Write-downs Still*

*Rife at Merrill Lynch* stated, in part, the following:

"U.S. finance giant Merrill Lynch lost $1.96 billion in the first quarter, including $9.4 billion in write-downs, the company reported Thursday."

"The company, reeling from a turnaround in the credit market, has reported a total of $27.4 billion in write-downs over this quarter and the previous two, The New York Times reported."

"First quarter 2008 losses were all in the investment banking division, which lost $4 billion and saw a decline in revenues..."

"Write-downs for the quarter included $1.5 billion related to collateralized debt and $3.1 billion related to Alt-A residential mortgages."

""Despite this quarter's loss, Merrill Lynch's underlying businesses produced solid results in a difficult market environment," Chairman and Chief Executive John A. Thain said in a statement."

207.    An April 17, 2008 CNN Money article entitled *TF North America Daybook*

stated, in part, the following:

Merrill Lynch said it swung to a first-quarter loss from continuing operations of $1.97 billion, or $2.20 a share, as net revenue fell 69% from a year earlier on net write-downs of about $1.5 billion related to collateralized debt obligations comprised of asset-backed securities and certain credit valuation adjustments of negative $3 billion.

208.    An April 17, 2008 CNN Money article entitled *Wall St.'s Pain, Jobless Claims on*

*Investors' Minds* stated, in part, the following:

The bad news in finance continued early Thursday when Merrill Lynch (MER, Fortune 500) wrote down another $1.5 billion in the value of its assets and reported a net loss of $2.16 billion that was larger than expected. The nation's largest brokerage firm also announced it was cutting 4,000 jobs.

209.    An April 17, 2008 CNN Money article entitled *More Pain for Merrill Lynch*

stated, in part, the following:

Still suffering from bad bets in the mortgage market, Merrill Lynch Thursday missed even the drastically lowered estimates for its first-quarter results, reporting a net loss of $1.96 billion, or $2.19 per diluted share. It also recorded about $6.6 billion in new writedowns.

"It will focus the reductions in its global markets and investment banking division."