# EXHIBIT A

# Mortgage-Backed Securities

## Products, Analysis, Trading



William W. Bartlett
*Vice President, Product Management*
*Shearson Lehman Hutton*

Françoise Dearden
*Developmental Editor*

New York Institute of Finance

```
              Library of Congress Cataloging-in-Publication Data
Bartlett, William W.
   Mortgage-backed securities : products, analysis, trading / William
W. Bartlett.
      p.    cm.
   Includes index.
   ISBN 0-13-725516-0 : $39.50
   1. Mortgage-backed securities--United States.   I. Title.
HG5095.B35 1988
332.63'244--dc19                                           88-28866
                                                               CIP
```

The views expressed in this book are the author's own and do not necessarily reflect the views of Shearson Lehman Hutton Inc. or its clients.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional service. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

*From a Declaration of Principles Jointly Adopted by*
*a Committee of the American Bar Association and a*
*Committee of Publishers and Associations*

© 1989 by NYIF Corp.
A Division of Simon & Schuster, Inc.
70 Pine Street, New York, NY 10270-0003

All rights reserved. No part of this book may
be reproduced in any form or by any means without
permission in writing from the publisher.

Printed in the United States of America

KF
1442
.M6
B35
1988
c.2

10 9 8 7 6 5 4 3 2 1

New York Institute of Finance
(NYIF Corp.)
70 Pine Street
New York, New York 10270-0003

**396**                                                                 Chapter 14

# EVOLUTION OF THE RESIDUAL SECONDARY MARKET

The developments that led to the creation of a secondary market for residuals stem from the requirements of the Grantor Trust mechanism for issuing MBSs. Virtually all pass-through MBSs are packaged with the mortgage collateral deposited in a **Grantor Trust**, which because of its totally passive nature, enables the MBS issuer to enjoy sale-of-asset treatment for tax and accounting purposes. Sale-of-asset accounting is particularly essential for mortgage bankers because with literally billions of dollars of loans under servicing, few such originators would be able to continue issuing MBS pools if the pools had to be carried on the books as debt issuance. One constraint of the Grantor Trust, however, is the IRS requirement that only a single-class Grantor Trust can be treated as a sale of assets.

Therefore, for the first years of their issuance, CMOs had to be structured as issuance of debt. To assure financing (debt issuance) status certain structural elements were introduced. Among these was to structure remittance of P&I payments to be distributed in some fashion other than monthly. Most issuers of the early CMOs elected quarterly distributions, but monthly distributions are quite common today. Another major structural element was retention of an equity interest in the collateral.

A party that retains an economic interest in the collateral remains "at risk," a key test in determining financing versus sale-of-asset treatment. This interest took the form of an equity, or ownership, position in the collateral, resulting in consolidation of the assets (the mortgage collateral) and the liabilities (the CMO bonds) on the issuer's balance sheet. This equity interest is what we now call a residual.

The requirement that CMOs be issued as debt restricted their use to the large, well-capitalized Wall Street firms which issued "arbitrage CMOs" under special-purpose corporations (see Chapter 12), builders who enjoyed other tax benefits (see Chapter 1), and some S&Ls which used the CMO as an economic means of liquifying below-market seasoned loans and preferred not to have sale-of-asset treatment (see Chapter 1).

### The Owner-Trust Vehicle

Toward the end of 1985 the introduction of the owner trust as the CMO issuing entity made it possible to achieve off-balance sheet financing of mortgage collateral issued under a CMO. The owner-trust form of ownership may provide either owner-trust or partnership-style tax treatment. The owner-trust partnership allowed nonconsolidation of the CMO liabilities to the residual investor. Therefore, if the CMO issuer could sell 51 percent or more of the

beneficial interest in the equity (or residual) of the CMO to a third party, the issuer could remove the collateral assets of the CMO from his balance sheet. With this development the secondary market for residuals was born.

In trust form, the CMO residual is an unregistered security that is placed privately by the issuer with investors. The form of the security is a certificate of beneficial ownership in the issuing trust. Many owner trusts that have been established to issue CMOs must be sold to qualified investors who will be able to meet ongoing net worth tests. These tests are different for each transaction, but all serve to effectively limit potential buyers to institutional investors who have adequate net worth. The fundamental reason for the requirement stems from the opinion of legal experts, who take the position that the CMO residual investors are the legal owners of the issuing entity. As such, they must be able to ensure that if the expenses of the trustee are not covered by residual cash flow, the residual owners will provide for those expenses. If the investors, as equity holders, did not have significant net worth, tax authorities might consider the CMO bond holders to be the real owners of the trust. In such a case both the collateral income and the bond interest might be taxable to the bond holders.

### The TIMs Initiative

Determined to fulfill the dream of a multiclass pass-through, mortgage bankers and some friendly legislators undertook to amend housing legislation and the tax law to make it possible. In 1983 and 1984, the Mortgage Bankers Association and Fannie Mae spearheaded a lobbying effort leading to the TIMs (Trusts for Investment in Mortgages) initiative, but the effort folded under opposition by the investment bankers to the participation of Fannie Mae (see Chapter 1). Sears Mortgage Securities in 1983 structured a pass-through-type CMO, but the IRS issued a directive that such an issue would be taxed as a corporation (see Chapter 1).

### The REMIC Impact

The pressure continued to build, however, and finally with the inclusion of the REMIC legislation in the 1986 Tax Reform Act a multiclass pass-through became permissible if the REMIC election was taken (for full discussion of the REMIC legislation, see Chapter 1). When first introduced, the REMIC election could be used only for the issuance of all-fixed–rate classes, but in 1987 legislative amendments permitted floating classes to be issued under the REMIC election as well.

Under the REMIC election, there are two classes of interests, the regular interests and the residual interest. The regular interests may look like the familiar tranches of a CMO or take other forms. The breakthrough for the

**398**                                                                                          Chapter 14

residual secondary market was that under the REMIC structure the residual interest is a bond class in the multiclass REMIC offering and, therefore, may be freely traded, avoiding the awkwardness of the private placement process in the owner trust as described above. Furthermore, as part of the REMIC bond issue, the residual interest by definition is a qualifying real property loan investment.

## SOURCES OF RESIDUAL CASH FLOWS

The residual interest (residual) represents the cash-flow remainder after all debt-service and administrative expenses of the bond issue have been met. Figure 14.1 illustrates the flow of funds for a generic CMO issue. The numbers 1, 2, and 3 on the figure specify the priority in the order of cash-flow distributions; note the residual holder receives distributions after priorities (1) and (2) have been met.

### Fixed-Rate CMO Residuals—Bear Market Bias

The primary source of the residual interest derives from the coupon differential between the average weighted coupon of the MBS or mortgage collateral held in the trust and the weighted average of all the coupon payments due to be paid on the CMO bonds. In periods of a positively sloped yield curve the coupon differential could be considerable. Consider, for example, the coupon structure of the four-tranche CMO as illustrated in Table 14.1.

**FIGURE 14.1**
CMO Cash Flow

