# EXHIBIT JJ

**Table of Contents**

SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(A) of the Securities
Exchange Act of 1934 (Amendment No.   )**

Filed by the Registrant   ☑

Filed by a Party other than the Registrant   ☐

Check the appropriate box:

☐  Preliminary Proxy Statement
☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a–6(e)(2))
☒  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material Under Rule 14a–12

Merrill Lynch & Co., Inc.

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing proxy statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☑  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a–6(i)(1) and 0–11.

   (1)  Title of each class of securities to which transaction applies:

   (2)  Aggregate number of securities to which transaction applies:

   (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0–11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)  Proposed maximum aggregate value of transaction:

   (5)  Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0–11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)  Amount Previously Paid:

   (2)  Form, Schedule or Registration Statement No.:

   (3)  Filing Party:

   (4)  Date Filed:

Annual Meeting of Shareholders
April 27, 2007

Merrill Lynch Hopewell Campus
1550 Merrill Lynch Drive
Hopewell, New Jersey



2007 Proxy Statement
Merrill Lynch & Co., Inc.

## BENEFICIAL OWNERSHIP OF OUR COMMON STOCK

### Ownership by Our Directors and Executive Officers

We believe that share ownership by Directors, officers and employees helps to align their interests with the interests of shareholders. We also believe that this alignment has been an important factor in the long–term returns we have achieved for our shareholders.

The following table contains information about the beneficial ownership of our common stock by each of the Directors, the Chief Executive Officer and the named executive officers and by all Directors and named executive officers considered as a group. In addition, we have provided information about ownership of stock–linked instruments that provide economic exposure to our common stock but do not represent actual beneficial ownership of shares. This information is as of February 28, 2007, the record date.

**Amount and Nature of Beneficial Ownership**

| Name | Position | Total Beneficial Ownership (1) | Common Stock (2) | Stock Options (3) | Stock Units (4) |
|---|---|---|---|---|---|
| Armando M. Codina | Director | – | – | – | 6,995 |
| Virgis W. Colbert | Director | – | – | – | 1,389 |
| Jill K. Conway | Director | 27,049 | 9,377 | 17,672 | 13,555 |
| Alberto Cribiore | Director | 43,333 | 35,000 | 8,333 | 14,647 |
| Jeffrey N. Edwards | Chief Financial Officer | 789,886 | 455,455 | 342,703 | – |
| Ahmass L. Fakahany | Executive Vice President | 937,197 | 612,200 | 338,474 | – |
| John D. Finnegan | Director | 3,554 | – | 3,554 | 7,215 |
| Gregory J. Fleming | Executive Vice President | 912,904 | 672,809 | 254,797 | – |
| Dow Kim | Executive Vice President | 794,042 | 794,042 | 20,828 | – |
| Robert J. McCann | Executive Vice President | 1,231,680 | 587,697 | 658,685 | – |
| Judith Mayhew Jonas | Director | – | – | – | 1,389 |
| David K. Newbigging | Director | 34,329 | 16,657 | 17,672 | 14,635 |
| E. Stanley O'Neal | Director, Chairman and CEO (5) | 3,214,358 | 1,363,774 | 1,884,889 | – |
| Aulana L. Peters | Director | 4,079 | 4,079 | – | 32,005 |
| Joseph W. Prueher | Director | 17,601 | 869 | 16,732 | 11,010 |
| Ann N. Reese | Director | 6,992 | 4,480 | 2,512 | 6,853 |
| Charles O. Rossotti | Director | 7,012 | 4,500 | 2,512 | 9,252 |
| Directors and named executive officers as a group | | 8,024,018 | 4,560,941 | 3,569,363 | 118,951 |

(1) This column presents the total shares of common stock that are beneficially owned or can be acquired within 60 days of the record date. No individual Director or named executive officer beneficially owns more than 1.0% of our outstanding common stock. The Directors and named executive officers as a group beneficially own approximately 0.91% of our outstanding common stock. None of our Directors or named executive officers has pledged any of our common stock as security.

