91.     Over the next few months, Merrill Lynch worked feverishly to sell down that position.  Because of the credit-market meltdown, however, Merrill Lynch was able to unload only about half of its untenable position and wound up at the end of the 2007 fiscal third quarter still holding $15 billion in unattractive CDOs that have not been sold to investors.

92.     A July 2007 Euromoney article entitled *Best CDO House: Merrill Lynch* stated, in part, the following:

> It is hard to ignore Merrill Lynch in the CDO market – it is just so big. Its global issuance grew from $26.5 billion to $55 billion last year – a jump of 110%. But sheer size can bring its own problems and it is often hard to keep at the cutting edge of innovation while managing flows of this magnitude....It also maintained its traditional dominance of the global CDO rankings, claiming a 12.2% market share for 2006, which rises to 17.9% for the first quarter of 2007.

93.     On September 21, 2007, Merrill Lynch closed its purchase of First Republic Bank for $1.8 billion.  Based on the merger agreement, the aggregate consideration would be paid with 50% Merrill Lynch common stock and 50% cash.  The exchange rate used to calculate the number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill Lynch's average closing price over the five trading days preceding Sept. 21, 2007, which was $75.02 per share.[35]

94.     As described in a lawsuit against Merrill Lynch by First Republic shareholders,[36] to obtain approval for the merger Merrill Lynch filed three registration statements (dated May 8, 2007, June 8, 2007 and June 21, 2007) that were materially false and misleading because none

---

[35] *See* Merrill Lynch Press Releases: *Merrill Lynch to Acquire First Republic Bank for $1.8 Billion* (Jan. 29, 2007); *See also Merrill Lynch and First Republic Bank Successfully Close Merger; Final Results of Election Regarding Merger Consideration Announced* (Sept.21, 2007).

[36] The plaintiffs are now Merrill Lynch shareholders because they exchanged their First Republic shares for Merrill Lynch shares.

disclosed the truth about Merrill Lynch's CDO and subprime exposure of $43 billion and its third quarter write-downs of $7.8 billion.[37]

95.    Had Merrill Lynch disclosed the truth about its CDO and supbrime losses and exposure, Merrill Lynch's stock would have dropped in value – as it did when the company disclosed any write-downs related to its CDO and subprime exposure starting on Oct. 5, 2007.

96.    As a result, Merrill Lynch would have had to issue a greater number of shares to purchase First Republic, which would have had a dilutive effect on its post merger pro forma earnings per share.   As a consequence, the merger may not have been approved by First Republic's Board of Directors or its shareholders.   Merrill therefore failed to disclose the truth about its exposure and losses to CDO and subprime securities until three weeks after the merger closed and therefore was able to purchase First Republic with inflated stock.

97.    On December 22, 2007, the Economist estimated subprime defaults would reach a level between U.S. $200-300 billion.[38]

98.    By year end 2007, subprime related positions forced Merrill Lynch to report back-to-back quarterly losses that exceeded the previous two years' net income.

**Defendants Knew the CDO securities Underwritten and Purchased by Merrill Lynch had were Risky and Illiquid Securities Despite their AAA ratings**

99.    Various investigatory bodies, Wall Street analysts and the public at large have questioned, why should any tranche of correlated triple B rated assets ever have received a AAA bond rating simply because it had been repackaged into a new security.

---

[37] *See Class Action Complaint for Violation of Federal Securities Laws, Conn v. Merrill Lynch, et. al.,* (Dec. 28, 2007) (No: 07-cv-11626).

[38] *See The credit crunch: Postcards from the ledge,* The Economist, Dec. 19, 2007.

100.    For example, 75% of the issuance of one of Merrill Lynch's CDOs, Norma CDO I Ltd. ("Norma") was initially rated AAA despite the fact underlying assets, were largely of credit default swaps on "triple B" (the lowest investment-grade rating) mortgage backed securities and securities of other CDOs.    Within less than a year Moody's downgraded seven of the nine tranches to junk and and Fitch downgraded all nine tranches to junk.[39],[40]

101.    "The whole idea," says Brad Hintz of Bernstein Research, "is taking a pool of risky, illiquid bonds and, through the magic of securitization, offering higher yields than on similarly rated securities."[41]

102.    According to the Herny Paulson's Policy Statement on Financial Market Developments, underwriters of CDOs "shopped" for credit ratings in the process of issuing new CDO securities.    CDO underwriters often did not disclose to investors in their CDOs the preliminary ratings they received from the Credit Rating Agencies.

103.    In fact, Mr. Riccardi "was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group. A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings[.]"

---

[39] *See* Carrick Mollenkamp and Serena Ng, Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch, Wall Street Journal, Dec. 27, 2007.

[40]    Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime mortgage related securities (29%).    The three tranches that were downgraded to junk were initially rated AAA , AA  and BBB (all investment grade).

[41]    Shawn Tully, *Wall Street's money machine breaks down:    The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

104.    The practice of re-securitizing subprime related assets that have already been securitized once, twice or even three times[42] generated fees for a handful of big banks without actually spreading risks among the new CDO securities issued because the purchasers of the CDO securities was a rather small pool of investors (mostly the banks engaged in underwriting CDOs). "Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York structured-finance consultancy. "If you hold my risk and I hold yours, we can say whatever we think it's worth and generate fees from that. It's like . . . creating artificial value."[43]

105.    Such cross-selling benefited banks like Merrill Lynch because it helped support the flow of new CDOs and underwriting fees. Each CDO sold some of its CDO securities to the next CDO, which could repackage securitize those securities again into a new CDO issuance to provide additional underwriting fees. Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDO securities.[44]

---

[42] Merrill Lynch exacerbated the already high level of risks inherent in subprime CDO securities with several "innovations" in its underwriting practices. Merrill Lynch created CDOs, such as Norma, where the underlying collateral were also CDO securities. Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall Street Journal, Dec. 27, 2007. See also Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, Wall St. J., Oct. 25, 2007. CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared" and a CDO squared that adds another layer of securitization is referred to as "CDO cubed."