(2) Except as noted, the Directors and named executive officers have sole voting and investment power over the shares of common stock listed. Of the common stock held by Mrs. Peters, 3,412 shares are held in a trust for which she has shared voting and investment power.

(3) This column includes 3,463,077 stock options held by the Directors and named executive officers that are exercisable as of the record date or within 60 days of the record date, and are, therefore, also included in the Total Beneficial Ownership column. The number of stock options exercisable as of the record date or within 60 days of the record date for the named individuals are as follows: Mrs. Conway 17,672; Mr. Cribiore 8,333; Mr. Edwards 334,431; Mr. Fakahany 324,997; Mr. Finnegan 3,554; Mr. Fleming 240,095; Mr. Kim 0; Mr. McCann 643,983; Mr. Newbigging 17,672; Mr. O'Neal 1,850,584; Admiral Prueher 16,732; Mrs. Reese 2,512; and Mr. Rossotti 2,512.

(4) Stock units are linked to the value of our common stock and generally are paid in shares of common stock at the end of the applicable restricted or deferral period. None of the stock units are payable within 60 days of the record date.

(5) Mr. O'Neal also serves as the President and Chief Operating Officer of the Company.

equity firms and hedge funds. These entities actively compete for talented financial services professionals, offering them highly attractive alternative compensation opportunities. There is also strong demand for senior financial services professionals to manage the portfolio companies owned by private equity firms.

**Recent trends in the structure and operating model of the financial industry have intensified the competition for talented financial professionals.**

The overall demand for experienced financial services professionals continues to grow as globalization has led to capital markets expansion and innovation in both developed and emerging markets. In particular the demand for scarce, specialist risk management, product development and trading skills has grown significantly as the importance of capital deployment in global markets and investment banking activities has increased. Global capital markets are expanding rapidly in sophistication, depth and diversity as financial services innovation is a priority for most developing economies. This growth in financial markets is a key ingredient in the successful development of the global economy and has led to increased demand for financial services professionals with global experience and capabilities.

New business models provide alternative, entrepreneurial opportunities for talented financial services professionals. Examples include the growth in hedge funds (there are now more than 9,000 hedge funds globally) and the development of independent financial advisors, both of which have benefited from technological innovation that has lowered entry costs and enabled the efficient outsourcing of costly back-office functions. With the emergence of these new business models, relationships between individuals are often as important as relationships between institutions. The range of options for individuals and select teams is sustaining growth in compensation levels and providing a new benchmark of entrepreneurial opportunity, often within private organizations, against which many employees calibrate their career and compensation choices.

Technological innovation has also led to reduced margins in several traditional elements of the financial services business so that increasingly, the success of our business is tied to employee-driven innovation in the deployment of capital to generate incremental returns for clients and shareholders.

**The competitive environment influences the structure, as well as the absolute level, of compensation for key executives and producers.**

In light of the factors outlined above, Merrill Lynch applies a compensation framework that emphasizes variable pay, uses substantial stock-based compensation to support alignment with stockholders and retention of employees and ensures that compensation opportunities are competitive in the markets in which we operate. Merrill Lynch has a long-standing practice of emphasizing stock as a substantial component of compensation for its key executives and producers. This practice promotes an alignment of interests between shareholders and employees and fosters an ownership culture, which increases employee focus on returns across the economic and business cycles. Stock-based compensation also provides a risk/reward profile comparable to the entrepreneurial opportunities available at private competitors, in that total rewards are driven in large measure by the ability to generate superior returns. We believe that our shareholders are also well served by the use of stock compensation because of the retention value inherent in the vesting period.