[43] The fair market value of CDO securities held my Merrill Lynch should also have declined based on the news rising foreclosures, falling home prices and the increase in interest rates, predictably changed the value for CDO securities. Bloomberg article *Fed Adds $38 Billion in Funds, Most since September 2001*, August 10, 2007.

[44] According to Greg Medcraft, chairman of the American Securitization Forum, the use of derivatives "multiplied the risk," of the newly issued CDO securities. The potential losses are greater than anyone expected because it is not just physical loans that are defaulting. *Id.*

106. "It is a tangled hairball of risk," Janet Tavakoli, a Chicago consultant who specializes in CDOs, described how risky Norma's CDO securities were: "In March of 2007, any savvy investor would have thrown this . . . in the trash bin."[45]

107. Moreover the fact that Merrill Lynch paid money to enter credit default swap contracts with non-investment grade financial guarantors to "insure" against the risk of loss of its portfolio of "super senior" CDO and subprime securities, demonstrates that the company knew that these securities were risky and illiquid assets, despite their initial AAA rating. Since then the fact that many of Merrill Lynch's CDOs have been downgraded to junk or are in default, which confirms what the company knew long before they disclosed this information to its employees and the investing public.

## Stock Repurchase Plan

108. On April 30, 2007, Merrill Lynch issued a press release announcing that the Company's Board had authorized the repurchase of up to $6 billion of the Company's outstanding common shares ("Stock Repurchase Plan"). The press release stated in pertinent part as follows:

> NEW YORK, April 30, 2007 — Merrill Lynch & Co., Inc. (NYSE: MER) today announced that its board of directors has authorized the repurchase of up to $6 billion of the company's outstanding common shares.
>
> * * *
>
> The authorization will be exercised from time to time, subject to market conditions, the relative attractiveness of other capital deployment opportunities, and regulatory considerations. Any repurchases are intended to make appropriate adjustments to the company's capital structure.

---

[45] Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall Street Journal, Dec. 27, 2007.

109. Commenting on the announcement, Defendant Edwards stated that the Stock Repurchase Plan "will enable us to continue to be active and flexible in managing our equity capital. We seek to balance increasing our return on equity and growing our book value per share. To achieve this goal, our primary focus is to deploy capital into profitable growth opportunities. But to the extent we generate excess capital, we will continue to use share repurchases, as well as cash dividends, to return capital to stockholders."

110. The Stock Repurchase Plan was recommended to the Company's Board by the Finance Committee. According to Merrill Lynch's proxy dated March 16, 2007, one of the Finance Committee's responsibilities is that it "reviews and recommends capital management policies related to our common stock, including dividend policy, repurchase programs and stock split." At the time of the $6 billion repurchase authorization, the Finance Committee was comprised of four directors: Defendants Charles O. Rossoti, Ann N. Reese, John D. Finnegan and Alberto Cribiore. Defendant Finnegan is the Chairman of the Finance Committee. Amongst other things, the Finance Committee is responsible for overseeing Merrill Lynch's credit and market risk management. By recommending that the Board approve the Stock Repurchase Plan, the Finance Committee failed to fulfill its oversight responsibilities.

111. In authorizing the Stock Repurchase Plan, Merrill Lynch's Board completely abdicated their duties owed to the Company and failed to fulfill their oversight responsibilities. The Board allowed the Company to waste a substantial amount of capital through the Stock Repurchase Plan at a time when the eventual need to raise additional capital to repair Merrill Lynch's balance sheet after the impact of the impending write-downs should have been readily apparent.

43

112.    The Director Defendants owed a duty to Merrill Lynch and its shareholders to be reasonably informed about the business and operations of the Company.  The Stock Repurchase Plan is not the product of reasonable business judgment and exposes the Director Defendants' failure to fulfill their oversight responsibilities to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

### Defendants Cause Merrill Lynch to Issue False-and-Misleading Financial Statements

113.    Throughout the Relevant Period, Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes.

114.    There is evidence that Merrill Lynch had substantial warnings of the impending subprime crisis.  A Merrill Lynch analysis report on December 5, 2006, that losses on recent subprime deals could be 6% to 8% if home prices were flat in 2007 and in double digits if home prices fell by 5%.  The report further stated that falling home prices could trigger losses not only in riskier classes of mortgage-backed securities, but also in investment grade bonds.[46]

115.    As early as 2006 the imminent collapse of the subprime lending industry was widely-documented.   In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.[47]   Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.

---

[46] *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[47] Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.

116.   Nevertheless, in 2007, the Director and Officer Defendants caused or allowed the Company to issue materially false and misleading statements, and omitted to disclose information necessary to make such statements not false and misleading.

117.   In a January 18, 2007 press release, Defendant O'Neal made several false and misleading statements. The press release discussed fourth quarter and full year 2006 financial results and stated, in part, the following:

> NEW YORK, January 18 – Merrill Lynch (NYSE: MER) today reported record full year net revenues, net earnings and earnings per diluted share for 2006, driven by strong growth in the firm's business segments. Net earnings for 2006 were $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to $34.7 billion. Pre-tax earnings increased to a record $10.4 billion, the pre-tax profit margin rose to a record 30.1%, and the return on average common equity increased to 21.3%. Book value per common share was $41.37, up 15% from 2005.