**Compensation Rationale and Objectives**

At the end of 2005, in support of a Board and management review of our strategic priorities over the next three to five years, we took a number of steps to increase emphasis on longer-term performance. As a result, we made several changes in the compensation structure for key senior executives, including the named executive officers:

- We substantially increased the equity component of total annual compensation to 60% (one of the highest equity percentages in our Peer Group) and reduced the cash component accordingly, so that a higher

Merrill Lynch 2007 Proxy Statement 35 

percentage of compensation is subject to vesting and potential forfeiture and dependent on future share prices.

- We adopted guidelines requiring executive officers to retain 75% of the net after–tax value of their equity holdings on an annual basis.

- We invited each executive officer to participate in the Managing Partner Incentive Program (MPP or MP program), a three–year performance–based program that is tied to the Company's annual ROE performance in 2006, 2007 and 2008. Under the MPP, a portion of annual equity compensation is allocated to this performance–based program. These amounts may be reduced or completely forfeited if specified ROE goals are not met, and there is also upside opportunity if target goals are exceeded. The MPP created a strong partnership incentive by rewarding top executives equally for firm–wide team achievements regardless of individual pay levels. The MPP also has a strong retention element because it is subject to four–year cliff vesting and cannot be easily replicated or replaced by our competitors.

The key objectives of our approach to executive compensation are outlined below:

**We Pay for Performance.** Our annual incentive compensation programs emphasize the variable component of compensation and compensate executives and key employees based on individual, business unit and Company–wide performance measured against pre–determined objectives. We believe this approach drives profitability and competitive advantage for the Company and for our shareholders. In determining compensation for our executives, we consider Company performance both on an absolute basis and relative to our Peer Group. We emphasize variable pay as the core of our compensation policy to provide a strong incentive to increase financial performance and enhance returns to shareholders. In addition, our industry is highly sensitive to market conditions and this approach enables us to control costs when revenues decline in down markets and to increase variable pay when revenues are growing in expanding markets. We also strive to remain disciplined in our approach to compensation; although overall compensation expense tends to increase with revenue growth, we have been able to reduce our ratio of compensation expense to net revenues for the last four years even as we repositioned our businesses and took advantage of opportunities for growth.

**Our Compensation Programs Support Retention and Alignment with Shareholders.** We pay a significant portion of variable annual incentive compensation in the form of annual restricted share grants that contain restrictive covenants and vest incrementally over a four–year period. The equity component of annual compensation helps us retain our executives because it is subject to forfeiture if an executive leaves the Company prior to vesting for any reason other than retirement. Consequently, because a large portion of each executive's annual bonus is not paid in the year it is earned, the cost of leaving the Company can be significant to both the executive and the competition. By emphasizing the stock component of annual pay, we encourage key employees to establish long–term careers with Merrill Lynch, which helps us recruit our leaders from inside the Company. Their experience and long–term perspective benefit us as we grow our businesses and take measured risks in complex financial markets. Over time, their wealth is increasingly concentrated in Merrill Lynch stock, which intensifies their focus on the long–term performance of the Company and ensures alignment with our shareholders because a significant portion of their net worth will increase or decrease with the Company's stock price. In addition, our stock retention guidelines require executive officers to retain 75% of the net after–tax value of their equity holdings on an annual basis, and executive officers are not permitted to hedge their exposure to Merrill Lynch stock.

**We Offer Compensation Opportunities that are Competitive in Our Industry.** We offer compensation opportunities that are comparable to those of our competitors so that we can attract, retain and motivate the executive officers and key employees who are essential to our success. With this in mind, we remain informed about competitive pay levels and take them into account as we determine compensation within our pay–for–performance philosophy. Our information is based on independently prepared compensation survey results conducted by compensation consultants and publicly–reported information for executive officers and key employees with similar responsibilities and experience at Peer Group companies. We focus primarily on

 36 Merrill Lynch 2007 Proxy Statement

[Table of Contents](#)

aggregated and reported compensation information from The Bear Stearns Companies Inc., Citigroup Inc., The Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Lehman Brothers Holdings Inc. and Morgan Stanley (collectively, the Peer Group). The MDCC also uses the financial performance of the Peer Group to measure our relative performance in making year–end compensation decisions. We have used this Peer Group for compensation and performance comparisons for a number of years, as we believe that these firms have profit margins in key businesses and a business mix most similar to our own and compete directly for the same talent pool globally. This Peer Group also serves as a proxy for our other non–traditional competitors – such as hedge funds and private equity funds – who also compete for this talent pool but do not make compensation information publicly available.