> \*     \*     \*

> "We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "*By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent*. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

> Fourth quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71% from the year-ago quarter but down 24% from the third quarter of 2006, which included the one-time net gain from closing the BlackRock transaction. Similarly, pre-tax earnings of $3.4 billion were up 65% from the year-ago period but down 19% from the third quarter, as net revenues of $8.6 billion were up 27% from the year-ago quarter and down 13% sequentially. The fourth quarter pre-tax profit margin was 39.0%, and the annualized return on common equity was 25.6%.

**Global Markets and Investment Banking (GMI)**

GMI generated record revenues and pre-tax earnings for both the fourth quarter and full year 2006, as targeted investments around the world to expand and diversify its portfolio of businesses and geographic reach continued to enable the group to capitalize on a favorable market environment.

GMI generated $18.9 billion in net revenues for the full year 2006, up 37% from 2005, driven by record revenues in both Global Markets and Investment Banking. Pre-tax earnings were $7.1 billion, up 43% from the prior-year period. The pre-tax profit margin was 37.6%, up from 36.0% in 2005 demonstrating operating leverage even as substantial investments were made across the business.

GMI's fourth quarter 2006 net revenues were $5.4 billion, up 55% from the year-ago quarter. Compared with the fourth quarter of 2005, net revenues increased in all three major business lines:

> Fixed Income, Currencies and Commodities net revenues of $2.3 billion increased 70%, setting a quarterly record, driven by every major business line, in particular record revenues from credit products, commodities and foreign exchange, as well as strong growth from trading interest rate products.

> Equity Markets net revenues of $1.8 billion increased 49%, driven by nearly every major business line, led by the private equity, proprietary trading and cash trading businesses.

> Investment Banking net revenues of $1.3 billion set a quarterly record, up 41%, as record revenues from debt and equity origination more than offset a decline in revenues from merger and acquisition advisory activities.

Pre-tax earnings for GMI were $2.6 billion, up 73% from the year-ago quarter, driven by the strong revenue growth and continued discipline over expenses, especially compensation expenses. The fourth quarter 2006 pre-tax profit margin was 48.4%, compared with 43.4% in the prior-year period.

At the beginning of the fiscal first quarter of 2007, Merrill Lynch completed its acquisition of the First Franklin mortgage origination and servicing businesses from National City Corporation (NYSE: NCC) for $1.3 billion.

118. During a conference call on January 18, 2007 discussing the 2006 fourth quarter results, Defendant Edwards stated, in part, the following:

> GMI had nothing short of an outstanding quarter across nearly all businesses and regions. With $5.4 billion in revenues, GMI set a new quarterly record, up 21% sequentially and 55% year on year. Pre-tax earnings for the quarter of $2.6 billion, up 76% sequentially and 73% from the year-ago quarter. GMI's pre-tax margin of

48.4% was an all-time high, driven both by strong revenue growth and operating leverage achieved through discipline over compensation costs.

"This record fourth quarter completed a record full year for GMI. Net revenues of $18.9 billion were the highest ever, up 37% from 2005, with double-digit percentage increases coming from each division and each region."
"Pre-tax earnings growth was even stronger at 43% to $7.1 billion, as GMI achieved solid operating leverage even as significant investments continued to be made across the business. The full year pre-tax margin was 37.6%."

"Looking at the revenue detail within GMI, fourth quarter FICC net revenues set another new record at $2.3 billion, up 11% from the third quarter and 70% from last year's fourth quarter, as business activity remained strong across virtually every business."

Investment banking also set a revenue record in the fourth quarter, with $1.3 billion in net revenues, up 59% sequentially and 41% year on year. Advisory revenues of $286 million were up 10% from the third quarter but down 18% from the particularly strong fourth quarter of 2005. However, revenues from both debt and equity origination set new quarterly records.

"We look back at 2006 as a year of exceptional growth and strategic progress at Merrill Lynch. Financial performance was very strong, and that is our primary scorecard."

119.   During this earnings call, Defendant Edwards stated the following:

[O]ur Investment Banking business continued to make great strides ranking number one for the quarter in global equity and equity linked underwriting league tables and number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space. For the year we also ranked in the top five in global high yield origination for the first time since 1998, and this is the first year since 2003 that any non-commercial bank player has cracked the top five in this crucially important product category.

120.   On February 26, 2007, Merrill Lynch filed its Form 10-K for fiscal 2006, signed by Defendant O'Neal, which included results for the fourth quarter and full year 2006, and included the same financial results as previously reported.  The 2006 Form 10-K mentioned the word "subprime" (or "sub-prime") only three times and never mentioned the word "CDO" (or "Collateralized Debt Obligation").  Merrill Lynch also falsely represented that its "risk management and control process ensures that our risk tolerance is well-defined and understood

47

by our businesses as well as by our executive management." *Merrill Lynch Annual Report* (Form 10-K) (Dec. 31, 2006). The Form 10-K stated in part:

> During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including both interest rate and credit derivatives, principal investing/real estate, and foreign exchange.

> Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

> In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity-linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

121. Merrill Lynch also stated in its 2006 10-K, which was signed by Defendant O'Neal, that the Company retained only $6.8 billion worth of all securitizations in 2006, which included CDOs:

> In certain instances, Merrill Lynch retains interests in the senior tranche, subordinated tranche, and/or residual tranche of securities issued by certain SPEs created to securitize assets.
>
> Retained interests in securitized assets were approximately $6.8 billion and $4 billion at December 29, 2006 and December 30, 2005, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have observable market prices. These retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity.