**Components of Executive Compensation**

**Annual Pay for Executive Officers.** The primary components of our annual pay to our executive officers are summarized in the following table.

| Annual Pay for Executive Officers | Description | Delivery | Comments |
|---|---|---|---|
| **Base Salary** | Base salary typically represents less than 3% of total compensation. | 100% in cash, paid bi–weekly. | Executive salaries are based on job function and are typically reviewed annually. |
| **Annual Incentive Compensation (Annual Bonus)** | Performance–based incentive compensation that can vary significantly from year to year. | Paid in January for performance in the prior fiscal year.<br><br>Delivered in a combination of cash and equity–based grants with 60% of total compensation for executives delivered as equity.<br><br>For 2006, the equity portion was 100% restricted stock. | Variable, increasing or decreasing annually, based on individual, business unit and company–wide performance.<br><br>Not formulaic; performance based. |

*Equity Portion of the Annual Bonus.* We pay a significant portion of annual incentive compensation for executive officers in the form of stock–based compensation. Under our current programs, 60% of combined salary and annual bonus for our executive officers is paid in equity. Restricted stock awards are delivered in lieu of cash bonus compensation and represent an integral part of the annual incentive compensation paid for performance in the prior fiscal year. As a result, restricted stock awards are not subject to further performance–based vesting requirements. These awards contain restrictive covenants against post–termination competition, use of confidential information and solicitation of employees and remain subject to forfeiture during the vesting period.

- *Vesting and Retirement Treatment.* Restricted stock awards for executives vest in 25% increments over the four years following the year of grant. This is a change from our previous policy of four–year "cliff vesting," in which 100% of the award vests in the fourth year following the grant. We made this change for the 2005 performance year for all employees who participate in our stock plans. At the same time, we introduced a new definition of retirement in our stock grants to make it more difficult for employees to retain grants when they leave the Company, even if they do not join a competitor. Grants made for the 2006 performance year permit executives and employees to retain grants upon retirement if, at the time they retire, their combined age and length of service with the Company equals a total of at least 60 and they do not join a competitor of Merrill Lynch or breach any other covenant in the grant during the vesting period. Under earlier grants, employees

Merrill Lynch 2007 Proxy Statement 37 

**Table of Contents**

**Summary**

The following table sets forth the annual compensation approved by the MDCC for performance in fiscal year 2006, based on the methodology described above.

### 2006 ANNUAL EXECUTIVE COMPENSATION

| Executive | Salary | Cash Bonus | Stock Grant | Managing Partner Incentive Program (1) | Total |
|---|---|---|---|---|---|
| E. Stanley O'Neal | $ 700,000 | $ 18,500,000 | $ 26,800,000 | $ 2,000,000 | $ 48,000,000 |
| Jeffrey N. Edwards | 270,833 | 5,625,000 | 8,183,333 | 666,667 | 14,745,833 |
| Dow Kim | 350,000 | 14,450,000 | 20,200,000 | 2,000,000 | 37,000,000 |
| Gregory J. Fleming | 350,000 | 13,250,000 | 18,400,000 | 2,000,000 | 34,000,000 |
| Ahmass L. Fakahany | 350,000 | 11,650,000 | 16,000,000 | 2,000,000 | 30,000,000 |
| Robert J. McCann | 350,000 | 8,850,000 | 11,800,000 | 2,000,000 | 23,000,000 |

(1) Represents the portion of the executive's 2006 stock bonus retained by the Company as a contribution to three–year participation in the MPP.