122. The 2006 Form 10-K was signed by Defendants O'Neal, Edwards, Codina, Cribiore, Finnegan, Rossoti, and Prueher. In addition, Defendants O'Neal and Edwards signed Certifications to the Form 10-K stating:

1. I have reviewed this annual report on Form 10-K for the fiscal year ended December 30, 2005 of Merrill Lynch & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

123.    On April 19, 2007, Merrill Lynch issued its financial results for the first quarter of

2007,[48] which had several false and misleading comments by Defendant O'Neal.   The release

stated in part:

> Merrill Lynch today reported strong growth in net earnings and earnings
> per diluted share for the first quarter of 2007, driven by net revenues of
> $9.9 billion. Net revenues were up 24 percent from the prior-year period
> and up 14 percent from the fourth quarter of 2006, with increases both
> year over year and sequentially in both Global Markets & Investment
> Banking (GMI) and Global Wealth Management (GWM), and in all global
> regions. These are the second-highest quarterly net revenues Merrill
> Lynch has ever generated, only $51 million lower than in the third quarter
> of 2006, when net revenues included a $2.0 billion one-time, pretax gain
> arising from the merger of Merrill Lynch Investment Managers (MLIM)
> with BlackRock, Inc.
>
> First-quarter 2007 net earnings per diluted share were $2.26, up 414
> percent from 44 cents for the first quarter of 2006, or 37 percent on an
> operating basis, which excludes $1.2 billion, after taxes, of one-time
> compensation expenses from the 2006 first quarter. Net earnings per
> diluted share were down 6 percent from $2.41 for the fourth quarter of
> 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent
> from the first quarter of 2006, or up 31 percent excluding the one-time
> expenses in the prior-year period. Net earnings were down 8 percent from
> the fourth quarter of 2006, which included a lower compensation expense
> ratio. The pretax profit margin for the first quarter of 2007 was 31.4
> percent, and the annualized return on average common equity was 23.3
> percent. At the end of the first quarter, book value per share was $41.95,
> up 13 percent from the end of the first quarter of 2006 and 1 percent from
> the end of 2006.

---

[48]   Merrill Lynch adopted the new accounting standard SFAS 157 in the first quarter of 2007.
Under SFAS No. 157, companies are required to assess the fair value of assets on their books.
Merrill Lynch must label its assets as Level 1, 2, or 3, based on how easy they are to price.  The
three-level hierarchy gives the highest priority to quoted prices in active markets for identical
assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3).  SFAS No.
157 also requires that where no liquid market exists, Merrill Lynch attempt to value assets using
other observable inputs such as: quoted prices for similar assets or liabilities in other markets,
whether active or inactive; observable inputs, other than quoted prices, such as interest rates,
yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates; and
inputs that are derived principally from or can be corroborated by market data.  Changes in the
observability of valuation inputs may result in a reclassification for certain financial assets or
liabilities.  See Merrill Lynch Quarterly Report (Form 10-Q) (March, 2007).

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. . . .

**Global Markets & Investment Banking (GMI)**

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

GMI's first-quarter 2007 net revenues were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

> Fixed Income, Currencies and Commodities (FICC) net revenues ncreased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of

Merrill Lynch's total net revenues over the past five quarters.

Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first-quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

## Global Wealth Management (GWM)

GWM generated strong revenue and pretax earnings growth in the first quarter of 2007. The growth was driven by Global Private Client (GPC), which increased its net revenues year over year for the 10th consecutive quarter, as well as by the contribution of Global Investment Management (GIM), including earnings from Merrill Lynch's investment in BlackRock. GPC continues to focus on delivering a superior product and service offering, positioning Merrill Lynch financial advisors (FAs) as essential partners to their clients. GPC also continues to invest in technology to further enhance both the efficiency and effectiveness of the FA force, and to invest in growing the FA census globally.

GWM's first-quarter 2007 net revenues were $3.4 billion, up 16 percent from the first quarter of 2006:

GPC's net revenues increased 11 percent to $3.1 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products. Transaction and origination revenues also increased, driven by new issue origination activity, and net interest revenues grew to a new record level.

GIM's net revenues increased 151 percent to $261 million, due primarily to revenues from Merrill Lynch's investment in

BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment management companies and the business that creates alternative investment products for GPC clients.

Pretax earnings for GWM in the first quarter of 2007 were $842 million, up 31 percent from the first quarter of 2006, driven by the growth in revenues. The pretax profit margin was 24.7 percent, up from 21.9 percent in the prior-year period, driven by the impact of the investment in BlackRock.

Turnover among FAs, especially top-producing FAs, remained low. FA headcount reached 15,930 at quarter-end, as GPC continued to exercise discipline in recruiting and training high-quality FAs.

Client assets in products that generate annuitized revenues ended the quarter at $633 billion, up 13 percent from the first quarter of 2006, and total client assets in GWM accounts were a record $1.6 trillion, up 10 percent. Net inflows of client assets into annuitized-revenue products were $16 billion for the first quarter, and total net new money was $16 billion.

On January 29, 2007, Merrill Lynch announced that it had reached a definitive agreement to acquire First Republic Bank (NYSE: FRC), a private banking and wealth management firm focused on high-net-worth individuals and their businesses, for approximately $1.8 billion in cash and stock.