**The stock grant amounts shown above represent the dollar value of the portion of 2006 annual incentive compensation delivered as restricted stock. These amounts are different from the amounts included in the Summary Compensation Table under "Stock Awards," which are calculated as required by the SEC disclosure rules and represent expense related to awards for multiple performance years (including the expense for the full fair value of awards for two performance years for Mr. O'Neal, Mr. Edwards, Mr. Fakahany and Mr. McCann). See the disclosure in "Tax, Accounting and Regulatory Factors" and the "Summary Compensation Table," footnote 2, in this Proxy Statement for more information.**



and annual contributions to our broad–based defined contribution retirement plan in 2006 were: (i) $11,000 for each of Messrs. O'Neal, Edwards and Fakahany; (ii) $8,800 for each of Messrs. Kim and Fleming; and (iii) $13,200 for Mr. McCann.

Because the FAS 123R value of Merrill Lynch's restricted shares and MP units is based on the fair market value of Merrill Lynch's common stock, which includes an expectation of a future stream of dividends, amounts paid as dividends or dividend equivalents on outstanding equity awards are not included in the "All Other Compensation" column.

### GRANTS OF PLAN–BASED AWARDS

| Name | Grant Date (1) | Restricted Stock; Number of Shares of Stock (1)(2) | Grant Date Fair Value of Restricted Stock (3) |
|---|---|---|---|
| E. Stanley O'Neal | 1/22/07 | 279,677 | $ 26,800,049 |
| Jeffrey N. Edwards | 1/22/07 | 85,399 | 8,183,359 |
| Dow Kim | 1/22/07 | 210,801 | 20,200,006 |
| Gregory J. Fleming | 1/22/07 | 192,017 | 18,400,029 |
| Ahmass L. Fakahany | 1/22/07 | 166,972 | 16,000,092 |
| Robert J. McCann | 1/22/07 | 123,142 | 11,800,082 |

(1) Merrill Lynch delivers its annual stock grants in January for performance in the preceding fiscal year; therefore, this column reflects the restricted stock awards granted in January 2007 for performance in 2006. In January 2006, we granted stock awards for performance in 2005 and MP units relating to the full three–year participation in the MPP. Those awards are reflected in full in the "Outstanding Equity Awards at Fiscal Year–End" table in this Proxy Statement.

The grants in the table were made under the Merrill Lynch & Co., Inc. Long–Term Incentive Compensation Plan and the material terms of the grants are described under "Compensation Discussion and Analysis – Equity Portion of the Annual Bonus" in this Proxy Statement. The number of restricted shares set forth above was obtained by dividing the dollar amount of the award by $95.825, the fair market value (average of the high and low) of a share of Merrill Lynch common stock on January 22, 2007, the grant date.

(2) These awards were made entirely in restricted shares of Merrill Lynch's common stock. Restricted shares convey all the rights of a shareholder, including the right to vote and receive dividends, but are subject to forfeiture upon termination of employment and may not be sold or transferred during the vesting period. These restricted shares vest in four annual installments of 25% on January 31 in the years 2008 to 2011.

(3) The amounts shown in this column represent the fair value in accordance with FAS 123R of the annual grants for 2006 performance as of the grant date (January 22, 2007). See footnote 14 to the consolidated financial statements included in our 2006 Annual Report for an explanation of the methodology and assumptions used in the FAS 123R valuation. For each executive in the table the value of the awards shown above plus the amounts shown in the "Bonus" column of the "Summary Compensation Table" are less than the amount yielded by the shareholder–approved formula discussed under the heading "Compensation Discussion and Analysis – Tax, Accounting and Regulatory Factors – Internal Revenue Code Section 162(m)," in this Proxy Statement.

 50 Merrill Lynch 2007 Proxy Statement