124. The April 19, 2007 press release was drafted and approved by Defendants O'Neal and Edwards. Moreover, Defendants Cribiore, Finnegan, Reese and Rossoti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the press release announcing the quarterly results. Defendants Jonas, Prueher, Reese and Rossoti, as members of the Audit Committee, were responsible for the preparation and integrity of the Company's financial statements, including the quarterly financial results. Specifically, the Audit Committee charter required Defendants Jonas, Prueher, Reese and Rossoti to meet with both the Company's auditor and the Company's

management, including Defendants O'Neal and Edwards, prior to release of the quarterly financial results.

125.    In the first quarter conference call with analysts on April 19, 2007, Defendant Edwards stated:

> I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation. Let me put this business into context. As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as    our CDO activity involving subprime, including all the retained interests, you would see that revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters. And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.

> That said, this is an asset class that will continue to be significant, both in the U.S. and worldwide. And the strategic importance of the First Franklin acquisition was clearly evident this quarter, as having both origination and servicing capabilities enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.

> I would also point out that our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets. In fact, we've been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned.

> At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors. Finally, it's important to understand that we manage our FICC businesses in aggregate as a portfolio and that portfolio delivered record revenues for the quarter. On a broader basis, most FICC markets experienced a continued favorable environment characterized by both high levels of client activity and opportunities for proprietary trading, enabling outstanding results as we continue to build out our capabilities in areas that are poised for growth.

126.    During this April 19, 2007 call Investment Analyst, William Tanona of Goldman Sachs asked Edwards:

**Q - William Tanona**: ...And then, your commentary there in terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business. Can you share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**A - Jeffrey Edwards**: Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume. And on the subprime business, maybe just a couple of more comments there.

While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. And we did that in a background where we were enhancing our already strong underwriting standards. We rationalized our array of products, eliminating certain products that were performing less well, and we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin, of First Franklin-originated paper fall steadily throughout the quarter. They started out and remain at a level far below the industry.

So I think the trends there show some signs of positiveness, and while it is early to say anything obviously about the second quarter, I'd just point out that we did our First Franklin securitization earlier in the week. It was a $2 billion securitization and we saw spreads tighter really across all tranches from where they were a month ago, as investors have clearly begun to reengage.

127.   In a conference call dated April 20, 2007 discussing the first quarter 2007 results,

Defendant Edwards stated, in part, the following:

"This morning, Merrill Lynch reported another outstanding quarter."

Highlights include:

Very strong performances across both business segments, including record net revenues from Fixed Income Currencies and Commodities, or FICC, as well as from Equity Markets and Investment Banking

"Non-U.S. net revenues comprised 39% of Merrill Lynch's total net revenues for the quarter, and 54% of net revenues in Global Markets and Investment Banking, or GMI. Both those proportions set new quarterly records."

"In key businesses in both GMI, and Global Wealth Management, or GWM, we continue to successfully execute our strategy to broaden and deepen our platform."

"Non-U.S. net revenues comprised 39% of Merrill Lynch's total net revenues for the quarter, and 54% of net revenues in Global Markets and Investment Banking, or GMI. Both those proportions set new quarterly records."

"GMI turned in another record-setting performance as momentum accelerated across its expanding global portfolio of businesses, and investments for growth continued to pay off."

"Now turning to FICC, which produced an outstanding first quarter performance. Net revenues in FICC set a new record for the third consecutive quarter."

"At this point, we believe the issues in this narrow slice of the market [the sub-prime market] remain contained and have not negatively impacted other sectors."

"Finally, it's important to understand that we manage our FICC businesses in aggregate as a portfolio — and that portfolio delivered record revenues for the quarter."

"Now to Investment Banking, which generated record net revenues for the second quarter in a row, at $1.4 billion up 4% from the fourth quarter and 47% year on year."

"This quarter's revenues were particularly strong in merger and acquisition advisory and leveraged finance, two core areas of focus for us, and were achieved despite the typical seasonal slowdown in broader market volumes."

"Our outstanding performance in investment banking underscores the progressively more powerful market position we have attained through key investments in personnel."

"We continue to be extremely pleased with the successful integration of MLIM and BlackRock, and refer you to their earnings release this morning for a review of their outstanding progress."

128.    Following the Company's announcement regarding its financial results for fiscal 2006, Merrill Lynch's stock traded above $90 at the end of April.

129.   On May 7, 2007, the Company issued its Form 10-Q, which was signed by Defendant Edwards.  The Form 10-Q stated the following:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices. The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.[49]

130.   Defendants Cribiore, Finnegan, Reese and Rossoti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the Form 10-Q.  Defendants Jonas, Prueher, Reese and Rossoti, as members of the Audit Committee, were responsible for the preparation and integrity of the Company's financial statements, including the quarterly financial results.  Specifically, the Audit Committee charter required Defendants Jonas, Prueher, Reese and Rossoti to meet with both the Company's auditor and the Company's management, including Defendants O'Neal and Edwards, prior to the release of the quarterly financial results.

131.   Attending a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime area were "reasonably well contained."  O'Neal added that, "There have been no clear signs it's spilling over into other subsets of the bond market, the fix-income market and the credit market."

132.   In July 2007, Merrill Lynch also reported its second-best ever net revenues for the FICC business, with little impact from exposure to mortgage-backed securities but failed to account for the actual valuation of the Company's warehouse of increasingly illiquid CDOs.

---

[49]  Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 30, 2007).

Merrill Lynch continued to tout the CDO business, citing "continued innovation in the CDO space, including the development of unique new CDO products" among the second quarter highlights for FICC. *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5. Yet, its FICC net revenues were in fact "partially offset by a ***decline*** in net revenues from the structured finance and investments business, which includes mortgage-related activities." (emphasis added) *Merrill Lynch Reports Second-Quarter 2007 Results: Net Earnings Per Diluted Share of $2.24, Up 37 Percent From Second Quarter 2006.*

133. In a July 17, 2007 Merrill Lynch conference call, Merrill Lynch re-affirmed its risk-management capabilities. Defendant Edwards, who was responsible for the Company's independent risk groups, explained that: "[w]hile we have seen some positive signals …the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize. Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ***ours have proven to be effective in mitigating the impact on our results***." *Merrill Lynch Second Quarter 2007 Analyst Conference Call, July 17, 2007* (emphasis added).

134. Defendant Edwards also answered questions from UBS Investment Analyst Glenn Schorr and Deutsche Bank's Mike Mayo during the call and reassured investors and the market that the Company was prepared to weather the volatile CDO market:

> **Q - Glenn Schorr**: … Can we switch to the other one that you brought up, in terms of both subprime and CDO exposure? You are one of the largest – or the largest – underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment on related to some of the Bear hedge funds what collateral you have taken on your books or have not. And just overall comfort there, as well.

> **A - Jeffrey Edwards**: Okay. Well, look, again I want to make two points. The first is that this is another example where I think proactive, aggressive risk

management has put us in exceptionally good position. Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market. Our warehouse lines are down materially, our whole-loan inventory is down materially. As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market. …

**Q - Glenn Schorr**: Maybe just a last thing, yes or no – obviously, yes – but point of clarification, therefore anything you're financing in your repo business or through your prime brokerage business or on your own books, you've, to the best of your knowledge at the end of quarter is marked to an effective market even if it is a mark to model type of security?

**A - Jeffrey Edwards**: Yeah, that's right. I mean, obviously we have a very robust process around marking these assets, and we're confident in how they were marked, how they'll mark.

***

**Q - Mike Mayo**: …Can you remind us what percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

**A - Jeffrey Edwards**: Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. I don't think there's anything that would change that comment that I made in the first quarter.

**Q - Mike Mayo**: Then lastly, a tougher question perhaps, how much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**A - Jeffrey Edwards**: Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets. From an overall asset standpoint, again the point I would make there is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.

**Q - Mike Mayo**: Okay. Do you have an overall number, though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**A - Jeffrey Edwards**: We don't disclose our capital allocations against any specific or even broader group.

135. During the conference call, Defendant Edwards also stated, in part, the following:

This outstanding revenue performance was broad-based, with significant year-over-year increases in all major business lines and regions, and is a testament to the successful execution of our diversification and growth strategies. The critical importance of these efforts was evident in the quarter, as we were able to deliver these strong overall results, despite lower revenues from our private equity business, which contributed significantly less than in recent quarters; and in spite of persistently challenging conditions in the U.S. sub-prime mortgage market.

Global Markets and Investment Banking, or GMI, again generated very strong results, as our investments in all three core business lines continue to produce robust and diversified year-on-year growth. GMI's second quarter net revenues of $6.2 billion, were 36% higher than the second quarter of last year, and down just 5% from the record first quarter. For the first time, non-U.S. revenues represented more than 60% of GMI's total net revenues for the period.

Looking at GMI's second quarter net revenues by major business line, FICC net revenues were the second-best ever at $2.6 billion, up 55% from the second quarter of 2006, and only 7% lower than the record first quarter. For the first six months, FICC generated record revenues of $5.4 billion, up 45% from last year. Compared with the second quarter of 2006, the increase in revenues was driven primarily by increases from trading both credit and interest rate products, the latter of which set a record for the second consecutive quarter. Revenues from commodities were also up substantially. The depth and strength of these increases more than offset a decline from mortgages.

The sequential decline in FICC revenues was driven primarily by credit, commercial real estate and currencies, which had offset revenue records in the first quarter, as well as commodities. Partially offsetting these declines was a substantial increase from structured finance and investment, which primarily reflect a better performance from our U.S. sub-prime mortgage activities, and to a lesser extent the continued growth in global rates.

Importantly, we have increasingly diversified our FICC business within and across asset classes and regions, creating many different drivers of growth. Our strong 55% revenue increase in the quarter reflects the breadth of both very active client flows and attractive markets for proprietary risk-taking.

Some additional highlights for FICC in the second quarter include: record revenues in EMEA and the Pacific Rim for the second consecutive quarter; continued strength in distressed and structured credit trading; continued

innovation in the CDO space, including the development of unique new CDO products involving foreign exchange and hybrid long/short structures; and in commodities, continued diversification of the platform with the first meaningful revenues from trading coal and our first major structured transaction in metals.

... *I think proactive aggressive risk management has put us in exceptionally good position.* Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management, I think, has certainly helped transform our risk profile since the end of the year.

136.    However, Defendant Edwards failed to disclose that the Company had $43 billion dollars in exposure to risky and illiquid CDO securities and subprime mortgages; that crucial information was withheld until October 24, 2007.[50] *See* Form 8-K (Oct. 24, 2007).

137.    According to the *New York Times*, Merrill Lynch's Board had been informed of its subprime exposure and CDO obligations as early as April and July 2007, respectfully.[51] Despite the Company's vast exposure to CDOs and subprime, the Board failed to take any action to decrease the risks faced by the Company or to protect investors from the increasing risks posed by the acquisition and holding of Merrill's shares particularly in light of the failure to make adequate disclosures.

138.    Disclosing its exposure from its proprietary positions in CDO and subprime securities was critical for investors to understand the true risk of owning Merrill Lynch stock because the subprime crisis would not have been "a dire problem for Merrill if it hadn't gone

---

[50]   The Company first disclosed in their Oct. 24, 2007 8-K that it had $40.1 billion of CDO and subprime related net exposures as of June 29, 2007. *See* Merrill Lynch Form 8-K (Oct. 24, 2007).  However, in its Sept 2007 10-Q filed with the SEC on Nov. 7, 2007, the Company restated the value of its June 29, 2007 CDO and subprime net exposure at $42.7 billion. *See* Merrill Lynch For, 10-Q (Sept. 28, 2007).

[51]   *See* Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

from simply manufacturing CDOs and reaping fees to becoming a huge investor in the CDOs it created . . . Merrill was willing, even eager, to speculate with its own balance sheet[.]"[52]

139.    On July 17, 2007, Merrill Lynch announced its financial results for the second quarter of 2007. In this press release, Defendant O'Neal made false or misleading comments. The release stated, in part, the following:

> Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.
>
> Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.
>
> Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.
>
> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline

---

[52] *See* Shawn Tully, *Wall Street's money machine breaks down: The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

\*       \*       \*

**Merrill Lynch Investment Managers (MLIM)**
On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

\*       \*       \*

64

**Income Taxes**

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

**Share Repurchases**

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

140.    The July 17, 2007 press release was drafted and approved by Defendants O'Neal and Edwards.  Moreover, Defendants Cribiore, Finnegan, Reese and Rossoti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the press release announcing the quarterly results. Defendants Jonas, Prueher, Reese and Rossoti, as members of the Audit Committee, were responsible for the preparation and integrity of the Company's financial statements, including the quarterly financial results.  Specifically, the Audit Committee charter required Defendants Jonas, Prueher, Reese and Rossoti to meet with both the Company's auditor and the Company's management, including Defendants O'Neal and Edwards, prior to the release of the quarterly financial results.

141.    During July of 2007, the problems in the housing market, coupled with the credit crisis, led to significant declines in the stock prices of many financial institutions.  However, Merrill Lynch's stock, while declining, remained at artificially inflated levels due to the false and misleading statements and financial results issued and publicly disseminated by the Individual Defendants.

142.     To summarize, Merrill Lynch became the largest underwriter of CDOs over the past few years.  The Company also purchased CDO securities despite the obvious signs that the subprime and CDO market was deteriorating.  When those markets collapsed, the Company found itself exposed to billions in losses from securities it could no longer sell because they were almost completely illiquid and had lost most, if not all, of their value.

143.     Nonetheless, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors throughout the Relevant Period.  Defendants knew or should have known that the Company's stock price would drop drastically and that investors would lose billions, once the truth was exposed.

144.     Merrill Lynch's statements during the Relevant Period were materially false and misleading because they failed to disclose and misrepresented the following material, adverse information: (a) that the Company was more exposed to CDOs backed by high-risk subprime debt than it publicly disclosed and (b) that the Defendants failed to inform the market of the extent of likely write-downs in the Company's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill Lynch's portfolio to be impaired.

145.     The Individual Defendants had actual knowledge of the foregoing material, adverse non-public information concerning the Company.  The Individual Defendants also knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known that the Company's statements were false and materially misleading because of Defendants' failure to disclose the foregoing material, adverse information concerning Merrill Lynch's financial predicament and the true state of its business prospects.

## Merrill Lynch is Forced to Write Down Over $8 Billion in Bad Debt

146.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs.  The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim.[53]  *Bloomberg News* also reported that: "The company severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses."

147.    Unfortunately, the damage to its business had already been done. On October 5, 2007, Merrill Lynch announced that it would be writing down the value of its CDOs by $4.5 billion.  Merrill Lynch further estimated that it would lose as much as 50 cents per share.  The comment shocked analysts who had been expecting a profit of around $2 a share.

148.    Defendant O'Neal, commenting on the announcement, stated that "[d]espite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our FICC business than we expected earlier in the quarter."

149.    Although prohibited from speaking on the record, investment bankers, traders and financial advisers quietly expressed disbelief, frustration and a bit of self-interested concern over what the write-down would do to their pay.  "Money at risk doesn't bother me," one senior broker said. "It's the risk of the money. Is it being run intelligently? If you take a $5 billion hit, my question is, do these guys know what they are doing?"[54]

---

[53]  *See* Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.

[54]  Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

150.    "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."[55]    Or, as stated by one corporate and securities law professor, "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective.  It turns out, they weren't."

151.    As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around."  But on October 3, 2007, the risks to Merrill were still understated and only partly disclosed.

152.    Then, just three weeks later, on October 24, 2007, Merrill Lynch admitted that its losses would actually total $7.9 billion.  In addition to a $463 million write down on leverage-buyout commitments, Merrill Lynch's total write downs for 2007's third fiscal quarter were over $8.3 billion.  The Company also announced a loss of $2.2 billion, or $2.85 a share, for the quarter – nearly six times the size of the loss Merrill Lynch had predicted just three weeks earlier.   Shares of Merrill Lynch fell $3.80, or 5.7%, to $63.32 following this announcement.

153.    During a conference call on October 24, O'Neal admitted that risk management had failed the firm, and that errors in judgment had allowed Merrill to amass an untenable $32 billion position in CDOs.  According to O'Neal, "We made a mistake."  "Some errors in judgment were made in the business itself and within the risk management function." O'Neal also warned that further write downs were a possibility. Indeed, some analysts estimate the

---

[55]  *Id.*

Company might have to write down those assets anywhere from $4 billion to $5 billion in the

fiscal fourth quarter. Defendant O'Neal commented in pertinent part as follows:

> Over the past few weeks, our FICC management team, led by David, has worked with out Finance staff to undertake a rigorous and comprehensive review of our remaining CDO and subprime related exposures. This collective review has resulted in the use of more conservative valuation assumptions, and a total net write-down of approximately $7.9 billion for this quarter.
>
> ***
>
> The bottom line is that we got it wrong by being over-exposed to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market. No one, no one, is more disappointed than I am in the result.
>
> ***
>
> Despite the fact that nearly all of our remaining CDO exposure is super senior, it turned out that both our assessment of the potential risk and our mitigation strategies were inadequate
>
> ***
>
> We're not, I'm not, going to talk around the fact that there were some mistakes that were made. We, I am accountable for these mistakes, just as I am accountable for the performance of the firm overall. And my job, our job, the leadership team's job – is to address where we went wrong and what changes were necessary, to make sure that we respond to changes in risk dynamics early, correctly, and in every asset class at every stage of the market's evolution.
>
> ***
>
> So, as I have mentioned, we have made a number of important changes....

154. Despite the magnitude of the announcement, both Defendant O'Neal and

Edwards, refused to provide complete, straight-forward information regarding the Company's

disposition of its inventory of CDOs. One analyst asked the executives about apparent

inconsistencies in the accounting of their subprime losses between the second and third quarter

of 2007, "As of the end of June you noted that your ABS CDO related exposure was around $32

billion, $15 as of the end of September. You marked down around $6. Where did the other $11 go?"[56] Defendant O'Neal repeatedly refused to comment.[57]

155. A Lehman Brothers analyst asked whether the existing CDO exposures are held in broker / dealer accounts or on the Company's balance sheet. Defendant Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient." *See* Merrill Lynch Third Quarter 2007 Earnings Conference Call.

156. On October 24, 2007, Merrill Lynch issued a press release containing several false and misleading comments from Defendant O'Neal. The release stated, in part, the following:

> Merrill Lynch today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.
>
> Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's

---

[56] *See also Merrill Lynch Quarterly Report* (Form 10-Q) (Sept. 30, 2007Q).

[57] Discrepancy eventually explained in Sept 2007 10-Q.

third-quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following

discussion of business segment results exclude the impact of these one-time items.

## Global Markets & Investment Banking (GMI)

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. See below for details.

Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

Equity Markets net revenues increased 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

157. Immediately after Merrill Lynch released this adverse information, the Company's shares dropped from $67.12 per share to an intra-day low of $61.40 per share, closing at $63.22 per share on volume of 52 million shares.

158.    As a result of this massive write off, Moody's Investor Service and other agencies have downgraded the firm's credit and debt ratings.  Further, S&P reduced Merrill Lynch's credit rating to negative, causing the Company' stock price to drop to $60.90 per share.

159.    Neither Defendant O'Neal nor Defendant Edwards could explain why the Company's write-down of asset values – based on a fixed date in time – had nearly-doubled in only three weeks.  In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time."  If that statement is true, it is reasonable to infer that the Company realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

160.    The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's stock.  News articles chronicled the FICC business' recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

### It Takes an Egregious Act of Hubris by O'Neal
### Before the Board Decides to Show him the Door

161.    By any measure, O'Neal's tenure at Merrill Lynch was rocky at best.  Since becoming chief executive in late 2002, Merrill Lynch's shares had an annual return of about 7 percent before dividends, compared with returns of 11 percent for Morgan Stanley and 24 percent for Goldman Sachs.  Indeed, at the end of 2007's fiscal third quarter, Merrill Lynch's earnings per share were down 241% from the year before and the share price was down 34% from just a few months earlier in June 2007.  These returns were far and away worse than those of any of Merrill Lynch's competitors.

162.     Incredibly, Merrill Lynch's flat performance and $8.3 billion in write downs were not, by themselves, enough for the Director Defendants to fire O'Neal.  Rather, O'Neal had to attempt to accomplish a staggering breach of loyalty before he was shown the door.

163.     Specifically, on October 26, the *New York Times* reported that O'Neal had contacted one of Merrill Lynch's competitors, Wachovia Bank, about a potential merger.  He did so without informing Merrill Lynch's Board or obtaining its permission.  Why did O'Neal makes such an overture to Wachovia?  It wasn't because he thought it would be in the best interests of the Company.  Rather, O'Neal stood to make $250 million in severance pay if there was a change in control of the Company.

164.     Upon publication of the *New York Times* article, rumors quickly spread that the Board was incensed by his actions and that O'Neal was on his way out.  Sure enough, just a few days later, on October 30, Merrill Lynch announced that O'Neal had retired, effective immediately.  Unbelievably, the Director Defendants gave O'Neal a severance package worth more than $160 million as a parting gift.  That day, the Company's stock closed at $65.56 per share, down 14% from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

**Merrill Lynch Continues to Suffer as Defendants' Wrongdoings are Exposed**

165.     An October 24, 2007 MarketWatch article entitled *Merrill's CDO push comes back to bite firm* stated, in part, the following:

> In late 2002, Merrill (MER) was a minor player in CDOs, but by the end of 2003, the firm had become the largest underwriter of the products in the world. It retained that lead in 2004, 2005 and 2006.
> That fast expansion came back to bite Merrill on Wednesday as the investment bank reported an unexpectedly large third-quarter loss from almost $8 billion in write-downs. Most of that came from the firm's exposure to CDOs, built up from years of underwriting the products.