**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (JSR) |
| This Document Relates To: Derivative Action, 07cv9696 (JSR) (DFE) | |



## VERIFIED THIRD AMENDED SHAREHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT

## INTRODUCTION

1.     This is a shareholder's class and double-derivative action complaint brought by Miriam Loveman, a former long-term shareholder of Merrill Lynch & Co., Inc. ("Merrill" or "Merrill Lynch") who became a shareholder of Bank of America Corporation ("Bank of America" or "BofA") pursuant to the merger of BofA with Merrill (the "Merger"), on January 1, 2009, pursuant to the Agreement and Plan of Merger, dated September 15, 2009, as amended on October 21, 2008 (the "Merger Agreement").   Pursuant to the Merger Agreement, each outstanding share of Merrill common stock was converted into the right to receive 0.8595 shares of BofA common stock (the "Merger Consideration"), Merrill became a wholly-owned subsidiary of BofA, and the BofA Board of Directors was expanded to include three former directors from Merrill's Board of Directors.

2.     This complaint is being filed pursuant to the Court's February 17, 2009 Opinion and Order, 07-cv-9633, Dkt. No. 200 (the "Opinion and Order").   The Court's Opinion and Order was later amended, on March 3, 2009, to reflect that the Opinion and Order only addressed Counts I-VIII in the Plaintiff's Verified Second Amended Shareholder and Class Action

Complaint, the shareholder derivative claims (the "Derivative Claims"). Amended Order, Dkt. No. 208. The Derivative Claims on behalf of Merrill Lynch were dismissed – without prejudice – based on the Court's holding that Plaintiff lost standing to assert claims on behalf of Merrill Lynch once it was acquired by Bank of America. *Id.* The Court's Opinion and Order on February 17, 2009, noted "that its dismissal is without prejudice to plaintiffs' filing with this Court if and when they have standing, a renewed action, recast as a derivative action against Bank of America, or as a so-called 'double derivative' action, or otherwise, but based on the same underlying allegations as the actions here dismissed." Opinion and Order, Dkt. No. 200 at 7. This complaint is being filed in accordance with the Court's Opinion and Order, and asserts in Counts I through XII below, double derivative claims against defendants named in those counts based on the claims of Merrill Lynch on behalf of its parent, BofA.

3.      The derivative claims in this action are brought for the benefit of Nominal Defendants Merrill and BofA against the members of Merrill's Board of Directors (the "Merrill Board"), BofA's Board of Directors, and certain current an former members of Merrill's Board of Directors, BoA's Board of Directors, and Merrill executive officers named as defendants in this action, seeking to recover derivatively on behalf of Merrill and BofA for their violations of the law, including breaches of fiduciary duties, corporate mismanagement, waste of corporate assets and unjust enrichment, relating to claims that arose prior to the Merger on behalf of Merrill that have financially harmed Merrill and BofA. The class action claims are brought on behalf of a proposed class of former shareholders of Merrill – who became shareholders of BofA – and have been harmed by, among other things, defendants' actions in connection with the Merger.

4.      Prior to announcement of the Merger, as a result of improper financial reporting and gross mismanagement, Merrill Lynch's credibility with investors, clients, federal regulators and the stock market was virtually destroyed.  In an effort to eliminate their own personal liability for the wrongdoing, on September 14, 2009, the defendant members of Merrill's Board and its senior executives negotiated the Merger with senior management of BofA, and that transaction was approved, ***within a period of less than 48 hours***, without any substantive due diligence, by the BofA Board.

5.      In connection with the Merger Agreement, BoA's Board agreed to the Merger. To ensure that the Merrill Defendants (as defined below) were completely insulated from any liability concerning their prior  breaches of their fiduciary duties alleged herein, the Merger Agreement, approved by the BofA Board, contained an ***iron-clad*** indemnification clause which states, in relevant part, that:

> [BofA] shall . . . , to the fullest extent permitted by applicable law, ***indemnify, defend and hold harmless***, and provide advancement of expenses to, each [Merrill Lynch officer and director] ***against all losses, claims***, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or ***in connection with any Claim based in whole or in part on*** or arising in whole or in part out of ***the fact that such person is or was a director or officer of [Merrill Lynch]*** or any of its Subsidiaries, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time ***(including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby)***….[1]

6.      In addition to approving the protections from liability described above, the BofA Board, again, without any due diligence, blindly approved ***$3.62 billion*** in bonus compensation for 2008 (a year in which Merrill suffered unprecedented losses in the tend of billions of dollars) to Merrill Lynch employees.

---

[1]   Merger Agreement at ¶ 6.6 (emphases added) (attached to Joint Proxy, defined *infra*, as Appendix A).

7.    Further, in anticipation of the Merger, BofA permitted Merrill to settle claims against its officers and directors in a consolidated securities fraud class action and an ERISA class action in an amount in excess of $500 million in cash, thereby further insulating the Merrill officers and directors from personal liability at the expense of Merrill's shareholders (and ultimately BofA's shareholders) with no provision for the individual defendants in those suits to share in the costs of the settlements or make any personal payments to obtain releases of their personal liability to Merrill Lynch's investors.

8.    On November 3, 2008, Merrill Lynch and BofA filed joint proxy statements with the SEC on Schedule 14A (the "Joint Proxy"), dated October 31, 2008,[2] seeking shareholder approval for the Merger from both companies' stockholders.[3]    Relying on Defendants' disclosures in the Joint Proxy and Supplemental Disclosure, on December 5, 2008, shareholders of Merrill Lynch and BofA voted in favor of approving the Merger, which was consummated on January 1, 2009.

9.    In fact, the Merrill Individual Defendants' breaches of fiduciary duty were so thorough and damaging to Merrill that, beginning in December 2008, Merrill Lynch's financial losses were quickly spiraling out of control.  By mid-November, ***prior to the shareholder votes on December 5, 2008***, Bank of America had watched Merrill Lynch's pre-tax quarterly loss approach $9 billion and – by November's-end – Merrill Lynch's pre-tax loss had swelled to

---

[2]  Merrill Lynch & Co., Inc., Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008); Bank of Am. Corp., Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008).

[3]  Pursuant to a November 21, 2008, memorandum of understanding with plaintiffs in the Court of Chancery and in the Southern District of New York actions, Merrill Lynch and BofA agreed to supplement the Joint Proxy and make certain additional disclosures related to the Merger (the "Supplemental Disclosure").  Merrill Lynch & Co., Inc., 8-K (Form 8-K) (Nov. 21, 2008); Bank of Am. Corp., 8-K (Form 8-K) (Nov. 21, 2008).

$13.3 billion, or $9.3 billion after taxes.[4]  By December 9, 2008, three days after the shareholder votes, Bank of America Chief Financial Officer Joe Price had informed the BofA Board that Merrill's pre-tax quarterly loss had reached $19 billion, or $14 billion net loss after taxes, and Bank of America Chief Executive Officer ("CEO") Kenneth Lewis informed the BofA Board that BofA would seek to abandon the Merger.[5]  Finally, by mid-December, Merrill Lynch's pre-tax quarterly loss had ballooned to $21 billion, or $15 billion net of taxes.[6]

10.     Faced with these unexpected "monstrous" Merrill lynch losses that BofA's Board failed to discover before the Merger Agreement was approved due to their failure to require or even inquire that any meaningful due diligence of Merrill's current and near term financial condition prior to approving the Merger, on December 17, 2008, BofA CEO, Kenneth Lewis, flew to Washington, D.C., to meet with then-Secretary of Treasury Henry Paulson and Federal Reserve Chairman Ben Bernanke to inform them that BofA would seek to cancel the Merger, pursuant to a Material Adverse Change ("MAC") clause in the Merger Agreement.[7]  The December 17, 2008 meeting concluded with Messrs. Bernanke and Paulson urging Kenneth Lewis to "finish the deal and not invoke a material-adverse change clause, saying it was in his interest to finish the deal."[8]

---

[4] Dan Fitzpatrick, Susanne Craig and Deborah Solomon, *In Merrill Deal, U.S. Played Hardball*, Wall St. J., Feb. 5, 2009, at A1

[5] *Id.*

[6] *Id.*

[7] *See id.*; *see also* Dan Fitzpatrick, Deborah Solomon and Susanne Craig, *Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury to Inject $20 Billion More; Stock at 1991 Level*, Wall St. J., Jan. 16, 2009, at C1.

[8] Dan Fitzpatrick, Deborah Solomon and Susanne Craig, *Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury to Inject $20 Billion More; Stock at 1991 Level*, Wall St. J., Jan. 16, 2009, at C1.

11.     Despite Merrill Lynch's staggering losses, BofA's efforts to avoid closing the Merger ended on December 21, 2008.  The events of December 21, 2008, were described in a letter written by the Attorney General of the State of New York ("N.Y. A.G."), Andrew M. Cuomo ("Cuomo"), which states, in part:

> [On December 21, 2008,] Lewis informed Secretary Paulson that Bank of America still wanted to exit the merger agreement.  According to Lewis, ***Secretary Paulson then advised Lewis that, if Bank of America invoked the MAC, its management and Board would be replaced. . . .***
>
> ***. . . .***
>
> ***Secretary Paulson's threat swayed Lewis.  According to Secretary Paulson, after he stated that the management and the Board could be removed, Lewis replied, "that makes it simple.*** Let's deescalate."  Lewis admits that Secretary Paulson's threat changed his mind about invoking that MAC clause and terminating the deal.[9]

12.     Consequently, although the breaches of fiduciary duty by Merrill Lynch's directors and officers had caused Merrill billions of dollars in damages, including the grant of $3.6 billion in wholly unearned, undeserved and wasteful bonus compensation; and although BofA had full knowledge of Merrill's breaches of fiduciary duty and breaches of covenants and warranties in the Merger Agreement, which would have enabled BofA to terminate the Merger Agreement; the BofA Board elected to proceed with closing the Merger, indemnifying all Merrill directors and officers, and waiving, in violation of their fiduciary duties, the ability of BofA to directly pursue Merrill Lynch's claims post-Merger against Merrill's officers and directors by providing the Merrill officers and directors with a waiver defense.

---

[9] Letter from Andrew M. Cuomo, Attorney General of the State of New York, to Christopher J. Dodd, Chairman U.S. Senate Committee on Banking, Housing, and Urban Affairs, *et al.* (Apr. 23, 2009) (*available at* http://www.oag.state.ny.us/media_center/2009/apr/pdfs/ BofAmergLetter.pdf) (emphases added).

13.     The BofA Board elected to close the Merger, with full knowledge of the value of the claims against the Merrill officer and directors to Merrill's former shareholder and subsequently, upon closing of the Merger to BoA, including that these Merrill Lynch officers and directors had concealed even greater losses than those previously reported to the public and revealed to BofA before approval of the Merger Agreement, for one single reason:  to preserve their own employment as officers and/or directors of BofA and the benefits to themselves and their outside enterprises those positions provided.

14.     The *fait accompli* Merger was consummated on January 1, 2009, wherein each share of Merrill Lynch was converted into 0.8595 shares of BofA and Merrill Lynch was merged into, and became a subsidiary of, BofA.  Sadly, for Merrill Lynch's former stockholders, as a final testament to Defendants' myriad breaches of fiduciary duty, the Merger Consideration which was valued at approximately $29 per-share when the Merger was first announced, had precipitously declined in value, to just $12.10 per-share, as of the closing date of the Merger.

15.     The damage to Merrill Lynch did not occur overnight and were not the fault of a single wrongdoer.  Rather, through the concerted effort of Merrill's senior management and its Board, Merrill was driven from the top tier of Wall Street investment houses to the abyss.  As James Post, Boston University School of Management professor and an expert on corporate governance and business ethics has stated: "*Merrill Lynch is a case study in 'corporate misgovernance.'*"

16.     Merrill Lynch had been in business for over 100 years.  Yet, on Monday, September 15, 2008, after devoting no more than a few hours over a weekend to the question, the Merrill Lynch announced that its Board had approved a transaction to sell Merrill to Bank of America at the fire sale price of just $29 per share, substantially below Merrill's value of over

$90 per share just a year before.  The sale was timed during the most critical moment of a short-term credit market crisis and was promoted as a rescue operation in order to induce Merrill shareholders to panic and blindly accept it.  The sale was the direct result of the directors' abdication and/or violations of their fiduciary duties over, at least, the prior two years, which had caused Merrill Lynch to become massively overexposed to toxic CDOs, many of which it had welcomed to its own balance sheet.  Indeed, the directors orchestrated the sale in large part to eliminate their own substantial liability for the claims asserted in this lawsuit.

17.     Merrill first announced material write-downs related to the value of these securities on October 24, 2007, when it officially became Wall Street's biggest loser in the subprime debacle.

18.     The massive damage caused to Merrill Lynch and its shareholders by its officers and directors caused the Merrill Board to ask for defendant O'Neal's resignation in October 2007.  His replacement, defendant Thain, expressed dismay in January 2008 at the inappropriate risks taken by his predecessors, stating that:  "They shouldn't be taking risks that wipe out the earnings of the entire firm."

19.     From 2002 to 2006, Merrill Lynch earned a staggering $22.6 billion in profits.  In stark contrast, the write-downs taken by Merrill Lynch ultimately surpassed $46 billion – incredibly, more than *double* the entire profit the firm earned over the four-year period preceding the first write-downs.

20.     Specifically, for the past several years, under the leadership of Merrill Lynch's former chief executive, defendant O'Neal, Merrill Lynch was the lead underwriter of billions of dollars of collateralized debt offerings ("CDOs") secured by risky, under-collateralized subprime mortgages.  As the subprime market began to collapse over the past several years, most

investment banks reduced their exposure to CDOs.  But not Merrill Lynch.  Defendant O'Neal caused Merrill Lynch to charge forward and become the world's leading underwriter of these risky investments.

21.     Of course, defendant O'Neal did not act alone.   Merrill Lynch's senior management supported and participated in the conduct with defendant O'Neal, and Merrill Lynch's directors approved, and often turned a blind eye, to defendant O'Neal's reckless strategy.  In other words, they completely abdicated their role of ensuring that Merrill Lynch had adequately managed its risk exposure.  Even worse, some of the defendants named in this action intentionally and/or recklessly caused Merrill Lynch to issue financial statements that concealed the dangers Merrill Lynch faced as a result of its huge exposure to CDOs.

22.     The Merrill Individual Defendants (as defined below) were aware of these unacceptable risks because they were active participants in taking specific steps which reduced the quality of the loans which were bundled together to form the CDOs that Merrill first sold in record numbers and then, when the market for such toxic securities vanished, imprudently purchased for Merrill's own balance sheet in record numbers.  The Merrill Individual Defendants did this *by actively directing the subprime mortgage lenders from whom Merrill was purchasing such loans to loosen their underwriting loans.*  The Merrill Individual Defendants either actively participated in such actions or were aware that the executives of Merrill Lynch were taking such action and did nothing to stop it or to mitigate the unacceptable risk Merrill faced due to such conduct.

23.     For example, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's designee to the board of subprime

originator Ownit, instructed Ownit founder Bill Dallas in January 2006 to materially lower its underwriting standards so Merrill had access to a greater number of subprime mortgages.

24.    The Merrill subprime house of cards began to collapse on October 24, 2007, when defendant O'Neal was forced to announce that Merrill Lynch would write down more than $8 billion in the value of its CDOs and other investments and would suffer a $2.2 billion loss in the third quarter of fiscal year 2007 alone.  This loss was at the time the largest quarterly loss in the 93-year history of the company.

25.    How did Merrill Lynch's Board punish O'Neal for this staggering loss?  They ignored unanimous demands from Wall Street and Merrill Lynch's shareholders to fire O'Neal and instead allowed O'Neal to retire, giving him an exorbitant severance package valued at more than $160 million.

26.    As explained below, the defendants named in this lawsuit breached their fiduciary obligations to exercise a high degree of due care, good faith, loyalty and diligence in the management and administration of the affairs of Merrill Lynch, as well as in the use and preservation of its property and assets.  Because the majority of the members of Merrill Lynch's Board at the time this suit was instituted approved the transactions giving rise to the claims herein, or are otherwise liable for those transactions due to their misfeasance and malfeasance, and that conduct resulted in the collapse of Merrill Lynch, plaintiff, a Merrill Lynch shareholder at the time these events occurred and a current shareholder of BofA, bring this action on behalf of Merrill Lynch (and for its parent, BofA) to, among other things, recover the damages caused to Merrill Lynch by these defendants' misconduct.

27.    As opposed to the massive damage caused to Merrill Lynch and its shareholders, the Merrill Lynch management who brought these disastrous events about have profited

handsomely from their wrongdoing.  The sale of Merrill to Bank of America resulted in billions of dollars of losses for Merrill Lynch shareholders, but the defendants were still paid obscenely large 2008 bonuses.  As reported in a September 17, 2008 article published by the *Boston Globe,* Merrill's CEO John Thain and two former Goldman Sachs Group Inc. colleagues he recruited may reap almost $200 million for their one year stint at Merrill if they leave or are given lesser roles after Bank of America buys Merrill Lynch.  According to the article:

> Thain, who got a $15 million bonus when hired in December, stands to get an additional $11 million in accelerated stock payouts if he doesn't stay after the deal . . . Trading chief Thomas Montag, 51, who joined in August, may get $76 million, including bonus and accelerated awards.

28.     Moreover, three of Merrill's directors will benefit because they have been asked to join Bank of America's board after the Merger.

29.     Moreover, having approved the Merger Agreement, with insufficient information, including the broad indemnification of the Merrill officers and directors and the outlandish bonuses to Merrill employees, and having failed to terminate the transaction when they learned the truth about the undisclosed losses at Merrill and the size of the bonuses permitted by the Merger Agreement, the members of the BoA Board, threatened with replacement as directors if they sought to terminate the Merger, resolved the conflicts of interest between their own personal pecuniary and business interests as directors of BofA and those of the BofA shareholders to whom they owed undivided loyalty.  Having approved the Merger in breach of their duties of care, and having consummated the Merger in breach of their duties of loyalty, the BofA Board disabled themselves from pursuing claims against the former Merrill officer and directors who they indemnified because, to pursue those claims after obtaining full knowledge of the breadth of the deception and undisclosed financial problems at Merrill, these BofA directors' actions provided the Merrill Lynch officers and directors with potential waiver defenses and thus face

11

liability for their decision to proceed with the Merger to the pre-Merger BofA shareholders who were injured by the BoA Board's decision to retain their directorships rather than terminate the Merger and abandoned their own ability to approve pursuit of the billions of dollars in damages suffered by BofA's new subsidiary following the Merger.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction of the claims asserted herein under Section of the Exchange Act [15 U.S.C. § 78aa], and defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets, and the principles of supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

31.     This Court also has jurisdiction over all claims asserted herein under 28 U.S.C. §1332, as complete diversity exists between Plaintiff and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and many of the false and misleading statements were made in or issued from this District.  .

33.     Venue is also proper in this District pursuant to 28 U.S.C. §1391(a) because: (i) Merrill Lynch maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial

portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and the negotiation of the Merger in violation of fiduciary duties owed to Merrill Lynch occurred in this District; and (iv) defendants receive substantial compensation in this District by doing substantial amounts of business and numerous other activities in this District.

## THE PARTIES

34.     Plaintiff Miriam Loveman, until the Merger, owned Merrill Lynch common stock before and at the beginning of the relevant period and, since the Merger, owns Bank of America common stock that she received as Merger Consideration in connection with the combination of BofA and Merrill Lynch, and she has continuously held the stock.  Plaintiff, who is a citizen of Baltimore, Maryland.

35.     Nominal defendant, Merrill Lynch, is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 4 World Financial Center, 250 Vesey Street, New York, NY 10080.  Merrill Lynch is a citizen of both New York and Delaware. On January 1, 2009, Merrill Lynch became a subsidiary of Bank of America Corporation.

36.     Nominal defendant, Bank of America, is a Delaware corporation with its headquarters located at Bank of America Corporate Center, 100 North Tryon St., Charlotte, NC 28255.  Bank of America is a bank holding company, which provides a diversified range of banking and nonbanking financial services world-wide.   It also provides consumer and commercial banking, asset management, global corporate and investment banking and equity investments. Bank of America has branch offices throughout the United States, including many in this District. Bank of America is a citizen of Delaware and North Carolina.

37.     Until his "retirement" from the Company on October 30, 2007, defendant E. Stanley O'Neal ("O'Neal") was a member of Merrill's Board since December 2001, the Chairman of the Merrill Board since 2003, and Merrill's Chief Executive Officer ("CEO") since 2002.  Previously, O'Neal had served as Merrill's President and Chief Operating and, prior to that, he had been in charge of Capital Markets and a Managing Director in investment banking, heading the financing services group, which included the high yield finance, restructuring, real estate, project and lease finance, and equity private placement groups. Before joining Merrill Lynch, O'Neal was employed at General Motors Corporation in New York and Madrid.  He held a number of financial positions at the company, including General Assistant Treasurer in New York, responsible for mergers, acquisitions and domestic financing activities.  He was Director at BlackRock, Inc., a premier provider of global investment management, risk management and advisory services to institutional and retail clients around the world. Upon information and belief, O'Neal is a citizen of New York.

38.     Defendant John A. Thain ("Thain") served as Chairman and Chief Executive Officer of the Company from 2007 until terminated on January 22, 2009 as part of the Merrill bonus scandal that rocked the financial community following the consummation of the Merger with BofA.  Prior to joining Merrill, Thain was CEO of NYSE Euronext which operates a group of securities exchanges and offers financial products and services.  From 1999 to 2004, Thain served as Chief Operating Officer of The Goldman Sachs Group, Inc., a financial services firm. Upon information and belief, Thain is a citizen of New York.

39.     Defendant Ahmass L. Fakahany ("Fakahany") was Co-Chief Operating Officer of Merrill Lynch from May 2007 until February 1, 2008, and Merrill's Co-President from May 16, 2007, to February 1, 2008.  In announcing Fakahany's resignation effective February 1, 2008,

news reports indicated that "Fakahany will leave the company as the brokerage builds a new management team following a credit implosion that triggered $12 billion in net losses in the second half of 2007. . . Before his promotion in May [2007] to co-president, Fakahany's duties included responsibility for market risk management as Merrill's build-up of risky collateralized debt obligations surged. Exposure to the subprime-laden debt vehicles backfired.  Soured CDO positions were mostly to blame for Merrill's $24 billion in write-downs last year and huge net losses. Company insiders told Reuters in late October [2007] they expected Fakahany to resign as Merrill's CDO problems mushroomed. Inside the company, he was seen as a close ally of ousted Chief Executive Stan O'Neal."  Fakahany joined Merrill Lynch in 1987, and held a number of global positions, including Senior Vice President and Finance Director for Merrill Lynch; Chief Financial Officer and Chief Administrative Officer for Corporate and Institutional Client Group (now GMI); Chief Administrative Officer of the Japan Region; Chief Financial Officer for the Asia Regions (Japan, Asia Pacific, Australasia); Japan Region Chief Financial Officer; and regional Controller for Europe, the Middle East and Africa (MLEMEA).  Fakahany served as an Executive Vice President of Merrill Lynch, a General Partner of Merrill Lynch Funds from December 2002 until May 16, 2007, and Chief Administrative Officer and Vice Chairman from March 2005.  Fakahany served as Chief Financial Officer of Merrill Lynch & Company Inc. from November 2002 to March2005.  Fakahany served as Chief Operating Officer for Global Markets and Investment Banking from October 2001 to November 2002, and Senior Vice President and Finance Director from December 1998 to October 2001.  Before joining Merrill Lynch, he held several senior finance positions with Exxon Corporation.  Upon information and belief, Fakahany is a citizen of New York.

40.     Defendant Gregory J. Fleming ("Fleming") was at all relevant times, President and Chief Operating Officer ("COO") of Merrill Lynch.  Mr. Fleming was the Executive Vice President from October 2003 to May 2007; President of GMI from August 2003 to May 2007; Chief Operating Officer of the Global Investment Banking Group of GMI from January 2003 to August 2003; Co-Head of the Global Financial Institutions Group of GMI from April 2001 to August 2003; Head of the United States Financial Institutions Group of GMI from June 1999 to April 2001; Managing Director of the Global Investment Banking Group of GMI from February 1999 to October 2003.  Upon information and belief, Fleming is a citizen of New York.

41.     Defendant Jeffrey N. Edwards ("Edwards") was Senior Vice President and Chief Financial Officer ("CFO") of Merrill Lynch from March 2005 until December 2007.  He also served as Vice Chairman and member of Merrill's Executive Client Coverage Group.  Edwards was the Senior Vice President and Head of Investment Banking for Americas region from September 2004 to March 2005; Head of Global Capital Markets and Financing from August 2003 to September 2004; Co-Head of Global Equity Markets (covering trading, sales and origination activities) from October 2001 to August 2003; prior to that, in March 2000, appointed Co-Head of Global Equity Capital Markets.  Upon information and belief, Edwards is a citizen of New York.

42.     Defendants O'Neal, Fakahany, Fleming, Edwards and Thain are sometimes collectively referred to in this Complaint as the "Merrill Officer Defendants."

43.     Because of their positions with Merrill, the Merrill Officer Defendants possessed the power and authority to control the contents of Merrill Lynch's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market.  They were provided with copies of Merrill's reports and press

16

releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with Merrill, and their access to material non-public information available to them but not to the public, the Merrill Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Merrill Officer Defendants are liable to BofA's shareholders for their breaches of their fiduciary duties as officers of Merrill pleaded below.

44.     Defendants O'Neal, Fakahany, and Fleming are also sometimes collectively referred to in this Complaint as the "Insider Selling Defendants." The Insider Selling Defendants, while in possession of material, nonpublic information regarding Merrill lynch's true business prospects, improperly sold Merrill Lynch stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions. As a result, the Insider Trading Defendants are liable for damages to Merrill Lynch for violations of the federal securities laws and, thereby, liable to BofA for such damages as Merrill lynch's successor in interest.

45.     Defendant Carol T. Christ ("Christ") was a member of Merrill Lynch's Board from 2007 until the Merger was consummated on January 1, 2009. She is also the President of Smith College since June 2002 and was the Executive Vice Chancellor and Provost of University of California, Berkeley from 1994 to 2000. Upon information and belief, Christ is a citizen of Massachusetts.

46.     Defendant Armando M. Codina ("Codina") was a member of Merrill Lynch's Board from 2005 until the Merger was consummated on January 1, 2009. Mr. Codina is also the

President and Chief Executive Officer of Flagler Development Group, a real estate investment, development, construction, brokerage and property management company since 2006.  He was also the Founder, Chairman and Chief Executive Officer of Codina Group, a real estate investment company, from 1979 until its merger with Flagler Development Group in 2006. Upon information and belief, Codina is a citizen of Florida.

47.      Defendant Virgis W. Colbert ("Colbert") was a member of Merrill Lynch's Board since 2006 and, after the Merger was consummated, he became a member of BofA's Board as of January 28, 2009.  Colbert is also the Senior Advisor to Miller Brewing Company since 2006 and was the Executive Vice President of Worldwide Operations for Miller Brewing Company from 1997 to 2005.  Upon information and belief, Colbert is a citizen of Wisconsin.

48.      Defendant Alberto Cribiore ("Cribiore") was a member of Merrill Lynch's Board from 2003 until the Merger was consummated on January 1, 2009.  He was the Founder and Managing Principal of Brera Capital Partners LLC, a private equity investment firm since 1997 and Co-President of Clayton, Dubilier & Rice, Inc., an equity investment firm, from 1985 to 1997.  Before 1985, he had been a Senior Vice President at Warner Communications, where he was responsible for mergers, acquisitions and divestitures. He serves on the Boards of Directors of 2-10 Home Buyers Warranty, a risk-management company, and GAB Robins, which provides the world's most comprehensive network of loss adjustment, risk management and investigative services.  Upon information and belief, Cribiore is a citizen of New York.

49.      Defendant John D. Finnegan ("Finnegan") was a member of Merrill Lynch's Board from 2004 until the Merger was consummated on January 1, 2009.  Mr. Finnegan is the President and Chief Executive Officer of The Chubb Corporation since December 2002 and Chairman since December 2003. Mr. Finnegan previously had been Executive Vice President of

General Motors Corporation and Chairman and President of General Motors Acceptance Corporation, a finance company and subsidiary of General Motors Corporation from May 1999 to December 2002. Upon information and belief, Finnegan is a citizen of New Jersey.

50.     Defendant Judith Mayhew Jonas ("Jonas") was a member of Merrill Lynch's Board from 2006 until the Merger was consummated on January 1, 2009. She was the Vice Chair of the London Development Agency from 2000 to 2004 and a Special Advisor to the Chairman at Clifford Chance from 2000 to 2003. Upon information and belief, Jonas is a citizen of the United Kingdom.

51.     Defendant Joseph W. Prueher ("Prueher") was a member of Merrill Lynch's Board since 2001 and, after the Merger was consummated, he became a member of BofA's Board as of January 28, 2009. Prueher resigned from the BofA Board as of June 17, 2009. In 2001, he also became board member for New York Life Insurance Company, a Fortune 100 company and one of the largest insurance companies in the United States and the world. On the investment side, New York Life's affiliates provide institutional asset management and trust services. Upon information and belief, Prueher is a citizen of Virginia.

52.     Defendant Ann N. Reese ("Reese") was a member of Merrill Lynch's Board from 2004 until the Merger was consummated on January 1, 2009. She was a Principal of Clayton, Dubilier & Rice, Inc., an equity investment firm, from 1999 to 2000 and Executive Vice President and Chief Financial Officer of ITT Corporation, a hotel and leisure company, from 1995 to 1998. She is also a member of The Financial Accounting Standards Board, which operates under the oversight of the Financial Accounting Foundation, responsible for funding the activities of both the FASB and its counterpart for state and local government, the Governmental Accounting Standards Board. Upon information and belief, Reese is a citizen of New York.

53.     Defendant Charles O. Rossotti ("Rossotti") was a member of Merrill Lynch's Board since 2004 and, after the Merger was consummated, he became a member of BofA's Board as of January 28, 2009.  He was the Senior Advisor to The Carlyle Group, a private global investment firm since 2003 and the Commissioner of Internal Revenue at the Internal Revenue Service from 1997 to 2002. He was also the Founder, Chairman of the Board, President and Chief Executive Officer of American Management Systems, an international business and information technology consulting firm from 1970 to 1997.  He is also the Director of AES Corporation since 2003.  In addition, he is a member of the Boards of Directors of Adesso Systems Corporation, Liquid Engines, Inc., and Compusearch Systems, Inc.  Upon information and belief, Rossotti is a citizen of Washington D.C.

54.     Defendant Aulana L. Peters ("Peters") was a member of the Board of Directorsof Merrill Lynch from 1994 until the Merger was consummated on January 1, 2009.  Peters is currently a member of the Management Development and Compensation Committee and the Public Policy & Responsibility Committee.  Peters is a former Commissioner of the SEC, a former partner of the law firm of Gibson, Dunn & Crutcher, and is a director of 3M, Northop Grumman, and John Deere.  Peters is a citizen of the State of California.

55.     Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese, Rossotti, and Thain are sometimes collectively referred to in this Complaint as the "Merrill Director Defendants."

56.     By reason of their positions as directors of Merrill Lynch, and because of their ability to control the business and corporate affairs of Merrill Lynch, the Merrill Director Defendants owed Merrill Lynch and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of

Merrill Lynch, as well as in the use and preservation of its property and assets.  The Merrill Director Defendants were required to act in furtherance of the best interests of Merrill Lynch and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  By virtue of their duties, the Merrill Director Defendants were obligated to use their best efforts to act in the interests of Merrill Lynch and shareholders to ensure that no waste of corporate assets occured.  The Merrill Director Defendants, because of their positions of control and authority as directors and/or officers of Merrill Lynch, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.    The Merrill Officer Defendants, Insider Selling Defendants and Merrill Director Defendants are sometimes collectively referred to herein as the "Merrill Defendants."

58.    Because of the Merrill Defendants' positions with Merrill Lynch, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Merrill's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof and via reports and other information provided to them in connection therewith.

59.    Each of the Merrill Defendants, by virtue of their positions as directors and/or officers of Merrill Lynch, directly participated in the management of Merrill Lynch, was directly involved in day-to-day operations of Merrill Lynch at the highest levels and/or was privy to confidential proprietary information concerning Merrill Lynch and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Such defendants were involved in drafting, producing, reviewing, disseminating, approving, ratifying

21

and/or recklessly permitting the dissemination of the false and misleading statements and information herein.  The Merrill Defendants were aware or recklessly disregarded that false and misleading statements were being issued regarding Merrill Lynch, and approved or ratified these statements.  In addition, the Merrill Defendants were in a position and had a duty to implement procedures and controls to prevent the false and misleading statements, but completely abdicated their oversight responsibilities to the Company by failing to do so.

**Bank of America Directors**

60.    The following persons are members of the board of Director of bank of America.  These BofA directors are not named as defendants in this action.  However, as demonstrated below, due to their actions and inaction, as well as their relationships with other BofA directors and/or the Merrill Director Defendants, demand on these BofA directors to being the claims asserted herein on behalf of BofA and its wholly-owned subsidiary, Merrill Lynch, would be futile.

61.    Walter E. Massey ("Massey") has served as a director of BofA since 1998 and as Chairman of the BofA Board since April 29, 2009.  Massey also serves on the BofA Board's Audit Committee.  Massey was a director of BankAmerica Corporation from 1993 to 1998 and currently also serves as a director of McDonald's Corporation. Massey was also formerly a director of Delta Airlines, Motorola, BP PLC.  Massey is President Emeritus at Morehouse College in Atlanta, having previously served as President of Morehouse from August 1995 to June 2007.  Massey is a citizen of the State of Georgia.

62.    William Barnet III ("Barnet") has served as a director of BofA since April 2004 and is a member of the BofA Audit Committee.  Barnet also serves as Chairman, President and Chief Executive Officer, The Barnet Company, a real estate and other investments firm. Barnet

also served as Chairman of William Barnet & Son, LLC, a synthetic fiber processing company, from 2001 to 2006, and served as Chief Executive Officer from 2000 to 2001. Barnet also serves as a director of Duke Energy Corporation. Barnet is a citizen of the State of South Carolina.

63. Frank P. Bramble, Sr. ("Bramble") has served as a director of BofA since January 2006 and is a member of the BofA Asset Quality Committee. Bramble previously served as an advisor to the Executive Committee of MBNA Corporation, a financial services company, from April 2005 to December 2005 when it was acquired by BofA. Prior to that time, Bramble had served as Vice Chairman of MBNA from July 2002 to April 2005. Bramble is a citizen of the State of North Carolina.

64. John T. Collins ("Collins") has served as a director of BofA since April 2004 and is a member of the BofA Audit Committee. Collins has also served as Chief Executive Officer, The Collins Group, Inc., a venture capital, private equity investments and management since 1995. Collins is a citizen of the State of Washington.

65. Gary L. Countryman ("Countryman") has served as a director of BofA since April 2004 and is a member of the BofA Compensation and Benefits, Corporate Governance and Executive Committees. Countryman also serves as Chairman Emeritus and Director, Liberty Mutual Group, an international and property and casualty insurance company, where he previously served as Chairman of Liberty Mutual Group from 1986 to 2000 and as Chief Executive Officer from 1986 to 1998. Countryman also serves as trustee of NSTAR and a director of CBS Corporation. Countryman is a citizen of the State of Massachusetts.

66. Charles K. Gifford ("Gifford") has served as a director of BofA since April 2004 and is a member of the BofA Asset Quality and Executive Committees. Gifford previously served as Chairman of BofA from April 2004 until January 2005. Gifford also served as

Chairman and Chief Executive Officer of FleetBoston since 2002, as President and Chief Executive Officer of FleetBoston from 2001 to 2002, and President and Chief Operating Officer from 1999 to 2001.  Gifford also serves as a trustee of NSTAR and a director of CBS Corporation.  BofA does not consider Gifford an independent director because "[he] was employed by Bank of America or a predecessor and receives compensation from the Corporation which exceeds the threshold set forth in the Categorical Standards."[10]  Gifford is a citizen of the State of Massachusetts.

67.     Kenneth D. Lewis ("Lewis") has served as a director of BofA since 1999 and is a member of the BofA Executive Committee.  Lewis has served as Chief Executive Officer of BofA since April 2001, as President since July 2004 and as Chairman from February 2005 until April 29, 2009.  Lewis previously served as BofA's Chairman from April 2001 to April 2004, as President from January 1999 to April 2004, and as Chief Operating Officer from October 1999 to April 2001.  Lewis also serves as Chairman and a director of Merrill Lynch.  BofA does not consider Lewis an independent director because "[he] is our Chief Executive Officer."[11]  Lewis is a citizen of the State of North Carolina.

68.     Monica C. Lozano ("Lozano") has served as a director of BofA since April 2006 and is a member of BofA's Asset Quality Committee.  Lozano also serves as Publisher and Chief Executive Officer of La Opinion, the largest Spanish-language newspaper in the United States.  Lozano has also served as a member of the Board of Regents of the University of California since December 2001 and as trustee of the University of Southern California since 1991.  In addition, Lozano also serves as a director of The Walt Disney Company.  Lozano is a citizen of the State of California.

---

[10]  Bank of Am. Corp., Definitive Proxy (Schedule 14A), at 5 (Mar. 18, 2009).

[11]  *Id.*

69.     Thomas J. May ("May") has served as a director of BofA since April 2004 and is Chairman of BofA'sAudit Committee.  May also serves as Chairman, President and Chief Executive Officer, NSTAR, an energy utility company.  May has served as President of NSTAR and its subsidiaries since 2002 and as Chairman, Chief Executive Officer and Trustee since 1999. May is a citizen of the State of Massachusetts.

70.     Thomas M. Ryan ("Ryan") has served as a director of BofA since April 2004 and is Chairman of BofA's Corporate Governance Committee and a member of the Compensation and Benefits Committee.  Ryan also serves as Chairman, President and Chief Executive Officer of CVS/Caremark Corporation, an integrated provider of pharmacy and related healthcare services.  Ryan also serves as a director of Yum! Brands, Inc.  Ryan is a citizen of the State of Rhode Island.

71.     Collectively, defendants Massey, Barnet, Bramble, Colbert, Collins, Countryman, Gifford, Lewis, Lozano, May, Rossotti, and Ryan, are sometimes collectively referred to in this Complaint as the "BofA Director" or the "BofA Board."  By reason of their positions as directors of BofA and because of their ability to control the business and corporate affairs of BoA, the BofA Director Defendants owed BofA and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of BofA, as well as in the use and preservation of its property and assets.  The BofA Director were and are required to act in furtherance of the best interests of BofA and its shareholders and not in furtherance of their personal interest or benefit.  As a result, the BofA Director are obligated to use their best efforts to act in the interests of BofA and shareholders to ensure that no waste of corporate assets occurs.  The BofA Director, because of their positions of control and authority as directors and/or officers of BofA, were able to and did, directly and/or

indirectly, exercise control over BofA and failed to take action necessary to protect the interests of BofA and, instead, took action, in violation of their fiduciary duties that prejudiced the rights of BofA in connection with BofA's claims, as successor in interest to the claims of Merrill Lynch more fully alleged herein.

## SUBSTANTIVE ALLEGATIONS

**Background of Merrill Lynch**

72.    Until its Merger with BofA, Merrill Lynch was one of the world's leading wealth management, capital markets and advisory companies, with offices in 38 countries and territories and total client assets of approximately $1.8 trillion.  Merrill Lynch offered a broad range of services to private clients, small businesses, and institutions and corporations.

73.    Merrill Lynch operated primarily in the United States, Canada, Europe, the Middle East, Africa, the Pacific Rim, and Latin America.  The Company was founded in 1820 and was headquartered in New York, NY.

74.    As an investment bank, Merrill Lynch was a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.

75.    The Company's Retail Wealth Management segment provided brokerage, investment advisory, and financial planning services.  This segment also offered commission and fee-based investment accounts, banking, cash management, and credit services, trust generational planning, retirement services, and insurance products to individuals, small to mid-sized businesses, and employee benefit plans.

**The Rise and Fall of Subprime Mortgage Lending**

76.     The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."[12]

77.     Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.[13]

78.     Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to several factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.[14]

79.     In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").[15]

---

[12]    *See Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* 110th Cong. (2007) (Statement of Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd.).

[13]    Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[14]    *See Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[15]    *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see*

80.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.   Examples of typical subprime mortgages are: interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates.[16]   These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

81.     As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.[17]

82.     Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.[18]

83.     Then housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.

---

*also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

[16]   *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity*, Wall St. J., April 19, 2006, at D1 *and* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[17]   *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[18]   *See* Ruth Simon*, Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005.

84.     In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.[19]   The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders.[20]

85.     However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.   Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."[21] Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired.   However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

86.     In 2006, subprime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans).   This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001.[22] Mortgage industry research reported in April 2006 revealed that 90% of borrowers had

---

[19]  *Id.*; *See also Mortgage Market Turmoil: Causes and Consequence: Hearing Before the Senate Banking, Housing and Urban Affairs Committee,* 110th Cong. (2007) (Statement of, Sandra L. Thompson, Dir., Div. of Supervision and Consumer Prot.).

[20]  *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* September 29. 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.

[21]  *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

[22]  Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases.[23]

87.     The recent subprime mortgage crisis began with mortgages to subprime borrowers, *i.e.,* borrowers with low-rated credit history.  The loans were then packaged into securities and sold into commercial paper markets.  Mortgage backed securities are generally sold as commercial instruments, such as bonds and CDOs.  When the borrowers began to default on their mortgage payments, due to increasing interest rates, investment banks, such as Merrill Lynch, began to feel the effects in the market for mortgage backed securities.

88.     Since 2006, the erosion of the market for securities linked to subprime mortgages has led to a global credit-market contraction.  Holdings of CDOs as well as its high-risk home loans and bonds are among the types of securities that have been suffering the most.  Merrill Lynch, being one of the largest underwriters of asset-backed CDOs in 2007 has taken one of the biggest hits.

89.     The Merrill Defendants caused or allowed Merrill Lynch to develop a scheme to conceal a tremendously risky subprime mortgage portfolio.  Merrill Lynch used this portfolio as the collateral for debt instruments sold or held by Merrill Lynch.  During the relevant period, the Merrill Defendants directed Merrill Lynch to acquire a large inventory of securities backed by mortgages made to subprime borrowers.  These actions were reckless due to the impending subprime mortgage crisis and increasing delinquency rates among subprime borrowers.

90.     In addition, Merrill Lynch also provided the initial financing in many instances which has helped create the subprime mortgage crisis in the first instance.  Merrill Lynch provided warehouse lines of credit to subprime lenders, who do not normally service such loans

---

[23] *Id.*

that enabled the subprime lenders to make these subprime loans to persons and entities with inadequate collateral and/or no ability to repay the mortgages. These subprime lenders then retained the servicing of the benefits of the loans or sold all of the loans off to intermediary financial institutions that did retain the serving of the loans. Those intermediaries, in turn, sold the balance of the instruments to financial institutions like Merrill Lynch. Merrill Lynch was then able to package these inadequately collateralized subprime loans, which its officers knew or with little inquiry, could determine, were made to borrowers with little or no ability to repay them, and sell them as CDOs or invest in them.

91.     Thus, the management of Merrill Lynch knew or should have known that the loans were made to subprime borrowers, who were unlikely to be able to make their mortgage payments to the financial institution. By providing the warehouse lines of credit to subprime lenders to begin with, Merrill Lynch provided the seed money – at the very bottom of the mortgage market – for lenders, many of which were no better than classic boiler room operations – to continue to provide a steady stream of subprime loans to those who were unable to repay them. The Merrill Defendants knew, or could have easily uncovered that these loans – the foundation of Merrill Lynch's CDO underwriting and investment strategy – were not credit-worthy since Merrill Lynch's lending to subprime lenders and mortgage brokers made these subprime loans possible.

92.     As a supposed safeguard over the valuation of its financial instruments, Merrill Lynch stated publicly its practices and procedures regarding risk management. Merrill Lynch's supposed internal controls to ensure appropriate valuations and adequate financial disclosures failed either through a deficient risk management structure or its lax implementation or both. Merrill Lynch's flawed design to protect the firm from these types of overly aggressive

investment and business strategies reflected the failures of the Merrill Defendants at every turn to prevent Merrill Lynch's eventual near-collapse and forced sale.

93.     Despite these material adverse circumstances, the Merrill Defendants directed Merrill Lynch to issue a series of improper statements that proclaimed record growth.   The Merrill Defendants have misled investors regarding the financial condition of Merrill Lynch and its exposure to risk in the subprime market by failing to disclose the risks created by its subprime lending activities.

**O'Neal Takes the Helm at Merrill Lynch**

94.     In 1986, Merrill Lynch hired defendant O'Neal as a banker in its junk bond department.   Over the years, O'Neal rose through the ranks and became President and Chief Operating Officer in July 2001.

95.     In December 2001, O'Neal joined Merrill Lynch's Board.   A year later – following the burst of the "tech bubble" – he was named Chief Executive Officer of the Company.  In order to reverse Merrill Lynch's tumbling profits, O'Neal was given a mandate to slash costs and implement fiscal discipline.  As one commentator put it, the assumption was that O'Neal "would be [an] effective leader[] for a new era of sobriety and careful management of risk.  That era lasted for about 12 months."

96.     During his first year in charge, O'Neal cut jobs and costs and cut back Merrill's fixed-income business dramatically.  Critics say "O'Neal was so brutal as chief executive that Machiavelli called him cruel and Sun Tzu surrendered."  But O'Neal went too far.

97.     Indeed, while Merrill Lynch was cutting back, its competitors were pushing forward.  Firms like Goldman Sachs and Lehman Brothers were making big profits in fixed income forcing Merrill Lynch to scramble in order to catch up.

**O'Neal Causes Merrill Lynch to Become the Leading Underwriter of CDOs**

98.     In order to undo the damage his cost cutting had done to Merrill Lynch's business, O'Neal caused Merrill Lynch to ramp up its investments in CDOs.  In 1995, there were hardly any CDO offering.  In 2006, CDOs worth more than $500 billion were issued.

99.     CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets.  These assets are divided into different tranches: senior tranches, mezzanine tranches, and equity tranches.  Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to compensate for the added default risk.  But the system only works if the underlying asset backed securities held by the CDO are uncorrelated – that is, if they are unlikely to go bad all at once.[24]

100.     To the contrary, CDOs holding only subprime related investments (e.g., notes, bonds, and other instruments dependent on mortgages for their value) were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.[25]  Nonetheless, because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks securitizing CDOs.[26]

101.     When O'Neal took the reins at Merrill Lynch, Merrill Lynch was a minor player in CDOs.  Soon after O'Neal's ascension, Merrill Lynch undertook a dramatic transformation of its Fixed-Income, Currencies and Commodities ("FICC") business.  Specifically, Merrill Lynch rapidly increased its CDO underwriting business, which resulted in Merrill's ascent "from bit

---

[24]  *See* Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit – It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

[25]  Merrill Lynch explained that the valuation of its CDO and subprime related securities "will also continue to be impacted by external market factors including default rates a decline in the value of the underlying property,"  *See* Merrill Lynch 2007 10-K.

[26]  *See* FDIC Outlook, *A New Plateau for the U.S. Securitization Market*, *available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

player to powerhouse in the lucrative business of bundling loans into salable securities."[27] Merrill Lynch leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.2 billion of deals, to the top Global underwriter of CDOs in 2004, 2005, and 2006.  CDO underwriting became an increasingly important profit center for Merrill Lynch, which earned $400 million in CDO underwriting profits in 2005.[28]

102.    A May 2005 profile of Merrill Lynch in Credit U.S. magazine stated, in part, the following:

> [D]eals are priced almost weekly as Merrill Lynch solidifies its position as the world's top issuer of CDOs. In 2004, the country's third-largest investment bank priced $16.5 billion in deals, or almost 14% of the market total. . . .
>
> Merrill Lynch did not always rule the market. Before Ricciardi and his team joined, it was their former employer CSFB that consistently took first prize. Merrill could barely make the top 10. Almost immediately after Ricciardi switched jobs in April 2003, taking a good portion of his group with him, CSFB started sliding and Merrill soared. Since then, Merrill has led the league tables quarter after quarter, gradually increasing its lead over the competition, while CSFB has slipped to eighth position.
>
> This year, with analysts expecting new CDO issuance around the world to rise 5–15% from last year's $120 billion, Ricciardi expects Merrill to issue 30–40% more than it did in 2004. Perhaps more importantly, Merrill's CDO revenues have jumped tenfold since Ricciardi and his team joined.
>
> "Collateralized debt obligations have been around since 1987, but annual issuance never exceeded $5 billion until 1996."
>
> "CDOs offer a handsome return—these days of up to 240 basis points over comparable corporate bonds—because the market is complex, opaque and illiquid."
>
> "High-yield CLOs and CBOs dominated the market until about 2001, when a corporate recession and a wave of defaults sent prices crashing. CDO issuance

---

[27]  *See* Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

[28]  *See* Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, Wall St. J., Oct. 25, 2007.

dropped from almost $68 billion to approximately $52 billion annually in 2001 and didn't pick up again for three years."

"Today the clear favorites are CDOs backed by asset-backed securities, which make up about 55% of the total CDO issuance."

"CDOs backed by ABS are generally safer than those backed by bonds because losses are filtered through the underlying securitization first."

"Luckily for Merrill Lynch, Ricciardi and his team started using asset-backed securities to collateralize CDOs early and have ridden the wave all the way to the top. 'Some of our success,' says Norell, 'lies in the fact that we just happened to start working on and developing something that turned out to be very popular.'"

In 1999, [Ricciardi's team at Prudential Securities] issued the first ABS CDO as it is defined today, backed by a diversified pool of residential mortgage-backed securities and home equity loans. "We thought ABS was excellent collateral for CDOs because asset-backed securities—particularly subordinate classes of, let's say, home equity loans—trade at much wider levels than corporates of the same rating," says Ricciardi. "It was our feeling that they trade at these wider levels not because they're of worse credit quality but because of technical reasons."

A year later, Ricciardi left Prudential for CSFB and took Harin De Silva with him. There they joined up with Norell, and the three helped CSFB become the largest issuer of CDOs. Then, in 2003, they headed for Merrill Lynch.

Up until 2003, Merrill Lynch barely had a presence in the CDO market, only pricing a couple of collateralized loan obligations a year. When Ricciardi joined he quickly ramped up the ABS and trust-preferred business and this year the firm plans to focus on further growing its CLO and synthetic CDO output.

ABS CDOs, backed mainly by residential mortgage-backed securities, have had a good run over the past few years as the housing market has rallied. ABS issuance rose from $27 billion in 2003 to $46 billion in 2004 alone, according to Standard & Poor's. But some analysts worry about the consequences on ABS CDOs if the real-estate market stalls. "The biggest thing is always the leverage in the CDO market. When the general high-yield bond market got hit, CBOs backed by high-yield bonds got hit even more," says Michiko Whetten, quantitative credit derivative analyst at Nomura Securities. "The same thing is concerning lots of market participants now, in that ABS CDOs have a very high exposure to the residential mortgage-backed securities market. So the fortunes of the ABS CDO market can go up and down with the housing market."

Whetten says ABS CDO spreads may have tightened too much, and like other analysts she expects ABS CDO issuance to be flat to slightly lower this year. Ricciardi says he expects ABS CDO issuance at Merrill Lynch to rise marginally.

These days, TruPS CDOs are being extended to more asset classes. Earlier this year Merrill Lynch was the first to issue a CDO backed by a pool of real-estate investment trust (Reit) TruPS: the $729 million Taberna Preferred Funding vehicle managed by Cohen Brothers. The deal had 10 investment-grade tranches, the most senior of which yielded 47 basis points over Libor.

"It's quite a process," says Ricciardi, who says it took about two years from when the idea was first hatched to execution. "It's a new product. You have to work with the rating agencies, educate investors, educate the Reits so they'll issue the product." It took a while to convince the Reits to borrow through a vehicle they had never heard of before, and it took some effort to convince rating agencies to take a look at small institutions usually below their radar screens.

Ricciardi says he expects Reit trust preferreds to grow rapidly this year and next at least, although this asset class demonstrates one of the drawbacks of CDOs: there has to be underlying collateral to back them, and supply is limited. "It's not clear how much more capital Reits need. It is a more limited audience than banks. There are 10,000 banks, but there are only two or three hundred Reits," says Ricciardi. "At some point we're going to run out of guys to do this for."

This problem exists in other asset classes as well. "In ABS, the availability of assets has been a sticking point," says Norell. "There's a finite amount of them issued." Only about $10–12 billion in subordinate classes of home equity loans are issued annually, he says, putting a natural cap on CDO issuance.

But as Norell points out, the TruPS technology can be extended to any type of borrower who is too small to tap capital markets directly. And to mitigate any slowdown caused by lack of collateral, Wall Street has set its sights on synthetic CDOs, backed by the large and growing supply of credit default swaps.

Ironically, while one challenge is bringing investors on board, the other is keeping the masses away. "We need to continuously innovate," says Norell. "We don't necessarily want everything to be too simple and universally accepted by everyone, because then the relative increase in yield to investors who do want to take the time to understand complex product is going to be difficult to find."

Norell points out that collateralized debt obligations carry handsome yields compared with corporate bonds of the same rating because fewer people understand them. By the same token, ABS CDOs yield more than CLOs because people don't understand the mortgage-backed market as well as loans.

"If you polled a hundred capital markets participants about IBM, most people are going to have some opinion of it. But if you went to the same group and asked them about an Ameriquest or Countrywide triple-B mortgage security, very few people are going to have any idea of how to analyze it," says Norell. This

complexity is what adds yield to ABS CDO products, he says, because demand is limited to a small pool of very specialized investors.

One undeniable source of risk, which helps contribute to the yield on CDOs, is the lack of a real secondary market. David Weeks, head of secondary trading at Merrill Lynch, says secondary market volumes in cash CDOs were under $30 billion in 2004. "Generally speaking we advise our investors that the products we sell them are buy-and-hold securities," says Norell. "Liquidity is tricky, and the rule seems to be that it's never there when you really need it," he says, explaining that when a transaction performs poorly investors have a difficult time selling it.

But again, the same principal applies: if the market were to become too liquid, returns for investors might start to diminish, says Norell.

In this vein, many Wall Street players would like to keep the CDO market as opaque as possible to keep yields juicy.

103.    An August 30, 2005 Bloomberg article entitled *Merrill, Citigroup Record CDO*

*Fees Earned in Top Growth Market* stated, in part, the following:

Merrill, the No. 2 U.S. securities firm by market value, and Citigroup, the biggest bank, sold a third of this year's $72 billion of U.S. collateralized debt obligations, data compiled by Bloomberg show. The CDO market more than doubled in the past five years…

"CDO fees usually equal about 1.5 percent to 1.75 percent of the size of a deal, bankers who arrange such sales say. That's more than triple the average 0.4 percent that banks charge to sell investment-grade bonds."
"About $290 billion is invested in U.S. CDOs, up from $125 billion at the end of 2000, according to the Bond Market Association…"

Synthetic CDOs are backed by credit-default swaps, which are contracts that allow investors to bet on a company's creditworthiness or get protection from default. Like insurance, buyers of the swaps pay an annual fee similar to a premium to protect a certain amount of debt against default for a specified number of years. In the event of a default, they are paid face value of the bonds or loans.

Cash CDO sales jumped 80 percent in the first seven months of 2005 from a year earlier, according to Merrill research. In July, 26 CDOs valued at $15.8 billion were priced. That same month, $1.6 billion of CDO "squareds," or those backed by other CDOs, were sold, almost equivalent to all of 2003 and 2004 combined, New York- based Merrill reported.

"It wasn't until the late 1990s that CDO issuance began in earnest, rising to $80 billion in 2000 from less than $5 billion in 1995, according to Moody's Investors Service…"

"…the lack of transparency has driven away some of the bond market's traditional investors."

Maxim Advisory LLC, the New York money manager, used Merrill last month to lead a $2 billion CDO called Jupiter High Grade CDO III Ltd. Backed by residential mortgage-backed securities, credit- default swaps and other CDOs, it was Merrill's third assignment for Maxim since last year, helping the firm outpace Citigroup among underwriters.

"Since they are the No. 1 issuer, it gave us a sense of comfort in terms of execution,'' said Wing Chau, 38, a money manager at Maxim who oversees CDO investments."

"Merrill has handled $13.7 billion of dollar-denominated CDO sales so far this year, Bloomberg data show."

"Merrill … reaped fees of at least $100 million this year from selling CDOs, according to Bloomberg estimates. That's equal to about 15 percent of Merrill's debt underwriting revenue …in the first half of 2005."

The Jupiter deal was split into nine tranches, with ratings ranging from the highest possible, or AAA, to two notches below investment grade, or BB.

Investors receive annual yields ranging from 27 basis points above the benchmark London Interbank Offered Rate for the highest-ranking tranche to 270 basis points above Libor for the lowest-ranking slice, Chau said. A basis point is 0.01 percentage point.

"If you were to make a direct investment in a triple-A corporate, the Libor equivalent there would probably be something like Libor plus 17," Aladdin's Eggenschwiler said. "That's where the pickup in yield is."

"The market has become more mainstream,'' said Chris Ricciardi, 36, Merrill's global head of structured credit products, who joined the firm in 2003 after three years at Credit Suisse First Boston. "We anticipate strong CDO volume through the end of the year and into next year.''

So far this year, the most popular cash CDOs are those backed by assets such as commercial and residential mortgage-backed securities, including home equity loans and mortgage loans to individuals with patchy credit histories.

104.    In a November 15, 2005 speech at the Merrill Lynch Banking and Financial Services Investor Conference, O'Neal, stated, in part, the following:

> We'll also continue to invest in and upgrade mortgage finance and trading, derivatives, municipals, prime brokerage and portfolio trading. A key area, where we intend to dedicate resources, is in risk taking for the benefit of the firm across our trading and principal investing businesses. It's important for us to be able to take advantage of favorable trends across asset classes and provide the same opportunities to our clients. We've got the right people in place, as well as good risk management and controls. We expect them to continue to draw more capital and generate more profits.

> "I think it is not well understood that the areas we cut in 2001 are largely not the ones we're rebuilding now.... In CDO's, collateralized debt, we were almost non-existent in 2000 — ranked 13th. Today we're ranked number one."

105.    CDOs helped fuel the housing boom of the late 1990s and most of this decade. About 40% of CDO collateral is residential-mortgage-backed securities. Almost three quarters of that is secured by risky subprime and home-equity loans.

**The Deterioration of the Subprime Mortgage and CDO Market**

106.    Since subprime loans were vulnerable to falling home prices, all of Merrill Lynch's subprime related securities (e.g., residential mortgage backed securities (RMBS), CDOs and CDO squared securities)[29] had the same vulnerabilities.

107.    The sharp increase in defaults and falling home prices that started in 2005 eroded the value of all tranches of the RMBS and CDO securities that Merrill Lynch underwrote. In turn, because RMBS yields were falling, the yields on the CDO bonds sank as well.[30]

108.    When the housing bubble began to burst, rating agencies quickly began downgrading many CDOs. And while most brokerage firms began pulling back from the CDO market, Merrill Lynch did not.

---

[29] A "CDO squared" is a CDO collateralized by securities issued by other CDOs.

[30]  *See* Shawn Tully, *Wall Street's money machine breaks down: The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

109.   As the *Wall Street Journal* reported, "For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world.  But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging.  Many investors felt they had invested enough money in this asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market."[31]

110.   As early as July 11, 2005, a Pakistani publication, Dawn, made the following prescient analysis:

> The [US] regulatory regime cannot address risk management issues raised by the explosive growth of the collateralized debt obligation (CDO) industry. The US regulatory regime measures CDO transactions in terms of their book value and not their risk but a 2005 Morgan Stanley study has shown that during 2003-2004 the book value of CDO transactions represented only about 40 per cent of their risk adjusted value.

> Greenspan warns that "understanding the credit risk profile of CDO tranches poses challenges to even the most sophisticated market participant." CDOs have the potential to act as mechanisms for crisis transmission—investment banks, insurance companies, hedge funds and pension funds have large CDO holdings— and the regulatory regime is not equipped to deal with such a situation. This is becoming an increasingly important concern as interest rates rise in America.

111.   The Merrill Defendants' continued push in CDO investments exposed Merrill Lynch to major risk of lower earnings amidst warnings from analysts that Companies with substantial subprime exposure could face significant financial problems should the subprime market collapse.  However, since the Merrill Officer Defendants' compensation was tied to Merrill Lynch's financial performance, these defendants ignored these warnings even though everyone else was downgrading.

---

[31]   Randal Smith & Jed Horowitz, *Merrill Takes $8.4 Billion Credit Hit*, Wall St. J., Oct. 25, 2007.

112.    When demand for CDO securities waned in late 2005, the Merrill Defendants were unwilling to give up the lucrative underwriting fees so they caused the Company to begin purchasing the AAA tranches of the CDO securities with its own capital.[32]    As reported in the financial press, O'Neal pushed this strategy of buying CDO securities with Merrill Lynch's own capital.  Executives, who resisted, such as fixed income adviser Jeff Kronthal, were fired.[33]

113.    "Merrill took the top tranches onto its own balance sheet," said Scott Sprinzen, an analyst with S&P. "The amounts were staggering."[34]

114.    "That decision turned out to be one of the worst miscalculations in the annals of risk management."[35]    Ultimately, when credit markets tightened, Merrill Lynch could not borrow sufficient cash to keep the CDOs afloat.[36,]  "It's like me buying all those buildings out there just to get a little fee. It wouldn't make sense," a Merrill official stated in the financial press.[37]

---

[32]  Merrill Lynch's underwriting fees averaged 1.25% of its total deal volumes, or around $12.5 million for each $1 billion CDO.

[33]    *See* Gary Weiss, *The Taming of Merrill Lynch,* May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3.

[34]  *See* Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

[35]  The underwriter of a CDO issuance typically acts as a middleman by underwriting the CDO issuance for a fee, but does not retain a proprietary interest in the issued securities.

[36]  As described in detail below, Merrill Lynch's inability to liquidate the CDO securities it held on its balance sheet during the credit crisis, may also have led Merrill Lynch's to engage in various fraudulent activities.  Merrill Lynch was ultimately sued for fraud and misrepresentation as underwriter for not disclosing the true nature of the underlying securities.  In addition, Merrill Lynch's has been accused of selling CDO securities to investors by hiding the fact that they were actually CDOs or other subprime related securities.  *See* Peter Eavis, *CDOs explained:  How these debt vehicles led to big losses at big banks – and why there may be more to come*, Fortune, Nov. 26, 2007.

[37]    *See* Gary Weiss, *The Taming of Merrill Lynch,* May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3.

115.    In response to the decreased demand for CDOs, Mr. Ricciardi (then head of Merrill Lynch's CDO business) had budgeted for no growth in 2006 in mortgage CDOs before he left Merrill in February 2006.

116.    But following Mr. Ricciardi's departure, Dow Kim (then head of markets and investment banking) sought to reassure the CDO group that Merrill Lynch remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs.

117.    Indeed, in 2006, Merrill Lynch sharply boosted its issuance of CDO securities to $44 billion, compared to $14 billion in 2005.  Merrill Lynch's fees from CDOs jumped to more than $700 million in 2006.  Throughout 2006, Merrill Lynch continued taking additional CDO securities onto its own balance sheet.

118.    In September of 2006, Kenneth Bruce, Merrill Lynch's own analyst, warned the Merrill Defendants that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Bruce specifically warned that an "asset fire-sale" could cause prices to fall.[38]

119.    In short, Merrill Lynch began purchasing the CDO securities that its customers were rejecting, despite the deterioration of the subprime and CDO markets and warnings from its own analyst that a subprime meltdown was imminent.

120.    Between 2006 and mid-2007, Merrill Lynch earned over $800 million in underwriting fees as the lead underwriter on 136 CDO deals with a dollar value of $93 billion.  And because O'Neal's compensation was tied to Merrill's performance, O'Neal received a total compensation of $48 million, $18.5 million of which was a cash bonus, in the year 2006 alone.

121.    Eager to earn his millions, O'Neal ignored the warnings of his own analysts.  Instead, O'Neal and the other Merrill Officer Defendants continued to push forward with the

---

[38]  Al Yoon, *Merrill's Own Subprime Warnings Unheeded,* Reuters, Oct. 29, 2007.

high-risk business strategy in order to boost Merrill's earnings and increase their substantial executive compensation.

122.    A November 28, 2006 Bloomberg article entitled *Wall Street Leads Consolidation Of Subprime-Lending Business High-Risk Loan Defaults Open Door for Brokerages; 'Two Birds With One Stone'* stated the following:

> Wall Street thrives on risk, so what better investment these days than the subprime-mortgage business.
>
> Lenders that make home loans to buyers with troubled credit history sprinted ahead during the housing boom, only to see prospects wane as interest rates rose, home prices fell and borrowers had trouble making payments. With losses mounting and consolidation sweeping the industry, Wall Street, not the banking industry, is emerging as the consolidator.
>
> In the past three months, Morgan Stanley agreed to buy Saxon Capital Inc. for $706 million. Merrill Lynch & Co. struck a $1.3 billion deal to buy National City Corp.'s First Franklin lending unit, and Bear Stearns Cos. is buying the mortgage unit of ECC Capital Corp. for $26 million in cash. H&R Block Inc. recently disclosed it might sell its Option One lending unit, which last year made about $40 billion in loans.
>
> "Clearly the broker-dealers are leading the charge," says Matthew Howlett of Fox-Pitt, Kelton, an investment bank specializing in financial institutions.
>
> It may be because Wall Street firms have built large businesses creating asset-backed securities, including bundles of subprime loans, they sell to investors. Perhaps more important, asset-backed securities are a component in an even more profitable product Wall Street sells, collateralized-debt obligations, which are derivative securities whose value is tied to the underlying asset-backed security.
>
> "They need...to feed the CDO underwriting machine, and what better way to feed the machine than create more subprime assets," Mr. Howlett says. "They can kill two birds with one stone."
>
> CDOs, also known as CLOs, or collateralized loan obligations, are a way to repackage and transfer credit risk. Most asset-backed securities are priced in relation to the London interbank offered rate, or Libor. High-quality debt issues are priced to yield Libor, or a few hundredths of a percentage point above it. Low-quality debt is priced one to two percentage points higher. Profiting on the difference between those rates is what is driving Wall Street investment banks to buy subprime lenders.

Here's how it works: Investment banks create CDO securities and sell them to investors at, for example, Libor plus seven-tenths of a percentage point. They also sell a smaller piece of equity in the deal to separate investors.

With the proceeds, the banks turn around and buy asset-backed securities that pay Libor plus 1.5 percentage points. The difference, eight-tenths of a point before expenses in this case, translates into a gain for those who purchase the equity portion of the CDOs. In addition, the investment banks borrow money against every dollar invested in the CDO, sometimes five, 10, or even 20 times the original investment, which can boost the return substantially.

Because CDOs are a type of derivative, they sidestep limits on investing in low-grade debt that many institutions face. That opens the CDO market to insurance companies and pension funds, among others. And because of their potential for double-digit returns, CDOs are a favorite among hedge funds.

The process can be very profitable for investment banks. Firms can pinch off a few cents of every $100 invested in the process in fees. "It's a very lucrative business for this industry," Mr. Howlett says.

The banks lump revenue from asset-backed securities and CDOs into larger business units. "Mortgage and CDO net revenues increased significantly when compared to the prior year," Samuel Molinaro, chief financial officer of Bear Stearns, told analysts during an earnings conference call in late September. Total revenue for its fixed-income business in the most recent quarter was up 19% over the same period the prior year.

The story was similar at Lehman Brothers Holdings Inc., which has snapped up eight mortgage firms in the U.S. and Europe in the past three years. Revenue in the investment firm's fixed-income origination business in the latest quarter was up 4% over the prior year. Lehman recently said its appetite for subprime lenders remained keen, even though it didn't emerge as a bidder in the past three months.

More lenders may come on the market, as subprime borrowers, many of whom pay adjustable interest rates, are unable to pay. Recently, lenders have even experienced defaults within the first few months of origination, so-called early payment defaults. But industry watchers say that won't deter Wall Street, which views the industry's problems as a buying opportunity.

"We're starting to see bigger deals now with Option One coming up for sale," says Mr. Howlett of Fox-Pitt, Kelton. "We think we will begin to see over the next 12 months even larger deals."

123.    A December 11, 2006 Bloomberg article, entitled *Mortgage Bonds, CDOs to Suffer Next Year, Fitch Says*, stated the following:

> Mortgages, credit-card balances of risky borrowers and some other types of debt backing so-called structured-finance bonds will perform worse next year as the slowing U.S. housing market hurts consumers, Fitch Inc. said.
>
> Higher delinquencies on mortgages and the effect of slower consumer spending pose risks to the debt's performance, said Fitch, a bond-rating firm in New York. More mortgage borrowers "today than historically are sensitive to a slowdown'' in home- price appreciation because of the riskier loans taken out amid the high prices of recent years, Fitch said.
>
> About a third of the structured-finance sectors, or 25 sectors, will experience worse performance in their underlying collateral next year, Fitch said in a report to clients today. The affected areas include bonds backed by so-called sub-prime, near-prime and prime mortgages; sub-prime credit-card balances; franchise loans; and small-business loans, Fitch said.
>
> Fitch said its ratings outlook for sub-prime mortgage bonds is "negative,'' with the expected number of its downgrades to exceed the number of upgrades next year. The outlook for prime and so-called Alt-A, or near-prime, mortgage bonds not issued by government-related companies is "positive'' because of greater protection through structuring on recent issues.
>
> Some sub-prime mortgage borrowers with adjustable-rate or interest-only loans will find it difficult to refinance into cheaper loans when their payments are due to increase, Fitch said. Delinquencies, which have risen 50 percent from last year, should climb another 50 percent next year, it said.
>
> Mortgage Losses
>
> Sub-prime mortgage and credit cards loans are generally defined loans given to borrowers with low credit scores, which usually reflects poor or limited debt repayment histories.
>
> Cumulative losses on securitized sub-prime mortgages made this year will exceed 7 percent over the loans' lives, Fitch said in a separate statement today about the report. That would be the largest loss of any year.
>
> Losses to date on sub-prime mortgages issued in 2000 are about 5.5 percent, the worst tally ever, according to Michael Youngblood, an analyst at Friedman Billings Ramsey Group Inc., an Arlington, Virginia-based investment bank. Youngblood has said this year's loans could have the highest losses ever.

Collateralized-Debt Obligations

U.S. diversified structured-finance collateralized-debt obligations, as well as CDOs backed by low-rated U.S. mortgage bonds, also will experience worse performance due to housing- market links, Fitch said. The company's ratings outlook for such debt is "stable/negative'' and "negative,'' respectively.

CDO issuance more than doubled in the first three quarters of the year to $322 billion from the year-ago period, according to the Securities Industry and Financial Markets Association.

CDOs are investment vehicles that buy bonds, loans and derivatives, and resell the cash flows in new debt, some of which has higher credit ratings. About 61 percent of the year- to-date total involved re-securitizations of other structured-finance bonds, according to the association.

All six types of global CDOs, which range from securitizations of investment-grade bonds to ones of loans used by buyout firms, will experience weaker asset performance next year, without negative ratings effects, Fitch said.

Performing Better

Ten structured finance sectors will experience better asset performance next year, according to Fitch. They include bonds backed by equipment leases or loans, and mortgages on apartment buildings, offices, and hotels. Fitch's outlook for the performance of assets behind 38 other sectors is "stable.''

Fitch's ratings outlook is "positive'' for 18 sectors; "negative'' for ten, and stable for 44.

Asset-backed securities, which include sub-prime mortgage securities and credit-card bonds, have returned 5.2 percent this year, according to a Merrill Lynch & Co. index of total return. That would be the best full-year performance since 2001.

124.    In January 2007, to gain access to a larger number of subprime mortgages, Merrill

Lynch purchased First Franklin, a mortgage company, for $1.3 billion.  This transaction catered

specifically to subprime borrowers.    Ironically, Merrill Lynch's analyst made his

recommendation at the same time Merrill purchased First Franklin.  As *Reuters* reported: "The

First Franklin deal puzzled analysts because the market for subprime loans was souring in a

hurry when the deal was announced.  Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."[39]

125.    A February 12, 2007 Bloomberg article entitled *Merrill Loaded for Bear in Mortgage Market That Humiliated HSBC* stated, in part, the following:

"Merrill Lynch & Co. Chief Executive Officer Stanley O'Neal was willing to lose $230 million to catch Bear Stearns Cos. and the shakeout is just beginning."

Merrill is determined to capture a dominant share of trading in bonds backed by home loans, the fastest- growing debt market since 1995 and this year's most troubled. O'Neal's enthusiasm for mortgages to potentially delinquent borrowers coincides with the highest default rate in more than six years, a record contraction in demand for so-called subprime loans and descending bond prices.

Merrill already has bankrolled two home lenders that subsequently failed and purchased a third, First Franklin Financial Corp., for $1.3 billion, just before HSBC Holdings Plc disclosed that its bad-loan provisions increased 20 percent because of the unraveling U.S. subprime market.

New York-based Merrill, the third-largest securities firm by market value, isn't the only challenger to No. 1 Bear Stearns. Deutsche Bank AG, Morgan Stanley and Barclays Plc have bought or agreed to buy subprime lenders in the past six months, betting that a bigger presence in mortgages will produce more revenue from packaging the loans into bonds.

"Fees from securitizing debts including mortgages, auto loans, aircraft leases and credit-card receivables have almost tripled in the past five years to $5.6 billion, Bank of America Corp. analyst Michael Hecht estimates."

Merrill is counting on securitization to dispose of risky mortgages and avoid the headaches now plaguing HSBC, the world's third-largest bank. The London-based company on Feb. 7 increased the amount set aside for bad loans in 2006 to almost $10.6 billion, 20 percent more than analysts estimated, and shook up management in the U.S.

"The same day, New Century Financial Corp., the Irvine, California-based rival to HSBC in subprime mortgages, said the market has deteriorated so much that it expects to report a quarterly loss for the first time since 2001."

O'Neal, 55, agreed to buy First Franklin from Cleveland- based National City Corp. in September. Since then, home loans to borrowers with erratic credit

---

[39]  Al Yoon, *Merrill's Own Subprime Warnings Unheeded,* Reuters, Oct. 29, 2007.

records or burgeoning debt burdens have defaulted at a faster rate than during the U.S. recession in 2001, according to Arlington, Virginia-based Friedman Billings Ramsey Group Inc.

"So many mortgage lenders have failed in the past two months that a blogger in Georgia set up a Web site to track them and called it the "Implode-o-Meter.'' His tally, illustrated with a mushroom cloud, stood at 20 as of Feb. 9 [2007]."

"We still have way too much capacity," said David Olson, president of Wholesale Access Mortgage Research & Consulting in Columbia, Maryland, and the former director of market research at Freddie Mac, the second-biggest financier of U.S. mortgages. "That means a lot more firms have to go out of business.''

O'Neal's ambitions to take on Bear Stearns in mortgage bond underwriting and trading date back to at least 2002. That's when Merrill increased hiring in its mortgage department, said spokesman Bill Halldin. In May 2004, Merrill bought Wilshire Credit Corp., which handles billing and collections on subprime loans. In a speech in November 2005, O'Neal named "mortgage finance and trading'' among his top priorities.

Merrill, which made more than three times as much money as Bear Stearns last year, took a stake in Ownit Mortgage Solutions Inc. in 2005 and bought many of the company's loans to securitize. Last year, Merrill began extending a $1.7 billion credit line to Middletown, Connecticut-based Mortgage Lenders Network USA, which in a decade had mushroomed from a seven-person firm to the nation's 15th-largest provider of subprime mortgages.

"With more than 8,500 financial institutions competing for mortgages, many began extending them to borrowers who might not have qualified previously."

"Too many firms got involved in making loans probably motivated in part by fees,'' Federal Reserve Bank of St. Louis President William Poole told reporters after a speech last week. "They thought they could lay off the credit risk by securitizing and selling these off in the market.''

Ownit, based in Agoura Hills, California, filed for bankruptcy in December because it couldn't meet those repurchase obligations, and Merrill wrote down its $100 million investment in the fourth quarter. Merrill also has $93 million in unsecured claims, according to Ownit's bankruptcy filing. Last week, Mortgage Lenders Network sought protection from creditors and said in court documents that it owes Merrill $36.5 million.

"By acquiring First Franklin and doing the lending itself instead of buying loans from other companies, Merrill can ensure that the mortgages it packages into bonds are sound."

"'Certainly, we recognized that there was the potential for volatility in the market in the short term,'' Merrill Chief Financial Officer Jeff Edwards said in a Jan. 18 interview. 'We think this is a very important long-term investment for us.'"

ACC Capital Holdings, the parent of Ameriquest Mortgage Co., announced plans in May to close all 229 of its retail branches and cut about 3,800 jobs. H&R Block Inc., the largest U.S. tax preparer, put its subprime mortgage unit up for sale in November and Sebring Capital Partners LP closed it doors in December.

Countrywide, the biggest U.S. mortgage lender and No. 1 underwriter of bonds backed by subprime or home-equity loans, last month reported its biggest earnings drop in seven quarters. The company said profit may decline this year because the housing slump is leading to more foreclosures and competition.

"That's the one [subprime] area across all businesses in all firms that is actually in a bit of trouble now,'' David Viniar, chief financial officer of New York-based Goldman Sachs Group Inc., the world's largest securities firm, said on a Feb. 8 conference call with investors. "My view is that that market's going to get worse before it gets better.''

HSBC's troubles stem from its $15.5 billion purchase in 2003 of Household International Inc., then one of the largest U.S. lenders to consumers with poor credit. Beguiled by the high interest rates on subprime loans, HSBC erred by keeping many mortgages on its books instead of selling them to investors.

"Bear Stearns, the fifth-largest U.S. securities firm, reduced its purchases of subprime loans by half last year because of concerns over the decline in credit quality, President Warren Spector said on a conference call Feb. 9 [2007].''

Now Barclays, the U.K.'s third-biggest bank, is buying Regions Financial Corp.'s EquiFirst Corp. for $225 million, in part because the London-based bank can no longer count on buying subprime loans from First Franklin and other lenders controlled by its Wall Street rivals.

"Merrill Lynch buys First Franklin and a lot of the flow that would have gone to all the other firms goes away,'' said Michael Wade, head of U.S. asset securitization business for Barclays in New York. "This business is here to stay. There's a need for the product.'''

The average pretax profit margin from making and selling a subprime mortgage was 0.25 percent in the first half of 2006 and probably dropped in the last six months of the year, said Jim Cameron, an Atlanta-based partner at Stratmor Group, an industry consultant that runs profitability studies with the Mortgage Bankers Association. Three years ago, the margin was 1.5 percent.

126.    Indeed, by the spring of 2007, the collapse of the subprime lending industry was well underway.  As of March 2007, more than two dozen subprime mortgage lenders had failed or filed for bankruptcy.[40]  This signaled that the value of securities tied to subprime mortgages, including the CDO securities Merrill Lynch underwrote, would sharply decline in value especially given their illiquid nature.

127.    Nonetheless, Merrill Lynch underwrote $28 billion in mortgage CDO securities in the first half of 2007, a pace which would have exceeded the record-breaking $44 billion in CDO securities Merrill Lynch underwrote in 2006.  *See* Merrill Lynch Quarterly Report (Form 10-Q) (June 29, 2007) at 97.

128.    Reacting to this environment, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market in April 2007.  O'Neal unequivocally dismissed those concerns.  O'Neal's statements were both highly misleading and careless.  As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.
>
> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed … and it's not consistent with what I would assess the state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007.

129.    In fact, in May 2007, despite the deteriorating market for CDO and subprime related securities, Dow Kim stated that "we are growing our leading CDO business."[41]

---

[40]    *See* Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007.

[41]    *See* Greg Fleming and Dow Kim, *UBS 2007 Financial Services Conference*, May 14, 2007, *available at* http://files.shareholder.com/downloads/MER/98834184x0x100475/8009ea49-f245-4a26-b08d-140ceab31db1/UBS%20Conference0514_2007-Remarks.pdf.

130.    In late June of 2007, a steep rise in the default rates on subprime mortgages helped trigger the collapse of two subprime based Bear Stearns hedge funds.[42]

131.    During the summer of 2007, the credit crunch intensified and demand for CDOs completely stagnated.  When the predictions of a collapse in the housing market came to fruition, Merrill Lynch became one of the largest casualties.  In addition to the CDO securities that Merrill purchased, it "got stuck with subprime assets they had intended to eventually place in CDO entities.  In addition, as underwriters of the deals, some were also left with large amounts of CDO bonds they could no longer sell."[43]

132.    By the end of June 2007, Merrill Lynch had accumulated at least $43 billion in net exposure to CDO securities and subprime mortgages.  As commentators have acknowledged, Merrill Lynch was "sitting on rotting piles [of] highly suspect, thinly traded securities [*sic*] [that nobody wanted to touch]."[44]  Merrill Lynch withheld this information from the public until October 24, 2007 when it first disclosed its CDO and subprime related securities exposure.  *See* Form 8-K (Oct. 24, 2007).

133.    Over the next few months, Merrill Lynch worked feverishly to sell down that position.  Because of the credit-market meltdown, however, Merrill Lynch was able to unload only about half of its untenable position and wound up at the end of the 2007 fiscal third quarter still holding $15 billion in unattractive CDOs that have not been sold to investors.

---

[42]    *See* Michael M. Grynbaum, *Bear Stearns Profit Plunges 61% on Subprime Woes*, N.Y. Times, Sept. 21, 2007.

[43]    *See* Peter Eavis, *CDOs explained:  How these debt vehicles led to big losses at big banks -- and why there may be more to come*, Fortune, Nov. 26, 2007.

[44]    *See* Shawn Tully*, Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims*, Fortune, Nov. 12, 2007.

134.    A July 2007 Euromoney article entitled *Best CDO House: Merrill Lynch* stated, in part, the following:

> It is hard to ignore Merrill Lynch in the CDO market – it is just so big. Its global issuance grew from $26.5 billion to $55 billion last year – a jump of 110%. But sheer size can bring its own problems and it is often hard to keep at the cutting edge of innovation while managing flows of this magnitude....It also maintained its traditional dominance of the global CDO rankings, claiming a 12.2% market share for 2006, which rises to 17.9% for the first quarter of 2007.

135.    On September 21, 2007, Merrill Lynch closed its purchase of First Republic Bank for $1.8 billion.  Based on the merger agreement, the aggregate consideration would be paid with 50% Merrill Lynch common stock and 50% cash.   The exchange rate used to calculate the number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill Lynch's average closing price over the five trading days preceding September 21, 2007, which was $75.02 per share.[45]

136.    As described in a lawsuit against Merrill Lynch by First Republic shareholders,[46] to obtain approval for the merger Merrill Lynch filed three registration statements (dated May 8, 2007, June 8, 2007 and June 21, 2007) that were materially false and misleading because none disclosed the truth about Merrill Lynch's CDO and subprime exposure of $43 billion and its third quarter write-downs of $7.8 billion.[47]

---

[45]    *See* Merrill Lynch Press Releases: *Merrill Lynch to Acquire First Republic Bank for $1.8 Billion* (Jan. 29, 2007); *See also Merrill Lynch and First Republic Bank Successfully Close Merger; Final Results of Election Regarding Merger Consideration Announced* (Sept. 21, 2007).

[46]    The plaintiffs are now Merrill Lynch shareholders because they exchanged their First Republic shares for Merrill Lynch shares.

[47]    *See* Class Action Complaint for Violation of Federal Securities Laws, *Conn. v. Merrill Lynch, et. al.,* (Dec. 28, 2007) (No: 07-cv-11626).

137.   Had Merrill Lynch disclosed the truth about its CDO and subprime losses and exposure, Merrill Lynch's stock would have dropped in value – as it did when the company disclosed any write-downs related to its CDO and subprime exposure starting on Oct. 5, 2007.

138.   As a result, Merrill Lynch would have had to issue a greater number of shares to purchase First Republic, which would have had a dilutive effect on its post merger pro forma earnings per share.   As a consequence, the merger may not have been approved by First Republic's Board of Directors or its shareholders.   The Individual Merrill Defendants therefore failed to disclose the truth about its exposure and losses to CDO and subprime securities until three weeks after the merger closed and therefore was able to purchase First Republic with inflated stock.

139.   On December 22, 2007, the Economist estimated subprime defaults would reach a level between U.S. $200-300 billion.[48]

140.   By year end 2007, subprime related positions forced Merrill Lynch to report back-to-back quarterly losses that exceeded the previous two years' net income.

**Defendants Knew the CDO Securities Underwritten and Purchased By Merrill Lynch Were Risky and Illiquid Securities Despite Their AAA ratings**

141.   Various investigatory bodies, Wall Street analysts and the public at large have questioned why should any tranche of correlated triple-B-rated assets ever have received a AAA bond rating simply because it had been repackaged into a new security?

142.   For example, 75% of the issuance of one of Merrill Lynch's CDOs, Norma CDO I Ltd.  ("Norma") was initially rated AAA despite the fact that the underlying assets were largely credit default swaps on "triple B" (the lowest investment-grade rating) mortgage backed

---

[48]  *See The credit crunch: Postcards from the ledge*, The Economist, Dec. 19, 2007.

securities and securities of other CDOs.  Within less than a year Moody's downgraded seven of the nine tranches to junk and Fitch downgraded all nine tranches to junk.[49]

143.    "The whole idea," says Brad Hintz of Bernstein Research, "is taking a pool of risky, illiquid bonds and, through the magic of securitization, offering higher yields than on similarly rated securities."[50]

144.    According to the Henry Paulson's Policy Statement on Financial Market Developments, underwriters of CDOs "shopped" for credit ratings in the process of issuing new CDO securities.  CDO underwriters often did not disclose to investors in their CDOs the preliminary ratings they received from the Credit Rating Agencies.

145.    In fact, Mr. Riccardi "was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group.  A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings[.]"

146.    The practice of re-securitizing subprime related assets that have already been securitized once, twice or even three times[51] generated fees for a handful of big banks without

---

[49]  *See* Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis -- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall Street Journal, Dec. 27, 2007.  Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime mortgage related securities (29%).  The three tranches that were downgraded to junk were initially rated AAA , AA  and BBB (all investment grade).

[50]  Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

[51]  Merrill Lynch exacerbated the already high level of risks inherent in subprime CDO securities with several "innovations" in its underwriting practices.  Merrill Lynch created CDOs, such as Norma, where the underlying collateral were also CDO securities.  Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall Street Journal, Dec. 27, 2007.  See also Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, Wall St. J., Oct. 25, 2007.

actually spreading risks among the new CDO securities issued because the purchasers of the CDO securities were from a rather small pool of investors (mostly the banks engaged in underwriting CDOs).  "Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York structured-finance consultancy.  "If you hold my risk and I hold yours, we can say whatever we think it's worth and generate fees from that.  It's like . . . creating artificial value."[52]

147.    Such cross-selling benefited banks like Merrill Lynch because it helped support the flow of new CDOs and underwriting fees.  Each CDO sold some of its CDO securities to the next CDO, which could repackage securitize those securities again into a new CDO issuance to provide additional underwriting fees.  Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDO securities.[53]

148.    "It is a tangled hairball of risk," Janet Tavakoli, a Chicago consultant who specializes in CDOs, described how risky Norma's CDO securities were: "In March of 2007, any savvy investor would have thrown this . . . in the trash bin."[54]

149.    Moreover the fact that Merrill Lynch paid money to enter credit default swap contracts with non-investment grade financial guarantors  to "insure" against the risk of loss of its portfolio of "super senior" CDO and subprime securities, demonstrates that the company

---

CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared" and a CDO squared that adds another layer of securitization is referred to as "CDO cubed."

[52]   The fair market value of CDO securities held by Merrill Lynch should also have declined based on the news rising foreclosures, falling home prices and the increase in interest rates, predictably changed the value for CDO securities.  Bloomberg, *Fed Adds $38 Billion in Funds, Most since September 2001*, August 10, 2007.

[53]   According to Greg Medcraft, chairman of the American  Securitization Forum, the use of derivatives "multiplied the risk," of the newly issued CDO securities.  The potential losses are greater than anyone expected because it is not just physical loans that are defaulting.  *Id*.

[54]   Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall St. J., Dec. 27, 2007.

knew that these securities were risky and illiquid assets, despite their initial AAA rating.  Since then the fact that many of Merrill Lynch's CDOs have been downgraded to junk or are in default, which confirms what the Merrill Defendants knew long before this information was disclosed to its employees and the investing public.

**Stock Repurchase Plan**

150.   On April 30, 2007, Merrill Lynch issued a press release announcing that the Merrill Board had authorized the repurchase of up to $6 billion of Merrill Lynch's outstanding common shares ("Stock Repurchase Plan").  The press release stated in pertinent part as follows:

> NEW YORK, April 30, 2007 — Merrill Lynch & Co., Inc. (NYSE: MER) today announced that its board of directors has authorized the repurchase of up to $6 billion of the company's outstanding common shares.
>
> . . . .
>
> The authorization will be exercised from time to time, subject to market conditions, the relative attractiveness of other capital deployment opportunities, and regulatory considerations. Any repurchases are intended to make appropriate adjustments to the company's capital structure.

151.   Commenting on the announcement, Edwards stated that the Stock Repurchase Plan "will enable us to continue to be active and flexible in managing our equity capital.  We seek to balance increasing our return on equity and growing our book value per share.  To achieve this goal, our primary focus is to deploy capital into profitable growth opportunities.  But to the extent we generate excess capital, we will continue to use share repurchases, as well as cash dividends, to return capital to stockholders."

152.   The Stock Repurchase Plan was recommended to the Merrill Board by the Finance Committee.  According to Merrill Lynch's proxy statement dated March 16, 2007, one of the Finance Committee's responsibilities is that it "reviews and recommends capital management policies related to our common stock, including dividend policy, repurchase

programs and stock split." At the time of the $6 billion repurchase authorization, the Finance Committee was comprised of four directors: defendants Rossotti, Reese, Finnegan and Cribiore. Defendant Finnegan was the Chairman of the Finance Committee. Amongst other things, the Finance Committee was responsible for overseeing Merrill Lynch's credit and market risk management. By recommending that the Merrill Board approve the Stock Repurchase Plan, the Finance Committee failed to fulfill its oversight responsibilities and induced Merrill Lynch to purchase securities at prices that the members of the Finance Committee knew or should have know but for their reckless disregard of facts known to them, were artificially inflated due to Merrill Lynch's undisclosed losses and exposure to its subprime portfolio.

153.    In authorizing the Stock Repurchase Plan, the Merrill Director Defendants (in conjunction with the Merrill Officer Defendants who orchestrated the Stock Repurchase Plan) knowingly caused Merrill Lynch to waste a substantial amount of capital through the Stock Repurchase Plan at a time when the eventual need to raise additional capital to repair Merrill Lynch's balance sheet after the impact of the impending write-downs should have been readily apparent and approved Merrill's purchase of Merrill securities while they were in possession of material undisclosed information that would have resulted in Merrill paying far less for those shares had the truth been revealed. As a result, Merrill Lynch engaged in the purchase and sale of securities and, as a result of the Merrill Defendants' failures to disclose material information, Merrill Lynch was caused substantial economic loss by overpaying for those shares.

154.    The Merrill Director Defendants owed a duty to Merrill Lynch and its shareholders to be reasonably informed about the business and operations of Merrill Lynch. The Stock Repurchase Plan was not the product of reasonable business judgment and exposed the Merrill Director Defendants' failure to fulfill their oversight responsibilities to Merrill Lynch by

failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

155.    Instead, the Merrill Defendants knew, or should have known but for their reckless disregard of facts known to them, that the publicly traded shares of Merrill Lynch common stock were inflated due to their failures to fully and completely disclose Merrill's exposure to its subprime portfolios.  As a result, the Merrill Defendants induced and caused Merrill to purchase Merrill common stock in the open-market at artificially inflated prices which resulted in substantial damage to Merrill Lynch in violation of the federal securities laws and their fiduciary duties to Merrill Lynch and its public shareholders.

**Defendants Cause Merrill Lynch to Issue False-and-Misleading Financial Statements**

156.    Throughout the relevant period, Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes.

157.    There is evidence that Merrill Lynch had substantial warnings of the impending subprime crisis.  A Merrill Lynch analysis report on December 5, 2006, that losses on recent subprime deals could be 6% to 8% if home prices were flat in 2007 and in double digits if home prices fell by 5%.  The report further stated that falling home prices could trigger losses not only in riskier classes of mortgage-backed securities, but also in investment grade bonds.[55]

158.    As early as 2006 the imminent collapse of the subprime lending industry was widely-documented.    In December 2006, the Center for Responsible Lending issued a report

---

[55] *See* Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006.

predicting the worst foreclosure crisis in the modern mortgage market.[56]   Shortly thereafter,

several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries

from the SEC and FDIC, and resulting in several bankruptcy filings.

159.    Nevertheless, in 2007, the Merrill Defendants caused or allowed Merrill Lynch to

issue materially false and misleading statements, and omitted to disclose information necessary

to make such statements not false and misleading.

160.    In a January 18, 2007 press release, O'Neal made several false and misleading

statements.  The press release discussed fourth quarter and full year 2006 financial results and

stated, in part, the following:

> NEW YORK, January 18 – Merrill Lynch (NYSE: MER) today reported record
> full year net revenues, net earnings and earnings per diluted share for 2006, driven
> by strong growth in the firm's business segments. Net earnings for 2006 were
> $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to
> $34.7 billion. Pre-tax earnings increased to a record $10.4 billion, the pre-tax
> profit margin rose to a record 30.1%, and the return on average common equity
> increased to 21.3%. Book value per common share was $41.37, up 15% from
> 2005.
>
> *            *            *
>
> "We are extremely pleased with Merrill Lynch's performance for the year and the
> fourth quarter," said Stan O'Neal, chairman and chief executive officer. "***By
> virtually any measure, our company completed the most successful year in its
> history. Revenues, earnings, earnings per share and return on equity all grew
> strongly as a result of our continued emphasis on broadening the asset classes
> and capabilities we can offer clients, expanding our geographic footprint,
> diversifying our business mix, managing and deploying our capital more
> effectively, and investing in top talent***. We finished the year positioned better
> than ever to capitalize on the array of opportunities still emerging around the
> world as a result of what we believe are fundamental and long-term changes in
> how the global economy and capital markets are developing."
>
> Fourth quarter 2006 net earnings were $2.3 billion, and net earnings per diluted
> share were $2.41, up 71% from the year-ago quarter but down 24% from the third
> quarter of 2006, which included the one-time net gain from closing the

---

[56]   Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20,
2006.

BlackRock transaction. Similarly, pre-tax earnings of $3.4 billion were up 65% from the year-ago period but down 19% from the third quarter, as net revenues of $8.6 billion were up 27% from the year-ago quarter and down 13% sequentially. The fourth quarter pre-tax profit margin was 39.0%, and the annualized return on common equity was 25.6%.

**Global Markets and Investment Banking (GMI)**

GMI generated record revenues and pre-tax earnings for both the fourth quarter and full year 2006, as targeted investments around the world to expand and diversify its portfolio of businesses and geographic reach continued to enable the group to capitalize on a favorable market environment.

GMI generated $18.9 billion in net revenues for the full year 2006, up 37% from 2005, driven by record revenues in both Global Markets and Investment Banking. Pre-tax earnings were $7.1 billion, up 43% from the prior-year period. The pre-tax profit margin was 37.6%, up from 36.0% in 2005 demonstrating operating leverage even as substantial investments were made across the business.

GMI's fourth quarter 2006 net revenues were $5.4 billion, up 55% from the year-ago quarter. Compared with the fourth quarter of 2005, net revenues increased in all three major business lines:

> Fixed Income, Currencies and Commodities net revenues of $2.3 billion increased 70%, setting a quarterly record, driven by every major business line, in particular record revenues from credit products, commodities and foreign exchange, as well as strong growth from trading interest rate products.

> Equity Markets net revenues of $1.8 billion increased 49%, driven by nearly every major business line, led by the private equity, proprietary trading and cash trading businesses.

> Investment Banking net revenues of $1.3 billion set a quarterly record, up 41%, as record revenues from debt and equity origination more than offset a decline in revenues from merger and acquisition advisory activities.

Pre-tax earnings for GMI were $2.6 billion, up 73% from the year-ago quarter, driven by the strong revenue growth and continued discipline over expenses, especially compensation expenses. The fourth quarter 2006 pre-tax profit margin was 48.4%, compared with 43.4% in the prior-year period.

At the beginning of the fiscal first quarter of 2007, Merrill Lynch completed its acquisition of the First Franklin mortgage origination and servicing businesses from National City Corporation (NYSE: NCC) for $1.3 billion.

161.    During a conference call on January 18, 2007 discussing the 2006 fourth quarter

results, Defendant Edwards stated, in part, the following:

> GMI had nothing short of an outstanding quarter across nearly all businesses and
> regions. With $5.4 billion in revenues, GMI set a new quarterly record, up 21%
> sequentially and 55% year on year. Pre-tax earnings for the quarter of $2.6 billion,
> up 76% sequentially and 73% from the year-ago quarter. GMI's pre-tax margin of
> 48.4% was an all-time high, driven both by strong revenue growth and operating
> leverage achieved through discipline over compensation costs.
>
> "This record fourth quarter completed a record full year for GMI. Net revenues of
> $18.9 billion were the highest ever, up 37% from 2005, with double-digit
> percentage increases coming from each division and each region."
> "Pre-tax earnings growth was even stronger at 43% to $7.1 billion, as GMI
> achieved solid operating leverage even as significant investments continued to be
> made across the business. The full year pre-tax margin was 37.6%."
>
> "Looking at the revenue detail within GMI, fourth quarter FICC net revenues set
> another new record at $2.3 billion, up 11% from the third quarter and 70% from
> last year's fourth quarter, as business activity remained strong across virtually
> every business."
>
> Investment banking also set a revenue record in the fourth quarter, with $1.3
> billion in net revenues, up 59% sequentially and 41% year on year. Advisory
> revenues of $286 million were up 10% from the third quarter but down 18% from
> the particularly strong fourth quarter of 2005. However, revenues from both debt
> and equity origination set new quarterly records.
>
> "We look back at 2006 as a year of exceptional growth and strategic progress at
> Merrill Lynch. Financial performance was very strong, and that is our primary
> scorecard."

162.    During this earnings call, Defendant Edwards stated the following:

> [O]ur Investment Banking business continued to make great strides ranking
> number one for the quarter in global equity and equity linked underwriting league
> tables and number one in 2006 in CDO issuance for the third year in a row as we
> continue to be an innovator in that space. For the year we also ranked in the top
> five in global high yield origination for the first time since 1998, and this is the
> first year since 2003 that any non-commercial bank player has cracked the top
> five in this crucially important product category.

163.   On February 26, 2007, Merrill Lynch filed its Form 10-K for fiscal 2006, signed by O'Neal, which included results for the fourth quarter and full year 2006, and included the same financial results as previously reported.   The 2006 Form 10-K mentioned the word "subprime" (or "sub-prime") only three times and never mentioned the word "CDO" (or "Collateralized Debt Obligation").   Merrill Lynch also falsely represented that its "risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management."   Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2006).  The Form 10-K stated in part:

> During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including both interest rate and credit derivatives, principal investing/real estate, and foreign exchange.

> Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

> In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity-linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business,

which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

164.    Merrill Lynch also stated in its 2006 10-K, which was signed by O'Neal, that the company retained only $6.8 billion worth of all securitizations in 2006, which included CDOs:

In certain instances, Merrill Lynch retains interests in the senior tranche, subordinated tranche, and/or residual tranche of securities issued by certain SPEs created to securitize assets.

165.    Retained interests in securitized assets were approximately $6.8 billion and $4 billion at December 29, 2006 and December 30, 2005, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions.  The majority of the retained interest balance consists of mortgage-backed securities that have observable market prices.  These retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity.

166.    The 2006 Form 10-K was signed by O'Neal, Edwards, Codina, Cribiore, Finnegan, Rossotti, and Prueher.  In addition, O'Neal and Edwards signed Certifications to the Form 10-K stating:

1.    I have reviewed this annual report on Form 10-K for the fiscal year ended December 30, 2005 of Merrill Lynch & Co., Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

167.    On April 19, 2007, Merrill Lynch issued its financial results for the first quarter of

2007,[57] which had several false and misleading comments by O'Neal.  The release stated in part:

> Merrill Lynch today reported strong growth in net earnings and earnings
> per diluted share for the first quarter of 2007, driven by net revenues of
> $9.9 billion. Net revenues were up 24 percent from the prior-year period
> and up 14 percent from the fourth quarter of 2006, with increases both
> year over year and sequentially in both Global Markets & Investment
> Banking (GMI) and Global Wealth Management (GWM), and in all global
> regions. These are the second-highest quarterly net revenues Merrill
> Lynch has ever generated, only $51 million lower than in the third quarter
> of 2006, when net revenues included a $2.0 billion one-time, pretax gain
> arising from the merger of Merrill Lynch Investment Managers (MLIM)
> with BlackRock, Inc.
>
> First-quarter 2007 net earnings per diluted share were $2.26, up 414
> percent from 44 cents for the first quarter of 2006, or 37 percent on an
> operating basis, which excludes $1.2 billion, after taxes, of one-time
> compensation expenses from the 2006 first quarter. Net earnings per
> diluted share were down 6 percent from $2.41 for the fourth quarter of
> 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent
> from the first quarter of 2006, or up 31 percent excluding the one-time
> expenses in the prior-year period. Net earnings were down 8 percent from
> the fourth quarter of 2006, which included a lower compensation expense
> ratio. The pretax profit margin for the first quarter of 2007 was 31.4
> percent, and the annualized return on average common equity was 23.3
> percent. At the end of the first quarter, book value per share was $41.95,
> up 13 percent from the end of the first quarter of 2006 and 1 percent from
> the end of 2006.
>
> "This was a terrific quarter. In an environment which was volatile at times,
> we took full advantage of market opportunities and delivered value to our

---

[57]   Merrill Lynch adopted the new accounting standard SFAS 157 in the first quarter of 2007.
Under SFAS No. 157, companies are required to assess the fair value of assets on their books.
Merrill Lynch must label its assets as Level 1, 2, or 3, based on how easy they are to price.  The
three-level hierarchy gives the highest priority to quoted prices in active markets for identical
assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3).  SFAS No.
157 also requires that where no liquid market exists, Merrill Lynch attempt to value assets using
other observable inputs such as: quoted prices for similar assets or liabilities in other markets,
whether active or inactive; observable inputs, other than quoted prices, such as interest rates,
yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates; and
inputs that are derived principally from or can be corroborated by market data.  Changes in the
observability of valuation inputs may result in a reclassification for certain financial assets or
liabilities.  *See* Merrill Lynch Quarterly Report (Form 10-Q) (March, 2007).

clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses….

**Global Markets & Investment Banking (GMI)**

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

GMI's first-quarter 2007 net revenues were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

> Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first-quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

**Global Wealth Management (GWM)**

GWM generated strong revenue and pretax earnings growth in the first quarter of 2007. The growth was driven by Global Private Client (GPC), which increased its net revenues year over year for the 10th consecutive quarter, as well as by the contribution of Global Investment Management (GIM), including earnings from Merrill Lynch's investment in BlackRock. GPC continues to focus on delivering a superior product and service offering, positioning Merrill Lynch financial advisors (FAs) as essential partners to their clients. GPC also continues to invest in technology to further enhance both the efficiency and effectiveness of the FA force, and to invest in growing the FA census globally.

GWM's first-quarter 2007 net revenues were $3.4 billion, up 16 percent from the first quarter of 2006:

GPC's net revenues increased 11 percent to $3.1 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products. Transaction and origination revenues also increased, driven by new issue origination activity, and net interest revenues grew to a new record level.

GIM's net revenues increased 151 percent to $261 million, due primarily to revenues from Merrill Lynch's investment in BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment

management companies and the business that creates alternative investment products for GPC clients.

Pretax earnings for GWM in the first quarter of 2007 were $842 million, up 31 percent from the first quarter of 2006, driven by the growth in revenues. The pretax profit margin was 24.7 percent, up from 21.9 percent in the prior-year period, driven by the impact of the investment in BlackRock.

Turnover among FAs, especially top-producing FAs, remained low. FA headcount reached 15,930 at quarter-end, as GPC continued to exercise discipline in recruiting and training high-quality FAs.

Client assets in products that generate annuitized revenues ended the quarter at $633 billion, up 13 percent from the first quarter of 2006, and total client assets in GWM accounts were a record $1.6 trillion, up 10 percent. Net inflows of client assets into annuitized-revenue products were $16 billion for the first quarter, and total net new money was $16 billion.

On January 29, 2007, Merrill Lynch announced that it had reached a definitive agreement to acquire First Republic Bank (NYSE: FRC), a private banking and wealth management firm focused on high-net-worth individuals and their businesses, for approximately $1.8 billion in cash and stock.

168.   The April 19, 2007 press release was drafted and approved by O'Neal and Edwards.  Moreover, Cribiore, Finnegan, Reese and Rossotti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the press release announcing the quarterly results. Jonas, Prueher, Reese and Rossotti, as members of the Audit Committee, were responsible for the preparation and integrity of Merrill Lynch's financial statements, including the quarterly financial results.  Specifically, the Audit Committee charter required Jonas, Prueher, Reese and Rossotti to meet with both Merrill Lynch's auditor and its management, including O'Neal and Edwards, prior to release of the quarterly financial results.

169.   In the first quarter conference call with analysts on April 19, 2007, Edwards stated:

I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation. Let me put this business into context. As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as    our CDO activity involving subprime, including all the retained interests, you would see that revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters. And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.

That said, this is an asset class that will continue to be significant, both in the U.S. and worldwide. And the strategic importance of the First Franklin acquisition was clearly evident this quarter, as having both origination and servicing capabilities enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.

I would also point out that our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets. In fact, we've been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned.

At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors. Finally, it's important to understand that we manage our FICC businesses in aggregate as a portfolio and that portfolio delivered record revenues for the quarter. On a broader basis, most FICC markets experienced a continued favorable environment characterized by both high levels of client activity and opportunities for proprietary trading, enabling outstanding results as we continue to build out our capabilities in areas that are poised for growth.

170.    During this April 19, 2007 call Investment Analyst, William Tanona of Goldman

Sachs asked Edwards:

**Q - William Tanona**: …And then, your commentary there in terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business. Can you share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**A - Jeffrey Edwards**: Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business

broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume. And on the subprime business, maybe just a couple of more comments there.

While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. And we did that in a background where we were enhancing our already strong underwriting standards. We rationalized our array of products, eliminating certain products that were performing less well, and we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin, of First Franklin-originated paper fall steadily throughout the quarter. They started out and remain at a level far below the industry.

So I think the trends there show some signs of positiveness, and while it is early to say anything obviously about the second quarter, I'd just point out that we did our First Franklin securitization earlier in the week. It was a $2 billion securitization and we saw spreads tighter really across all tranches from where they were a month ago, as investors have clearly begun to reengage.

171.    In a conference call dated April 20, 2007 discussing the first quarter 2007 results,

Edwards stated, in part, the following:

"This morning, Merrill Lynch reported another outstanding quarter."

Highlights include:

Very strong performances across both business segments, including record net revenues from Fixed Income Currencies and Commodities, or FICC, as well as from Equity Markets and Investment Banking

"Non-U.S. net revenues comprised 39% of Merrill Lynch's total net revenues for the quarter, and 54% of net revenues in Global Markets and Investment Banking, or GMI. Both those proportions set new quarterly records."

"In key businesses in both GMI, and Global Wealth Management, or GWM, we continue to successfully execute our strategy to broaden and deepen our platform."

"Non-U.S. net revenues comprised 39% of Merrill Lynch's total net revenues for the quarter, and 54% of net revenues in Global Markets and Investment Banking, or GMI. Both those proportions set new quarterly records."

"GMI turned in another record-setting performance as momentum accelerated across its expanding global portfolio of businesses, and investments for growth continued to pay off."

"Now turning to FICC, which produced an outstanding first quarter performance. Net revenues in FICC set a new record for the third consecutive quarter."

"At this point, we believe the issues in this narrow slice of the market [the sub-prime market] remain contained and have not negatively impacted other sectors."

"Finally, it's important to understand that we manage our FICC businesses in aggregate as a portfolio — and that portfolio delivered record revenues for the quarter."

"Now to Investment Banking, which generated record net revenues for the second quarter in a row, at $1.4 billion up 4% from the fourth quarter and 47% year on year."

"This quarter's revenues were particularly strong in merger and acquisition advisory and leveraged finance, two core areas of focus for us, and were achieved despite the typical seasonal slowdown in broader market volumes."

"Our outstanding performance in investment banking underscores the progressively more powerful market position we have attained through key investments in personnel."

"We continue to be extremely pleased with the successful integration of MLIM and BlackRock, and refer you to their earnings release this morning for a review of their outstanding progress."

172.    Following the Company's announcement regarding its financial results for fiscal 2006, Merrill Lynch's stock traded above $90 at the end of April.

173.    The Merrill Defendants' April 2007 statements were also knowingly false and misleading, as revealed by events which were occurring contemporaneously but which were not being disclosed by Merrill and its officers and directors. On April 10, 2008, Merrill Lynch Bank & Trust Co. filed a verified petition in New York State Supreme Court which demonstrates that the defendants knew as early as the end of 2006 that significant write-downs would be required to the value of Merrill's CDOs and related securities. Merrill filed the April 10, 2008 petition

against National City Bank, from whom Merrill had purchased First Franklin in 2006.  In the petition, Merrill argued that National City Bank owed Merrill money since the First Franklin merger agreement contained a provision obligating National City Bank to adjust the purchase price if First Franklin's estimated final pro forma net asset statement as of December 30, 2006 was lower than the pro forma net asset statement as of June 30, 2006.

174.    On March 16, 2007, National City Bank wrote a letter to Merrill indicating it would adjust the purchase price downward by $30 million.  This was not enough for Merrill, however, which responded by letter dated April 13, 2007 demanding a further adjustment of $67 million, for a total adjustment of $97 million.  The biggest reason that Merrill claimed for the requested adjustment pertained to mortgage loans held for sale by First Franklin which Merrill had acquired.  Merrill's letter claimed that First Franklin had not properly valued these mortgage loans since it had allegedly "***failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006***, and resulted in an overstatement of such loans held for sale of approximately $43.65 million."

175.    These admissions by Merrill in April 2007 reflect the Merrill Defendants' knowledge at the time of the fact that Merrill's decision to purchase First Franklin was not in Merrill's best interests and that Merrill was purchasing a company whose assets were inflated and would have to be written down immediately.  They also reflect the Merrill Defendants' knowledge at the end of 2006 that massive write-downs would be required of similar assets on Merrill's own balance sheet.

176.    In addition, at this time, the defendants knew that Merrill had intentionally and significantly lowered the underwriting standards for subprime loans purchased from subprime originators such as ResMae, MLN, and Ownit.  For example, Michael Blum, a Managing

Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's designee to the board of subprime originator Ownit, instructed Ownit founder, Bill Dallas, in January 2006 to materially lower its underwriting standards so Merrill would have access to a greater number of subprime mortgages.

177.    On May 7, 2007, the Company issued its Form 10-Q, which was signed by Edwards.  The Form 10-Q stated the following:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices. The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.[58]

178.    Cribiore, Finnegan, Reese and Rossotti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the Form 10-Q.  Jonas, Prueher, Reese and Rossotti, as members of the Audit Committee, were responsible for the preparation and integrity of Merrill Lynch's financial statements, including the quarterly financial results.  Specifically, the Audit Committee charter required Jonas, Prueher, Reese and Rossotti to meet with both Merrill Lynch's auditor and its management, including O'Neal and Edwards, prior to the release of the quarterly financial results.

179.    Attending a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime area were "reasonably well contained."  O'Neal added that,

---

[58]  Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 30, 2007).

"There have been no clear signs it's spilling over into other subsets of the bond market, the fix-income market and the credit market."

180.    In July 2007, Merrill Lynch also reported its second-best ever net revenues for the FICC business, with little impact from exposure to mortgage-backed securities but failed to account for the actual valuation of the company's warehouse of increasingly illiquid CDOs. Merrill Lynch continued to tout the CDO business, citing "continued innovation in the CDO space, including the development of unique new CDO products" among the second quarter highlights for FICC.  *See* Merrill Lynch Second Quarter 2007 Analyst Conference Call, July 17, 2007, at 5.  However, its FICC net revenues were in fact "partially offset by a ***decline*** in net revenues from the structured finance and investments business, which includes mortgage-related activities."  Press Release, *Merrill Lynch Reports Second-Quarter 2007 Results: Net Earnings Per Diluted Share of $2.24, Up 37 Percent From Second Quarter 2006* (emphasis added)  .

181.    In a July 17, 2007 Merrill Lynch conference call, Merrill Lynch re-affirmed its risk-management capabilities.  Edwards, who was responsible for Merrill Lynch's supposedly independent risk groups, explained that: "[w]hile we have seen some positive signals…the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize.  Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ***ours have proven to be effective in mitigating the impact on our results***."  Merrill Lynch Second Quarter 2007 Analyst Conference Call, July 17, *2007* (emphasis added).

182.    Edwards also answered questions from UBS Investment Analyst Glenn Schorr and Deutsche Bank's Mike Mayo during the call and reassured investors and the market that Merrill Lynch was prepared to weather the volatile CDO market:

**Q - Glenn Schorr**: … Can we switch to the other one that you brought up, in terms of both subprime and CDO exposure? You are one of the largest – or the largest – underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment on related to some of the Bear hedge funds what collateral you have taken on your books or have not. And just overall comfort there, as well.

**A - Jeffrey Edwards**: Okay. Well, look, again I want to make two points. The first is that this is another example where I think proactive, aggressive risk management has put us in exceptionally good position. Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market. Our warehouse lines are down materially, our whole-loan inventory is down materially. As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market. …

**Q - Glenn Schorr**: Maybe just a last thing, yes or no – obviously, yes – but point of clarification, therefore anything you're financing in your repo business or through your prime brokerage business or on your own books, you've, to the best of your knowledge at the end of quarter is marked to an effective market even if it is a mark to model type of security?

**A - Jeffrey Edwards**: Yeah, that's right. I mean, obviously we have a very robust process around marking these assets, and we're confident in how they were marked, how they'll mark.

***

**Q - Mike Mayo**: …Can you remind us what percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

**A - Jeffrey Edwards**: Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. I don't think there's anything that would change that comment that I made in the first quarter.

**Q - Mike Mayo**: Then lastly, a tougher question perhaps, how much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**A - Jeffrey Edwards**: Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets. From an overall asset standpoint, again the point I would make there is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.

**Q - Mike Mayo**: Okay. Do you have an overall number, though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**A - Jeffrey Edwards**: We don't disclose our capital allocations against any specific or even broader group.

1.      During the conference call, Edwards also stated, in part, the following:

This outstanding revenue performance was broad-based, with significant year-over-year increases in all major business lines and regions, and is a testament to the successful execution of our diversification and growth strategies. The critical importance of these efforts was evident in the quarter, as we were able to deliver these strong overall results, despite lower revenues from our private equity business, which contributed significantly less than in recent quarters; and in spite of persistently challenging conditions in the U.S. sub-prime mortgage market.

Global Markets and Investment Banking, or GMI, again generated very strong results, as our investments in all three core business lines continue to produce robust and diversified year-on-year growth. GMI's second quarter net revenues of $6.2 billion, were 36% higher than the second quarter of last year, and down just 5% from the record first quarter. For the first time, non-U.S. revenues represented more than 60% of GMI's total net revenues for the period.

Looking at GMI's second quarter net revenues by major business line, FICC net revenues were the second-best ever at $2.6 billion, up 55% from the second quarter of 2006, and only 7% lower than the record first quarter. For the first six months, FICC generated record revenues of $5.4 billion, up 45% from last year. Compared with the second quarter of 2006, the increase in revenues was driven primarily by increases from trading both credit and interest rate products, the latter of which set a record for the second consecutive quarter. Revenues from commodities were also up substantially. The depth and strength of these increases more than offset a decline from mortgages.

The sequential decline in FICC revenues was driven primarily by credit, commercial real estate and currencies, which had offset revenue records in the first quarter, as well as commodities. Partially offsetting these declines was a substantial increase from structured finance and investment, which primarily reflect a better performance from our U.S. sub-prime mortgage activities, and to a lesser extent the continued growth in global rates.

Importantly, we have increasingly diversified our FICC business within and across asset classes and regions, creating many different drivers of growth. Our

strong 55% revenue increase in the quarter reflects the breadth of both very active client flows and attractive markets for proprietary risk-taking.

Some additional highlights for FICC in the second quarter include: record revenues in EMEA and the Pacific Rim for the second consecutive quarter; continued strength in distressed and structured credit trading; continued innovation in the CDO space, including the development of unique new CDO products involving foreign exchange and hybrid long/short structures; and in commodities, continued diversification of the platform with the first meaningful revenues from trading coal and our first major structured transaction in metals.

… *I think proactive aggressive risk management has put us in exceptionally good position.* Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management, I think, has certainly helped transform our risk profile since the end of the year.

183.    However, Edwards failed to disclose that Merrill Lynch had $43 billion dollars in exposure to risky and illiquid CDO securities and subprime mortgages; that crucial information was withheld until October 24, 2007.[59]  *See* Form 8-K (Oct. 24, 2007).

184.    According to the *New York Times*, the Merrill Board had been informed of its subprime exposure and CDO obligations as early as April and July 2007, respectfully.[60]

185.    At the end of July 2007, Fakahany [Merrill Lynch's former Co-President and CFO], who had assumed broad responsibility over Merrill's risk exposure, warned Merrill's Board and others, including O'Neal, Rossotti (a director in charge of Merrill's Risk Committee), and Rosemary Berkery (Merrill's General Counsel), of the mounting risk the company faced from CDOs and subprime MBS.

---

[59]  The Company first disclosed in their Oct. 24, 2007 8-K that it had $40.1 billion of CDO and subprime related net exposures as of June 29, 2007.  *See* Merrill Lynch Form 8-K (Oct. 24, 2007).  However, in its Sept 2007 10-Q filed with the SEC on Nov. 7, 2007, the Company restated the value of its June 29, 2007 CDO and subprime net exposure at $42.7 billion. *See* Merrill Lynch Form, 10-Q (Sept. 28, 2007).

[60]  *See* Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

186.    In addition, on August 9, 2007, Fakahany and Fleming – the Co-Presidents and Chief Operating Officers of Merrill Lynch – sent a three-page letter to Merrill's Board warning its members of Merrill's overexposure to CDOs and the subprime mortgage market.  The letter was entitled 'Board Market Update End July Results:  Note From Fakahany and Fleming, and was sent to the Merrill Director Defendants, O'Neal and Ms. Berkery.  The letter discussed the mounting losses and troubles facing Merrill Lynch's CDO exposure and explained that significant deterioration in this business had taken place in July 2007.

187.    The repeated, specific warnings from Fakahany and Fleming were not only particularly credible since such individuals were the Co-Presidents and COOs of Merrill, but because at the time Fakahany was responsible for Merrill Lynch's market risk management, and also because the Merrill Board subsequently placed Fakahany and Fleming in charge of Merrill's day-to-day affairs and risk management after O'Neal resigned. [61]

188.    In August 2007 Merrill's Co-Head of Risk Management, Keishi Hotsuki, warned his superiors at Merrill that the company's exposure to mortgage-related securities was too big.

189.    Despite Merrill Lynch's vast exposure to CDOs and subprime, the Merrill Board failed to take any action to decrease the risks faced by the company or to protect investors from the increasing risks posed by the acquisition and holding of Merrill's shares particularly in light of the failure to make adequate disclosures.

[61]    *See* May 16, 2007 Merrill Lynch press release entitled "Merrill Lynch Names Ahmass Fakahany and Greg Fleming Co-Presidents") (stating that Fakahany was "responsible for  the firm's Chief Financial Office (including Finance/Controllers, Treasury, Credit & Market Risk Management, Tax, and Corporate Strategy and Planning").  *See also* October 30, 2007 Merrill Lynch press release entitled "Stan O'Neal Retires from Merrill Lynch:  Alberto Cribiore to Serve as Interim Non-Executive Chairman and Chair Search Committee") (noting that Fakahany and Fleming will continue as co-presidents and that Fleming will take over Fakahany's responsibilities for risk management).

190.    Disclosing its exposure from its proprietary positions in CDO and subprime securities was critical for investors to understand the true risk of owning Merrill Lynch stock because the subprime crisis would not have been "a dire problem for Merrill if it hadn't gone from simply manufacturing CDOs and reaping fees to becoming a huge investor in the CDOs it created . . . Merrill was willing, even eager, to speculate with its own balance sheet[.]"[62]

191.    On July 17, 2007, Merrill Lynch announced its financial results for the second quarter of 2007.  In this press release, O'Neal made false or misleading comments.  The release stated, in part, the following:

> Merrill Lynch today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.
>
> Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.
>
> Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

---

[62]  *See* Shawn Tully, *Wall Street's money machine breaks down:  The subprime mortgage crisis keeps getting worse-and claiming more victims,* Fortune, Nov. 12, 2007.

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

*       *       *

**Merrill Lynch Investment Managers (MLIM)**
On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its

pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

\*      \*      \*

**Income Taxes**

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

**Share Repurchases**

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

192.     The July 17, 2007 press release was drafted and approved by O'Neal and Edwards.   Moreover, Cribiore, Finnegan, Reese and Rossotti, as members of the Finance Committee, were responsible for reviewing issues concerning balance sheet and capital management which were commented on in the press release announcing the quarterly results. Jonas, Prueher, Reese and Rossotti, as members of the Audit Committee, were responsible for the preparation and integrity of Merrill Lynch's financial statements, including the quarterly financial results.   Specifically, the Audit Committee charter required Jonas, Prueher, Reese and Rossotti to meet with both Merrill Lynch's auditor and its management, including O'Neal and Edwards, prior to the release of the quarterly financial results.

193.     During July of 2007, the problems in the housing market, coupled with the credit crisis, led to significant declines in the stock prices of many financial institutions.   However, Merrill Lynch's stock, while declining, remained at artificially inflated levels due to the false and

misleading statements and financial results issued and publicly disseminated by the Merrill Defendants.

194.    In sum, Merrill Lynch became the largest underwriter of CDOs over the few years preceding 2007.  Merrill Lynch also purchased CDO securities despite the obvious signs that the subprime and CDO market was deteriorating.  When those markets collapsed, Merrill Lynch was exposed to billions in losses from securities it could no longer sell because they were almost completely illiquid and had lost most, if not all, of their value.   Nonetheless, the Merrill Defendants, directly, or through Merrill Lynch, repeatedly issued inaccurate, incomplete and materially misleading statements to investors throughout the relevant period.   The Merrill Defendants knew or should have known that Merrill Lynch's stock price was artificially inflated by these misstatements and omissions, and would drop drastically (and by billions of dollars in market capitalization), once the truth was exposed.

195.    The statements made or authorized by the Merrill defendants, either directly or through Merrill lynch, during the relevant period were materially false and misleading because they failed to disclose and misrepresented the following material, adverse information: (a) that Merrill Lynch was more exposed to CDOs backed by high-risk subprime debt than it publicly disclosed and (b) that the Merrill Defendants failed to inform the market of the extent of likely write-downs in Merrill Lynch's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill Lynch's portfolio to be impaired.

196.    The Merrill Defendants had actual knowledge of the foregoing material, adverse non-public information concerning Merrill Lynch or were extremely reckless in the conduct of their statutory and common law duties as officers and directors of Merrill Lynch by failing to discovery material, adverse non-public information concerning Merrill Lynch.   The Merrill

Defendants also knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known that Merrill Lynch's statements that they made or authorized be made, were false and materially misleading because of those statements failed to disclose the foregoing material, adverse information concerning Merrill Lynch's true, extremely serious and current financial problems and the true state of its business prospects.

**Merrill Lynch Writes Down Over $8 Billion in Bad Debt**

197.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs.  The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim.[63]  *Bloomberg News* also reported that: "The company severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses."

198.    However, the damage to its business had already been done.  On October 5, 2007, Merrill Lynch announced that it would be writing down the value of its CDOs by $4.5 billion. Merrill Lynch further estimated that it ***would lose*** as much as 50 cents per share.  The comment shocked analysts who had been expecting ***a profit*** of around $2 a share.

199.    O'Neal, commenting on the announcement, stated that "[d]espite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our FICC business than we expected earlier in the quarter."

200.    Although prohibited from speaking on the record, investment bankers, traders and financial advisers quietly expressed disbelief, frustration and a bit of self-interested concern over what the write-down would do to their pay.  "Money at risk doesn't bother me," one senior

---

[63]    *See* Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.

broker said. "It's the risk of the money. Is it being run intelligently? If you take a $5 billion hit, my question is, do these guys know what they are doing?"[64]

201.    "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."[65]    Or, as stated by one corporate and securities law professor, "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't."

202.    As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards . . . There seems to be some blame to go around." But on October 3, 2007, the risks to Merrill Lynch were still understated and only partly disclosed.

203.    Then, just three weeks later, on October 24, 2007, the Merrill Defendants admitted that Merrill Lynch's losses would actually total $7.9 billion. In addition to a $463 million write down on leveraged-buyout commitments, Merrill Lynch's total write downs for 2007's third fiscal quarter were over $8.3 billion. Merrill Lynch also announced a loss of $2.2 billion, or $2.85 a share, for the quarter – **nearly six times the size of the loss Merrill Lynch had predicted just three weeks earlier**.    Shares of Merrill Lynch fell $3.80, or 5.7%, to $63.32 following this announcement.

204.    During a conference call on October 24, O'Neal claimed that risk management had failed the firm, and that errors in judgment had allowed Merrill to amass an untenable $32

---

[64]    Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

[65]    *Id*.

billion position in CDOs.   According to O'Neal, "We made a mistake."   "Some errors in

judgment were made in the business itself and within the risk management function."   O'Neal

also warned that further write downs were a possibility.  Some analysts estimated Merrill Lynch

might have to write down those assets anywhere from $4 billion to $5 billion in the 2007 fiscal

fourth quarter alone.  O'Neal commented in pertinent part as follows:

> Over the past few weeks, our FICC management team, led by David, has worked
> with out Finance staff to undertake a rigorous and comprehensive review of our
> remaining CDO and subprime related exposures.   This collective review has
> resulted in the use of more conservative valuation assumptions, and a total net
> write-down of approximately $7.9 billion for this quarter.
>
> ***
>
> The bottom line is that we got it wrong by being over-exposed to subprime and
> we suffered as a result of an unprecedented liquidity squeeze and deterioration in
> that market.  No one, no one, is more disappointed than I am in the result.
>
> ***
>
> Despite the fact that nearly all of our remaining CDO exposure is super senior, it
> turned out that both our assessment of the potential risk and our mitigation
> strategies were inadequate
>
> ***
>
> We're not, I'm not, going to talk around the fact that there were some mistakes
> that were made.   We, I am accountable for these mistakes, just as I am
> accountable for the performance of the firm overall.   And my job, our job, the
> leadership team's job – is to address where we went wrong and what changes
> were necessary, to make sure that we respond to changes in risk dynamics early,
> correctly, and in every asset class at every stage of the market's evolution.
>
> ***
>
> So, as I have mentioned, we have made a number of important changes….

205.   Despite the magnitude of the announcement, both O'Neal and Edwards, refused

to provide complete, straight-forward information regarding Merrill Lynch's disposition of its

inventory of CDOs.  One analyst asked the executives about apparent inconsistencies in the

accounting of their subprime losses between the second and third quarter of 2007, "As of the end of June you noted that your ABS CDO related exposure was around $32 billion, $15 as of the end of September. You marked down around $6. Where did the other $11 go?" O'Neal repeatedly refused to comment.[66]

206.    A Lehman Brothers analyst asked whether the existing CDO exposures are held in broker/dealer accounts or on Merrill Lynch's balance sheet. Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient." *See* Merrill Lynch Third Quarter 2007 Earnings Conference Call.

207.    On October 24, 2007, Merrill Lynch issued a press release containing several false and misleading comments from O'Neal. The release stated, in part, the following:

> Merrill Lynch today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.
>
> Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

---

[66]    *See also* Merrill Lynch Quarterly Report (Form 10-Q) (Sept. 30, 2007Q). The discrepancy was eventually explained in the September 2007 10-Q.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these one-time items.

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. See below for details.

Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

Equity Markets net revenues increased 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by

growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

208.    Immediately after Merrill Lynch released this adverse information, the company's shares dropped from $67.12 per share to an intra-day low of $61.40 per share, closing at $63.22 per share on volume of 52 million shares.

209.    As a result of this massive write off, Moody's Investor Service and other agencies downgraded the firm's credit and debt ratings.   Further, S&P reduced Merrill Lynch's credit rating to negative, causing the company' stock price to drop to $60.90 per share.

210.    Neither O'Neal nor Edwards could explain why Merrill Lynch's write-down of asset values – based on a fixed date in time – had nearly-doubled in only three weeks.  In fact, O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time."  If that statement is true, it is reasonable to infer that Merrill Lynch realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

211.    Merrill Lynch's stock continued to drop over the next days as rumors swirled regarding O'Neal's future at the company and analysts downgraded the company's stock.  News articles chronicled the FICC business' recent personnel changes and documented the risky

practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled Merrill Lynch before its actual financial condition was revealed.

**It Takes an Egregious Act of Hubris by O'Neal
Before the Merrill Board Decides to Show Him the Door**

212.    By any measure, O'Neal's tenure at Merrill Lynch was a disaster for the company.  Since becoming chief executive in late 2002, Merrill Lynch's shares had an annual return of about 7 percent before dividends, compared with returns of 11 percent for Morgan Stanley and 24 percent for Goldman Sachs.  Indeed, at the end of 2007's fiscal third quarter, Merrill Lynch's earnings per share were down 241% from the year before and the share price was down 34% from just a few months earlier in June 2007.  These returns were far and away worse than those of any of Merrill Lynch's competitors.

213.    Incredibly, Merrill Lynch's flat performance and $8.3 billion in write downs were not, by themselves, enough for the Merrill Director Defendants to fire O'Neal.  Rather, O'Neal had to attempt to accomplish a staggering breach of loyalty before he was shown the door.

214.    Specifically, on October 26, 2007, the *New York Times* reported that O'Neal had contacted one of Merrill Lynch's competitors, Wachovia Bank, about a potential merger.  He did so without informing Merrill Lynch's Board or obtaining its permission.  Why did O'Neal makes such an overture to Wachovia?  It wasn't because he thought it would be in the best interests of the Company.  Rather, O'Neal stood to make $250 million in severance pay if there was a change in control of Merrill Lynch.

215.    Upon publication of the *New York Times* article, rumors quickly spread that the Merrill Board was incensed by his actions and that O'Neal was on his way out.  Sure enough, just a few days later, on October 30, 2007, Merrill Lynch announced that O'Neal had "retired," effective immediately.  Unbelievably, the Merrill Director Defendants gave O'Neal a severance

package worth more than $160 million as a parting gift  compounding their waste of Merrill Lynch assets.  That day, the company's stock closed at $65.56 per share, down 14% from a closing price of $76.00 on October 3, 2007, the day before Merrill Lynch began publicly discussing its subprime losses.

**Merrill Lynch Continues to Suffer as Defendants' Wrongdoing is Exposed**

216.    An October 24, 2007 MarketWatch article entitled *Merrill's CDO push comes back to bite firm* stated, in part, the following:

> In late 2002, Merrill  (MER) was a minor player in CDOs, but by the end of 2003, the firm had become the largest underwriter of the products in the world. It retained that lead in 2004, 2005 and 2006.
>
> That fast expansion came back to bite Merrill on Wednesday as the investment bank reported an unexpectedly large third-quarter loss from almost $8 billion in write-downs. Most of that came from the firm's exposure to CDOs, built up from years of underwriting the products.
>
> Now analysts are questioning Merrill's risk management, while Moody's Investors Service and other agencies have downgraded the firm's credit and debt ratings. The bank still has $15.2 billion of exposure to CDOs, leaving analysts and investors wondering whether further write-downs may be needed.
>
> "We got too big in this area," Chief Executive Stan O'Neal said during a conference call with analysts on Wednesday. "Primary mistakes were errors of judgment and understanding the nature of the risk and the markets changing for the securities," he added, according to a transcript of the call.
>
> Merrill shares fell 5.8% to $63.22 on Wednesday, leaving them down almost a third so far this year. Earlier in the day, the bank's shares touched $61.40, their lowest level since late 2005.
>
> CDOs are a bit like mutual funds that buy securities backed by things like mortgages, auto loans and corporate bonds. After a loan is originated, it's often packaged up into a so-called asset-backed security. These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers. The riskiest bits offer the highest yields, while the highest quality parts suffer losses last but pay lower interest rates.

CDOs became very popular among fixed-income investors looking for higher yields in a low yield world. In 1995, there were hardly any. Last year, more than $500 billion worth was issued.

In recent years, CDOs have bought some of the riskiest tranches of mortgage-backed securities (MBS), including those backed by subprime home loans, which are offered to less creditworthy borrowers.

That helped fuel the housing boom. About 40% of CDO collateral is residential MBS. Almost three-quarters of that is in subprime and home-equity loans, with the rest in higher-quality, prime home loans, according to a study earlier this year by Joseph Mason, an associate finance professor at Drexel University's business school, and Joshua Rosner, a managing director at research firm Graham Fisher & Co.

When subprime mortgage delinquencies surged this year, rating agencies began downgrading many MBS. That led to downgrades of several bits of CDOs, too. The subprime problem then grew into a global credit crisis. Demand for CDOs dried up as investors realized the higher yield that initially attracted them wasn't enough to offset risks they'd taken on, sometimes unwittingly.

This month, just one U.S. CDO worth $500 million has been sold through Oct. 18. That's down from 41 CDOs worth $17 billion in October 2006, according to Dealogic.

In September, 19 U.S. CDOs worth $6.9 million were issued, down from 68 worth $31.16 billion a year earlier, Dealogic data show. In February 2006, Ricciardi and his team left Merrill to join Cohen Brothers LLC, which specializes in financing small and medium-sized companies through CDO securitizations.

But Merrill kept expanding, ending the year as the top global CDO book runner, with almost 14% market share, according to Dealogic. Citigroup (C) was second with less than 9%, followed by Goldman Sachs (GS) and Wachovia (WB) .

At the start of 2007, some brokerage firms began pulling back from the CDO market, but Merrill didn't, according to Dick Bove, an analyst at Punk Ziegel & Co. "It was a classic mistake," Bove said. "Merrill saw an opportunity and charged forward. They thought they were beating out the competition and grabbing market share, but they weren't really because the others were pulling back."

The seeds of this mistake may have been sown at the start of the decade, when Merrill cut back its fixed-income business dramatically, Bove explained.

O'Neal realized in 2002 and 2003 that the firm may have cut too much. Firms like Goldman and Lehman were making big profits in fixed-income, so Merrill "scrambled" to rebuild, Bove recalled.

This process, and the expansion into CDOs, was part of a broader push by O'Neal to get Merrill to take more risks to generate profits that would support advisory businesses like investment banking, according to Ryan Lentell, an equity analyst at Morningstar.

"The firm was basically a stock trading house until he took over," Lentell said. But the cutbacks from the beginning of the decade may have damaged Merrill and led to the mistakes that have hurt it this year, Bove noted. "Other firms didn't cut back so dramatically, so they maintained continuity and an understanding of the cycles in the market," he said. "Merrill lost that maybe, when it cut back at the start of this decade. That may have been why they made this mistake."

217.    An October 25, 2007 Wall Street Journal article entitled *Pioneer Helped Merrill*

*Move Into CDOs* stated, in part, the following:

Merrill Lynch & Co. is reeling after a giant write-down in mortgage-related securities. But the job-hopping executive who made the firm a leader in this once-hot, now-troubled arena has moved on.

From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. But the value of many of the securities, known as collateralized debt obligations, or CDOs, has tanked this summer and fall amid rising mortgage delinquencies.

Mr. Ricciardi liked to be called the grandfather of CDOs. Long before joining Merrill, he helped push Wall Street into risky new areas such as subprime mortgages, those made to home buyers with weak credit. Then he helped turn Merrill into the Wal-Mart of the CDO industry, before leaving behind a roughly $8 million annual paycheck to jump to a small firm that was a Merrill client.

Along the way, he lobbied both credit-rating firms and investors, talking up the safety and juicy returns of CDOs. He and his former Merrill colleagues churned these out frenetically during the height of the boom. Now that the market has soured, leading to billions of dollars in losses for CDO investors, those involved in the business face a growing legion of angry investors.

Merrill, which continued to expand its CDO business aggressively after Mr. Ricciardi left, now is the biggest casualty of the downturn after underwriting many troubled CDOs in the past year. In a conference call with investors yesterday, Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the

CDO business: "The bottom line is, we got it wrong by being overexposed to subprime." Mr. O'Neal added that Merrill had misjudged the risk of many CDOs. "It turned out that both our assessment of the potential risk and mitigation strategies were inadequate," he said.

Mr. Ricciardi, 38 years old, has remained a booster of the CDO market. At a meeting this spring – before the summer meltdown but amid cracks in the market – he exhorted salesmen, traders and bankers at the small firm he had joined to push investors to buy more CDOs, according to people who were there. "These are the trades that make people famous," he told his troops at the firm, Cohen & Co., say attendees.

Mr. Ricciardi's role is emblematic of the drive that so often pushes Wall Street to extremes. Long after signs of housing troubles first emerged in mid-2005, he and his colleagues at Merrill were setting out to smash records by issuing ever more CDOs.

Annual issuance of CDOs, which was just $52 billion in 1999, hit $388 billion in 2006, according to research provider Dealogic. The sales of these instruments to investors world-wide brought vast new capital into the business of mortgages, helping recycle loans so lenders could lend more. Thus, the promoters of CDOs played a crucial role in fueling one of the most salient economic phenomena of this decade, the near-global housing boom.

The bundling of loans [by the late 1990s] into salable securities was already a common business, but a much simpler one. Fannie Mae and Freddie Mac, the big government-sponsored mortgage buyers, had long been doing this with ordinary home loans. But as the government began to auction off huge collections of assets from failed S&Ls, Wall Street experimented with more exotic methods.

It bundled together pools of assets containing loans of many different types, ranging from credit-card debt to volatile aircraft leases. With these pools as backing, bankers issued new securities that had varying levels, or tranches, of risk and interest yield. Mr. Ricciardi was among pioneers who took this laboratory of debt repackaging a step further: Bundling the already exotic tranches together into new pools called CDOs.

All of these securities had high-risk tranches, the slices that would bear the brunt of any loan defaults. These often had low credit ratings and were hard to sell, despite their potentially high returns.

Mr. Ricciardi went an additional step in the business of bundling and rebundling, and created new CDOs out of these risky tranches. And the natural structure of a CDO – whereby the impact of defaults falls first on the riskiest tranches – made it possible for the safest tranches of even these CDOs to get top credit ratings.
[Jump Start]

"It was really put in Chris's lap to figure out how to do it," says Joseph Donovan, who was Mr. Ricciardi's boss at the time. In late 1999, Prudential sold a complex CDO backed by a collection of other securities that, in turn, were backed by debts such as mobile-home loans, airplane leases, car loans and credit-card receivables.

Other Wall Street firms began creating similar CDOs, using subprime mortgages, commercial mortgages and various other kinds of debt as building blocks.

Boosting the CDO boom was a decline in interest rates around the world. This created demand from fixed-income investors who wanted higher interest. Corporate junk bonds provide high yields, but investors soured on them in the post-bubble years of 2001 and 2002 when defaults on corporate bonds spiked. With the housing market surging, mortgage securities seemed to many investors like a better bet. Mr. Ricciardi coached salespeople he worked with to stress that mortgage CDOs offered better interest rates than corporate bonds with similar ratings.

He was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group. A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings, but rarely got his way.

By the summer of 2001, Credit Suisse was selling at least one new CDO a month and vaulting up Wall Street's so-called underwriting league tables. In 2001 Credit Suisse underwrote CDOs worth $12.5 billion, nearly double those of No. 2 Deutsche Bank AG, according to Dealogic.

Merrill, by contrast, had a minuscule presence. Its top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative, fast-growing businesses. His priorities included debt financing and derivatives, or instruments whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

Part of the strategy involved nurturing a new band of Wall Street professionals, people who help underwriters to create and market CDOs, and then babysit them after they're created. These professionals became known as CDO managers. It's the business Mr. Ricciardi's current firm, Cohen & Co., is in.

That firm is led by Daniel Cohen, a scion of a wealthy Philadelphia family. The firm specialized in providing financing to small and midsize financial firms, helping them issue securities. It was already a Merrill client, and Mr. Ricciardi had dealt often with Cohen & Co. while he was at Credit Suisse.

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

An industry newsletter, Private Placement Letter, quoted Mr. Ricciardi in early 2005: "The strategy has been to be a high-volume underwriter, with a focus on areas that are very popular." Every quarter, he taped underwriter rankings near Merrill's trading desk, highlighting in yellow the firm's top place.

Merrill salespeople scoured the globe for buyers of CDOs, selling pieces of them to a wide range of investors such as Woori Bank in Seoul, Korea, AXA SA of France, Uniqa Group of Austria and investment funds in Australia and Singapore. Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill over a $134 million investment made this spring in CDOs that Merrill underwrote between 2003 and 2006, while Mr. Ricciardi was still there.

These particular investments were known as auction-rate securities. They were marketed as short-term investments that the buyers could resell, if they wanted to, in auctions run by Merrill. But this summer, as nervous investors began to shun almost anything connected to subprime mortgages, MetroPCS found it couldn't sell the CDOs it had bought, and it now expects to incur losses. Merrill says it believes it "acted appropriately in its dealing with MetroPCS and made the relevant and necessary disclosures to them."

Something similar had happened to some clients of Mr. Ricciardi's previous firm, Credit Suisse, not long after he left that firm. To appease angry clients, Credit Suisse repurchased some auction-rate securities created by Mr. Ricciardi's group between 2001 and 2003. The problem then was loans on manufactured housing, which defaulted in large numbers. After its repurchase of the CDOs, Credit Suisse sold them at a loss, people familiar with the matter said. Credit Suisse declined to comment.

At Merrill, Mr. Ricciardi courted clients at his country club, Sleepy Hollow, where Merrill held an annual August golf outing for money managers and investors, and Merrill's top brass. One regular at the outings was Ralph Cioffi, who managed two Bear Stearns Cos. hedge funds that invested heavily in Merrill

Lynch CDOs. In a major casualty of the subprime mortgage turmoil this summer, the two Bear funds ended up losing as much as $1.6 billion of investors' money.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

When Mr. Ricciardi left in February of 2006, signs of trouble in the housing market were already abundant, as both home-price appreciation and home builders' orders slowed. Cohen & Co., aiming to go public, offered Mr. Ricciardi an equity stake if he came aboard. He had wanted a bigger job at Merrill that went beyond CDO underwriting. When it didn't come, he jumped to Cohen – taking with him several Merrill bankers, salesmen and a technology expert.

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDOs at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs, say three people who heard him.

That year, Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDOs jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.

At Cohen & Co., Mr. Ricciardi got back in growth mode, beefing up the boutique firm's staff, investing in new technology, and cobbling together many CDOs backed by mortgages, corporate debt, and even loans to hospitals and nonprofits. In the 18 months after his early-2006 arrival, Cohen's assets under management swelled to more than $40 billion from $10 billion. Mostly in conjunction with Merrill as underwriter, Cohen formed 25 new CDOs valued at more than $25 billion, many of which contained subprime mortgages, according to Dealogic data.

Tensions, however, were brewing between the two companies. Prior to 2006, Cohen was by far the biggest client of Merrill's CDO group, in one year contributing around a quarter of its profits. But there was some debate within Merrill over the large amount of financing it was extending to Cohen, and the risk Merrill took in the process.

A few months before he left Merrill for Cohen, Mr. Ricciardi had a heated discussion with another senior Merrill executive on the firm's trading floor. The other executive said it was risky for Merrill to underwrite every Cohen CDO. "Do we want to be the only bank doing Cohen deals?" the executive asked Mr. Ricciardi, according to people who were present. They say that Mr. Ricciardi shot back, "Yes, we do. Why do we want to have anything less than 100% market share?"

When Cohen accelerated its deal-making pace in 2006 and early this year, top Merrill managers decided to limit their exposure to Cohen-managed deals. Merrill was holding billions of dollars in mortgage bonds and other securities that were slated to go into CDOs, exposing the big investment bank to price fluctuations among these assets.

Mr. Cohen made personal phone calls to Merrill's Mr. Kim to try to persuade Merrill to finance more deals, according to people familiar with the situation. Merrill executives said they would do so only if Cohen & Co. agreed to bear a bigger chunk of the losses in case the securities the bank was holding for Cohen fell in value.

Cohen agreed, but also took some of its CDO business to other Wall Street firms, including Bear Stearns, Morgan Stanley, UBS AG and Wachovia Corp.

This summer's meltdown in subprime mortgages and related securities was swift, hurting Cohen as well as Merrill. Mr. O'Neal yesterday vowed to downsize Merrill's business in structured finance.

Cohen's hopes of going public look unlikely to be realized soon. Meanwhile, a publicly held real-estate investment trust that Cohen manages, Alesco Financial Inc., has seen its share price plunge. Last month it said it said it would not receive cash flows on a September payment date from two CDOs that contain securities backed by subprime home loans. Alesco declined to comment, as did Cohen & Co.

"Everybody was talking about the wonders of all the CDOs and the new innovations," says Stacey Nutt, the president of ClariVest Asset Management LLC in San Diego. They're discovering that these instruments have instead spread risk to parts of the financial system, such as hedge funds and foreign investors, that aren't regulated. "You end up with more risk than you had 15 years ago," Mr. Nutt says. "It's a very scary situation."

218.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure — and the financial press reported that the SEC was investigating reports that Merrill Lynch had engaged in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities.

219.    The Merrill Defendants causes Merrill Lynch to immediately deny that it had entered into such transactions.  On the same day the *Wall Street Journal* article appeared, Merrill Lynch issued a press release:

> The story is nonspecific and relies on unidentified sources. We have no reason to believe that any such inappropriate transactions occurred. Such transactions would clearly violate Merrill Lynch policy.[67]

220.    Five days later, on November 7, 2007, Merrill Lynch issued its quarterly report on Form 10-Q for the third quarter signed by Edwards.  The securities filing did not address the *Wall Street Journal* article, but stated "[on] October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio.  Merrill Lynch is cooperating fully with the SEC in this matter."  Merrill Lynch Quarterly Report (Form 10-Q) (Sept. 30, 2007).

221.    A November 8, 2007 Reuters article announced that *Merrill reveals $6.3 billion more in subprime-CDO exposure*:

> Merrill Lynch & Co Inc said on Wednesday its total exposure to risky collateralized debt obligations and subprime mortgages is $27.2 billion, or about $6.3 billion more than what the company disclosed late last month.
>
> Merrill's larger figure is mostly because of a deeper level of disclosure surrounding its banking operations. For the first time, the world's largest brokerage disclosed $5.7 billion worth of exposure to U.S. subprime mortgages at Merrill Lynch Bank USA, a Utah-chartered industrial bank, and Merrill Lynch Bank & Trust Co., a full-service thrift.
>
> Those operations file disclosures and financial statements with U.S. banking regulators, which have not required details on subprime exposure.
>
> In addition, Merrill said its exposure to CDOs is now $15.82 billion, or about $600 million more than what the company revealed in its third-quarter earnings release on October 24. The figure is larger because a hedge against potential loss was terminated recently after a dispute with a counterparty, which Merrill declined to name.

---

[67]  *Merrill Lynch Responds to Wall Street Journal Story*, Business Wire, Nov. 2, 2007.

CDOs and subprime mortgages were largely responsible for Merrill's $2.3 billion loss in the third quarter, the largest in the company's history. An $8.4 billion write-down, mostly related to subprime mortgages and CDOs, triggered the loss.

Analysts fear Merrill and other Wall Street banks will have to record further write-downs on their exposure because the market for CDOs and subprime mortgages remains in turmoil. Analysts at Citigroup estimate banks will take up to $64 billion more in write-downs, mostly from CDO-related exposure.

Mike Mayo, an analyst at Deutsche Bank, has estimated that Merrill's additional write-down could top $10 billion.

U.S. banks have had to slash the value of CDOs and subprime mortgages because they are linked to a rising tide of defaults on home loans given to borrowers with weak credit.

222.    On November 26, 2007, the *Wall Street Journal* issued a correction:

ON NOV. 2, the Journal published a page-one article on Merrill Lynch & Co. that was based on incorrect information that the firm had engaged in off-balance-sheet deals with hedge funds in a possible bid to delay the recognition of losses connected to the firm's mortgage-securities exposure. In fact, Merrill proposed a deal with a hedge fund involving $1 billion in commercial paper issued by a Merrill-related entity containing mortgage securities. In exchange, the hedge fund would have had the right to sell the mortgage securities back to Merrill after one year for a guaranteed minimum return. However, Merrill didn't complete the deal after the firm's finance department determined it didn't meet proper accounting criteria. In addition, Merrill says it has accounted properly for all its transactions with hedge funds.

*Corrections & Amplifications*, Wall St. J., Nov. 26, 2007.

223.    The correction purportedly assuaged doubts about Merrill Lynch's accounting for the $1 billion hedge-fund transaction previously reported, but it neither resolved the ongoing SEC inquiry into the company's subprime mortgage portfolio nor mitigate the damages resulting from Merrill Lynch's subprime debacle.  In fact, it confirms that Merrill Lynch itself "proposed" the extraordinary hedge fund deal, designed to conceal its actual financial condition.

**Merrill Lynch Faces a Litany of Lawsuits Alleging Fraud and Misrepresentation**

224.    Merrill Lynch has been accused repeatedly of using fraud and misrepresentation to find buyers for the CDO securities in an effort to limit the number of CDO securities it was forced to purchase as it continued its underwriting pace in 2007 despite the lack of buyers for these risky and illiquid securities.  Whether or not fraud can be proven, the allegations in these suits demonstrate that Merrill Lynch sought to sell the risky CDOs and subprime securities without full disclosure to the buyers (for no rational buyer with full knowledge would have purchased them), and that these securities became unmarketable before October 2007.  Thus, the allegations of these suits provide more evidence that Merrill Lynch itself knew it was overexposed to these risky securities before the October disclosures.

225.    Merrill Lynch is under investigations by numerous federal and state authorities for fraud in the sales of CDO and subprime related securities.  For example, the Massachusetts secretary of state accused Merrill Lynch of fraud in a civil administrative proceeding over its sales of subprime-related debt to the City of Springfield, Massachusetts ("the City").

226.    In November 2006, Merrill Lynch was engaged as an investment advisor to the City.  According to the complaint, Merrill Lynch understood that it was to invest the City's money only in safe-money-market-like investments that would protect the City's principal and as authorized by City personnel.[68]  Instead, without disclosing the nature of these instruments, Merrill Lynch invested approximately $14 million of the City's funds in the securities of three highly illiquid "CDO squared."  The instruments appeared with other names on the City's account statements through June 2007, but were "quietly relabeled as CDOs in July."

227.    According to the complaint, shortly after the sale, the market value for CDOs backed by subprime markets began to plummet and the City's accounts began to lose money.  In

---

[68]  *See* Respondents' Administrative Complaint at 2, 3 and 9, *In the Matter of Merrill Lynch, et al.*

September 2007, after the City requested that the CDOs be sold, they were informed that the auctions had failed, the CDOs could not be sold at any price close to their par value, and there were no buyers.

228.   In a letter dated November 29, 2007, James Mann, First Vice President and Assistant General Counsel of Merrill Lynch, disclaimed responsibility for these investments stating that the City made its own investment decisions.   Contradicting this disclaimer, in February 2008, Merrill Lynch agreed to buy back the securities at their original value of $13.9 million plus attorneys' fees.[69]

229.   Similarly, Merrill Lynch was sued by MetroPCS Communications, Inc. for fraud and misrepresentation connected with the sale of senior tranch CDO securities in May 2007.[70] MetroPCS hired Merrill Lynch as its investment advisor for its $134 million in cash reserves contingent upon compliance with MetroPCSs Investment Policy that specifically stated that "MetroPCS's risk tolerance is 'LOW' and that cash must, therefore, be invested to preserve capital and to provide liquidity."

230.   MetroPCS claims that beginning in May 2007 – well after the subprime mortgage market had started to show signs of distress:

- Merrill caused MetroPCS to begin purchasing highly risky CDO securities, which violated its investment policy.

- Merrill failed to disclose that the collateral backing many of these CDOs had wide ranging exposure to the subprime mortgage market.

- Merrill also failed to disclose that it had a conflict of interest in urging MetroPCS to continue to buy these CDO securities because Merrill was one of the largest underwriters and sellers of such securities and in fact "held

---

[69]  Craig Karmin, *Merrill Buys Back CDOs it Sold to Springfield, Mass.,* Wall St. J, Feb. 1, 2008.

[70]   *See MetroPCS Commcn's, Inc. v. Merrill Lynch, et al.*, No. 07-12430 (D. Dallas. Oct. 18, 2007).

significant investments of its own in CDO [securities] and related instruments with subprime exposure and thus stood to lose significantly if the market for such instruments weakened."

231.   MetroPCS asserts that the investments violated its goal of holding only safe, liquid assets but that Merrill Lynch told MetroPCS that the securities were low-risk and highly liquid.

232.   In addition, in *Luminent Mortgage Capital v. Merrill Lynch*, *et al.*, filed on December 24, 2007, the complaint alleges fraud against Merrill Lynch in the underwriting and sale of mortgage backed securities.[71]   Luminent purchased the mortgage backed securities on August 30, 2005.  After doing its own due diligence to gather information about the underlying mortgage loans, Luminent discovered that a substantial portion of those loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans; that the characteristics of the portfolio as a whole did not comport with the information provided by Merrill Lynch.

233.   The foregoing are only a few of the multitude of suits brought against Merrill Lynch by governmental entities, its investors, investment partners, counter-parties, employees and others relating to its business practices and, in particular, its involvement in the subprime markets.

**Ongoing Concern About the Validity of Merrill Lynch's Financial Statements**

234.   Analysts continued to speculate that Merrill Lynch had not come clean regarding the full extent of its past misrepresentations and its exposure to subprime-backed securities and CDOs.  Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have

---

[71]   *See Luminent Mortgage Capital v. Merrill Lynch, et al.*, No. 07-5423, (Pa. D. Dec. 24, 2007).

increasingly lost confidence in the financials of Merrill Lynch.  It's not enough to say the CEO has gone, problem fixed."[72]

235.    Other commentators have noted, "Just think how much better warned investors would have been if those actual loss estimates had been made public.  And just think how useful it would be to know those loss estimates for distressed conduits the banks must deal with now."[73]

236.    A January 6, 2008 Wall Street Journal articled entitled *Wall Street Wizardry Amplified Credit Crisis* stated, in part, the following:

> In recent years, as home prices and mortgage lending boomed, bankers found ever-more-clever ways to repackage trillions of dollars in loans, selling them off in slivers to investors around the world. Financiers and regulators figured all the activity would disperse risk, and maybe even make markets safer and stronger.
>
> Norma CDO I Ltd., as its full name goes, is one of a new breed of mortgage investments created in the waning days of the U.S. housing boom. Instead of spreading the risk of a global home-finance boom, the instruments have magnified and concentrated the effects of the subprime-mortgage bust. They are now behind tens of billions of dollars of write-downs at some of the world's largest banks, including the $9.4 billion announced last week by Morgan Stanley.
>
> Norma illustrates how investors and Wall Street, in their efforts to keep a lucrative market going, took a good idea too far. Created at the behest of an Illinois hedge fund looking for a tailor-made bet on subprime mortgages, the vehicle was brought into existence by Merrill Lynch & Co. and a posse of little-known partners.
>
> In its use of newfangled derivatives, Norma contributed to a speculative market that dwarfed the value of the subprime mortgages on which it was based. It was also part of a chain of mortgage-linked investments that took stakes in one another. The practice generated fees for a handful of big banks. But, say critics, it created little value for investors or the broader economy.
>
> "Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York

---

[72]  Graham Bowley and Jenny Anderson*, Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

[73]  Peter Eavis, *The Next Credit Scandal:  The Real Outrage Of The Credit Crunch Has Been In The Way Major Banks Disclosed Potential Losses. Now, There Are Billions More In Undisclosed Risk.*  Fortune, Nov. 26, 2007.

structured-finance consultancy. "If you hold my risk and I hold yours, we can say whatever we think it's worth and generate fees from that. It's like...creating artificial value."

Only nine months after selling $1.5 billion in securities to investors, Norma is worth a fraction of its original value. Credit-rating firms, which once signed off approvingly on the deal, have slashed its ratings to junk.

The concept behind Norma, known as a collateralized debt obligation, has been in use since the 1980s. A CDO, most broadly, is a device that repackages the income from a pool of bonds, derivatives or other investments. A mortgage CDO might own pieces of a hundred or more bonds, each of which contains thousands of individual mortgages. Ideally, this diversification makes investors in the CDO less vulnerable to the problems of a single borrower or security.

The CDO issues a new set of securities, each bearing a different degree of risk. The highest-risk pieces of a CDO pay their investors higher returns. Pieces with lower risk, and higher credit ratings, pay less. Investors in the lower-risk pieces are first in line to receive income from the CDO's investments; investors in the higher-risk pieces are first to take losses.

But Norma and similar CDOs added potentially fatal new twists to the model. Rather than diversifying their investments, they bet heavily on securities that had one thing in common: They were among the most vulnerable to a rise in defaults on so-called subprime mortgage loans, typically made to borrowers with poor or patchy credit histories. While this boosted returns, it also increased the chances that losses would hit investors severely.

Also, these CDOs invested in more than simply subprime-backed securities. The CDOs held chunks of each other, as well as derivative contracts that allowed them to bet on mortgage-backed bonds they didn't own. This magnified risk. Wall Street banks took big pieces of Norma and similar CDOs on their own balance sheets, concentrating the losses rather than spreading them among far-flung investors.

"It is a tangled hairball of risk," Janet Tavakoli, a Chicago consultant who specializes in CDOs, says of Norma. "In March of 2007, any savvy investor would have thrown this...in the trash bin."

Norma was nurtured in a small office building on a busy road in Roslyn, on the north shore of New York's Long Island. There, a stocky, 37-year-old money manager named Corey Ribotsky runs a company called N.I.R. Group LLC. Mr. Ribotsky came not from the world of mortgage securities, but from the arena of penny stocks, shares that trade cheaply and often become targets of speculation or manipulation.

N.I.R. and its affiliates have taken stakes in 300 companies, some little-known, including a brewer called Bootie Beer Corp., lighting firm Cyberlux Corp. and water-purification company R.G. Global Lifestyles. Mr. Ribotsky's firms are in litigation in New York federal court with all three companies, which claim N.I.R. manipulated their share prices. Through its lawyer, N.I.R. denies wrongdoing and has accused the companies of failing to repay loans.

Mr. Ribotsky's firm attracted the attention of Merrill Lynch in 2005. The top underwriter of CDOs from 2004 to mid-2007, Merrill had generated hundreds of millions of dollars in profits from assembling and then helping to distribute CDOs backed by mortgage securities. For each CDO Merrill underwrote, the investment bank earned fees of 1% to 1.50% of the deal's total size, or as much as $15 million for a typical $1 billion CDO.

To keep underwriting fees coming, Merrill recruited outside firms, called CDO managers. Merrill helped them raise funds, procure the assets for their CDOs and find investors. The managers, for their part, choose assets and later monitor the CDO's collateral, although many of the structures don't require much active management. It was an attractive proposition for many start-up firms, which could earn lucrative annual management fees.

Mr. Ribotsky's entry into the world of CDO managers began at Engineers Country Club on Long Island. There, in 2005, he met Mitchell Elman, a New York criminal-defense lawyer who specializes in drunk-driving and drug cases. Mr. Elman introduced Mr. Ribotsky to Kenneth Margolis, then a high-profile CDO salesman at Merrill, according to people familiar with the situation. Mr. Elman declined to comment.

Mr. Margolis, who in February 2006 became co-head of Merrill's CDO banking business, played a key role in seeking out start-up firms to manage CDOs. He put Mr. Ribotsky in contact with a few people who had experience in the mortgage debt market. They included two former Wachovia Corp. bankers, Scott Shannon and Joseph Parish III, who left Wachovia and established their own CDO management firm.

Mr. Ribotsky decided to team up with Messrs. Shannon and Parish. "It sounded interesting and that's how we ventured into it," Mr. Ribotsky says. Messrs. Parish and Shannon declined to discuss specifics of Norma.

Together the trio set up a company called N.I.R. Capital Management, which over the next year or so took on the management of three CDOs underwritten by Merrill.

In 2006, Mr. Ribotsky says Merrill came to N.I.R. with a new proposition: One of the investment bank's clients, a hedge fund, wanted to invest in the riskiest piece

of a certain type of CDO. Merrill worked out a general structure for the vehicle. It asked N.I.R. to manage it.

"It was already set up when it was presented to us," Mr. Ribotsky says. "They interviewed a bunch of managers and selected our team."

The CDO would be called Norma, after a small constellation in the southern hemisphere. According to people familiar to the matter, the hedge fund was Evanston, Ill.-based Magnetar, a fund that shared its name with a powerful neutron star. Magnetar declined to comment.

On Dec. 7, 2006, Norma was established as a company domiciled in the Cayman Islands. N.I.R., as its manager, would earn fees of some 0.1%, or about $1.5 million a year.

Norma belonged to a class of instruments known as "mezzanine" CDOs, because they invested in securities with middling credit ratings, averaging triple-B. Despite their risks, mezzanine CDOs boomed in the late stages of the credit cycle as investors reached for the higher returns they offered. In the first half of 2007, issuers put out $68 billion in mortgage CDOs containing securities with an average rating of triple-B or the equivalent – the lowest investment-grade rating – or lower, according to research from Lehman Brothers Holdings Inc. That was more than double the level for the same period a year earlier.

For Norma, N.I.R. assembled $1.5 billion in investments. Most were not actual securities, but derivatives linked to triple-B-rated mortgage securities. Called credit default swaps, these derivatives worked like insurance policies on subprime residential mortgage-backed securities or on the CDOs that held them. Norma, acting as the insurer, would receive a regular premium payment, which it would pass on to its investors. The buyer of protection, which was initially Merrill Lynch, would receive payouts from Norma if the insured securities were hurt by losses. It is unclear whether Merrill retained the insurance, or resold it to other investors who were hedging their subprime exposure or betting on a meltdown.

Many investment banks favored CDOs that contained these credit-default swaps, because they didn't require the purchase of securities, a process that typically took months. With credit-default swaps, a billion-dollar CDO could be assembled in weeks.

In principle, credit-default swaps help banks and other investors pass along risks they don't want to keep. But in the case of subprime mortgages, the derivatives have magnified the effect of losses, because they allowed bankers to create an unlimited number of CDOs linked to the same mortgage-backed bonds. UBS Investment Research, a unit of Swiss bank UBS AG, estimates that CDOs sold credit protection on around three times the actual face value of triple-B-rated subprime bonds.

The use of derivatives "multiplied the risk," says Greg Medcraft, chairman of the American Securitization Forum, an industry association. "The subprime-mortgage crisis is far greater in terms of potential losses than anyone expected because it's not just physical loans that are defaulting."

Norma, for its part, bought only about $90 million of mortgage-backed securities, or 6% of its overall holdings. Of that, some were pieces of other CDOs mostly underwritten by Merrill, according to documents reviewed by The Wall Street Journal. These CDOs included Scorpius CDO Ltd., managed by a unit of Cohen & Co., a company run by former Merrill CDO chief Christopher Ricciardi. Later, Norma itself would be among the holdings of Glacier Funding CDO V Ltd., managed by an arm of New York mortgage firm Winter Group.

A Winter Group official said the company declined to comment, as did Cohen & Co.

Such cross-selling benefited banks, because it helped support the flow of new CDOs and underwriting fees. In fact, the bulk of the middle-rated pieces of CDOs underwritten by Merrill were purchased by other CDOs that the investment bank arranged, according to people familiar with the matter. Each CDO sold some of its riskier slices to the next CDO, which then sold its own slices to the next deal, and so on.

Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDOs. Rather than widely dispersing exposure to these mortgages, the practice circulated the same risk among a relatively small number of players.

By early 2007, Norma was ready to face the ratings firms. Different slices of CDOs get different ratings because some protect the others from losses to defaults. A "junior" slice might take the first $30 million in losses on a $1 billion CDO, while a triple-A "senior" slice would not be affected until losses reached $200 million or more.

But the system works only if the securities in the CDO are uncorrelated – that is, if they are unlikely to go bad all at once. Corporate bonds, for example, tend to have low correlation because the companies that issue them operate in different industries, which typically don't get into trouble simultaneously.

Mortgage securities, by contrast, have turned out to be very similar to one another. They're all linked to thousands of loans across the U.S. Anything big enough to trigger defaults on a large portion of those loans – like falling home prices across the country – is likely to affect the bonds in a CDO as well. That's particularly true for the kinds of securities on which mezzanine CDOs made their

bets. Triple-B-rated bonds would typically stand to suffer if losses to defaults on the underlying pools of loans reached about 10%.

When rating companies analyzed Norma, though, they were looking backward to a time when rising house prices and easy credit had kept defaults on subprime mortgages low. Norma's marketing documents noted plenty of risks for investors but also said that CDO securities had a high degree of ratings stability.

Beyond that, rating firms say they had reason to believe that the securities wouldn't all go bad at once as the housing market soured. For one, each security contained mortgages from a different mix of lenders, so lending standards might differ from security to security. Also, each security had its own unique team of companies collecting the payments. Yuri Yoshizawa, group managing director at Moody's Investors Service, says the firm figured some of these mortgage servicers would be better than others at handling problematic loans.

In March, Moody's, Standard & Poor's and Fitch Ratings gave Norma their seal of approval. In its report, Fitch cited growing concern about the subprime mortgage business and the high number of borrowers who obtained loans without proof of income. Still, all three rating companies gave slices comprising 75% of the CDO's total value their highest, triple-A rating – implying they had as little risk as Treasury bonds of the U.S. government.

Merrill and N.I.R. took Norma to investors. Together, they produced a 78-page pitchbook that bore Merrill's trademark bull. Inside were nine pages of risk factors that included standard warnings about CDOs. The pitchbook also extolled mortgage securities, which it noted "have historically exhibited lower default rates, higher recovery upon default and better rating stability than comparably rated corporate bonds."

Most importantly, though, Norma offered high returns: On a riskier triple-B slice, Norma said it would pay investors 5.5 percentage points above the interest rate at which banks lend to each other, known as the London interbank offered rate, or Libor. At the time, that translated into a yield of over 10% on the security – compared with roughly 6% on triple-B corporate bonds.

Mr. Ribotsky says the selling required little effort, as Merrill drummed up interest from its network of contacts. "That's what they get their fees for," he says.

Norma sold some $525 million in CDO slices – largely the lower-rated ones with higher returns – to investors. Merrill declined to say whether it kept Norma's triple-A rated, $975 million super-senior tranche or sold it to another financial institution.

Many investment banks with CDO businesses – Citigroup Inc., Morgan Stanley and UBS – frequently kept or bought these super-senior pieces, whose lower

returns interested few investors. In doing so, they bet that the top CDO slices, which typically comprised as much as 60% of the whole CDO, were insulated from losses.

By September, Norma was in trouble. Amid a steep decline in house prices and rising defaults on mortgage loans, the value of subprime-backed securities went into a free fall. As increasingly worrisome delinquency data rolled in, analysts upped their estimates of total losses on subprime-backed securities issued in 2006 to 20% or more, a level that would wipe out most triple-B-rated securities.

Within weeks, ratings firms began to change their views. In October, Moody's downgraded $33.4 billion worth of mortgage-backed securities, including those which Norma had insured. Those downgrades set the stage for a review of CDOs backed by those securities – and then further downgrades.

Mezzanine CDOs such as Norma were the hardest hit. On Nov. 2, Moody's slashed the ratings on seven of Norma's nine rated slices, three all the way from investment-grade to junk. Fitch downgraded all nine slices to junk, including two that it had rated triple-A.

Other mezzanine CDOs, including some underwritten by other investment banks, have had worse performances. Around 30 are now in default, according to S&P. Norma is still paying interest on its securities. It is not known whether it has had to make payouts under the credit default swap agreements.

Ratings companies say their March opinions represented their best read at the time, and called the subprime deterioration unprecedented and unexpectedly rapid. "It's one of the worst performances that we've seen," says Kevin Kendra, a managing director at Fitch. "The world has changed quite drastically – and our view of the world has changed quite drastically."

By mid-December, $153.5 billion in CDO slices had been downgraded, according to Deutsche Bank. Because banks owned the lion's share of the mezzanine CDOs, they bore the brunt of the losses. In all, banks' write-downs on mortgage investments announced so far add up to more than $70 billion.

For larger banks, holdings of mezzanine CDOs could account for one-third to three-quarters of the total losses. In addition to the $9.4 billion fourth-quarter write-down Morgan Stanley just announced it would take, Citigroup has projected its fourth-quarter write-down could reach $11 billion. UBS said this month it would take a $10 billion write-down after taking a $4.4 billion third-quarter loss.

Merrill, for its part, took a $7.9 billion write-down on mortgage-related holdings in the third quarter. Analysts expect it to write down a similar amount in the current quarter, which would represent the largest losses of any bank. News of the

110

losses have led to the ouster of CEO Stan O'Neal and Osman Semerci, the bank's global head of fixed income. Mr. Margolis left this summer.

Mr. Ribotsky says he doesn't have plans to do any more CDOs at the current time. "Obviously, we're not happy about the occurrences in the marketplace," he says.

237.   On January 17, 2008, Merrill Lynch released the 2007 year-end financial results which included $23.2 billion in write-downs from CDO and subprime exposure.[74]   The Company's net loss from continuing operations for the fourth quarter was $10.3 billion, or $12.57 per diluted share.   In one quarter, Merrill Lynch lost more than its *record breaking* earnings of $7.5 billion for the *entire year* of 2006.   Thain (O'Neal's replacement) acknowledged that "the firm's earnings performance for the year is clearly unacceptable[.]"

238.   On January 17, 2008, during Merrill Lynch's Fourth Quarter 2007 Earnings Conference Call, Thain addressed concerns about the $23.2 billion write-down, which was more than five times the initial write-down disclosed on October 5, 2007.   Thain was less than optimistic about Merrill Lynch's ability to recover some of the $23.2 billion losses and diverted questions about how Merrill Lynch ended up with such high levels of exposure to CDO and subprime securities and whether it failed to report this to its risk management systems.   *See Merrill Lynch Q4 2007 Earnings Call Transcript*, Jan. 17, 2008, at 8.   Thain ended the call stating that although there was very little trading by anyone in the CDO market in the fourth quarter and that, moving forward, he intends to sell them and reduce Merrill Lynch's absolute position.   *Id.* at 10.

239.   The next day, after the company released its fourth quarter earnings, Thain appeared on the "Nightly Business Report" on PBS on January 18, 2008, and conveyed that

---

[74]   *See* Press Release, *Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing Operations of $8.6 Billion*.

Merrill Lynch did not have significant remaining exposure to subprime loans and did not expect any more changes from its asset based securities (which included its CDOs).[75]  Thain made the following false statements during his interview on PBS' "Nightly Business Report" (emphasis added):

> SUSIE GHARIB: More now on Merrill's big quarterly loss and that massive write-down today. A short while ago, I talked with Merrill's new chairman and CEO John Thain. My first question, *will Merrill need to take more write-downs*?

> JOHN THAIN, CHAIRMAN & CEO, MERRILL LYNCH: We still have risk and we're still in a trading business. We're on our trading floor right now. So you can never say that there wouldn't be any further write-downs. *But given where the CDOs (ph) are marked and you can see there was a very significant reduction from their carrying value in September to the end of December. They have mostly IO interest only value at this point, so they don't really have very much downside any more*.

> GHARIB: John, *if there are going to be more write-downs, what range can we expect, $5 to $10 billion more or less*?

> THAIN: *No, no*, you know, our net exposure right now is $4.8 billion. And *we don't really expect there to be further write-downs*. We raised $12.8 billion of capital. *We believe we've more than filled the hole*. As you know, we lost $8.6 billion after tax, so we raised significantly excess amount of capital than we lost and *we're now well capitalized to go forward into 2008*.

> GHARIB: *Do you think, though, that you may need to raise more capital down the road* and if so, will you go back to those same foreign investors?

> THAIN: *No*, one of the things we wanted to do was to raise the capital up front, raise it in front of the earnings and then be out of the equity capital market. So no, I don't think we're going to need more equity capital. *We are well capitalized. We did get all of our ratings reconfirmed today from all of the rating agencies and we're in actually very good shape going forward*.

> GHARIB: *What about selling any of Merrill's current businesses*?

> THAIN: We did sell ML Capital or most of the assets of ML Capital. ML Capital was the middle market lending business. It really wasn't strategic to us, so we did sell that. We sold most of it right at the end of '07. And then we also sold our insurance business. *Going forward, there really are not other pieces that we're looking to sell*. Blackrock is

---

[75]   *See* "One on One with Merrill Lynch CEO John Thain," *available at* http://www.pbs.org/nbr/site/onair/transcripts/080117_gharib/.

a strategic part of our business. We have no intention of selling that. And we own 20 percent of Bloomberg which we carry on our balance sheet at zero. And you know, it's worth probably $5 billion. But we're not intending to sell that either.

GHARIB: John, I know you have been CEO for less than two months. But as you've had a chance to look over Merrill's businesses, what would you say is the key issue that you need to address?

THAIN: We had to get the risk in the mortgage, mortgage-related areas down. We had to repair the capital base that had the problem and so put ourselves in a well capitalized position. We had to change the risk management function so we're changing the reporting structure of risk. And then we're changing the philosophy on risk management.

GHARIB: What are you doing to manage risk differently?

THAIN: We have a weekly risk committee meeting. The heads of the businesses go to that. And we're not going to have the same risk profile where you can risk the earnings not only of the entire company. We don't want them to be risking 100 percent of the earnings of their businesses. Risk should be sized appropriately, monitored, managed and we're still in the risk-taking business. But it's really keeping the risk under the appropriate level of control.

GHARIB: *How are the problems stemming from sub-prime impairing the rest of Merrill's businesses?*

THAIN: *You know what is interesting about that is they are not.* So as I said, the wealth management business had a great quarter, a great year. Banking had a great year. Trading businesses had a great year. So really *the problems in sub-prime are isolated just to the mortgage and mortgage-related part.*

GHARIB: As you know, Citigroup announced this week thousands of layoffs to solve its financial problems. *Do you see Merrill considering any layoffs going forward*?

THAIN: *We're not looking at any significant layoffs*. We have looked at our employee base. And in the fixed income area, over the last year we did reduce fixed income by about a thousand people. That was mostly in the mortgage origination side so in the first Franklin and those mortgage originators. There might be a little bit more to do. But we're not looking for significant head count reductions.

GHARIB: *Yesterday JPMorgan CEO Jamie Diamond said that he is open to doing an acquisition. If Jamie calls you and says he wants to talk about a merger, what would you say?*

THAIN: Well, I respect and like Jamie very much but *we're not interested in that*. I think our business mix and our franchise is very strong. We don't need to buy someone. *We*

*certainly don't need to be bought*. And we are really going to focus on running our business.

GHARIB: *Let's talk a little bit about Merrill's stock. It's down sharply*, not only today, but it is half of where it was since May. *What do you need to do to get investors interested in Merrill Lynch again?*

THAIN: *I think they already are interested*. We saw that from the capital raising we just did. We could have raised twice as much money in the mandatory convertible structure. *We actually turned money away*. We size people down. And there was just a lot of interest in investing in the franchise. But look it, I think our job is to prove the earnings power of this franchise over a longer period of time. If we – since we have the capital, since we have the business mix, if we produce good earnings over the course of the next few quarters, *our stock price will do fine.*

GHARIB: John, thank you so much. And good luck to you on everything.

THAIN: Thank you very much.

240.    Thus, during his January 18, 2008, interview, Thain made false and misleading statements that (1) Merrill Lynch would not need to take any further significant write-downs; (2) Merrill Lynch did not need to raise any further capital and, indeed, that it had "turned money away"; (3) the problems with Merrill's subprime investments were isolated to that area and would not affect the rest of Merrill's businesses; (4) that "we certainly don't need to be bought"; and (5) that Merrill did not need to make any significant layoffs.  *See "*One on One with Merrill Lynch    CEO    John    Thain," *available    at*    http://www.pbs.org/nbr/site/onair/ transcripts/080117_gharib/.

241.    Further, on January 16, 2008, in announcing that Merrill had raised $6.6 billion in capital from the Korean Investment Corp., Thain had told the *Los Angeles Times* that "One of my priorities over the last several weeks has been to ensure Merrill Lynch's balance sheet is strong, and these transactions *make certain* that Merrill Lynch is well capitalized" (emphasis added).

242.    Thain was also quoted in the *New York Times* on January 18, 2008, as stating: "We're very confident that we have the capital base now that we need to go forward in 2008."

*See* Jenny Anderson, "Merrill Posts Huge Loss; Chief Says Firm's Capital is Adequate," N.Y. Times, Jan. 18, 2008.

243.   On January 25, 2008, Thain told *Bloomberg* in an interview at the World Economic Forum in Davos, Switzerland that "***We are very well positioned to go forward into 2008***."   Amazingly, Thain stated that "The market volatility has been very good for our business."   Thain also boasted that Merrill had not taken any write-downs since December 28, 2007, thus again leading the market to believe that Merrill would not have to take any additional write-downs.

244.   Thain's public comments between January 16, 2008, and January 25, 2008, to PBS, the *Los Angeles Times*, *Bloomberg*, and the *New York Times* were material and reassured the market and Merrill Lynch shareholders that Merrill Lynch stock was a good long-term investment.   After these comments by Thain, Jeffrey Harte, an analyst at Sandler O'Neill & Partners, stated "The good thing was ***John Thain and company said everything I wanted them to say***."   *See* Jenny Anderson, "Merrill Posts Huge Loss; Chief Says Firm's Capital is Adequate," N.Y. Times, Jan. 18, 2008 (emphasis added).

245.   Within six months many of Thain's statements were proven false, and within nine months **_all_** Thain's statements were proven false, as Merrill:   (1) ***took over $20 billion in additional write-downs*** (*cf*: "we don't really expect there to be further write-downs."); (2)  ***laid off over 4200 employees in the first half of 2008*** (*cf.* "We're not looking at any significant layoffs"); (3) ***completed a $4.43 billion sale of Merrill's stake in Bloomberg LP and announced plans to sell a controlling interest in Financial Data Services Inc.,*** again all within the first six months of 2008 (*cf.* Thain's statements that "we're not intending to sell [Bloomberg]" and "going forward, there really are not other pieces that we're looking to sell");

**(4) sold the entire Company to Bank of America for an aggregate value less than that of the combined write-downs** (*cf.* "We certainly don't need to be bought").

246.    On January 28, 2008, Merrill Lynch announced that Fakahany would resign effective February 1, 2008.  News reports indicated that "Fakahany will leave the company as the brokerage builds a new management team following a credit implosion that triggered $12 billion in net losses in the second half of 2007. . . Before his promotion in May [2007] to co-president, Fakahany's duties included responsibility for market risk management as Merrill's build-up of risky collateralized debt obligations surged. Exposure to the subprime-laden debt vehicles backfired. Soured CDO positions were mostly to blame for Merrill's $24 billion in write-downs last year and huge net losses.  Merrill Lynch insiders told Reuters in late October [2007] they expected Fakahany to resign as Merrill's CDO problems mushroomed.  "Inside the company, he was seen as a close ally of ousted Chief Executive Stan O'Neal." [76]

247.    Analysts and investors at the time blamed poor risk management for Merrill's exposure to securities underpinned by risky subprime mortgages.  Fakahany had been a rising star under O'Neal, who had been ousted in the fall of 2007 as chairman and chief executive after Merrill's CDO problems began to emerge.  When the Merrill Board ousted O'Neal in October 2007, Fakahany's duties for overseeing business segment operations were consolidated under Fleming. At that time, Merrill Lynch insiders expected Fakahany to resign.

248.    On February 25, 2008, Merrill Lynch released its 2007 10-K.  The Power of Attorney for the preparation of the form was signed by Christ, Codina and Colbert.  Merrill Lynch provided greater detail on its previously disclosed $23.2 billion in write-down resulting from CDO and subprime related exposure.  The majority of these write-downs were from Merrill

---

[76]  *See* "Merrill Co-President Fakahany to Leave Company," Reuters, Jan. 28, 2008.

Lynch's exposure to CDO securities, which totaled $16.7 billion.  In addition, Merrill Lynch also wrote down $3.2 billion in related to U.S. sub-prime residential mortgage exposure, $2.6 billion in credit valuation adjustments related to Merrill Lynch's hedges with financial guarantors (mainly credit default swaps) related to its CDO securities, and $700 million related to subprime related securities in Merrill Lynch's U.S. banks investment securities portfolio.  *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 28, 2007), at 22.

249.    Merrill Lynch also reported that its remaining net exposure related to CDO securities as $4.8 billion, which was based on Merrill Lynch's long exposure to CDO securities of $30.4 billion (post write-downs) less its $23.6 billion short exposure and less $2.0 billion for "secondary trading."  *See* 2007 10-K, p. 36.  The short position primarily consisted of hedges (such as credit default swaps), which involve risk of loss of capital based on the financial viability of the guarantor (many of which are non-investment grade companies).  In fact, Merrill Lynch took $2.6 billion in write-downs from credit valuation adjustments in 2007 demonstrates that some hedging vehicles, such as credit default swaps introduce new risk of loss to Merrill Lynch's capital base.  Put plainly, reports of net exposure are inadequate, if not misleading, when the hedges that contribute to the net exposure number are not working or are themselves fraught with credit risk.

250.    On March 5, 2008, Merrill Lynch issued a press release announcing that it is discontinuing mortgage origination at its First Franklin subsidiary and will explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin, due to the deterioration of the subprime lending market.[77]  Merrill Lynch bought First Franklin in late 2006 for $1.3

---

[77] *See Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services, available at* http://www.ml.com/index.asp?id= 7695_7696_8149_88278_92707_92961.

billion.   As recently as April of 2007, Merrill Lynch boasted of the contribution that First Franklin made to Merrill Lynch's business.  Merrill Lynch will spend $60 million to pay for severance and other real estate costs linked to unwinding First Franklin's operations.

251.    Throughout March and April 2008, Thain engaged in a concerted and systematic effort to convince the world markets that Merrill Lynch did not need any further infusion of capital and was well-positioned to prosper in 2008 and beyond.   On March 10, 2008, Thain was quoted by CNBC as having stated to France's *Le Figaro* that "the worst is over" and that Merrill would not have to raise any additional capital.  Thain stated that Merrill "would not need to seek more outside capital to bolster its balance sheet."  Thain further sought to assure Merrill Lynch shareholders by stating:  "We lost $8.6 billion last year. . . But in parallel we raised $12.8 billion in under two months, or more than the losses we suffered.  ***That is why today I can say that we will not need additional funds.  These problems are behind us.  We will not return to the market.***"  *See* "Merrill Lynch CEO Says Worst Is Over," CNBC.com, Mar. 10, 2008 (emphasis added).

252.    On March 16, 2008, Thain told Spain's El Pais newspaper that "We have more capital than we need, so we can say to the market that we don't need more injections.  We can confirm that we have tackled the problem."

253.    On April 4, 2008, Thain stated in an interview with Japan's Nihon Keizai Shimbun:  "<u>I'm sure we have enough capital.</u>"

254.    On April 8, 2008, Reuters reported that Thain told reporters in Tokyo that "We deliberately raised more capital than we lost last year. . . ***We believe that will allow us to not have to go back to the equity market in the foreseeable future.***"

255.    An April 16, 2008 Wall Street Journal article entitled *Merrill Upped Ante as Boom In Mortgage Bonds Fizzled* stated, in part, the following:

> On Thursday Merrill will report $6 billion to $8 billion in new write-downs, according to a person familiar with the matter. The latest would bring its total since October to more than $30 billion and mean that Merrill reports a third straight quarterly net loss, the longest losing streak in its 94-year history.
>
> Now the firm is readying a cost-saving plan that includes job cuts of 10% to 15% in some areas where business is off,
>
> [A] look at how [Merrill] got in so deep and its flawed efforts to recover sheds light on why the credit squeeze is proving so deep and persistent. Merrill aggressively continued to create new mortgage securities after doing so became riskier. Among those keenly interested in knowing what went wrong is the Securities and Exchange Commission, which is examining whether Merrill and other firms should have told investors sooner about the stumbling mortgage business last year.
>
> When housing boomed earlier this decade, Merrill profited by turning mortgage-backed bonds into complex securities. Initially, it was well protected from credit risk in this underwriting. The protection frayed at the start of 2006. But Merrill kept playing the game.
>
> By early 2007, as cracks in the housing and mortgage markets widened, Merrill again missed a chance to scale back. In fact, it revved up its production of complex debt securities – despite a shortage of buyers for them – in what turned out to be a misguided effort to limit its losses.
>
> Its torrid underwriting loaded Merrill with exposure to mortgage securities, whose top credit rating provided scant protection when investors fled. Then Merrill made another fateful move: trying to hedge some of its massive mortgage risk through bond insurers whose strength was questionable.
>
> [Merrill] has reduced its exposure to certain risky mortgage securities to $7.5 billion from $40.9 billion in June, mostly by writing down their value or paying another party to take on their credit risk.
>
> Mr. Thain has increased the importance of weekly risk-management meetings by requiring the heads of trading businesses to attend and by having the top risk managers report directly to him. Since taking over in December, he also has reduced executives' incentive to swing for the fences by tying more of their pay to the firm's overall results and less to how businesses do individually.

The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005. As it repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc. An AIG unit bore the default risk of the CDOs' largest and highest-rated chunk, known as the "super-senior" tranche, normally sold to big investors such as foreign banks.

But AIG was keeping a close eye on the housing boom because it had another unit that made subprime loans, those to home buyers with weak credit. AIG did a review of the market. Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities.

Merrill was used to having to keep lots of mortgage bonds and pieces of CDOs on its books temporarily before selling them. But without a firm like AIG providing credit insurance, Merrill had to bear the risk of default itself.

Instead of scaling back its underwriting of CDOs, however, Merrill put the business in overdrive. It began holding on its own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload.

Merrill was able to hang onto the top spot in Wall Street's CDO-underwriting ranks. It generated $44 billion in CDOs in 2006 – triple its 2004 output. Although not able to sell the bulk of the CDOs, it collected about $700 million for underwriting and trading these and other structured products. And its top ranking was considered in the calculation of executives' bonuses.

Risk controls at the firm, then run by CEO Stan O'Neal, were beginning to loosen. A senior risk manager, John Breit, was ignored when he objected to certain risks taken in underwriting Canadian deals, according to people familiar with the matter. Mr. Breit, then head of market-risk management, told colleagues he had never been overruled like that before, say former Merrill executives. Merrill lowered the status of Mr. Breit's job in its hierarchy. Mr. Breit sent a letter of resignation to Merrill's chief financial officer saying the job was too important to be diluted that much, says someone familiar with the matter. He was given a different job outside of the risk-management group and stayed at Merrill.

Some managers seen as impediments to the mortgage-securities strategy were pushed out. An example, some former Merrill executives say, is Jeffrey Kronthal, who had imposed informal limits on the amount of CDO exposure the firm could keep on its books ($3 billion to $4 billion) and on its risk of possible CDO losses (about $75 million a day). Merrill dismissed him and two other bond managers in mid-2006, a time when housing was still strong but was peaking.

To oversee the job of taking CDOs onto Merrill's own books, the firm tapped Ranodeb Roy, a senior trader but one without much experience in mortgage securities. CDO holdings on Merrill's books were soon piling up at a rate of $5

billion to $6 billion per quarter. This led to an inside joke at Merrill. Mr. Roy is known as Ronnie. Some employees took to saying that if they couldn't find a specialized bond insurer, known as a "monoline," to take Merrill's risk on the deal, they could resort to a "Ronoline."

Mr. Roy, whom Merrill asked to leave five months ago, says he was simply following orders in loading the books with mortgage securities and that he objected to the practice. He is now at Morgan Stanley.

In August 2006, one Merrill trader fought back when managers pushed to have the firm retain $975 million of a new $1.5 billion CDO named Octans. In a meeting in the office of a risk manager, the trader argued against keeping the securities on the books.

The result was a heated phone conversation with Merrill's CDO co-chief, Harin De Silva, who was out of the office. Mr. De Silva urged the trader to accept the securities, while the trader said he didn't know enough about the CDO to feel comfortable doing that, say people familiar with the meeting. Mr. De Silva reasoned that Merrill would bear less risk by taking on the super-senior tranche because it had already found investors to take on the riskier slices. The alternative was to let the deal fall apart, which would leave Merrill holding the risk of all the securities that would have backed the CDO.

In the end, Mr. Roy's group took the $975 million of securities on the firm's books. That meant Merrill could complete the underwriting of the Octans CDO, a step that helped the firm hold its top rank in CDO underwriting and led to an estimated $15 million in fee revenue for the deal, according to people close to the situation. It's unclear whether Merrill took losses on the deal. The firm later paid Morgan Stanley to take on the credit risk of the securities through a swap transaction.

Pressures rose in early 2007 as the housing bubble lost air. Merrill set out to reduce its exposure, in an effort referred to innocuously as "de-risking."
It could have sold off billions of dollars' worth of mortgage-backed bonds that it had stockpiled with the intention of packaging them into more CDOs. But with the market for such bonds slipping, Merrill would have had to record losses of $1.5 billion to $3 billion on the bonds, says a person familiar with the matter.

"Instead, Merrill tried a different strategy: quickly turn the bonds into more CDOs."

Doing so was no longer a profitable enterprise. Demand was weakening for the lower-rated CDO slices, normally sold to risk-tolerant investors such as hedge funds. Often, Merrill could move these only at discounted prices that all but eliminated its profit.

Still, executives believed that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgage securities. And they wouldn't have to sell off their mortgage bonds at a loss.

"In the first seven months of 2007, Merrill created more than $30 billion in mortgage CDOs, according to Dealogic, keeping Merrill No. 1 in Wall Street underwriting for this type of security."

By June, the market for mortgage securities was weakening faster. Two Bear Stearns Cos. hedge funds that invested in them were being forced by creditors – which included Merrill – to sell securities. That set prices tumbling across the credit markets. One Merrill trader recalls Dale Lattanzio, then co-manager of Merrill's bond business, hustling around the firm's football-field-sized trading floor ordering his traders to "sell everything – we're too long."

As the CDO business slid, Merrill's top managers embarked on a new plan, referred to as the "mitigation strategy." The aim was to find ways to hedge exposure through deals with bond insurers. This would reduce the size of write-downs Merrill would otherwise have to take.

"Through August, Merrill insured $3.1 billion of CDOs against losses in a series of transactions with bond insurer XL Capital Assurance Inc."

In August, Merrill proposed that XL insure about $20 billion more of its CDO exposure, according to papers XL filed in court after their relationship deteriorated. "Pick your size. It's a very nice deal for XL and a big help for ML," a Merrill salesman told an XL employee, according to the papers XL filed in federal court in New York. XL declined the additional business.

Merrill turned to another bond insurer, MBIA Inc. MBIA agreed to insure around $5 billion of the securities. But it wouldn't cover interest payments; it would only cover principal payments when they come due in more than 40 years.

Continuing to scramble, Merrill got a tiny insurer called ACA Financial Guaranty Corp. to insure about $6.7 billion of its CDOs. The problem was that ACA was poorly capitalized. It was insuring more than $60 billion of debt securities – a third of which were mortgage-related – yet had only about $400 million of capital and few other resources to cover claims.

Some other firms, including Lehman Brothers Holdings Inc., had already set aside reserves against their hedges with ACA, concerned that ACA would be unable to cover losses on the bonds it insured. Lehman wrote down its exposure to ACA during the first half of 2007.

Merrill's deals with the insurers helped it to show a reduction of about $11 billion in its CDO exposure in last year's third quarter. Coupled with CDO-related write-

downs of $6.9 billion in the quarter, this brought Merrill's CDO exposure down to $15.8 billion, from $33.9 billion in June. The bond-insurer deals thus helped reduce Merrill's third-quarter net loss, although it was a still-hefty $2.3 billion.

Even so, the numbers were worse than Merrill had previously indicated. In a late-October conference call with investors, Mr. O'Neal said that "we got it wrong by being overexposed to subprime" and that "both our assessment of the potential risk and mitigation strategies were inadequate." Within days, he resigned as CEO.

In December, Standard & Poor's cut its financial-strength rating of ACA to junk level. That forced Merrill to write down its CDO hedge with ACA by $1.9 billion in the fourth quarter, leaving questions about why it had turned to such a thinly capitalized partner.

"XL Capital's agreement to insure Merrill CDOs is embroiled in litigation. XL sought to walk away from the deal, contending Merrill had violated the terms. Merrill sued last month to force XL to honor the agreement."

In a countersuit, XL said the purpose of the bond-insurance deal was simply to enable Merrill to report that its CDO exposure was lower. "Merrill Lynch undertook a rushed campaign to find parties willing to hedge or provide protection on its remaining CDO positions," the suit said. A spokesman for Merrill says XL "makes assumptions that are, very simply, wrong."

Merrill's new CEO, Mr. Thain, is seeking to regain investors' trust by upgrading the firm's risk controls. In one move, the firm in December rehired Mr. Kronthal, the risk-conscious bond executive Merrill had let go in 2006 when it was determined to increase its bet on CDOs. His new job: to help Merrill clean up its CDO mess.

256.    An April 16, 2008 Reuters article entitled *Merrill Lynch To Write Down Further*

*$6-8 Billion: Report* stated, in part, the following:

"Investment bank Merrill Lynch & Co (MER.N: Quote, Profile, Research) will announce $6 billion to $8 billion of asset write-downs in its first quarter results on Thursday, the Wall Street Journal reported on Wednesday, citing a person familiar with the matter."

"The latest write-downs would increase total debt losses since October to more than $30 billion, the paper said. The setbacks will contribute to a third straight quarterly net loss at Merrill, the longest losing streak in its 94-year history."

257.    An April 16, 2008 Smart Money article entitled *Major Indexes Climb 2%* stated,

in part, the following:

Merrill Lynch (MER: 46.50, +0.09, +0.19%) is expected to report a first-quarter writedown of between $6 billion and $8 billion when it releases earnings on Thursday, The Wall Street Journal reported, citing an anonymous source. A charge in that range would bring the sum of Merrill's writedowns since October to upwards of $30 billion. The firm is also planning to cut costs by slashing payrolls 10% to 15% in struggling divisions like bond finance, anonymous sources told The Journal. New initiatives by Chief Executive John Thain are intended to curb the firm's risk-taking behavior.

258.    On April 17, 2008, Merrill Lynch reported large losses related to subprime and CDOs, which appear to contradict Thain's statements on the "Nightly Business Report" on January 18, 2008.  In its First Quarter Earnings Statement Merrill Lynch stated an additional $6.6 billion in write-downs from exposure to mortgages, CDOs and leveraged loans.[78]  These results included about $4.5 billion of write-downs plus $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure.  The current total write-downs related to CDO and subprime exposure is $30.8 billion.[79]

259.    The Merrill Lynch press release reporting the large losses stated, in part, the following:

> Merrill Lynch today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.
>
> In this challenging market environment, which continued to deteriorate during the quarter, first-quarter 2008 net revenues were $2.9 billion, down 69 percent from the prior-year period, primarily due to net write-downs totaling $1.5 billion

---

[78]  *See Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations of $1.97 Billion, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

[79]  Because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure.  *See* Merrill Lynch Reports First Quarter 2008, April 17, 2008, 2007 10-K, pg. 117.  *See also* David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., April 21, 2008.

related to U.S. ABS CDOs and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super-senior ABS CDOs. To a lesser extent, net revenues were also impacted by net write-downs related to leveraged finance and residential mortgage exposures, which were offset by a net benefit of $2.1 billion, due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities. Excluding these write-downs, credit valuation adjustments and the net benefit related to long-term debt liabilities, net revenues were $7.4 billion, down 26 percent from the prior-year period.

**Business Segment Review:**

**Global Markets and Investment Banking (GMI)**
GMI recorded net revenues of negative $690 million and a pretax loss of $4.0 billion for the first quarter of 2008, as the challenging market conditions resulted in net losses in Fixed Income, Currencies and Commodities (FICC) and weaker revenues in Equity Markets and Investment Banking from the prior-year period. GMI's first-quarter net revenues included a net benefit of approximately $2.1 billion (approximately $1.4 billion in FICC and $700 million in Equity Markets), due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain of our long-term debt liabilities.

Net revenues from GMI's three major business lines were as follows:

FICC net revenues were negative $3.4 billion for the quarter, impacted primarily by net losses related to U.S. ABS CDOs and credit valuation adjustments related to hedges with financial guarantors. To a lesser extent, FICC was impacted by net write-downs related to leveraged finance and residential mortgage exposures. These net write-downs more than offset record net revenues in interest rate products and currencies for the quarter. Net revenues for the other major FICC businesses declined on a year-over-year basis, as the environment for those businesses was materially worse than the year-ago quarter.

U.S. ABS CDOs:

At the end of the first quarter of 2008, net exposures to U.S. ABS CDOs were $6.7 billion, up from $5.1 billion at the end of 2007 as a reduction of hedges more than offset $1.5 billion of net write-downs.

Financial Guarantors:

During the first quarter of 2008, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.0 billion, including negative $2.2 billion related to U.S. super-senior ABS CDOs.

The hedges with financial guarantors related to U.S. super-senior ABS CDOs declined to $10.9 billion, due to net gains on these hedges and the firm's decision to consider $1.1 billion notional amount of certain hedges with a highly rated financial guarantor as ineffective, which resulted in a write-off of $45 million. The net gains, coupled with the deteriorating environment for financial guarantors, resulted in credit valuation adjustments of negative $2.2 billion during the 2008 first quarter. As a result, the carrying value of these hedges related to U.S. super-senior ABS CDOs was $3.0 billion at quarter end.

Residential Mortgages:

Net exposures related to U.S. subprime residential mortgages declined during the first quarter of 2008 to $1.4 billion, primarily due to additional hedging, asset sales and net write-downs of $306 million during the quarter. Net exposures related to Alt-A residential mortgages increased to $3.2 billion, primarily due to asset purchases that were partially offset by $402 million of net write-downs during the quarter. Net exposures related to prime residential mortgages increased to $30.8 billion, due to new originations with GWM clients. Net exposures related to non-U.S. residential mortgages declined to $8.8 billion, primarily due to a whole loan securitization and net write-downs of $105 million, which were partially offset by asset purchases.

U.S. Banks Investment Securities Portfolio:

Within the investment securities portfolio of Merrill Lynch's U.S. banks, net pretax write-downs of $3.1 billion were recognized through other comprehensive income/(loss) (OCI) and $421 million through the income statement during the first quarter of 2008. At quarter end, the pretax OCI balance related to this portfolio was approximately negative $5.4 billion. This quarter's write-downs were primarily related to Alt-A residential mortgage-backed securities.

Leveraged Finance:

At the end of the 2008 first quarter, leveraged finance commitments were approximately $14 billion, down from approximately $18 billion at the end of 2007. Net write-downs related to these exposures were approximately $925 million during the first quarter of 2008.

Commercial Real Estate:

At quarter end, net exposures related to commercial real estate totaled approximately $21 billion, down from the end of 2007[(3)], as a number of asset sales during the quarter were partially offset by new originations from First Republic and foreign currency translations. These amounts exclude $4 billion of net exposures sold to GE Capital during the quarter. Net gains related to the

firm's commercial real estate net exposures, excluding ML Capital, were $53 million during the first quarter of 2008.

Equity Markets net revenues declined 21 percent from the prior-year quarter to $1.9 billion, as increases from most client-related businesses were more than offset by declines from the principal-related businesses. Net revenues for financing and services and cash equity trading increased year over year, while equity-linked trading was down from its strong performance in the first quarter of 2007. The private equity business recorded negative net revenues of $207 million, down approximately $650 million from the prior-year quarter, and net revenues from the Strategic Risk Group and hedge fund investments declined approximately $450 million year over year.

Investment Banking net revenues were $805 million, down 40 percent from the strong performance in the 2007 first quarter, reflecting lower net revenues in debt and equity origination, as deal volumes for leveraged finance and initial public offerings significantly decreased this quarter from the high activity levels in the year-ago period. While revenues in strategic advisory also declined slightly from the year-ago quarter, the business showed strength, outperforming the decline in industry transaction volumes from the year-ago quarter levels.

260.    On April 17, 2008, Thain held Merrill Lynch's First Quarter 2008 Earnings Conference Call.  He stated that "widening of credit spreads forced liquidations, high volatility, [and] the lack of market liquidity for many credit products [e.g., CDO and subprime related securities]."  Thain also stated, "We are planning for a slower and more difficult next couple of months and probably next couple of quarters."[80]

261.    During the conference call discussing the results, Thain stated, in part, the following:

There's no question that the credit spread widening that occurred in this quarter impacted our inventories, particularly our ABS CDO inventory. You saw from the press release we had $1.5 billion of net write-downs on ABS CDOs, obviously much, much lower than the fourth quarter of last year. Just to give you an idea of how we were pricing those, we moved our cumulative loss assumptions on sub-prime mortgages from what was a range of 16% to 21% at the end of the fourth quarter, to a range of 19% to 24% at the end of the first quarter. And remember, at 24% that would mean that if half of the mortgages defaulted you would lose 48%

---

[80]    *See Merrill Lynch Q1 200 Earnings Call Transcript, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

of the value of the home. So very, very significant price declines. And just in terms of the average over the U.S. so far, year-over-year home prices are down about 11%. Although sub-prime in certain areas are down more than that.

FICC revenues were a negative $3.4 billion as the business continued to face significant head winds due to our CDO monoline-related exposures which I'll detail in a minute. However the positive trading environment drove FICC revenues of $1.9 billion which exclude marks of $6.6 billion in fair value debt gains of $1.4 billion.

The majority of the write-downs this quarter were related to the ABS CDOs and related monoline exposures, as John mentioned earlier.

262.    Thain also discussed moving their principal investing for subprime and CDO securities to third party funds but acknowledged that it is "not very likely [that they] will recover value. *Id*.  Despite the fact that Merrill Lynch's long exposure to CDO securities has decreased slightly from $30.4 billion at December 30, 2007 to $26 billion at March 28, 2008, the company's *net* exposure actually increased from $4.8 billion as of December 30, 2007 to $6.7 billion as of March 28, 2008 due to the failure of its credit default swaps to effectively hedge against the risk of losses from Merrill Lynch's remaining long exposures to CDO securities.

263.    In fact, the financial press has reported that holders of CDO securities, such as Merrill Lynch, purchased credit default swaps for reasons apart from their stated objective (to hedge against the risk of loss to their CDO securities).  A Business Week analysis explained that "the insurers' guarantees [i.e., the credit default swaps] turned out to be little more than a subprime shell game" because the "[i]nsurance turned out to be a sort of accounting arbitrage, allowing banks to take advantage of that different set of rules.  By using it, they could offload the price risk to insurers' books to avoid suffering a hit to earnings if the bonds dropped in value."[81]

---

[81]  David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street used ACA to hide loads of subprime risk. It worked—until the tiny company collapsed,* BusinessWeek, Apr. 3, 2008.

264.    "Bond insurance was an accounting strategy," says former ACA[82] (a large bond insurers that collapsed in December of 2007) chief Satz, now the founder of an online startup called BarterQuest.  "It reduced banks' mark-to-market worries."[83]

265.    Credit default swaps offered banks another advantage: It allowed them to execute "a negative-basis trade," a strategy that essentially allows banks book profits on CDOs up front, even though they have not actually collected any money yet and might never do so.[84]

266.    Overall, CDOs boosted Merrill Lynch's profits and reduced the amount of capital it had to set aside on their books for the securities.  That freed up money for the company to funnel back into subprime securities.  "The results of the game were bigger profits for banks, more money to continue cranking out securities built on risky subprime mortgages, and far less clarity about the banks' true exposure to the toxic investments."[85]

267.    An April 17, 2008 Gazette article entitled *Merrill Posts Big Loss, To Cut 2,900 Jobs* stated, in part, the following:

> Chief Executive John Thain is trying to turn the company around as it struggles with the aftermath of bad bets on subprime mortgages and repackaged debt. He is increasing the investment bank's business in emerging markets and cutting costs to help offset write-downs.
>
> Merrill Lynch reported losses, write-downs and reserve increases of $1.5 billion on collateralized debt obligations, $925 million on loans financing leveraged buyouts, $3.5 billion on an investment portfolio, more than $800 million on residential mortgages, and $3 billion for exposure to bond insurers.
>
> "Merrill Lynch's first-quarter net loss was $1.96 billion, compared with a year-earlier profit of $2.16 billion."

---

[82]  Merrill Lynch was one of ACA's largest clients.

[83]  David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street used ACA to hide loads of subprime risk. It worked—until the tiny company collapsed,* Business Week, Apr. 3, 2008.

[84]  *Id.*

[85]  *Id.*

"Including preferred stock dividends, the loss was $2.14 billion, or $2.19 per share, and compared with a profit of $2.11 billion, or $2.26 a share, a year earlier."

"The loss from continuing operations was $2.20 per share, wider than the analysts' average forecast of $1.96, according to Reuters Estimates."

"Net revenue declined 69 percent to $2.93 billion. Analysts expected $3.35 billion."

"The company had already recorded more than $24 billion of write-downs in prior quarters, spurring it to raise more than $12 billion of new capital.  Thain said this month that he did not expect to raise more capital in the foreseeable future."

"A $2.1 billion benefit from widening credit spreads partly offset the write-downs and losses on risky assets."

"Merrill Lynch shares were down 2.2 percent at $43.91 in trading before the market opened."

"At Wednesday's close, Merrill Lynch's shares had fallen 16.4 percent year to date, compared with a roughly 25 percent decline in the Amex securities broker-dealer index."

268.    An April 17, 2008 Housing Wire article entitled *Merrill Posts Quarterly Loss,*

*$4.3 Billion in Mortgage-Related Writedowns* stated, in part, the following:

"Despite this quarter's loss, Merrill Lynch's underlying businesses produced solid results in a difficult market environment," [Thain] said. "The firm's $82 billion excess liquidity pool has increased from year-end levels, and we remain well capitalized. In addition, our global franchise is positioned strongly for the future, and we continue to invest in key growth areas and regions."

Interestingly, Alt-A write-downs are now outpacing subprime write-downs — suggesting that while subprime mortgage-related losses remain significant, losses more generally tied to weakness in the overall mortgage market and a weakening economy are increasing. Merrill's net write-downs on Alt-A mortgages and related securities totaled just over $2 billion in Q1, while subprime net write-downs totaled a little over $1 billion. Merrill wrote off roughly $1.1 billion tied to Alt-A mortgages in the fourth quarter, by way of comparison.

Merrill saw its U.S. ABS CDO exposure jump to $6.7 billion in Q1, up from $5.1 billion one quarter earlier as a steep reduction in hedges more than offset $1.5 billion in writedowns — in plain English, this means that the firm is seeing its

attempts to limit downside exposure fail at a rate that's actually greater than the large losses already being recorded.

In particular, Merrill took a $3.0 billion hit on a credit valuation adjustment tied to recent ratings downgrades of various monoline bond insurers — Merrill, like many Wall Street firms, purchased credit default swaps from bond guarantors as protection for its CDO positions. The Wall Street bank said that it essentially was forced to write off some of its CDS contracts tied to one guarantor altogether, after deeming them "ineffective."

Moody's Investors Service said that it had placed Merrill Lynch on review for a possible downgrade after the earnings report Thursday morning. The rating agency cited "continued deteriorating conditions in the mortgage market and the increased expected losses on MER's portfolio of super-senior CDO's and related guarantor hedges as measured in Moody's stress tests."

269.    An April 17, 2008 Reuters article entitled *Merrill Lynch Posts Big Loss* stated, in

part, the following:

"Merrill Lynch & Co on Thursday posted a nearly $2 billion first-quarter loss, and said it plans to cut 4,000 jobs after suffering several billion dollars of write-downs for subprime mortgages and other risky assets."

The job cuts cover about 10 percent of staff at the world's largest brokerage, excluding financial advisers and investment associates. Merrill Lynch said the job cuts will be targeted in markets and investment banking operations and in support areas. The company said it ended March with 63,100 employees overall.

Brazilian mining giant Vale has fired Merrill Lynch & Co Inc as one of two lead advisers on a potential $90 billion (45.5 billion pound) bid for Xstrata because the bank could not provide financing, a person familiar with the matter said on Monday. Including preferred stock dividends, the loss was $2.14 billion, or $2.19 per share, and compared with a profit of $2.11 billion, or $2.26, a year earlier. The loss from continuing operations was $2.20 per share. On that basis, analysts on average expected a loss of $1.96 per share, according to Reuters Estimates.

Net revenue declined 69 percent to $2.93 billion. Analysts expected revenue of $3.35 billion. Results reflected a $1.5 billion write-down related to collateralized debt obligations tied to asset-backed securities, and a $3 billion write-down linked mainly to so-called "super-senior" CDOs tied to asset backed securities.

270.    An April 17, 2008 United Press International article entitled *Write-downs Still

Rife at Merrill Lynch* stated, in part, the following:

"U.S. finance giant Merrill Lynch lost $1.96 billion in the first quarter, including $9.4 billion in write-downs, the company reported Thursday."

"The company, reeling from a turnaround in the credit market, has reported a total of $27.4 billion in write-downs over this quarter and the previous two, The New York Times reported."

"First quarter 2008 losses were all in the investment banking division, which lost $4 billion and saw a decline in revenues..."

"Write-downs for the quarter included $1.5 billion related to collateralized debt and $3.1 billion related to Alt-A residential mortgages."

"Despite this quarter's loss, Merrill Lynch's underlying businesses produced solid results in a difficult market environment," Chairman and Chief Executive John A. Thain said in a statement."

271.    An April 17, 2008 CNN Money article entitled *TF North America Daybook* stated, in part, the following:

Merrill Lynch said it swung to a first-quarter loss from continuing operations of $1.97 billion, or $2.20 a share, as net revenue fell 69% from a year earlier on net write-downs of about $1.5 billion related to collateralized debt obligations comprised of asset-backed securities and certain credit valuation adjustments of negative $3 billion.

272.    An April 17, 2008 CNN Money article entitled *Wall St.'s Pain, Jobless Claims on Investors' Minds* stated, in part, the following:

The bad news in finance continued early Thursday when Merrill Lynch (MER, Fortune 500) wrote down another $1.5 billion in the value of its assets and reported a net loss of $2.16 billion that was larger than expected. The nation's largest brokerage firm also announced it was cutting 4,000 jobs.

273.    An April 17, 2008 CNN Money article entitled *More Pain for Merrill Lynch* stated, in part, the following:

Still suffering from bad bets in the mortgage market, Merrill Lynch Thursday missed even the drastically lowered estimates for its first-quarter results, reporting a net loss of $1.96 billion, or $2.19 per diluted share. It also recorded about $6.6 billion in new writedowns.

"It will focus the reductions in its global markets and investment banking division."

"The total number of job cuts amounts to a 10% reduction of Merrill Lynch's workforce excluding financial advisers and investment associates."

Merrill Lynch reported revenue of $2.9 billion, down 69% from the prior-year period, primarily due to net writedowns of $2.7 billion in mortgage-related securities and $3 billion in downward revisions of the value of faltering bond insurers' guarantees. It is also writing down $925 million of the value of its leveraged loan portfolio.

Analysts had projected a $1.99 per share loss on a net loss of $1.4 billion and revenue of $3.7 billion. Calling it "as difficult a quarter as I've seen in my 30 years on Wall Street," Chief Executive Officer John Thain said the bank is preparing for slower and tougher times ahead.

"…Merrill Lynch's results show that the industry is still suffering from the mortgage meltdown that began when the subprime sector crumbled last year."

"Merrill Lynch's and other investment banks' writedowns are a stark reminder that we are not out of the woods yet in terms of the credit crisis," said Octavio Marenzi, head of Celent, a Boston-based financial research and consulting firm. "There is more pain to come and the pressure on earnings is going to continue."

"At the start of 2008, analysts expected a profit of $1.52 per share and even a month ago, they were still predicting earnings of 48 cents per share."

Like its peers, the bank is still plagued by declines in the value of assets such as mortgages and leveraged loans and from its exposure to crumbling bond insurers. Merrill Lynch played big in the mortgage market and lost. It continued to issue mortgage-backed securities in 2007, even as the market was faltering.

"To compensate for roughly $24 billion in write downs in the second half of last year, Merrill Lynch raised $12.8 billion in capital during the past two quarters and Chief Executive John Thain said he doesn't plan to raise any more."

A year ago, the picture was much different. Merrill Lynch was basking in a 31% increase in quarterly profit, as trading revenue and investment banking fees soared. The bank turned in a record performance of $9.9 billion in revenue and $2.2 billion, or $2.26 per share, in net income.

"Executives knew the subprime sector was weakening but did not fathom what it would do the [sic]storied institution. Jeff Edwards, Merrill Lynch's chief financial officer at the time, sought to assure investors on the April 2007 conference call."

"At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors," [Jeff] Edwards said."

This year, after three straight quarterly losses, Merrill Lynch highlighted some of the strengths in its other businesses. It garnered record quarterly net revenue in its global wealth management division and had "significant" revenue growth from its stake in BlackRock, an investment management company. It also said it had a "healthy" investment banking fee pipeline, down only 5% overall from the end of 2007.

"The company has $82 billion in liquidity, more than its funding obligations, executives said on a conference call. Still, Merrill Lynch is looking to lower its capital needs by reducing its balance sheet and trimming back illiquid assets."

"The staff reductions will save the investment bank $800 million a year, though it will record a $350million restructuring charge in the second quarter. Merrill Lynch has 63,000 full-time employees, including 16,600 financial advisers."

""They are writing off everything they possibly can, but I think we have more to go," Grant said."

274.    An April 17, 2008 Forbes article entitled *Merrill Trips Up Street* stated, in part,

the following:

"Merrill said it lost $2 billion in the first quarter after another $1.5 billion in write-downs, and reported it still had exposure to U.S. asset-backed security collateralized debt obligations of $6.7 billion, up from $5.1 billion at the end of 2007."

"Merrill also announced it will cut about 4,000 jobs to save about $600.0 million in 2008 and $800 million a year moving forward."

275.    An April 17, 2008 Financial Planning article entitled *The Bright Spot in Merrill's*

*Results* stated, in part, the following:

Merrill Lynch reported a net loss from continuing operation of $1.97 billion for the first quarter of 2008. Meanwhile, the wealth management division increased record net revenues 7% to $3.6 billion from the same time period last year. But the division's pre-tax profit decreased 8% to $720 million as the firm prepared a loss reserve for an $80 million client receivable. Merrill attracted $4 billion of net new money over the quarter but this was largely offset by the downturn in the market and total client assets of $1.6 trillion were virtually unchanged from the year before.

276.    An April 17, 2008 Investors Business Daily article entitled *Merrill Lynch Misses*

*Views, But Shares Rise On* stated, in part, the following:

"Merrill Lynch (MER) said Thursday it lost money for a third consecutive quarter, wrote down risky assets by a further $6.6 billion and will cut more jobs."

"But its shares rose 4% on hints that profits will return."

"Merrill lost $2.20 a share in the first quarter, or about $2 billion. That was worse than Wall Street expected and nearly as much as the brokerage made a year earlier."

"Net revenue plunged 69% to $2.93 billion, also below views."

Wall Street has viewed Merrill as one of the most vulnerable big financials after Bear Stearns' (BSC) near-collapse. The brokerage lost $2.85 a share in the third quarter of 2007, followed by a huge $12.57-a-share loss in the fourth. It has written down about $30 billion in mortgage debt and other risky assets since the credit crunch began.

"Merrill plans to ax 4,000 jobs, or 10% of total staff this year. It already cut 1,100 in the first quarter."

"The wealth management unit's revenue rose 8%, a rare bright spot. "
"But investment banking revenue and proprietary trading fell sharply from the prior quarter."

"[John Thain] said the firm's $82 billion in excess liquidity should help protect it against choppy market conditions. It has raised about $12 billion in capital since late last year."

"[John Thain] had said Merrill was finished raising new equity money, but told analysts Thursday he was open to issuing preferred shares."

"[John Thain] said results were "actually much worse" than they appeared on the surface due to a $3.1 billion pretax write-down on its U.S. Banks' investment securities portfolio. It was recognized in "other comprehensive income" rather than on the income statement."

"Some observers said Merrill was not transparent about future write-downs." There's not enough information to opine on it," said Janet Tavakoli, a structured finance specialist. "It's up to them to open the kimono a bit.""

"We were surprised to see the firm's direct exposure to ABS CDOs increase to $6.7 billion in the first quarter of 2008 from $5.1 billion last quarter even after taking a $1.5 billion write-down in the quarter," [John Thain] wrote."

277.    An April 18, 2008 CNBC article entitled *Market 360: A Weekly Wrap of US Equity Markets, Commodities, Currencies, and More* stated, in part, the following:

Merrill Lynch reported a worse than expected first quarter net loss of $2.19 / share driven by write-downs in mortgage-related securities; it also plans to cut a total of 4,000 jobs. Nonetheless, CEO John Thain sees brighter business conditions in April, and shares rallied 8.40% for the week.

278.    An April 18, 2008 Daily Times article entitled *UK's FTSE 100 Slumps 0.3 Percent* stated, in part, the following:

"The FTSE 100 slipped out of positive territory after first-quarter earnings from Merrill Lynch. The world's largest brokerage reported a first quarter loss, after taking several billion dollars of writedowns for subprime mortgages and other risky assets."

279.    An April 18, 2008 Washington Post article entitled *Merrill Posts Wide Loss, Plans to Cut 3,000 Jobs* stated, in part, the following:

In reporting its third straight quarterly loss, the bank said its exposure to collateralized debt obligations, responsible for much of the meltdown in credit markets, actually increased in the first three months of the year. This is partly because the steps Merrill had taken to hedge, or reduce the risk of falling prices, had failed.

Despite Merrill's results, which were worse than most analysts' expectations, its shares rose more than 4 percent Thursday. This is an indication of how low the bar had been set for a beleaguered financial sector that has repeatedly reported disastrous earnings, analysts said.

280.    An April 18, 2008 Reuters article entitled *Financial Stocks Rally As 1st Wave of Earnings are Reported* stated, in part, the following:

Merrill Lynch took $6.5 billion in write-downs during the first quarter tied to mortgage and credit related problems. Overall, the investment bank lost $2.14 billion in the period. But those losses did not stop the bank's shares from rising 4 percent Thursday, the day it announced the losses. Since the middle of 2007,

Merrill Lynch has taken about $29 billion in write-downs. Shares rose 8.4 percent
for the week, to $47.35.

281.    An April 23, 2008 Bloomberg article entitled *Most U.S. Stocks Fall on Earnings*

*Reports, Manufacturing Slump* stated, in part, the following:

"Merrill Lynch & Co. advanced even after posting its third straight quarterly loss
and writing down at least $6.5 billion of debt. Merrill, the third-biggest U.S.
securities firm, climbed $1.82 to $46.71, paring its decline over the past year to 48
percent."

282.    Merrill Lynch released its March 2008 10-Q on May 6, 2008, which was signed

by Nelson Chai, Executive Vice President and Chief Financial Officer.  The company disclosed

that its Level 3 assets rose 69 percent during the first quarter from $48.6 billion on Dec. 28, 2007

to $82.4 billion on Mar. 28, 2008.  *See* Merrill Lynch Quarterly Report (Form 10-Q) (Sep. 28,

2007).  Merrill added $7 billion worth of mortgage-laden collateralized debt obligations to the

Level 3 category in the first quarter, along with $2 billion more of derivatives on subprime

securities, $18 billion of credit derivatives not related to mortgages, and $7.6 billion in

derivatives tied to equities, currencies and commodities.

283.    Both stock analysts and the financial press have expressed concern about the 69%

increase in Level 3 assets in just one quarter[86] because "Level 3 assets are those whose valuation

is essentially a best guess by the investor, because there is virtually no active trading market for

the product to use as a pricing guide."[87]

---

[86]    It is also important to note that this increase comes after Merrill Lynch's previous
reclassification of a significant amount of CDO and subprime securities in the third quarter 2007.

[87]    *See Merrill Lynch Level 3 Assets Increase Through March,* CNNMoney.com, May 6, 2008
*available        at        http://money.cnn.com/news/newsfeeds/articles/apwire/c278ee6274
6c916ea9e0f9913fd59fcf.html.  See* Liz Moyer, *Level 3: Merrill Keeps Feeling The Crunch*,
Forbes, May 6, 2008.

284.    The increase in Level 3 represents an incrementally higher probability–but not a certainty–that more write-downs are coming," said Fox Pitt Kelton analyst David Trone, in a research note about Merrill dated May 6, 2008.[88]

285.    Moody's Investors Service said that it has placed Merrill Lynch on review for a possible downgrade after the earnings report, citing "continued deteriorating conditions in the mortgage market and the increased expected losses on MER's portfolio of super-senior CDOs [sic] as measured in Moody's stress test."[89]

286.    On May 12, 2008, then Merrill President, Fleming, told The Times of London that "John Thain has been very clear that we have sufficient capital and don't have a need to raise additional common equity for the foreseeable future."

287.    On June 11, 2008, Thain stated on a conference call hosted by Deutsche Bank: "Today on a pro forma basis we have about $44 billion of equity capital, which actually isn't very much below the all-time high that Merrill ever had. And our philosophy about this is that we are well-capitalized. We're comfortable with our capital position. We, like everyone else, are deleveraging our balance sheet."

288.    On July 17, 2008, Merrill Lynch reported a wider-than-forecast $4.6 billion second-quarter loss due to $9.4 billion of write-downs in failed credit-related investments. The quarterly loss was "inexplicably larger than what people expected,'' Michael Holland, chairman of Holland & Co., which oversees more than $4 billion, said in a Bloomberg Television interview.

---

[88]   *See* Liz Moyer, *For Merrill's Thain, A Tough Road Ahead,* Forbes, May 6, 2008.

[89]   Paul Jackson, *Merrill Posts Quarterly Loss, $4.3 Billion in Mortgage-Related Writedowns,"* HousingWire.com, Apr. 17, 2008, *available at* www.housingwire.com/2008/04/17/merrill-posts-quarterly-loss.

289.    Nonetheless, Thain continued to represent that Merrill Lynch was healthy, remained a sold long-term investment for its shareholders, and the worst was past.   In announcing the losses, ***Thain stated on July 17, 2008 that "right now, we think we are in a good position, are well capitalized"*** and ***"[r]ght now we believe that we are in a very comfortable spot in terms of our capital."***

290.    Just eleven days later, however, on July 29, 2008, Merrill Lynch announced that it had sold CDOs and repacked mortgage backed securities for $7 billion that had been valued at $31 billion just weeks earlier.  Analysts and the stock market were taken by surprise.  "With all the prior write-downs, we assumed that the bottom had been reached or something close to it," said Scott Sprinzen, a credit analyst with Standard & Poor's Corp.  Analysts and the stock market were particularly shocked because Thain had just assured the market 11 days earlier that Merrill was in good financial condition.   As one commentator noted:  "So, at this point, announcements like Merrill's latest are bringing skepticism rather than relief especially after Chief Executive John Thain just 11 days ago said he was comfortable with the brokerage's financial position."  *See* Joe Bel Bruno, "Merrill to Sell $8.5 Billion in Stock After Large Write-Down," The Huffington Post, July 29, 2008.

**Defendants Scramble to Escape their Mounting Woes by Brokering a Panic Sale in Under 24 Hours Which Denies Shareholders Fair Value for Their Shares**

291.    On Sunday, September 14, 2008, the Merrill Director Defendants (at the recommendation of Thain and Fleming) agreed to sell Merrill Lynch to Bank of America after less than 48 hours of negotiations.  With Lehman Brothers teetering on the brink of bankruptcy, Merrill Lynch and Bank of America's executives along with executives from other major financial institutions had convened the day before at the Federal Reserve Bank of New York to

meet with various parties to discuss, *inter alia*, one of their companies acquiring Lehman Brothers.

292.    Thain used this opportunity as a vehicle to solicit BofA to acquire Merrill lynch instead of Lehman.  At that point, still out bargain hunting during the temporary capital markets imbalance, Bank of America is reported to have quickly turned its attention to a potential acquisition of Merrill Lynch.  By Sunday night, and after less than 48 hours of negotiation and discussion, both the Merrill Board and the BofA Board approved the Merger Agreement.  Thain later stated that Merrill Lynch had not reached out to any other companies to discuss a potential deal.  Thus, Merrill made absolutely no attempt to shop itself or any part of itself domestically or internationally.

293.    The transaction was agreed upon so quickly that the Merrill Director Defendants did not even utilize any independent investment bankers to review the fairness of the offer before accepting the offer.  Instead, Merrill Lynch relied solely on in-house personnel to evaluate the fairness of the transaction – persons who anticipated that would be terminated if the Merrill Lynch-BofA transaction did not occur.  Similarly, Bank of America rushed into this merger with a highly complex, international financial giant, conducting a virtually meaningless "due diligence" based almost entirely on outdated internal BofA evaluations of Merrill lynch that solely utilized public information.

294.    Nevertheless, as would become apparent after the announcement of this hasty, reckless Merger approval by the BofA Board, the Merrill Defendants found time during those few hours to negotiate astronomical bonuses for themselves and other Merrill Lynch employees for 2008 and obtain complete indemnifications for all of their prior wrongdoing that had so severely damaged Merrill and its shareholders that it forced the weekend fire sale of the

company to BofA.  For BofA's part, the BofA Board made no effort and gave no consideration to the value of any Merrill Lynch's claims against the Merrill defendants the BofA Board chose – blindly – to indemnify, or even determine the amount of the proposed Merrill Lynch bonuses before approving a Merger Agreement that made those material terms.  Rather, the BofA Board approved the Merger, including these benefits to the Merrill Defendants at the costs of ***billions*** of dollars to Merrill Lynch and its post-Merger parent, BofA, without any review of inquiry and did so, with full knowledge that no meaningful due diligence of Merrill lynch had been conducted before the Merger Agreement was presented to the BofA Board for approval.

295.    On September 15, 2008, before the markets opened, Bank of America issued a press release announcing that it would acquire Merrill Lynch  in an all-stock transaction after less than two days of negotiations.  The press release stated:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled in its breadth of financial services and global reach.
>
> "Acquiring one of the premier wealth management, capital markets and advisory companies is a great opportunity for our shareholders, Bank of America Chairman and Chief Executive Officer Ken Lewis said.  "Together, our companies are more valuable because of the synergies in our businesses."
>
> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management teams to create what will be the leading financial institution in the worked with the combination of these two firms," said John Thain, chairman and CEO of Merrill Lynch.
>
> Under terms of the transaction, Bank of America would exchange .8595 shares of Bank of America common stock for each Merrill Lynch common share.  The price is 1.8 times tangible book value.
>
> Bank of America expects to achieve $7 billion in pretax expense savings, fully realized by 2012.  The acquisition is expected to be accretive to earnings by 2010.  The transaction is expected to close in the first quarter of 2009.  It ha been approved by directors of both companies and is subject to shareholder votes at both companies and standard regulatory approvals.  Under the agreement, three directors of Merrill Lynch will join the Bank of America Board of Directors.

The combined company would have leadership positions in retail brokerage and wealth management.  By adding Merrill Lynch's more than 16,000 financial advisers, Bank of America would have the largest brokerage in the world with more than 20,000 advisers and $2.5 trillion in client assets.  The combination brings global scale in investment management, including an approximately 50% ownership in BlackRock, which has $1.4 trillion in assets under management.  Bank of America has $589 billion in assets under management.  Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States.  Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

296.    Despite the value of the Merrill assets (including the Merrill brand name) and its tremendous financial strength, the deal would add to Bank of America, in order to escape the serious and escalating problems detailed above, the Merrill Board agreed during a temporary crisis of confidence in the world capital markets to sell Merrill Lynch for far less than its actual worth.  Indeed, the Merrill Individual Defendants timed and promoted the agreement in a manner to portray the transaction as a "rescue" to play on investors' fears and obtain approval of the transaction by investors through panic rather than an informed business decision.  Indeed, as recently as September 12, 2008, an analyst report issued by Citigroup noted that Merrill Lynch was worth more than $40 per share.  The report detailed Merrill's valuable assets, including its half-ownership of BlackRock, Inc., a New-York based money-management company with a multi-billion market value.  The report also emphasized that Merrill's wealth management assets alone were worth more than $16 per share.

297.    Similarly, a *New York Times* article published in response to the Citigroup research report noted that:

- [E]ven in a "stress scenario" there's a whole lot more value there than is currently reflected in [Merrill's] beaten-down stock price;

- A discounted cash-flow valuation still gives Merrill a price target of $45 a share.

298.    Bank of America's agreement to acquire Merrill came just days after the Citigroup report.  Under the Merger Agreement, Bank of America exchanged 0.8595 shares of its common stock for each share of Merrill common stock.  Based on Bank of America's closing price on September 12, 2008, the indicated value of the Merger was $29 per share, or approximately $50 billion.  A *Bloomberg* article published on September 15, 2008, noted that Bank of America was picking up a retail distribution "powerhouse" and characterized the Proposed Acquisition as the "second bargain" picked up this year by Bank of America.  The first bargain was Bank of America's acquisition of Countrywide, which closed earlier that year.

299.    As explained by *Bloomberg,* the $29 per share consideration is based on Bank of America's closing price of $33.74 on September 12, 2008.  However, on September 15, 2008, Bank of America was already trading well below $29 per share.  As a result, due to the stock-for-stock deal, Merrill shareholders received less value when Bank of America's stock price continued to fall.

300.    The sale of Merrill Lynch was negotiated ***in fewer than 48 hours***.  Obviously, 48 hours is a grossly inadequate amount of time to complete due diligence necessary to make a fully informed decision as to whether to sell or buy a company as complex as Merrill Lynch. Moreover, as Thain acknowledged, the Merrill Director Defendants did not even attempt to contact any other companies to discuss a sale of the company or conduct any other type of market check.  Moreover, in a CNBC interview, Bank of America's Chairman noted that the Merger Agreement included provisions that would have made any competing bids for Merrill

enormously expensive, precluding any true market auction for the sale of Merrill.  The Merger

Agreement also contained a breakup fee which could reach $2 billion or more.

301.    The Merger with Bank of America did provide one guarantee that any effort to

marker Merrill lynch to other potential acquirors would not – it guaranteed billions of dollars in

bonus compensation to the Merrill Lynch's officers and employees – including enormous

bonuses to Thain and Fleming.  It also guaranteed that Merrill Lynch's claims against the Merrill

Defendants – including the Merrill Director Defendants -- for their violations against Merrill

Lynch of the federal securities laws and common law breached of fiduciary duty and their other

violations of law would not be pursued by Merrill lynch (or its new parent BofA), and no effort

would be made to seek contribution from the Merrill Defendants for the costs of any recoveries

by outsiders ion claims against Merrill Lynch arising from the business practices Merrill Lynch

engaged in at the Merrill Defendants' directions before the Merger.    Thus, the Merrill

Defendants had succeeded through the Merger with BofA in protecting their own personal

wealth.

302.    Indeed, in an effort to ensure that the Merrill Defendants were completely

insulated from any liability concerning the breaches of fiduciary duties alleged herein, the

Merger Agreement contained an iron-clad indemnification clause which states that:

> (a) In the event of any threatened or actual claim, action, suit, proceeding or
> investigation, whether civil, criminal or administrative (a "Claim"), including any
> such Claim in which any individual who is now, or has been at any time prior to
> the date of this Agreement, or who becomes prior to the Effective Time, a director
> or officer of Company or any of its Subsidiaries or who is or was serving at the
> request of Company or any of its Subsidiaries as a director or officer of another
> person (the "Indemnified Parties"), is, or is threatened to be, made a party based
> in whole or in part on, or arising in whole or in part out of, or pertaining to (i) the
> fact that he or she is or was a director or officer of Company or any of its
> Subsidiaries prior to the Effective Time or (ii) this Agreement or any of the
> transactions contemplated by this Agreement, whether asserted or arising before
> or after the Effective Time, the parties shall cooperate and use their reasonable

best efforts to defend against and respond thereto. All rights to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Effective Time now existing in favor of any Indemnified Party as provided in their respective certificates or articles of incorporation or bylaws (or comparable organizational documents), and any indemnification agreements which are existing as of the date hereof, shall survive the Merger and shall continue in full force and effect in accordance with their terms, and shall not be amended, repealed or otherwise modified for a period of six years after the Effective Time in any manner that would adversely affect the rights thereunder of such individuals for acts or omissions occurring at or prior to the Effective Time or taken at the request of Parent pursuant to Section 6.7, it being understood that nothing in this sentence shall require any amendment to the certificate of incorporation or bylaws of the Surviving Company.

(b) From and after the Effective Time, Parent shall or shall cause the Surviving Company to, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless, and provide advancement of expenses to, each Indemnified Party against all losses, claims, damages, costs, expenses, liabilities or judgments or amounts that are paid in settlement of or in connection with any Claim based in whole or in part on or arising in whole or in part out of the fact that such person is or was a director or officer of Company or any of its Subsidiaries, and pertaining to any matter existing or occurring, or any acts or omissions occurring, at or prior to the Effective Time, whether asserted or claimed prior to, or at or after, the Effective Time (including matters, acts or omissions occurring in connection with the approval of this Agreement and the consummation of the transactions contemplated hereby) or taken at the request of Parent pursuant to Section 6.7.

(c) Parent shall cause the individuals serving as officers and directors of Company or any of its Subsidiaries immediately prior to the Effective Time to be covered for a period of six years from the Effective Time by the directors' and officers' liability insurance policy maintained by Company (provided that Parent may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous than such policy) with respect to acts or omissions occurring prior to the Effective Time that were committed by such officers and directors in their capacity as such; provided that in no event shall Parent be required to expend annually in the aggregate an amount in excess of 250% of the annual premiums currently paid by Company (which current amount is set forth in Section 6.6 of the Company Disclosure Schedule) for such insurance (the "Insurance Amount"), and provided further that if Parent is unable to maintain such policy (or such substitute policy) as a result of the preceding proviso, Parent shall obtain as much comparable insurance as is available for the Insurance Amount.

(d) The provisions of this Section 6.6 shall survive the Effective Time and are intended to be for the benefit of, and shall be enforceable by, each Indemnified Party and his or her heirs and representatives.

Merger Agreement, ¶ 6.6 (Attached to Joint Proxy, defined *infra*, as Appendix A).

**Merrill Lynch and BofA Seek Shareholders' Approval of The Merger**

303.    On November 3, 2008, Merrill Lynch and BofA filed joint proxy statements with the SEC on Schedule 14A (the "Joint Proxy"), dated October 31, 2008,[90] seeking shareholder approval for the Merger from both companies' stockholders.[91]

304.    To shareholders considering the merits of the Merger, one of the most important parts of the Joint Proxy is the "Background of the Merger" section which purports to detail all the relevant facts and circumstances surrounding the background of the negotiations leading up to the Merger.  The Joint Proxy described the Background of the Merger, ***in its entirety***, as follows:

> Management and the boards of directors of both Bank of America and Merrill Lynch regularly review and consider potential strategic options for their companies in light of their respective performance, business needs and the challenges and opportunities presented by the economic and industry environment. As part of this process, senior management of both companies have met informally from time to time with senior management of other financial institutions, including each other, regarding industry trends and strategic considerations. Among these considerations has been the possibility of a combination of Bank of America and Merrill Lynch.
>
> During the week of September 8, 2008, the prices of publicly traded shares of many major financial services companies declined significantly as speculation and reports about financial difficulties at Lehman Brothers Holdings, Inc. began to circulate. On September 10, 2008, Lehman Brothers pre-announced a $3.9 billion net loss for its third quarter of 2008, as well as a number of initiatives to bolster its financial viability; however, the equity markets remained volatile. Merrill Lynch's common stock price declined by approximately 36 percent during that week. On the morning of Friday, September 12, 2008, the Merrill Lynch

---

[90] Merrill Lynch & Co., Inc., Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008); Bank of Am. Corp., Definitive Proxy Statement (Schedule 14A) (Nov. 3, 2008).

[91] Pursuant to a November 21, 2008, memorandum of understanding with plaintiffs in the Court of Chancery and in the Southern District of New York actions, Merrill Lynch and BofA agreed to supplement the Joint Proxy and make certain additional disclosures related to the Merger (the "Supplemental Disclosure").  Merrill Lynch & Co., Inc., 8-K (Form 8-K) (Nov. 21, 2008); Bank of Am. Corp., 8-K (Form 8-K) (Nov. 21, 2008).

board of directors held an informational conference call. During the conference call, senior management of Merrill Lynch updated the directors on recent market conditions, developments relating to Lehman Brothers' financial viability, and the status of, and certain considerations with respect to, Merrill Lynch's capital, liquidity and business results, Merrill Lynch's recent stock performance and potential rating agency actions. The Merrill Lynch board of directors urged senior management to continue to evaluate the potential impact of these market developments on Merrill Lynch and the possible courses of action Merrill Lynch might pursue in response to various possible scenarios, and stressed the need for Merrill Lynch to be prepared to act quickly as events unfolded.

On Saturday morning, September 13, 2008, John Thain, Chairman and Chief Executive Officer of Merrill Lynch, contacted Ken Lewis, Chairman, Chief Executive Officer and President of Bank of America. Mr. Thain told Mr. Lewis that, in light of the extremely distressed conditions in the financial services industry generally and the investment banking industry in particular, he believed that it might be beneficial to both companies to explore one or more potential investment or other transactions between Merrill Lynch and Bank of America. Mr. Lewis agreed that such discussions could be in both companies' best interests and agreed to meet with Mr. Thain later that day in New York City.

On Saturday afternoon, Messrs. Lewis and Thain met in New York City. The two executives discussed the unprecedented market environment that had triggered significant dislocations, the near-bankruptcy of The Bear Stearns Companies Inc. and the apparently imminent bankruptcy of Lehman Brothers. Mr. Thain proposed to Mr. Lewis that Bank of America consider acquiring a 9.9% equity stake in Merrill Lynch and provide a credit facility to Merrill Lynch. Mr. Lewis responded that Bank of America was not interested in acquiring a minority stake in Merrill Lynch, but that Bank of America would be interested in discussing a potential business combination with Merrill Lynch. Mr. Lewis expressed his view of the strategic fit between the two organizations and his belief that the combination of the two companies would result in a leading position in retail brokerage and wealth management, significantly enhanced investment banking capabilities and global scale in investment management. Messrs. Thain and Lewis agreed to further discuss both alternatives.

Following that afternoon meeting, and in view of the need to move expeditiously in light of the apparently imminent bankruptcy of Lehman Brothers and deteriorating market conditions, both companies began to arrange meetings among members of management and their advisors to discuss the challenges and benefits of a transaction and to undertake their respective business, financial, operational and legal due diligence investigations. The discussions among Bank of America, Merrill Lynch and their management teams and advisors, as well as their due diligence investigations, continued throughout the night and into the next day and night.

Also on Saturday, representatives of Merrill Lynch engaged in exploratory discussions regarding a transaction with two other large financial services companies, including with respect to the potential for a minority investment and credit facility with one company and for a business combination with the other company. The discussions regarding a potential minority investment did not result in the development of a transaction that the senior management of Merrill Lynch or its board of directors determined to be as favorable to Merrill Lynch or its stockholders as the combination proposed with Bank of America. After meeting with the other company, Merrill Lynch did not pursue further discussions regarding a potential combination because senior management of Merrill Lynch concluded that such a transaction was not readily achievable.

[At the time Merrill Lynch decided not to pursue further the exploratory discussions it was having with two other large financial services companies, certain terms of the merger agreement and stock option agreement with Bank of America remained subject to negotiation, Merrill Lynch's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), had not yet rendered its fairness opinion to Merrill Lynch's board of directors, and the proposed merger agreement with Bank of America was still subject to consideration and approval by both companies' boards of directors.][92]

Early in the morning of Sunday, September 14, 2008, Messrs. Thain and Lewis met in New York City. At this meeting, Messrs. Thain and Lewis discussed the results of the due diligence investigations conducted by their companies' respective representatives. Mr. Lewis and Mr. Thain discussed the strategic rationale for a business combination of Bank of America and Merrill Lynch and considered how the businesses of Merrill Lynch and Bank of America would complement each other. At the conclusion of the meeting, Messrs. Thain and Lewis agreed to have representatives of Merrill Lynch and Bank of America and their respective legal advisors pursue the negotiation of the terms of the agreements that would govern the proposed business combination transaction.

Later that day, the Merrill Lynch board of directors held an informational conference call. In addition to the directors, Shearman & Sterling LLP, counsel to Merrill Lynch, and Cravath, Swaine & Moore LLP, counsel to the non-employee directors, participated in the conference call. On the conference call, Mr. Thain updated the directors on the meetings held over the weekend between government officials and senior executives at leading financial services companies to provide financial assistance to Lehman Brothers, the exploratory discussions with two other institutions regarding the potential for a strategic transaction, the status of discussions with Bank of America regarding the proposed business combination transaction, and the status of, and certain considerations with respect to, Merrill Lynch's capital, liquidity and business results and the potential impact on Merrill Lynch of the expected public announcements regarding the expected bankruptcy

---

[92] As supplemented by the Supplemental Disclosure, at 3-4.

filing by Lehman Brothers and the reported liquidity issues facing American International Group. [As part of the update to the board members concerning the meetings held over the weekend between government officials and senior executives at leading financial services companies, Mr. Thain, Merrill Lynch's Chairman and Chief Executive Officer, informed the board that Lehman Brothers Holdings, Inc. was expected to file for bankruptcy.][93]  The Merrill Lynch board of directors indicated their agreement that representatives of Merrill Lynch and its legal advisors continue negotiating the terms of the proposed merger with Bank of America and its legal advisors with a view to reaching an agreement that could be presented to the Merrill Lynch board of directors that evening, particularly in light of the market uncertainties and related risks Merrill Lynch would be expected to face when the markets opened the next day. Mr. Thain proposed that the Merrill Lynch board of directors plan to meet at 6:00 p.m. that evening, and subsequently left the conference call together with the other representatives of Merrill Lynch and their advisors. The non-employee directors continued the conference call in executive session with their independent counsel for purposes of discussing the proposed business combination transaction with Bank of America and the alternatives available to Merrill Lynch.

From September 13, 2008 through September 14, 2008, representatives of Merrill Lynch met several times with representatives of Bank of America to discuss valuation and pricing for shares of Merrill Lynch common stock in any proposed business combination transaction. During these discussions, representatives of Merrill Lynch indicated that Merrill Lynch would be seeking a significant premium to the closing price of $17.05 for shares of Merrill Lynch common stock on the NYSE on September 12, 2008, as well as an appropriate multiple of book value. These discussions resulted in the parties' agreement to present to their respective boards a proposed transaction having a price of $29.00 for each share of Merrill Lynch common stock, which equated to an exchange ratio of 0.8595 based on the closing price for shares of Bank of America common stock on the NYSE on September 12, 2008.

In the late afternoon on Sunday, the Bank of America board of directors met with members of Bank of America senior management and its outside advisors. Bank of America senior management reviewed with the Bank of America board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction. Bank of America senior management and the company's financial advisors, J.C. Flowers and FPK, presented the Bank of America board of directors with the findings of their due diligence investigation of Merrill Lynch and additional information, including financial information regarding the two companies and the transaction as more fully described below under the heading "— Opinion of Bank of America's Financial Advisors". Each of J.C. Flowers and FPK orally advised the Bank of America board of directors, and indicated that it was prepared to render a written opinion to the same effect,

---

[93] As supplemented by the Supplemental Disclosure, at 3.

that, as of such date and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon their review as described in their respective opinions and other matters as J.C. Flowers and FPK considered relevant, the proposed exchange ratio to be paid by Bank of America in the merger was fair, from a financial point of view, to Bank of America. Bank of America's general counsel and Wachtell, Lipton, Rosen & Katz, counsel to Bank of America, discussed with the Bank of America board of directors the legal standards applicable to its decisions and actions with respect to the proposed transaction and reviewed the legal terms of the proposed merger. Following review and discussion among the members of the Bank of America board of directors, including consideration of the factors described under "— Bank of America's Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the Bank of America board of directors unanimously determined that the transaction was in the best interests of Bank of America and its stockholders and voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

Shortly after the start of the Bank of America board meeting, the Merrill Lynch board of directors met with members of Merrill Lynch's senior management and Merrill Lynch's financial advisors and outside legal advisors. Merrill Lynch senior management reviewed with the Merrill Lynch board of directors information regarding Bank of America, Merrill Lynch and the terms of the proposed transaction and updated the directors on developments in the discussions with representatives of Bank of America since the adjournment of the conference call earlier in the day. Merrill Lynch senior management apprised the Merrill Lynch board of directors of its due diligence investigations of Bank of America. MLPFS reviewed its financial analyses regarding the proposed merger with the Merrill Lynch board of directors as more fully described below under the heading "— Opinion of Merrill Lynch's Financial Advisor." MLPFS then rendered to the Merrill Lynch board of directors its oral opinion, which opinion was subsequently confirmed in writing, that as of September 14, 2008, based upon the assumptions made, matters considered and limits of such review, as set forth in its opinion, the exchange ratio in the merger was fair from a financial point of view to holders of Merrill Lynch common stock. In addition, Shearman & Sterling LLP reviewed with the Merrill Lynch board of directors the legal terms of the proposed merger and the legal standards applicable to its decisions and actions with respect to the proposed transaction. Following review and discussion among the members of the Merrill Lynch board of directors, including consideration of the factors described under "— Merrill Lynch's Reasons for the Merger; Recommendation of the Merrill Lynch Board of Directors," the Merrill Lynch board of directors determined that the merger was advisable and in the best interests of Merrill Lynch and its stockholders, and the Merrill Lynch board of directors voted unanimously to approve the merger agreement, the stock option agreement and the transactions contemplated by those agreements.

Following approval of each board of directors, the parties and their counsel continued to work to finalize and document the legal terms of the definitive agreements for the transaction, and early in the morning on September 15, 2008, the parties entered into the merger agreement and the stock option agreement and the transaction was announced in a press release issued by Bank of America.

Joint Proxy at 49-51.

305.     Relying on Defendants' disclosures in the Joint Proxy and Supplemental Disclosure, on December 5, 2008, shareholders of Merrill Lynch and BofA voted in favor of approving the Merger.

306.     What Merrill Lynch shareholders and the BofA Board and shareholders did not know at the time they approved the Merger, however, was that:  (1) the Merrill Board and BofA Board had approved previously undisclosed $3.62 billion in bonus compensation to Merrill Lynch employees; and (2) Merrill's financial losses were even greater than previously disclosed.

**The Truth About The Merger and Defendants' Colossal Breaches of Fiduciary Duties is Revealed**

307.     Unfortunately for Merrill Lynch's shareholders – who approved the Merger at a special meeting on December 5, 2008 – only days **after** the shareholder vote, new and disturbing information concerning Merrill's executive compensation on the eve of the Merger was slowly becoming public.

308.     On December 8, 2008, the *Wall Street Journal* published an article concerning Thain's attempts to secure additional bonus compensation from Merrill Lynch and stating, *inter alia*:

> Merrill Lynch & Co. chief John Thain has suggested to directors that he get a 2008 bonus of as much as $10 million, but the battered securities firm's compensation committee is resisting his request, according to people familiar with the situation.
>
> The committee and full board are scheduled to meet Monday to hear Mr. Thain's formal bonus recommendations for himself and other senior executives of the New York company. No decision has been reached, and it isn't known what Mr.

Thain will recommend, but the compensation committee is leaning toward denying the executives bonuses for this year, these people said.

. . . .

Merrill has suffered net losses of $11.67 billion this year and is about to complete its acquisition by Bank of America Corp. later this month. On Friday, shareholders of both companies separately approved the deal. Mr. Thain has said he deserves a bonus because he helped avert what could have been a much larger crisis at the firm, say people familiar with his thinking.

. . . .

Members of Merrill's compensation committee, which makes recommendations on pay and bonuses to the full board, say they agree with Mr. Thain that the takeover is in shareholders' best interest, according to people familiar with their thinking. But they say it would be foolish for the committee to ignore strong public sentiment against large compensation packages, even though Merrill says it opted not to take the recent multibillion-dollar federal capital injection that many of its rivals did.

Committee members are also weighing the fact that other firms are paying no bonuses, these people said. Also, they considered that most other Wall Street firms, including Goldman Sachs Group Inc., which did better than Merrill this year, isn't giving out bonuses to top executives. Executive bonuses also would look bad when as much as 20% of Merrill's employees will soon lose their jobs.

Any decision to pay Merrill executives big bonuses could also raise eyebrows at Bank of America, which is known for its often thrifty ways. Bank of America spokesman Scott Silvestri said: "We have no comment. They are still an independent company."

. . . .

A few months ago, when the board began seriously considering 2008 bonuses, a proposal was presented to the compensation committee by Merrill that Mr. Thain should be paid in excess of $30 million, according to people familiar with the matter. That number has since come down in recent talks with various board members and Mr. Thain has recently indicated to committee members that $5 million to $10 million is more reasonable.

. . . .

A decision not to give a bonus to Mr. Thain would represent an about-face for Merrill's board, which has long come under fire for not taking a stand against management as the firm's mortgage investments got out of control. On Friday, amid a vote to approve Bank of America's purchase of Merrill Lynch, Merrill shareholders criticized the firm's board.

> Winthrop Smith Jr. -- the 59-year-old son of one of the founding partners of Merrill Lynch, Pierce, Fenner & Smith -- admonished Merrill's board and the company's previous chiefs. "This is the story of failed leadership and the failure of a board of directors to understand what was happening to this great company, and its failure to take action soon enough," Mr. Smith said, according to meeting minutes. At the firm's annual meeting in April, one board member said she and fellow members did ask questions, but in many cases didn't learn about certain issues until late in the process.

Susanne Craig, *Thain Spars With Board Over Bonus At Merrill*, Wall St. J., Dec. 8, 2008, at A1.

309.    The following day, after the aforementioned facts concerning Thain's attempts to secure himself an additional multi-million dollar bonus became public, Thain purportedly withdrew his bonus request.  *See* Susanne Craig and Aaron Lucchetti, *Thain and Mack Lose '08 Bonuses – Merrill Lynch, Morgan Stanley Revisit Executive Payouts; Cuomo Looms*, Wall St. J., Dec. 9, 2008, at C1.  However, the bonus described in the article was separate and apart from, and did not impact Thain's hefty share of the $3.62 billion in bonuses the BofA Board had already agreed he could be paid at the time the Merger Agreement was approved – the amounts of which the BofA Board did not even know when they approved them.  Moreover, Thain's purported withdrawal of his bonus request, however, was barely the tip-of-the-iceberg of the true facts that would not come to light until several weeks after the Merger was consummated on January 1, 2009.

310.    On January 15, 2009, the *Wall Street Journal* published an article disclosing, for the first time, that:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> ***Discussions over these funds began in mid-December when Bank of America approached the Treasury Department. The bank, already the recipient of $25 billion in committed federal rescue funds, said that it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's***

***larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.***

Treasury, concerned the deal's failure could affect the stability of U.S. financial markets, agreed to work with the Charlotte, N.C., lender on the "formulation of a plan" that includes new capital from the $700 billion Troubled Asset Relief Program, according to the person familiar with the talks. The amount and terms are still being finalized, this person said. Details are expected to be announced with Bank of America's fourth-quarter earnings, due out Tuesday.

Any possible arrangement might protect Bank of America from losses on Merrill's bad assets. There would be a cap on the amount of losses the bank would have to absorb, with the federal government being on the hook for the remainder, said one person familiar with the matter.

Both the Federal Reserve and the Federal Deposit Insurance Corp., alongside the Treasury, are involved in the negotiations, say people familiar with them. That suggests that the aid could take a similar form to the hand extended to Citigroup Inc. late last year.

The commitment of funds is further evidence of the banking system's delicate condition and its hunger for more capital, despite billions of dollars already invested in financial institutions by the government. So far, the U.S. has already injected $25 billion into Bank of America, which includes $10 billion that Merrill Lynch would have received if the sale to Bank of America had not closed.

The talks with Bank of America were driven by Treasury Secretary Henry Paulson, people familiar with the matter said, because he was concerned that without help the deal wouldn't close, leaving Merrill adrift. When the merger closed at the beginning of this year, it was with the understanding the two sides would hammer out a plan afterwards, said a person familiar with the talks.

. . . .

Bank of America is expected by some analysts to report a loss for the fourth quarter, or at least a smaller profit than expected. It is not known exactly how much Merrill lost in the same time period. Merrill's problems largely stem from the deterioration of assets on its books and trading losses, said a person familiar with the matter.

. . . .

The deal between Bank of America and Merrill was forged during the hectic weekend last September that saw Lehman Brothers Holdings Inc. collapse and giant insurer American International Group Inc. start to unravel. Merrill Chief Executive John Thain, worried his firm would be next, pressed for a quick deal.

Dan Fitzpatrick, Damian Paletta and Susanne Craig, *Bank of America to Get Billions in U.S. Aid – Sides Finalizing Terms for Fresh Bailout Cash; Lender Told Treasury That Without Funds, It Couldn't Close Deal for Ailing Merrill*, Wall St. J., Jan. 15, 2009, at A1 (emphasis added).

311.    The following day, January 16, 2009, the *Wall Street Journal* published an article further detailing Merrill's financial losses and stating, in relevant part:

> ***Reeling from previously undisclosed losses from its Merrill Lynch & Co. acquisition, Bank of America Corp. is expected to receive an emergency capital injection of $20 billion from the Treasury, which will also backstop as much as $120 billion of assets at the bank, said people familiar with the plan.***
>
> Reports of the unexpected Merrill losses sent Bank of America shares to their lowest levels since 1991, and set off a new round of debate in Congress about the scope and mission of the Treasury's financial-system bailouts.
>
> . . . .
>
> The developments angered some Bank of America shareholders, who began to question why Chief Executive Kenneth Lewis didn't discover the problems prior to the Sept. 15 deal announcement. ***Many also wanted to know why he didn't disclose the losses prior to their vote on the Merrill deal on Dec. 5, or before closing the deal on Jan. 1.***
>
> . . . .
>
> Bank of America said it learned of Merrill's losses after the Dec. 5 shareholder vote. And in the days following, both Federal Reserve Chairman Ben Bernanke and Mr. Paulson impressed upon Mr. Lewis the importance of closing the transaction for the firm's own sake and also warned of the consequences for the country's overall financial system, say people familiar with the discussions.
>
> Bank of America spokesman James Mahoney said: "Beginning in the second week of December, and progressively over the remainder of the month, market conditions deteriorated substantially relative to market conditions prior to the Dec. 5 shareholder meetings. So Merrill wound up making adjustments for the quarter that were far greater than anticipated at the beginning of the month. These losses were driven by mark-to-market adjustments which were necessitated by changes in the credit markets, and those conditions change on a daily basis."
>
> At one point in December, Mr. Lewis even sent lawyers to New York to find out whether Merrill's situation amounted to a material-adverse situation that might

allow the bank to cancel the deal, according to a person familiar with the situation.

. . . .

By Dec. 17, Mr. Lewis went to Washington to discuss what he had already disclosed to Mr. Bernanke in an earlier phone call -- that his bank was having trouble digesting Merrill's losses. ***Mr. Lewis described the losses as monstrous, according to a person familiar with the matter.***

At that 6 p.m. meeting, Mr. Bernanke and Mr. Paulson both told Mr. Lewis that failing to complete the Merrill acquisition would be disastrous. The policy makers said abandoning the deal would further destabilize markets, and would hurt the bank, potentially setting off a ripple effect that would exacerbate a fragile situation.

Messrs. Bernanke and Paulson also urged Mr. Lewis to finish the deal and not invoke a material-adverse change clause, saying it was in his interest to finish the deal. ***If they walked away, it would reflect poorly on the bank and suggest it hadn't done its due diligence and wasn't following through on its commitments.***

. . . .

***"Bank of America didn't do proper due diligence,"*** said Bradley Dorman, managing partner at WhaleRock Point Partners, a Providence, R.I., investment adviser with 315,000 shares in the bank. He said Mr. Lewis "probably jumped the gun."

***"There was a tremendous lack of transparency,"*** added John Moore Sr., who controls 18,000 shares and lives in Charlotte, where is chairman of commercial real-estate firm Moore Cos. "As a shareholder, without disclosure and transparency it is extremely difficult to make a reasonable in-vestment decision."

Bank of America "couldn't explain the deal with the government for two reasons," said the person close to the bank. "It wasn't done" and the bank "would have had to disclose earnings to do that."

Dan Fitzpatrick, Deborah Solomon and Susanne Craig, *Crisis on Wall Street – Bank Stress: BofA's Latest Hit – Treasury to Inject $20 Billion More; Stock at 1991 Level*, Wall St. J., Jan. 16, 2009, at C1 (emphases added).

312.     Less than 24 hours later, on January 17, 2009, BofA's claim that it did not know about Merrill's "monstrous" losses until after the shareholder votes on December 5, 2008, was further undermined.  As reported in the *Wall Street Journal*:

Bank of America maintains it went back to the government for more support because of larger-than-expected fourth-quarter losses at Merrill Lynch and that the problems came to light after shareholders approved the Bank of America-Merrill combination on Dec. 5. ***But 25% of the protected asset pool belonged to Bank of America***, Chief Financial Officer Joe Price said Friday, a signal that the problems weren't tied strictly to Merrill's disintegration.

. . . .

***Executives at both Bank of America and Merrill have indicated the losses at Merrill ballooned in mid December***, leading to a meeting between Mr. Lewis and Treasury Secretary Henry Paulson on Dec. 17. ***However, the market for various credit-related products began to deteriorate in mid-November, leaving many Merrill Lynch insiders to ask what Merrill CEO John Thain knew, and when***.[94]

313.    Information about Merrill Lynch's new "colossal" losses and complete abdication of their fiduciary duties by the Merrill Board and the BofA Board continued to leak out slowly over the next days and weeks.  On January 20, 2009, the *Wall Street Journal* published an article typifying the Merrill Defendants' and BofA Board's circular finger-pointing, as each proclaimed that they "saw no evil, heard no evil, and spoke no evil."[95]  The January 20, 2009 *Wall Street Journal* article stated, in relevant part:

Just weeks after the sale of Merrill Lynch & Co. to Bank of America Corp., the architects of the transaction are coming under fire.

. . . .

Now, ***some former Merrill board members are complaining that Mr. Thain didn't fully inform them that mounting losses at the bank threatened to derail the deal last month until the federal government agreed to step in***. Mr. Thain declined to comment on whether he was aware of Mr. Lewis's December meeting with the Treasury about the deal or whether he felt he had a responsibility to be more forthcoming with his board. A person familiar with the matter says Mr. Thain was aware at a certain point in December that the deal could be in trouble.

---

[94] Dan Fitzpatrick and Susanne Craig, *Crisis on Wall Street: Bank of America Goes On Offense – Stock Tanks On Quarterly Loss, Details of Latest Bailout; Employees Angry*, Wall St. J., Jan. 17, 2009, at B3 (emphases added).

[95] Wikipedia, *Three Wise Monkeys*, http://en.wikipedia.org/wiki/Three_wise_monkeys #Meaning_of_the_proverb (last visited May 28, 2009).

In addition, on Monday a person familiar with how Bank of America obtained its information about the deal said senior executives there didn't learn of the losses from Mr. Thain, but rather from the Merrill transition team. While this person didn't fault Mr. Thain for this per se, the person said senior executives at Bank of America sensed that Mr. Thain didn't appear to be fully engaged in issues surrounding the deal just when the scope of Merrill's losses was becoming apparent. In mid-December, Mr. Thain left on a vacation to Vail, Colo., and was pretty much out of touch after that, says this person.

A person familiar with the matter says Mr. Thain was working and available while in Vail.

Last week, Bank of America disclosed to investors that Merrill losses going into the sale, which closed on Jan. 1, totaled some $15 billion, *a sum Mr. Lewis indicated he viewed as so unexpected that in December he contemplated scrapping the deal. Mr. Lewis also told investors on Friday that the size of the loss led him to inform the federal government in mid-December that he wouldn't be able to close the sale.* The Treasury then agreed to offer billions of dollars in emergency funding to help Bank of America absorb the losses.

Merrill's last full board meeting was on Dec. 8 in New York. At that meeting, a main topic was Mr. Thain's unsuccessful bid for a bonus, several board members say. Attendees at the meeting also say they were told about continuing losses: Mr. Thain described November as one of the worst months on Wall Street in history but said Merrill's losses were more or less in line with other firms' and within Bank of America's estimates. Merrill's losses, Mr. Thain added, stemmed from legacy trades and not new positions.

*Some former Merrill board members and executives now are questioning why Mr. Thain didn't inform them in December that the losses had become so outsize and that the deal might be in jeopardy. "I am shocked," said one former Merrill board member. "This is a public company," this person said, saying the expectation would be for Mr. Thain to inform board members. . . .*

In addition, these directors and executives are also asking why, so soon after the Dec. 8 meeting, circumstances compelled Mr. Lewis to consider scrapping the deal and led him to go to Washington to meet with officials on Dec. 17. Another matter of contention is why another board meeting wasn't called to discuss the status of the deal. Mr. Thain declined to comment.

. . . .

As questions about Mr. Thain's handling of the Merrill deal mount, *Mr. Lewis is coming under fire following his decision to close on the Merrill purchase despite the discovery of the mounting losses. Mr. Lewis says he moved ahead*

***because the government informed him it couldn't let this sale fall apart and
because it was the right thing to do.***[96]

314.    On January 21, 2009, the *Financial Times* published an article disclosing for the

first time that the Merrill Defendants had accelerated bonus payments to senior Merrill

executives (including Thain and Fleming) just prior to the closing of the Merger and just after

shareholder approval of the Merger; circumventing the requirement that such benefits must be

disclosed in the proxy materials soliciting shareholder approval.  The January 21, 2009 *Financial*

*Times* article stated, in its entirety:

> ***Merrill Lynch took the unusual step of accelerating bonus payments by a
> month last year, doling out billions of dollars to employees just three days
> before the closing of its sale to Bank of America.***
>
> The timing is notable because the money was paid as Merrill's losses were
> mounting and Ken Lewis, BofA's chief executive, was seeking additional funds
> from the government's troubled asset recovery programme to help close the deal.
>
> ***Merrill and BofA shareholders voted to approve the takeover on December 5.
> Three days later, Merrill's compensation committee approved the bonuses,
> which were paid on December 29. In past years, Merrill had paid bonuses later
> – usually late January or early February, according to company officials.***
>
> Within days of the compensation committee meeting, BofA officials said they
> became aware that Merrill's fourth-quarter losses would be greater than expected
> and began talks with the US Treasury on securing additional Tarp money.
>
> Last week, BofA said it would be receiving $20bn in Tarp money, in addition to
> the $25bn that had been earmarked for it and Merrill last year. It was then
> revealed that Merrill had suffered a $21.5bn operating loss in the fourth quarter.
>
> Despite the magnitude of the losses, Merrill had set aside $15bn for 2008
> compensation, a sum that was only 6 per cent lower than the total in 2007, when
> the investment bank's losses were smaller.
>
> The bulk of $15bn in compensation was paid out as salary and benefits
> throughout the course of the year. ***A person familiar with the matter estimated
> that about $3bn to $4bn was paid out in bonuses in December.***

---

[96] Susanne Craig and Dan Fitzpatrick, *Merrill Architects Criticized – Ex-Directors Say They
Weren't Informed As Mounting Losses Jeopardized a Deal*, Wall St. J., Jan. 20, 2009, at C1
(emphases added).

> ***Nancy Bush, an analyst with NAB Research, described the size of the 2008 Merrill bonus payments as "ridiculous".***
>
> ***BofA said: "Merrill Lynch was an independent company until January 1 2009. John Thain (Merrill's chief executive) decided to pay year-end incentives in December as opposed to their normal date in January. BofA was informed of his decision."***
>
> ***BofA declined to specify when Mr Thain informed the bank of his decision.***
>
> A source familiar with the matter says Mr Thain, in the weeks leading up to the December 8 compensation committee meeting, had been weighing the possibility of requesting a bonus of at least $10m for himself before ultimately deciding against such a move.[97]

315.     Facing increasing criticism over BofA's acquisition of Merrill Lynch as well as the undisclosed Merrill bonuses and losses, on January 22, 2009, Lewis forced Thain to resign his position with BofA.  A January 23, 2009 *New York Times* article described the circumstances surrounding Thain's departure stating, *inter alia*:

> His Wall Street pedigree seems impeccable. A top job at Goldman Sachs. The chief of the New York Stock Exchange. Finally, the reins of the stock market's "thundering herd," Merrill Lynch.
>
> But in less than 15 minutes on Thursday, the charmed career of John A. Thain was derailed.
>
> Three weeks after his foundering brokerage firm was sold to Bank of America for $50 billion in stock, Mr. Thain was pushed out by the bank's chief executive, Kenneth D. Lewis, who is struggling to contain the damage from his bank's daring gamble on Merrill Lynch.
>
> Gaping losses at the brokerage firm forced Bank of America to seek a second financial lifeline from Washington last week, leaving Mr. Lewis's bank, the nation's largest, facing an uncertain future.
>
> Mr. Lewis, who had pressed ahead with the acquisition at the urging of federal regulators, is now fighting to right his troubled empire and safeguard his job.

---

[97] Greg Farrell and Julie MacIntosh, *Merrill delivered bonuses before BofA deal*, Fin. Times, Jan. 21, 2009 (emphases added).

The tension between the two men had been building since mid-December, when the implications of Merrill's latest losses — $15.3 billion during the fourth quarter alone — began to sink in.

**_But despite the mounting losses, Merrill Lynch rushed to pay annual bonuses to its employees before its deal with Bank of America closed on Jan. 1. Those payments are now under investigation by the attorney general of New York, a person briefed on the investigation said Thursday._**

For Mr. Thain, the end came on Thursday in his office at Merrill Lynch, which, according to CNBC, he lavishly refurbished last year with an $87,000 rug and a $68,000 credenza. Mr. Lewis had flown to New York from Charlotte, N.C., where Bank of America is based, to deliver the bad news. After a brief conversation, Mr. Thain agreed to depart.

. . . .

Then a different picture began to emerge. Mr. Thain, who is 53, drew criticism from both outside and inside Merrill Lynch for suggesting in October that he be paid a large annual bonus, said by individuals briefed on the matter to be $30 million to $40 million. In December, the individuals said, the figure dwindled to $10 million and in the end, he received no bonus at all. He later denied having asked for one.

. . . .

Recent reports that Mr. Thain had spent $1.2 million to redecorate his office caused Mr. Lewis to further question Mr. Thain's judgment, according to a person close to Mr. Lewis.

**_Another frustration for Mr. Lewis may have been the decision by Mr. Thain to make an earlier-than-usual bonus payout to Merrill employees, just three days before the merger closed, and before Bank of America could do anything to prevent it._**

**_The office of Andrew M. Cuomo, the New York attorney general, is examining the payouts, which a person inside the office characterized on Thursday as "large, secret last-minute bonuses."_**

. . . .

Last week, Mr. Thain declined through a spokeswoman to comment on whether he had misrepresented Merrill's risks at the time of the merger. On Thursday, a spokeswoman said he did not wish to discuss his departure.[98]

---

[98] Julie Creswell and Louise Story, *Thain Resigns Amid Losses at Bank of America*, N.Y. Times, Jan. 23, 2009, at A1 (emphases added).

316.   Notwithstanding Lewis's proffer of Thain as the sacrificial-lamb, investors, investigators, legislators, and journalists were not mollified and continued their inquiries into Merrill, BofA and Merrill's "large, secret-last minute bonuses."   Although Lewis and BofA initially sought to perpetuate the misconception that BofA had no knowledge of the Merrill bonuses, Thain responded with compelling facts demonstrating otherwise.  A January 25, 2009 *Financial Times* article revealed that:

> **Bank of America played a role in Merrill Lynch's controversial decision to pay $4bn in bonuses in December just as mounting losses were threatening to derail BofA's takeover of the Wall Street firm, according to people close to the situation.**
>
> BofA has said that the payment of $4bn in compensation in a fourth quarter in which Merrill racked up $15bn in losses was sanctioned by John Thain, Merrill's chief executive.
>
> Ken Lewis, BofA's embattled chief executive, ousted Mr Thain on Thursday after news of the bonus payments appeared in the Financial Times. ***BofA told the FT last week that Mr Thain had made the decision to pay bonuses in December instead of January and it had been "informed" of the move. The bank said Merrill was an independent company until the deal closed on January 1.***
>
> ***However, a person familiar with Mr Thain's actions said the ousted chief had at least two conversations with BofA's chief administrative officer, J. Steele Alphin, one of the bank's most senior executives, before a December 8 board meeting at which Merrill's bonus payments were approved.***
>
> This person said Mr Alphin recommended, and Mr Thain accepted, a proposal to change Merrill's incentive compensation mix – 60 per cent cash and 40 per cent stock – to conform with BofA's system of 70 per cent cash and 30 per cent stock. The stock portion of the payouts was made January 2, the day after the deal closed, in BofA stock.
>
> In addition, Andrea Smith, a senior executive in BofA's human resource department, had been seconded to Merrill since September, according to people close to the situation.
>
> ***BofA on Sunday confirmed there were conversations about the bonus payments prior to the pay-outs: "We never said we didn't talk with them about it. But, in the end, it was their decision and they informed us of it."***

BofA has also said it learnt of Merrill's mounting losses in the second week of December. ***Merrill insiders said the investment bank supplied BofA with daily profit and loss statements starting in November***. It was unclear whether those statements detailed Merrill's trading positions and their daily losses.[99]

317.   Furthermore, on January 27, 2009, the *Wall Street Journal* published an article which included portions of an email Thain sent to his Merrill Lynch colleagues after his ouster from BofA which directly contradicted BofA's claim that it did not know about the Merrill Lynch bonuses and that, even if it did know about the bonuses, that BofA did not participate in the decision to award the Merrill Lynch bonuses.  The article states in relevant part:

> John Thain came out swinging against his former boss, Bank of America Chairman and Chief Executive Kenneth Lewis, saying Monday he was "completely transparent" about big fourth-quarter losses at Merrill Lynch & Co. that cost him his job last week.
>
> . . . .
>
> ***In a parting shot emailed to a small group of Merrill executives, the 53-year-old Mr. Thain also insisted that officials at the Charlotte, N.C., bank were involved in the decision to pay out 2008 bonuses at Merrill so that employees would get them by year end.***
>
> Mr. Thain's account differed sharply from Bank of America's descriptions of events leading up to the company's announcement earlier this month of a $15.31 billion quarterly loss at Merrill, which was acquired Jan. 1. Bank of America said Mr. Thain hadn't kept it informed of the ballooning losses. The losses led to sharp criticism of Mr. Thain by some of the bank's officials, and Mr. Lewis demanded his resignation in a meeting last Thursday.
>
> . . . .
>
> The situation at Merrill has cast doubt on the 61-year-old Mr. Lewis's future as chairman and CEO at Bank of America. "It is highly unlikely that large shareholders and other important constituencies are going to be happy with the preservation of the status quo," Nancy Bush, an analyst at NAB Research LLC in Annandale, N.J., wrote in a note to clients Monday.
>
> People close to the bank's board deny that the CEO's job is in jeopardy, and say no dramatic moves are expected during a Wednesday board meeting in Charlotte.

---

[99] Greg Farrell and Francesco Guerrera, *BofA had role in Merrill bonuses*, Fin. Times, Jan. 25, 2009 (emphases added).

A spokesman said Mr. Lewis was unavailable for comment. The spokesman declined comment on any speculation about Mr. Lewis's job.

. . . .

Like many Wall Street battles, this one is about money. Before quitting under pressure from Mr. Lewis, Mr. Thain approved paying out 2008 bonuses at Merrill so that they could be collected before the end of the year. Such bonuses typically are paid in January, but Merrill management wanted its managers to allocate the funds themselves before the firm officially disappeared as an independent company and was subsumed by a new company with new managers, according to people familiar with the matter.

. . . .

*In his email, Mr. Thain wrote that the "size of the pool, its composition (cash and stock mix), and the timing of the payments for both the cash and stock were all determined together with Bank of America and approved by our Management Development and Compensation Committee and our Board."*

. . . .

*A Bank of America spokesman disputed Mr. Thain's recollection, saying that he and the firm's "compensation committee made the decision on the amount and timing of year-end compensation at Merrill Lynch. We had no legal right to challenge it."*

. . . .

The back and forth was part of a larger attempt by Mr. Thain on Monday to fight back against what he described in the email as issues that have been "inaccurately reported in the press." On Merrill's larger-than-expected loss, he said in the email, Bank of America learned about the losses when Merrill did, and that there was complete transparency on the Merrill end. On Monday afternoon, Mr. Thain told CNBC in an interview that his ouster "was a surprise to me."

Since the deal closed, it has been dogged by revelations that Bank of America considered walking away from the transaction in December as losses at Merrill ballooned unexpectedly, prompting Bank of America to seek emergency funding. Mr. Thain has been criticized by Bank of America officials for leaving for a ski holiday after learning of the losses and for not being fully engaged.

*"They learned about these losses when we did," Mr. Thain wrote of Bank of America officials in the email. "They had daily access" to the brokerage firm's profit and loss statement and other key data, he wrote.*

*A Bank of America spokesman said the bank has never said it didn't know about the losses, just that the deterioration of Merrill's assets was much larger than expected in December.*[100]

318.    On January 29, 2009, the *Wall Street Journal* published an article discussing N.Y. A.G. Cuomo's expansion of his probe into the Merrill Lynch's bonuses and stating:

New York Attorney General Andrew Cuomo is expanding the scope of his investigation into bonuses paid by Merrill Lynch, with the inquiry now likely to include whether directors and shareholders were misled about giant losses at the Wall Street firm, a person familiar with the situation said.

Mr. Cuomo plans to press John Thain, the former Merrill chairman and chief executive who was forced to resign last week from Bank of America Corp., on what he told Merrill directors about ballooning losses in mid-December, this person said.

*In addition, Mr. Cuomo wants to know why the Charlotte, N.C., bank didn't publicly disclose that Merrill's condition was deteriorating. BofA Chairman and CEO Kenneth Lewis is likely to face questions from Mr. Cuomo about bonus payouts by Merrill, including what he told directors about them, according to this person.*

"We plan to look at the fiduciary duty of these two men and others at various points in this saga," the person familiar with the investigation said Wednesday. "Looking at Bank of America, if they did a bad deal and didn't tell anyone, it not only hurt shareholders, it hurt taxpayers because of the government funding that has been extended to the bank."

. . . .

The investigation is at an early stage, but Mr. Cuomo's office is examining potential remedies such as trying to recover bonuses already paid, fines or alleging securities-law violations, the person familiar with the investigation said.

*In a statement, Mr. Cuomo said Bank of America faces a "$4 billion question" about "why it failed to stop Merrill Lynch from issuing year-end bonuses as it was taking over the company."*

. . . .

---

[100] Susanne Craig and Dan Fitzpatrick, *Thain Fires Back at Bank of America*, Wall St. J., Jan. 27, 2009, at A1 (emphases added).

On Tuesday, Mr. Cuomo announced he had issued subpoenas to Mr. Thain and two Bank of America executives seeking their testimony about the bonus payments, according a person familiar with the investigation.

Before resigning, Mr. Thain approved paying out 2008 bonuses at Merrill so that they could be collected before the end of the year. Such bonuses typically are paid in January, but Merrill management wanted its managers to allocate the funds themselves before the firm officially disappeared as an independent company, the person familiar with the matter said.

According to the person familiar with the situation, Mr. Cuomo also wants to know if Merrill's board knew about the deepening losses last month, which resulted in a net loss of $15.31 billion in the fourth quarter. That information may have led Merrill's compensation committee to readjust the bonus payouts, the person familiar with the probe said.

Some Merrill directors have said they didn't know of the losses or that the losses threatened to derail the Bank of America deal. Mr. Thain has said Bank of America knew about the bonuses. Bank of America has said Merrill's compensation committee made the decision on amount and timing of year-end compensation. A person close to Bank of America said it had "no input" on when the bonuses would be paid.[101]

319.    The plot thickened further when, on February 5, 2009, the *Wall Street Journal* published an article providing further details about BofA's knowledge of Merrill Lynch's widening losses preceding the closing of the Merger and negotiations with government officials. The February 5, 2009 *Wall Street Journal* stated, in relevant part:

Kenneth Lewis is getting a hard lesson in the new balance of power between Washington and Wall Street.

The Bank of America Corp. chairman and chief executive had agreed to buy brokerage giant Merrill Lynch & Co. in September, possibly saving it from collapse. But *by early December, Merrill's losses were spiraling out of control. Internal calculations showed Merrill had a horrifying pretax loss of $13.3 billion for the previous two months, and December was looking even worse.*

*Mr. Lewis had had enough. On Wednesday, Dec. 17, he flew to Washington, ready to declare that he was through with Merrill, people close to the executive say.*

---

[101] Susanne Craig, *Merrill Bonus Case Widens as Deal Struggles – Were Directors Misled About Firm's Losses Before the Bank of America Deal?*, Wall St. J., Jan. 29, 2009, at C1 (emphases added).

"I need you to know how bad the picture looks," Mr. Lewis told then-Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke, according to accounts of the conversation by people inside the government. Mr. Lewis said Bank of America had a legal basis to abandon the deal.

Messrs. Paulson and Bernanke forcefully urged Mr. Lewis not to walk away, praising the bank's earlier cooperation -- but warning that abandoning the deal would be a death sentence for Merrill. They said the move also could undercut confidence in Bank of America, both in the markets and among government officials. Despite the blunt talk, Bank of America executives interpreted the comments as a signal that the government was willing to work out a compromise.

*Two days later, in a follow-up conference call, federal officials struck a harder tone. Mr. Bernanke said Bank of America had no justification for ditching Merrill, according to people who heard the remarks. A Federal Reserve official warned that if Mr. Lewis did so and needed more government money down the road, Bank of America could expect regulators to think hard about their confidence in management. Mr. Lewis was told that the government would consider ousting executives and directors, people close to the bank say.*

. . . .

*By the end of November, two months into the fourth quarter, Merrill had accumulated $13.34 billion in pretax quarterly losses, according to an internal document reviewed by The Wall Street Journal*. Some Bank of America executives expressed concern about proceeding with the takeover, people close to the bank say. On the advice of their lawyers, the bank decided to go ahead with Dec. 5 shareholder votes on the deal. Shareholders of both Merrill and Bank of America gave their approval.

. . . .

Bank of America executives remained confident about the deal. *Doubts began to creep in shortly before Thanksgiving. With more than a month to go until the end of the fourth quarter, the pretax quarterly losses at Merrill were approaching $9 billion*, according to people familiar with the figures. By month's end, the figure had exceeded $13 billion, or $9.29 billion after taxes.

. . . .

At Bank of America, executives debated whether Merrill's losses were so severe that the bank could walk away from the deal, citing the "material adverse effect" clause in its merger agreement. Merger agreements typically specify certain "adverse" conditions that give an acquirer the right to abandon a deal.

. . . .

But lawyers from inside and outside the bank concluded that the losses likely were in line with other firms, and recommended that Bank of America move forward with the purchase, according to people familiar with the discussions.

The deliberations continued up until a few days before shareholders of Merrill and Bank of America were scheduled to vote, one of these people says. Senior Bank of America executives had "mixed emotions," this person says, but "everyone wanted to see the deal go through."

*On Dec. 5, the deal was approved at separate shareholder meetings in Charlotte and New York. Nothing was said about Merrill's problems. . . .*

On Dec. 8, Merrill's board gathered in Manhattan for its last meeting. Mr. Thain said the firm faced continuing losses, but they weren't unusual, given upheaval in the markets, directors recall.

The next day, Bank of America Chief Financial Officer Joe Price gave a detailed presentation to the bank's directors about its financial situation and Merrill's fourth-quarter woes, according to a person familiar with the meeting.

*Within a few days, Merrill's quarterly net losses had swelled to about $14 billion….*

Mr. Lewis told Bank of America directors in a conference call that the bank might abandon the acquisition, which was supposed to close in two weeks.

In mid-December, Edward Herlihy, a partner at law firm Wachtell, Lipton, Rosen & Katz who had helped set the merger talks in motion, reached out to Ken Wilson, a former Goldman Sachs Group banker and a top deputy of Mr. Paulson. *By then, Merrill's losses had reached almost $21 billion on a pretax basis*, roughly equivalent to about $15 billion in net losses, and some of Bank of America's lawyers felt there was sufficient grounds to invoke the legal clause to torpedo the deal.

. . . .

[On December 19], about 20 people in Charlotte and Washington dialed into a conference call that included Mr. Lewis, other Bank of America executives, Messrs. Paulson and Bernanke, and other Treasury and Fed officials. Mr. Bernanke told Mr. Lewis that Fed staff members had concluded there was no way for the bank to invoke the material-adverse-change clause in the takeover agreement that would allow it to abandon the deal.

Government officials also warned Mr. Lewis that withdrawing from the deal would frazzle the markets, spark a flurry of lawsuits against Bank of America and tarnish the bank for years. *A senior Fed official ratcheted up the pressure, telling Mr. Lewis that any future requests for government assistance would cause officials to consider taking a heavier hand in Bank of America's operations.*

> *The government's tone wasn't hostile. But the implication was obvious, people close to Bank of America say. As the bank's primary regulator, the Fed can force out executives if the agency concludes they are behaving irresponsibly. Mr. Lewis responded matter-of-factly that that government should do what it had to do, and Bank of America would do the same.*[102]

320.    Further details about BofA's involvement in the Merrill Lynch bonuses were

made public in a February 8, 2009 *New York Times* article which stated, *inter alia*:

> I[n] mid-September, as Wall Street unwound and venerable financial institutions were brought to their knees, the mood inside the Manhattan law offices of Wachtell, Lipton, Rosen & Katz was decidedly celebratory.

> After a weekend of whirlwind deal-making and emergency meetings at the Federal Reserve Bank of New York, John A. Thain and his team at Merrill Lynch had sold their troubled brokerage firm to the Bank of America Corporation, dodging the financial sinkhole that was swallowing Lehman Brothers.

> But before Wachtell lawyers, who were representing Bank of America, signed off on the deal, they told Merrill's lawyers that they wanted to be sure about just one more thing: the size of the bonuses that Mr. Thain and his colleagues would snare at the end of the year. A page was ripped from a notebook, and someone on Merrill's team scribbled eight-digit figures for each of Merrill's top five executives, including $40 million for Mr. Thain alone.

> Although Merrill had been bleeding money all year — and would continue to do so — the bonuses weren't, as Merrill executives later explained to colleagues, about that performance. Rather, they were fees for getting the merger done, akin to what investment bankers receive for blockbuster deals. Mr. Thain in particular felt he deserved a hefty payout for his deal-making heroics, according to five individuals with detailed knowledge of the situation who requested anonymity because of their personal and business relationships with those involved.

> . . . .

> Interviews with almost 30 current and former Bank of America and Merrill executives and employees convey just how messy the merger has been. All of them asked not to be identified because they either did not have permission from the banks to speak or because they had signed confidentiality agreements with their former employers.

> . . . .

---

[102]  Dan Fitzpatrick, Susanne Craig and Deborah Solomon, *In Merrill Deal, U.S. Played Hardball*, Wall St. J., Feb. 5, 2009, at A1 (emphases added).

[O]ther individuals inside Merrill note that Bank of America, shortly after the deal was announced, quickly put 200 people at the investment bank, including a large financial team. A Bank of America executive was sent to New York from Charlotte to act as an interim chief financial officer and had daily access to Merrill's profit-and-loss statements.

***Likewise, Bank of America was well aware of the $3.2 billion in bonuses that Merrill paid to its rank and file in late December. The two companies had agreed in September that Merrill might pay up to $5.8 billion, according to a private agreement reviewed by The New York Times.***

***Several weeks after that agreement was struck, a top deputy to Mr. Lewis met with Mr. Thain and asked him to lower the bonus pool below $3.5 billion and to increase the portion paid in cash. Mr. Thain agreed to do so, according to two people familiar with the meeting.***[103]

321.    On February 10, 2009, N.Y. A.G. Cuomo sent a letter to U.S. Representative and Chairman of the House Committee on Financial Services, Barney Frank.  In his letter, Cuomo sought to inform Representative Frank of the findings of his investigation up to that date, stating:

I am writing to provide you and your Committee with information concerning the executive compensation investigation currently being conducted by the Office of the New York Attorney General. As you know, as part of that investigation, this Office is conducting an ongoing inquiry into the 2008 bonus payments made by Merrill Lynch & Co., Inc.

On October 29, 2008, we asked Merrill Lynch to detail, among other things, their plans for executive bonuses for 2008, including the size of the bonus pool and the criteria they planned to use in determining what, if any, bonuses were appropriate for their top executives. On November 5, 2008, the Board responded and stated that any bonuses would be based upon a combination of performance and retention needs. However, Merrill did not provide my Office with any details as to the bonus pool, claiming that such details had not been determined.

***Rather, in a surprising fit of corporate irresponsibility, it appears that, instead of disclosing their bonus plans in a transparent way as requested by my Office, Merrill Lynch secretly moved up the planned date to allocate bonuses and then richly rewarded their failed executives.*** Merrill Lynch had never before awarded bonuses at such an early date and this timetable allowed Merrill to dole out huge bonuses ahead of their awful fourth quarter earnings announcement and before the planned takeover of Merrill by Bank of America.

---

[103] Louise Story and Julie Creswell, *For Bank of America and Merrill, Love Was Blind*, N.Y. Times, Feb. 8, 2009, at BU1 (emphases added).

***Merrill Lynch's decision to secretly and prematurely award approximately $3.6 billion in bonuses, and Bank of America's apparent complicity in it, raise serious and disturbing questions.*** By December 8, 2008, Merrill and presumably Bank of America must have been aware that the fourth quarter and yearly earnings results were disastrous. Indeed, on January 16, 2009, the companies announced that in the fourth quarter alone Merrill Lynch has lost $15.31 billion, and more than $27 billion for the year. In the face of these losses, federal taxpayers were forced to help Bank of America acquire Merrill. Thus, Bank of America also announced on January 16, 2009, that the federal government would invest $20 billion in the deal and provide $188 billion in protection against further losses primarily from the Merrill Lynch portfolio. These investments were in addition to the previous $25 billion in TARP funding that taxpayers had given to Bank of America.

. . . .

***What my Office has learned thus far concerning the allocation of the nearly $4 billion in Merrill Lynch bonuses is nothing short of staggering.*** Some analysts have wrongly claimed that individual bonuses were actually quite modest and thus legitimate because dividing the $3.6 billion over thousands upon thousands of employees results in relatively small amounts - estimated at approximately $91,000 per employee. In fact, Merrill chose to do the opposite. While more than 39 thousand Merrill employees received bonuses from the pool, the vast majority of these funds were disproportionately distributed to a small number of individuals. Indeed, Merrill chose to make millionaires out of a select group of 700 employees. Furthermore, as the statistics below make clear, ***Merrill Lynch awarded an even smaller group of top executives what can only be described as gigantic bonuses.***

. . . .

***Again, these payments and their curious timing raise serious questions as to whether the Merrill Lynch and Bank of America Boards of Directors were derelict in their duties and violated their fiduciary obligations.*** We will also continue to examine whether senior officials at both companies violated their own fiduciary obligations to shareholders. If they did, this raises additional serious issues with regard to the inappropriate use of taxpayer funds.[104]

---

[104] Letter from Andrew M. Cuomo, Attorney General of the State of New York, to Barney Frank, Chairman of House Committee on Financial Services (Feb. 10, 2009) (*available at* http://www.oag.state.ny.us/media_center/2009/feb/merrill%20letter.pdf) (footnote omitted) (emphases added).

322.    Furthermore, on February 12, 2009, the *New York Times* published an article, further undermining BofA's purported non-involvement in the setting of Merrill Lynch bonuses, which stated, *inter alia*:

> ***For its part, Bank of America has acknowledged that it was fully aware of the amounts and timing. In fact, the bank persuaded Merrill Lynch to reduce the size of the bonuses. But in a statement Wednesday, the bank said: "Although we had a right of consultation, it was their ultimate decision to make." However, several people involved say the bank signed off on the bonuses***.[105]

323.    Finally, on February 24, 2009, any lingering doubt concerning BofA's extensive involvement with awarding the Merrill bonuses was eliminated when *The New York Times* published an article discussing N.Y. A.G. Cuomo's most recent findings and stating:

> John A. Thain, the former chief of Merrill Lynch, faced six hours of questioning last week with the attorney general of New York.

> But it was not enough.

> A New York state judge ruled on Monday that Mr. Thain must return to the attorney general's office to provide more details about the bonuses that were given out on the eve of Merrill's merger with Bank of America. . . .

> . . . .

> A lawyer for Mr. Thain said he had avoided the questions about bonuses paid to individuals because Bank of America had directed him to do so. Mr. Thain is willing to answer all of the attorney general's questions, the attorney said Monday. "This is not Mr. Thain's dispute," said Andrew J. Levander, who is Mr. Thain's lawyer. "He has encouraged Bank of America and the attorney general to resolve the confidentiality issue."

> . . . .

> ***The attorney general's investigation has focused on some $3.6 billion in bonuses that Merrill paid at the end of last year.*** Merrill, struggling to survive, agreed to be acquired by Bank of America in September, but the merger did not close until the end of the year. In the months before the merger closed, Merrill's business deteriorated, resulting in a $15.3 billion post-tax loss in the fourth quarter.

---

[105] Michael J. de la Merced and Louise Story, *Nearly 700 at Merrill in Million-Dollar Club*, N.Y. Times, Feb. 12, 2009, at B1 (emphasis added).

*Neither company disclosed Merrill's problems before the merger closed*, and Mr. Cuomo's office is expected to broaden his inquiry beyond Merrill's bonuses into disclosure issues involving the transaction. The loss, which Mr. Lewis called a surprise, prompted Bank of America to seek a second round of taxpayer money.

Some details about the loss emerged on Monday. Merrill and Bank of America were $7 billion off in their estimates of Merrill's pretax loss in the fourth quarter, Mr. Thain told the attorney general's office. It was using those incorrect estimates on Dec. 8 when Merrill set its bonus pool, the court filing says. Normally, companies do not make bonus payments until after they close the books for a year — which Merrill did not do until Dec. 31.

Mr. Thain, when asked if the worsened results would have lowered bonuses, avoided answering the question last week, according to a partial transcript of his session with Mr. Cuomo's office.

. . . .

*Mr. Thain told Mr. Cuomo's office that he met with Andrea Smith, a manager in human resources for Bank of America, just after the bonus pool was set on Dec. 8. The two compared bonus awards line by line and Ms. Smith objected to some. In response, Mr. Thain lowered those bonuses, according to the motion.*

*Ms. Smith also detailed what some types of employees were paid at Bank of America, like employees in human resources, risk and public relations, to give Mr. Thain an idea of what to pay Merrill employees in those roles, Mr. Thain said, according to the transcript, which was included with the motion.*[106]

324.    In fact, BofA's repeated statements that it was not BofA's decision to set Merrill's bonuses because Merrill was an "independent" company, and that BofA had "no legal right" to challenge the bonuses, is directly contradicted by the terms of the Merger Agreement. Specifically, Article V of the Merger Agreement, entitled "Covenants Relating to Conduct of Business," contains the following covenant binding Merrill Lynch:

5.2  Company Forbearances.  *During the period from the date of this Agreement to the Effective Time*, except as set forth in this Section 5.2 of the Company Disclosure Schedule or except as expressly contemplated or permitted by this Agreement, *Company shall not, and shall not permit any of its Subsidiaries to, without the prior written consent of Parent*:

---

[106] Louise Story, *Cuomo Has More Questions on Merrill Bonuses*, Feb. 24, 2009, at B4 (emphases added).

. . . .

(c) except as required under applicable law or the terms of any Company Benefit Plan existing as of the date hereof, (i) *increase in any manner the compensation or benefits of any of the current or former directors, officers or employees of Company or its Subsidiaries* (collectively, "Employees"), (ii) *pay any amounts to Employees not required by any current plan or agreement* *(other than base salary in the ordinary course of business)*, (iii) become a party to, establish, amend, commence participation in, make any adjustment, terminate or commit itself to the adoption of any stock option plan or other stock-based compensation plan, compensation (including any employee co-investment fund), severance, pension, retirement, profit-sharing, welfare benefit, or other employee benefit plan or agreement or employment agreement with or for the benefit of any Employee (or newly hired employees), (iv) accelerate the vesting of any stock-based compensation or other long-term incentive compensation under any Company Benefit Plans, (v) (x) hire employees in the position of Vice President or above or (y) terminate the employment of any employee in the position of Vice President or above (other than due to terminations for cause) or (vi) take any action which could reasonably be expected to give rise to a "good reason" (or any term of similar import) claim[.][107]

325.    The facts relating to the Merrill/BofA Merger continued to unfold and, on July 16, 2009, former Treasury Secretary Hank Paulson testified before Congress on his involvement in the negotiation and finalization of the Merger.   In his testimony before Congress, Paulson confirmed earlier reports that he had threatened to remove BofA management and the BofA Board if BofA failed to close the transaction with Merrill, stating in part:

On December 17, 2008, Mr. Lewis called me and told me that Bank of America was considering exercising the "material adverse change"—or MAC—clause to terminate the Merrill Lynch acquisition. I recognized the danger that the potential dispute arising from invocation of the MAC clause would pose for Bank of America, for Merrill Lynch, and for the economy as a whole, and that evening, at my request, Mr. Lewis met with Chairman Bernanke, me, and other Federal Reserve and Treasury officials to discuss the matter. Mr. Lewis explained that Bank of America's concerns related to Merrill Lynch's accelerating fourth quarter loss projections and the effect they would have on the combined entity.

. . . .

In the few days following Mr. Lewis's call to me, officials from the Federal Reserve and Treasury conferred among themselves and with Bank of America

---

[107] Merger Agreement, ¶ 5.2 (Attached to Joint Proxy as Appendix A) (emphases altered).

representatives regarding these issues. My participation in that process consisted of conversations with people from the Federal Reserve, including several with Chairman Bernanke, and with Treasury personnel. During this period, the clear conclusion of Federal Reserve lawyers was that exercise of the MAC clause was not a legally reasonable option and, accordingly, that the merger contract was binding. Moreover, all public officials involved, including Mr. Bernanke and me, believed that the failure to consummate the merger would likely create immediate financial market instability, would threaten the viability of both firms, and would call into serious question the judgment of Bank of America's leadership.

. . . .

[S]ome have suggested that there was something inappropriate about my conversation of December 21st with Mr. Lewis in which I mentioned the possibility that the Federal Reserve could remove management and the board of Bank of America if the bank invoked the MAC clause. I believe my remarks to Mr. Lewis were appropriate. ***I explained to him that the government was supportive of Bank of America, but that it felt very strongly that if Bank of America exercised the MAC clause, such an action would show a colossal lack of judgment and would jeopardize Bank of America, Merrill Lynch, and the financial system. I further explained to him that, under such circumstances, the Federal Reserve could exercise its authority to remove management and the board of Bank of America.*** By referring to the Federal Reserve's supervisory powers, I intended to deliver a strong message reinforcing the view that had been consistently expressed by the Federal Reserve, as Bank of America's regulator, and shared by the Treasury, that it would be unthinkable for Bank of America to take this destructive action for which there was no reasonable legal basis and which would show a lack of judgment.[108]

326.    Also on July 16, 2009, the *Wall Street Journal* disclosed that BofA was subject to

a secret regulatory sanction under a memorandum of understanding:

> ***Bank of America Corp. is operating under a secret regulatory sanction that requires it to overhaul its board and address perceived problems with risk and liquidity management, according to people familiar with the situation.***
>
> Rarely disclosed publicly, the so-called memorandum of understanding gives banks a chance to work out their problems without the glare of outside attention. Financial institutions that fail to address deficiencies can be slapped with harsher penalties that include a publicly announced cease-and-desist order.

---

[108]  Testimony by Henry M. Paulson Before the House Committee on Oversight and Government Reform, July 16, 2009, 10:00 a.m., *available at* http://online.wsj.com/public/resources/documents/WSJ-20090715-PaulsonTestimony.pdf.

*The order was imposed in early May, shortly after shareholders of the Charlotte, N.C., bank stripped Chief Executive Kenneth Lewis of his duties as chairman. Bank of America faces a series of deadlines, some at the end of July and others in August, these people said.*

*The company might get more time to complete some of the steps it is taking, such as reconstituting its board with a majority of new directors. Since early June, Bank of America has named four directors to its 16-person board, <u>leaving the bank considerably short of the government's requirement.</u>*

*The MOU is the most serious procedural action taken against Bank of America by federal regulators since the financial crisis erupted.*

. . . .

Tensions between Bank of America and government officials have been building for several months, most notably a warning to Mr. Lewis by then-Treasury Secretary Henry Paulson that the bank's management could be pushed out if it abandoned the deal to acquire securities firm Merrill Lynch & Co., staggered at the time by massive losses.

. . . .

In late January, the Federal Reserve and Office of the Comptroller of the Currency downgraded their overall ratings of the bank to "fair" from "satisfactory," according to people familiar with the matter. In a letter that was reviewed by The Wall Street Journal, the Fed criticized Bank of America's management and directors for being "overly optimistic" about risk and capital. The bank's capital position "was vulnerable" even before the Merrill deal, the Fed concluded, citing "acquisition activity" that included last year's takeover of mortgage lender Countrywide Financial Corp.

"Management has taken on significant risk, perhaps more than anticipated at the time the acquisition was proposed," a Fed official wrote in the letter, which accompanied the ratings downgrade and was sent days after the government agreed to $20 billion in aid to keep the Merrill deal on track. As a result, "more than normal supervisory attention will be required for the foreseeable future."

The Fed declined to comment. The OCC didn't respond to a request for comment. A Bank of America spokesman declined to discuss the ratings changes or memorandum of understanding, saying the bank isn't allowed by law to discuss any confidential supervisory actions or communications.

The downgrades led Bank of America to create what it called the Regulatory Impact Office, or RIO, a traffic cop in its Charlotte headquarters charged with making sure future regulatory demands were met. Since then, certain regulatory requests such as approval of asset transfers within Bank of America have been cleared through the office, according to people familiar with the situation.

*The MOU surprised some Bank of America executives who hadn't expected federal regulators to issue such a formal rebuke. The bank responded swiftly, with six directors resigning since May 26. The departures include O. Temple Sloan Jr., Bank of America's lead independent director, and Jackie Ward, chairman of the board's asset-quality committee.*

*It is possible that regulators will allow Bank of America to count two directors who joined the board as part of the Merrill purchase to be considered "new," according to one person familiar with the discussions. Walter Massey, president emeritus of Morehouse College, who took over as chairman from Mr. Lewis, also is leading a continuing search for additional candidates.*

Late last month, Chief Risk Officer Amy Woods Brinkley stepped down in what company officials described as a retirement. J. Chandler Martin exited this week from his post as enterprise credit and market risk executive.

A spokesman confirmed that Mr. Martin, who retired in March 2008 as treasurer after 27 years at Bank of America but returned to help with the Merrill integration, is no longer with the company. Mr. Martin declined to comment.[109]

327.    Thus, the threats by U.S. government officials to terminate BofA management and the BofA Board if BofA failed to consummate the Merger were not idle, but real and immediate, and the U.S. government had the power to do so.  Thus, the members of the BofA Board faced the choice of consummating the Merger or being replaced.

## DEMAND FUTILITY ALLEGATIONS

**Demand on Merrill's Board Was Futile**

328.    The Merrill Board at the time the Merger was consummated was comprised of the following ten directors:  defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese, and Rossotti.  Plaintiffs did not make a demand on that Merrill Board to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

---

[109]  Dan Fitzpatrick, U.S. Regulators to BofA:  Obey or Else, July 16, 2009, at C1 (emphases added).

**Defendants Face a Substantial Likelihood of Liability and The Merrill Board Had Previously Refused Shareholder Demands Concerning The Allegations Made Herein**

329.    Several of Merrill Lynch's current and former executives and directors, as well as the Company itself, have been named as defendants in the securities fraud class action and ERISA actions, including, but not limited to, O'Neal, Thain, Christ, Codina, Colbert, Cribiore, Finnegan, Jones, Peters, Prueher, Reese and Rossotti.  In addition, the SEC, which previously announced an informal inquiry into Merrill Lynch due to the conduct alleged in this complaint, transformed its inquiry into a "formal" inquiry in February 2008.  The United States Attorney's Office for the Southern District of New York announced an investigation of Merrill Lynch in early 2008.  The New York Attorney General has issued a subpoena to Merrill Lynch related to the conduct alleged herein.  As indicated above, the Massachusetts Attorney General sued Merrill Lynch for securities fraud a day after Merrill agreed to buy back CDO securities sold to Massachusetts at their original value.   All these governmental investigations involve factual issues that also serve as a central focus of the wrongdoing alleged in this Complaint.  Thus, the Merrill Director Defendants could not be expected to remain independent and objective concerning conduct that occurred under their watch and for which they could ultimately face responsibility and/or culpability.

330.    Demonstrating that fact, on January 22, 2008, counsel for a Merrill Lynch shareholder, Nancy Lambrecht ("Lambrect"), wrote a demand letter addressed to the Merrill Board (the "Lambrecht Demand Letter") specifically stating that "[t]his letter is being sent to you to demand that the Company commence legal proceedings to recover its damages from each of you, from Merrill's present and former senior management (including Stan O'Neal and Ahmass Fakahany) who have also been responsible for the wrongdoing referred to herein…."   The

wrongdoing alleged in the Lambrecht Demand Letter included, *inter alia*, Merrill Lynch's

"multi-year mismanagement of the Company, which has led to mark-to-market losses of billions

of dollars to date," "undisclosed exposure to … to sub-prime related 'assets,'" Merrill Lynch's

sales of collateralized debt obligations ("CDOs") and structured investment vehicles ("SIVs") to

its clients, violations of GAAP, and wasting corporate assets by awarding Mr. O'Neal with a

compensation package that included "approximately $161.5 million as a 'going away' present."

331.    On May 1, 2008, Merrill Lynch rejected the Lambrecht Demand Letter in a letter

stating, in relevant parts:

> Please be advised that after careful consideration, the [Merrill Lynch] Board of Directors has determined that it is not in the best interests of Merrill Lynch to commence legal proceedings as demanded in your letter.
>
> In reaching this determination, the Board of Directors considered a significant amount of information. . . .   In assessing this information, ***the Board of Directors took into account, among other things, the amount of damages claimed in the pending federal securities and ERISA lawsuits and regulatory investigations involving Merrill Lynch's investment in and underwriting of collateralized debt obligations . . . ; the potential adverse effect of pursuing the claims asserted in your January 22 letter on Merrill Lynch's defenses in the pending federal securities and ERISA lawsuits and regulatory investigations. . . .***
>
> After considering and extensively discussing the foregoing and other information . . . the Board has determined that pursuing the claims raised in your January 22 letter is not in the best interests of Merrill Lynch at this time.

(Emphasis added).

332.    As a matter of law, if Merrill Lynch were found liable for the claims asserted on

the securities and ERISA suits, Merrill Lynch would have the right to claim over 100%

contribution from the individual officers and directors responsible for Merrill Lynch's conduct

that gave rise to the claims in those suits, including a majority of the Merrill Defendants (*i.e.*,

Crist, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese, and Rossotti, who were

named as defendants in those suits).  Accordingly, by its own admission, the members of the

Merrill Board rejected the Lembrecht Demand to protect themselves from personal financial liability for the conduct demand was made to remedy.  Therefore, the rejection of the demand itself -- the product of a facial conflict of interests by the Merrill Board – was yet another breach of the Merrill Director Defendants' fiduciary duties to Merrill Lynch's shareholders.  Since any demand would involve the Merrill Director Defendants considering whether to risk their own person assets or to bring suit against themselves for the misrepresentations, omissions, and other misconduct described here relating to Merrill Lynch's foray into the subprime arena, any demand upon the Merrill Board would have been a futile act.

### The Audit and Finance Committees Completely Failed in Their Oversight Role of Managing the Company's Risk

333.    The Board's Finance Committee is responsible for reviewing Merrill Lynch's "policies and procedures for managing exposure to market and credit risk."  Further, the Finance Committee is required  to review "significant risk exposures and trends in these categories of risk."  Merrill Board members Cribiore, Finnegan, Reese and Rossotti were on Merrill Lynch's finance committee, and Merrill Board member Finnegan was the committee's chair.  The charter of the Finance Committee states that committee members have the responsibility to assist the Merrill Board in fulfilling its oversight responsibilities relating to:

A.    Financial commitments and investments;

B.    The Corporation's financial and operating plan;

C.    The Corporation's financing plan, including funding, liquidity and insurance programs;

D.    Balance sheet and capital management; and

E.    Credit and market risk management.

334.     The Finance Committee was required to meet no less than three times per year.
The Committee is required to "report regularly to the Board with respect to such matters that are
within the Committee's responsibilities."

335.     The Finance Committee members – Cribiore, Finnegan, Reese and Rossotti – had
the following additional specific responsibilities:

    A.     Financial Commitments and Investments

        6.     The Committee shall review and approve the Corporation's policies governing the use of funds to acquire, create or dispose of an asset of long term value, including technology and real estate commitments and acquisitions and divestitures of businesses.

        7.     The Committee shall review and approve the Corporation's policies governing acquisition of ownership stakes in entities, funds or assets other than through a liquid or publicly traded security, where the investment is intended to be monetized or is not intended to be operated as a core business ("principal investments").

        8.     The Committee shall review and approve specific financial commitments and principal investments to the extent required by such policies.

        9.     The Committee shall periodically review financial commitments and principal investments effected pursuant to such policies.

    B.     Financial and Operating Plan

        10.     The Committee shall review the annual financial and operating plan.

    C.     Financing Plan/Insurance

        11.     The Committee shall review the Corporation's financing plan, including funding and liquidity policies and programs.

        12.     The Committee shall have the authority to authorize and, where appropriate, establish limits for the incurrence of debt by the Corporation and its subsidiaries.

        13.     The Committee shall periodically review the Corporation's insurance programs (other than Directors' & Officers' Insurance, which is reviewed by the Nominating and Corporate Governance Committee).

D.     Balance Sheet and Capital Management

14.     The Committee shall review management's framework for balance sheet management, including categories of assets and liabilities and levels of commitment. The Committee shall also periodically review capital allocation methodologies.

15.     The Committee shall review regulatory capital, leverage ratios and similar measures of capital adequacy.

16.     The Committee shall review and recommend the Corporation's capital management policies and programs relating to common stock, including dividend policy, repurchase programs, and stock splits.

17.     The Committee shall have the authority (i) to approve the issuance and sale of, and fix all the designations and any of the preferences of, preferred stock of the Corporation to the extent and within the limits authorized by the Board, (ii) to declare and pay dividends and designate record and payable dates on the Corporation's preferred stock, (iii) to authorize the repurchase of any or all of the Corporation's preferred stock and (iv) to take any other related actions with respect to the Corporation's preferred stock.

E.     Risk Management

18.     The Committee shall review the Corporation's policies and procedures for managing exposure to market and credit risk, including the framework for counterparty credit risk management, trading limits and VAR or other relevant models.

19.     The Committee shall, as appropriate, review significant risk exposures and trends in each of these categories of risk.

336.     To comply with these substantial duties, the Finance Committee members were explicitly granted by the Finance Committee charter "full, free and unrestricted access to the Corporation's senior management and employees."

337.     The Finance Committee members – Cribiore, Finnegan, Reese and Rossotti – were not independent and objective because they face a substantial likelihood of liability for their failure to manage Merrill Lynch's credit risk, including their failure to properly take action to curtail Merrill's significant risk exposures and trends in the relevant categories of risk faced by Merrill Lynch.  Because of their frequent meetings and review of Merrill's internal control

182

mechanisms, the Finance Committee members knew or recklessly disregarded Merrill's overexposure to CDOs and the subprime mortgage market. The Finance Committee members also breached their duties in authorizing the company's Stock Repurchase Plan and thus assisted in effectuating the securities law violation against Merrill Lynch in connection with its purchase of Merrill Lynch common stock at artificially inflated prices due to the misrepresentation and omission of Merrill Lynch's true financial condition to the public.

338. The Merrill Board's Audit Committee is also responsible for reviewing "the framework established by management to assess and manage the major categories of risk." The audit committee is also in charge of reviewing Merrill Lynch's "policies and processes for managing operational, legal and reputation risk." Merrill Director Defendants Jonas, Prueher, Reese, and Rossotti were on Merrill Lynch's Audit Committee during the relevant period.

339. Merrill Lynch's Audit Committee charter states that the role of the Audit Committee is to assist the Board in fulfilling its oversight responsibility relating to the:

A.  Preparation and integrity of Merrill's financial statements and oversight of related disclosure matters;

B.  Qualifications, independence and performance of, and the Corporation's relationship with, its registered public accounting firm (the "independent auditor");

C.  Performance of Merrill's internal audit function and internal controls;

D.  Compliance by Merrill with legal and regulatory requirements; and

E.  Provide the report required by the rules of the Securities Exchange Commission (the "Commission") to be included in Merrill's annual proxy statement.

340. The Merrill Lynch Audit Committee was required to meet at least six times per year and had the following additional specific requirements:

The Committee shall meet as frequently as it determines, but not less frequently than six times per year. The Chair of the Committee, or any two members of the Committee, (in consultation with the Chair where possible) may call meetings of the Committee. Meetings of the Committee may be held telephonically.

The Chair shall preside at all sessions of the Committee at which he or she is present and shall set the agendas for Committee meetings. All members of the Board of Directors are free to suggest to the Chair items for inclusion in the agenda for the Committee's meetings. The agenda and information concerning the business to be conducted at each Committee meeting shall, to the extent practical, be communicated to the members of the Committee sufficiently in advance of each meeting to permit meaningful review.

The Committee shall meet periodically in separate private sessions with management, the internal auditors, the independent auditor and the General Counsel. The Committee may request any officer or employee of the Corporation or the Corporation's outside counsel or independent auditor to attend a meeting of the Committee or to meet with any member of, or advisers to, the Committee.

The Committee shall report regularly to the Board with respect to such matters that are within the Committee's responsibilities and with respect to such recommendations as the Committee may deem appropriate. The report to the Board may take the form of an oral report by the Chair or by any other member designated by the Committee to make such report. The Committee shall maintain minutes or other records of meetings and activities of the Committee.  The Committee shall provide the report of the Committee to be contained in the Corporation's annual proxy statement, as required by the rules of the Commission.

341.    The Merrill Lynch Audit Committee also has the following significant duties:

Financial Statements and Disclosure Matters

1.      The Committee shall meet to review and discuss with management and the independent auditor the Corporation's annual audited and quarterly consolidated financial statements, including the disclosures contained in the Corporation's Annual Report on Form 10-K ("Form 10-K") and its Quarterly Reports on Form 10-Q ("Form 10-Q"), under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations." After review of the annual audited consolidated financial statements and the reports and discussions required by Sections IV.A.7. and IV.B.5. of this Charter, the Committee shall determine whether to recommend to the Board of Directors that such financial statements be included in the Corporation's Form 10-K.

2.      The Committee shall be advised of (i) the execution by the Corporation's Chief Executive Officer and Chief Financial Officer of the

certifications required to accompany the filing of the Form 10-K and the Forms 10-Q, and (ii) any other information required to be disclosed to it in connection with the filing of such certifications.

3.     The Committee shall discuss with management and the independent auditor any significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, and any major issues as to the adequacy and clarity of the Corporation's disclosure procedures.

4.     The Committee shall review and discuss the quarterly reports from the independent auditor on:

a.     All critical accounting policies and practices to be used.

b.     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment recommended by the independent auditor.

c.     Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

5.     The Committee shall discuss with management the Corporation's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, and financial information and earnings guidance, if any, provided to analysts and rating agencies. Such discussion may be conducted generally (i.e., by discussing the types of information to be disclosed and the types of presentations to be made). The Committee may delegate responsibility for the review of the quarterly earnings press release to a member of the Committee.

6.     The Committee shall discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Corporation's financial statements.

7.     The Committee shall discuss with the independent auditor the matters required to be discussed by Public Company Accounting Oversight Board Interim Auditing Standard AU Section 380, "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

342.     To carry out its substantial duties, the Audit Committee members (Jonas, Prueher, Reese, and Rossotti) were given absolute and unrestricted access to all senior management and the auditor:

> The Committee shall have full, free and unrestricted access to the Corporation's senior management and employees, and to the Corporation's internal and independent auditors.

343.     The Audit Committee members also had the power to retain their own advisors at Merrill Lynch's expense and without obtaining approval of any executive officer:

> The Committee has the authority to retain legal counsel, consultants, or other outside advisers, with respect to any issue or to assist it in fulfilling its responsibilities, without consulting or obtaining the approval of any officer of the Corporation.

> The Corporation shall provide for appropriate funding, as determined by the Committee, for payment (i) of compensation to the independent auditor, (ii) to any advisers retained by the Committee, and (iii) of any ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out the Committee's duties.

344.     By allowing Merrill Lynch to take on billions of dollars in CDO and subprime debt — over $50 billion of which has already been written down — the Merrill Director Defendant members of the Finance and Audit Committees completely failed to fulfill their oversight responsibilities.  As detailed by Forbes.com:

> Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for not catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion at the end of June [2007] just before the market started to crater.

345.     The Merrill Director Defendants sitting on Merrill's Audit and Finance Committees consciously disregarded unacceptable and huge financial risks.  The extent of the damage they have caused Merrill is massive.  After the recent implosion of Bear Stearns, analysts at Wachovia recently called Merrill "the riskiest of the remaining monoline banks" with

subprime CDO exposure of *$30.4 billion – 3.3x the group average*. Merrill also has the worst liquidity ratio of major banks, at 52% and the highest leverage ratio in the industry of 31.9%. These factors vastly increase the expense of any additional capital that Merrill needs to raise.[110]

346.    The Merrill Director Defendants who sat on Merrill's Audit and Finance Committees also failed miserably in disclosing Merrill's addiction to the subprime market. Merrill's 2006 Form 10-K Annual Report mentions the word "subprime" only twice. But by then Merrill was already addicted to subprime loans, using them to collateralize debt obligations it could package and sell for rich fees. To feed this improvident appetite, as discussed below, the Merrill Director Defendants caused Merrill to pay $1.3 billion to purchase subprime originator First Franklin at the peak of the market in December 2006. Merrill had to close First Franklin just fifteen months later, incurring $200 million in charges and firing 650 people.

347.    Merrill Director Defendants Jonas, Prueher, Reese, and Rossotti, as members of the Audit Committee, and Merrill Director Defendants Cribiore, Finnegan, Reese and Rossotti, as members of the Finance Committee, consciously ignored both actual notices as well as significant red flags which demonstrated that Merrill Lynch's risk management and financial investment policies were inadequate and overly risky. For example, in 2006 O'Neal fired Jeff

---

[110]    Merrill sold stock to two "rescuers" on Christmas Eve 2007 – Temasek (an arm of the Singapore government) and Davis Selected Advisors – for $48 a share. At the time, the price was an 11% discount to Merrill's stock price and 43% less than Merrill had spent earlier in the year to buy back $5.3 billion in stock. Wachovia senior analyst Douglas Sipkin noted that Merrill ended 2007 with $79 billion in its excess liquidity pool and that the broker had $22.3 billion available to it through a number of credit facilities at the end of the fourth quarter. "In the event of a ratings downgrade," Sipkin said, "Merrill Lynch must post additional collateral and make termination payments of $4 billion, highest among the group." Another issue of note, Wachovia contends, is Merrill's agreement on its $6.2 billion capital raise with Temasek Holdings and Davis Select Advisors. The firm said a **price reset agreement** is in place with the two parties in that if Merrill raises additional common stock or convertible securities with a price or reference below $48 a share within one year of closing, Merrill must pay both Temasek and Davis the aggregate excess amount.

Kronthal, one of the company's top traders, because Kronthal objected to Merrill Lynch's wildly excessive increased exposure to the subprime market which was being orchestrated by O'Neal and by Christopher Ricciardi, Managing Director and head of Global Structured Credit Products. Kronthal urged O'Neal and others at the company to curb Merrill Lynch's exposure to the subprime market in light of increasing public indications of credit deterioration and lax underwriting standards in the origination of mortgages.  When Kronthal continued to object to the policies of O'Neal and Ricciardi, O'Neal fired Kronthal.  Kronthal's firing was big news at Merrill and the Merrill Director Defendants on the Audit Committee and Finance Committee were aware of the firing and the reasons for it.  Nonetheless, despite their duties as members of the Audit and Finance Committees, these Merrill Director Defendants, Jonas, Prueher, Reese, Cribiore, Finnegan, and Rossotti, did not take adequate steps in 2006 and 2007 to curb Merrill's unreasonable risk in subprime investments.

348.    Ironically, in December 2007 Merrill's new CEO Thain hired Kronthal back. When he returned, Kronthal received a standing ovation from Merrill employees, who recognized that Kronthal's very public exhortations to O'Neal and other top executives at Merrill had gone unheeded in 2006 and 2007.  Thain hired Kronthal to direct the very areas that the Audit and Finance Committee members had ignored – risk management.

349.    Moreover, Merrill Director Defendants Reese and Rossotti are labeled as "Audit Committee Financial Experts" by Merrill Lynch and thus had a particular ability to detect and prevent the inappropriate exposure to the subprime market and the false financial statements that the Merrill Defendants caused the company to issue.  Moreover, the rest of the members of the Audit Committee were "financially literate" according to Merrill's 2008 Proxy Statement:  "In addition, all members of the Audit Committee meet the financial literacy requirements of the

NYSE and at least one member has accounting or related financial management expertise, as required by the applicable SEC and NYSE rules."

350.    The Merrill Director Defendants also had actual knowledge beginning in January 2007 that many of the subprime lenders from whom Merrill was purchasing subprime mortgages were declaring bankruptcy due to the poor quality of their loans.  In January 2007, Ownit Mortgage Solutions, the 16th largest subprime lender (owned in part by Merrill as discussed above) announced that it had filed for bankruptcy. Mortgage Lenders Network USA, Inc. ("MLN"), the 15th largest subprime lender, announced that it would no longer make new loans the same day the Ownit bankruptcy was announced. MLN filed for bankruptcy just three weeks later. On February 13, 2007, ResMAE Mortgage COT., another subprime lender which Merrill had dealings with, filed for bankruptcy.

351.    On February 7, 2007, the largest subprime lender, New Century, announced that it would restate financial results for three quarters of 2006 to correct errors regarding allowances for loan repurchase losses. The same day, British banking giant HSBC announced that it had set aside $10.5 billion dollars to cover bad loans in the United States.

352.    By mid-2007, Merrill had $150 billion in illiquid investments – four times its equity.  Nonetheless, the Merrill Director Defendants ignored these known risks which sat on Merrill's balance sheet like a ticking time bomb.  As noted above, the members of the Audit and Finance Committees were required to meet at least six and three times, respectively, per year with the Company's senior executives and review all issues concerning Merrill Lynch's risk management.  Thus, the Audit and Committee members became aware of the increased risks to Merrill Lynch's subprime investments (which were not only know within the company, but

which were public knowledge by early 2007) and consciously disregarded these risks and failed to carry out their fiduciary duties to manage such risks.

353.    Indeed, in March 2007 the directors received actual notice of the need to write-down the value of Merrill's CDOs and other subprime investments due to material reductions requested by Merrill Lynch in the purchase price Merrill paid for First Franklin, as detailed above.  The letters exchanged between Merrill and National City Bank (from whom Merrill had purchased First Franklin) amply demonstrate Merrill's knowledge of the need to write-down the value of CDOs and related securities in late 2006.

354.    In addition, according to the *New York Times*, the Merrill Board had been informed of its subprime exposure and CDO obligations as early as April and July 2007, respectfully.[111]  Despite Merrill Lynch's vast exposure to CDOs and subprime, the Merrill Board failed to take any action to decrease the risks faced by the company.

355.    Moreover, at the end of July 2007, Fakahany [Merrill Lynch's then Co-President and CFO], who had assumed broad responsibility over Merrill's risk exposure, warned the Merrill Board and others, including specifically O'Neal, Rossotti (a director in charge of Merrill's Risk Committee), and Ms. Berkery (General Counsel), of the mounting risk Merrill faced from CDOs and subprime MBS.

356.    In addition, on August 9, 2007, Fakahany and Fleming – the Co-Presidents and Chief Operating Officers of Merrill Lynch – sent a three-page letter to Merrill Lynch's Board of Directors warning them of Merrill's overexposure to CDOs and the subprime mortgage market. The letter was entitled 'Board Market Update End July Results: Note From Fakahany and Fleming,' and was sent to the Merrill Board, O'Neal and Ms. Berkery.  The letter discussed the

---

[111]   Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

mounting losses and troubles facing the company's CDO exposure and explained that significant deterioration in this business had taken place in July 2007.

357.    Moreover, the members of Merrill Lynch's Audit and Finance Committees face a particularly high likelihood of substantial liability because they were the ones directly responsible for ensuring adequate risk management.  "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."[112]  Or, as stated by one corporate and securities law professor, "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective.  It turns out, they weren't."[113]

358.    As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around."[114]

359.    Based on the Merrill Director Defendants' conscious disregard and failure to limit the company's aggressive exposure to risk, one of Merrill Lynch's largest institutional investors has recommended that shareholders vote against re-electing the members of the finance committee to the Merrill Board, absent a compelling explanation or immediate changes to the composition to the Finance Committee.  Specifically, in January 2008, the CTW Investment Group ("CTW"), a coalition of union pension funds with about $1.4 trillion in assets, sent a letter to the members of Merrill Lynch's finance committee expressing its concern that the finance committee failed to control Merrill's "exposure to mortgage-related risk in general and its

---

[112]  *Id.*

[113]  *Id*.

[114]  *Id*.

investments in complex, mortgage-backed derivatives in particular." CTW noted several factors that likely caused the finance committee to completely fail in its oversight role, including:

> The Finance Committee's chairman during 2007, Defendant Finnegan, has a "long personal and business relationship with Defendant O'Neal. As discussed below, that relationship compromised his willingness to reign in O'Neal's aggressive risk and outsized compensation.

> In addition, Defendant Finnegan is the Chairman, CEO and President of The Chubb Corporation. As such, he did not have the time to effectively monitor Merrill Lynch's exposure to mortgage risk and fully understand its investments in complex derivatives. For this very reason, many institutional investors have proxy voting policies that dictate that CEOs should restrict their service on outside boards.

> Further, the Board's decision to split responsibility for risk oversight between the audit and finance committees "may have had the effect of diffusing responsibility to the detriment of the corporation and its shareholders."

360.   Based on the above, each member of the Company's Audit and Finance committees cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

**The Audit Committee Allowed Merrill Lynch to Issue
False and Misleading Financial Statements**

361.   In addition to its role in managing risk, Merrill Lynch's Audit Committee was responsible for ensuring the integrity of Merrill Lynch's financial statements. The Audit Committee completely failed to fulfill its oversight role by allowing Merrill Lynch to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its unreasonable and outsized exposure to CDOs and subprime loans. As such, no member of the Audit Committee could independently analyze or investigate the claims asserted in this action because each faces a real and substantial danger of personal liability in this action.

**In A Unanimous Vote, The Merrill Director Defendants Gave O'Neal**

**An Undeserved $161 Million "Golden Goodbye"**

362.     As discussed above, Merrill Lynch's Board allowed O'Neal to retire rather than terminating him with cause.  Even worse, the Board *unanimously* voted to give O'Neal a retirement package worth $161 million.  Not surprisingly, Wall Street was disturbed by the Board's decision.  So were members of the United States Congress.  In March 2008, the House Committee on Oversight and Government Reform called O'Neal before it as part of its investigation into "CEO Pay and the Mortgage Crisis."  The day before the hearing, the majority staff released a memorandum detailing the findings of its investigation.  Based on its review of Merrill Lynch's Board minutes, emails and SEC filings, as well as its consultations with leading experts in executive compensation, the majority staff raised the following concerns about O'Neal's retirement package:

> By far the largest component of O'Neal's retirement package was $131 million in unvested stock and options.  If the board had terminated O'Neal for cause, he would have been required to forfeit these unvested stock and options.  "No documents were provided to the Committee that indicated that the board ever debated terminating Mr. O'Neal for cause or considered withholding all or part of Mr. O'Neal's $131 million in unvested stock and options.  From a shareholder perspective, there appears to be no justification for precluding the board from recouping unvested stock and options in cases of poor performance."

> O'Neal signed a non-compete agreement in 2004 prohibiting him from working for any Merrill Lynch competitor (defined broadly) for three to four years from the time of his retirement.  As part of his retirement package, the board agreed to modify O'Neal's noncompetition agreement to apply to only nine specific companies for a period of 18 months.  These changes in the competition agreement were approved at a special meeting of the compensation committee on October 29, 2007 and at a meeting of the full board the next day.  Only one board member, defendant Peters, raised any objection to loosening O'Neal's noncompetition restrictions.  "The documents the Committee received provide no explanation why the narrowing of Mr. O'Neal's noncompetition agreement was determined to be in the best interests of Merrill Lynch and its shareholders."

> Because O'Neal did not have an employment agreement with Merrill Lynch, he was not entitled to continued perquisites after he departed.  Nonetheless, the board agreed to provide O'Neal with office space in New York for his personal use and

the services of full-time executive assistant for a period of three years. "The documents do not reflect what shareholder value the board hoped to obtain by providing these perquisites to Mr. O'Neal."

363.    In sum, each of the Merrill Director Defendants wasted Merrill Lynch's assets in that O'Neal's retirement package was exorbitant given the circumstances and because the retirement package was given without consideration since the company could have, and should have, terminated O'Neal's employment for cause. As such, each Merrill Director Defendant faces a substantial threat of personal liability for such conduct.

**Given Their Close Ties to O'Neal, a Majority of the Board Would Not Vote to Approve This Lawsuit**

364.    With exception of Merrill Director Defendants Peters and Prueher, every person who was on the Merrill Board when O'Neal was named chief executive had since retired. O'Neal personally handpicked their successors. As such, Merrill Director Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Reese and Rossotti were beholden to O'Neal and would not pursue an action against him or those who acted in concert with him in committing the acts of misfeasance and malfeasance alleged herein.

365.    In addition, O'Neal has close personal ties with many of the Merrill Director Defendants such that they would not vote to pursue an action against him or those who acted in concert with him during his tenure. For example, Forbes.com reports that Finnegan and O'Neal are long time friends. And as mentioned above, CtW questioned Finnegan's willingness to reign-in O'Neal's aggressive risk and outsized compensation given their long personal and business relationship dating back "to the time they worked together in General Motors treasury department." Likewise, press reports have described Merrill Director Defendant Cribiore as close to O'Neal, and the *New York Times* has reported that in the late 1990s, Cribiore came close to recruiting O'Neal away from Merrill Lynch to work at Brera Capital.

**Several of the Merrill Director Defendants Have Already Been Named as Defendants in the ERISA Litigation**

366.     In addition to this derivative action, several "ERISA" lawsuits have been filed by Merrill Lynch employees.     Among others, Merrill Defendants Cribiore, Codina, Colbert, Finnegan and Peters are named as defendants in these lawsuits.    As members of the committees in charge of the company-sponsored-employee-retirement plans, these defendants had a heightened fiduciary duty to know all important details that affected the value of Merrill Lynch's stock and its appropriateness as an investment vehicle for Merrill's retirement plan.    These defendants breached that duty by allowing the retirement plans to invest heavily in Merrill Lynch' stock at the same time Merrill Lynch had become disastrously overexposed to CDO and subprime loans.    As a result, they face a substantial threat of liability in the ERISA case and, if it is settled, they are jointly and severely liable to Merrill Lynch for the cost of any such settlement. Thus, these defendants would not authorize an action premised on their gross negligence in allowing Merrill Lynch to become heavily overexposed to the CDO and subprime market and their intentional or reckless failure to disclose the full truth regarding Merrill Lynch's financial condition resulting from that exposure.

**All Of The Merrill Director Defendants Authorized the Purchases of First Franklin and First Republic, and Then Authorized a Massive Stock Repurchase Program to Keep Merrill Lynch's Stock Inflated Until the Exchange Ratio for the First Republic Merger Was Fixed**

367.     As discussed above, while most investment banks sought to get out of the subprime market, Merrill Lynch dove even deeper into it by purchasing First Franklin in December 2006.  Specifically, on December 30, 2006, the Merrill Board authorized the purchase of First Franklin for $1.3 billion.  By this time, the heightened risks in the subprime market were already well known.  Notwithstanding their knowledge or reckless disregard of Merrill's over-

exposure to these risks, the Merrill Director Defendants caused Merrill to increase its exposure to the subprime market by authorizing the purchase of First Franklin.  As a result, Merrill Lynch has suffered even further losses.  Indeed, in March 2008 the Merrill Board caused the company to close down First Franklin all together.  As such, all the directors face a substantial threat of liability and, thus none will authorize this suit.

368.    On April 10, 2008, Merrill Lynch Bank & Trust Co. filed a verified petition in New York State Supreme Court which demonstrates that the defendants knew as early as the end of 2006 that Merrill's acquisition of First Franklin was ill-advised, constituted corporate waste, and should not have been approved.  Merrill filed the April 10, 2008 petition against National City Bank, from whom Merrill had purchased First Franklin.  In the petition, Merrill argued that National City Bank owed Merrill money since the First Franklin merger agreement contained a provision obligating National City Bank to adjust the purchase price for First Franklin if First Franklin's estimated final pro forma net asset statement as of December 30, 2006 was lower than the pro forma net asset statement as of June 30, 2006.

369.    On March 16, 2007, National City Bank wrote a letter to Merrill indicating it would adjust the purchase price downward by $30 million.   This was not enough for Merrill, however, which responded by letter dated April 13, 2007 demanding a further adjustment of $67 million, for a total adjustment of $97 million.  The biggest reason that Merrill claimed for the requested adjustment pertained to mortgage loans held for sale by First Franklin which Merrill had acquired.  Merrill's letter claimed that First Franklin had not properly valued these mortgage loans since it had allegedly "*failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006*, and resulted in an overstatement of such loans held for sale of approximately $43.65 million."

370.   These admissions by Merrill in April 2007 reflect the Merrill Director Defendants' knowledge at the time of the fact that Merrill's decision to purchase First Franklin was not in Merrill's best interests and that Merrill was purchasing a company whose assets were inflated and would have to be written down immediately.  They also reflect the Merrill Director Defendants' knowledge at the end of 2006 that massive write-downs would be required of similar assets on Merrill's own balance sheet.

371.   In addition, the Merrill Director Defendants knew that Merrill had intentionally significantly lowered the underwriting standards for subprime loans purchased from subprime originators such as ResMae, MLN, and Ownit.  For example, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's designee to the board of subprime originator Ownit, instructed Ownit founder Bill Dallas in January 2006 to materially lower its underwriting standards so Merrill had access to a greater number of subprime mortgages.

372.   On January 29, 2007, Merrill Lynch announced that it would acquire another bank – First Republic – for $1.8 billion.

373.   By February 2007, the stock market was already questioning why Merrill chose to significantly increase its exposure to the subprime market at a time when defaults were increasing and many players were exiting the subprime market.  Merrill Lynch's acquisition of First Franklin threatened Merrill's ability to make other strategic acquisitions.[115]  Market analysts noted that "First Franklin is going to be more of an integration and absorption issue" and

---

[115]   *See* Shaheen Pasha, *Merrill Strategy Threatened by Bad Loan Market*, CNN Money.com, Feb. 21, 2007.

that "trying to navigate the subprime mortgage market at a time when delinquent borrowers are defaulting on loans in droves could slow down the company's acquisition plans."[116]

374.    With full knowledge of these significant problems in February 2007, Merrill Lynch's Finance and Audit Committee members not only did nothing to decrease Merrill's substantial risk to the subprime market, they took steps to perpetuate the problem and delay the inevitable.  Merrill Lynch needed to keep its stock price inflated in order to facilitate the First Republic transaction, which was set to close in September 2007, and in fact closed on September 21, 2007.  Based on the merger agreement, the aggregate consideration would be paid with 50% Merrill Lynch common stock and 50% cash.  The exchange rate used to calculate the number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill Lynch's average closing price over the five trading days proceeding September 21, 2007, which was $75.02 per share.   Merrill Lynch wanted and needed to keep its stock inflated so that it could issue as few shares of Merrill stock as possible to First Republic shareholders.   If Merrill's stock price declined in the February to September 2007 time period, then Merrill would have to issue more shares of its stock to First Republic shareholders, which would cause dilution and impair Merrill's acquisition strategy.

375.    To avoid this, the Merrill Director Defendant members of the Finance Committee authorized and the full Merrill Board approved a massive $6 billion stock repurchase program, which was publicly announced on April 30, 2007.  This repurchase plan was intended and designed to keep Merrill's stock artificially inflated at least through the completion of the First Republic acquisition.  Indeed, the stock repurchase plan was needed because analysts had begun to actively question Merrill's huge risk to the subprime market near this time.  Reacting to the

---

[116] *Id.*

increasing tide of publicly-available information about increased risks in the subprime market, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market in April 2007. O'Neal unequivocally dismissed those concerns in an effort to keep Merrill's stock inflated as long as possible. As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.
>
> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed ... and it's not consistent with what I would assess the state of the business to be."[117]

376.    The timing of Merrill's eventual belated disclosure of its massive write-downs related to its subprime investments on October 5, 2007 – just weeks after completion of the First Republic transaction – was highly suspect, and analysts at the time questioned why Merrill had waited so long to take write-downs. Analysts and the market were also shocked at the magnitude of the write-downs.

377.    As discussed above, First Republic shareholders sued Merrill Lynch for securities fraud. Had Merrill Lynch disclosed the truth about its financial and business prospects, the Company's stock would have dropped in value and Merrill Lynch would have had to issue a greater number of shares to purchase First Republic. As a consequence, the merger may not have been approved by First Republic's Board of Directors or its shareholders. Merrill therefore failed to disclose the truth about its exposure and losses to CDO and subprime securities until three weeks after the merger closed and therefore was able to purchase First Republic with inflated stock.

---

[117]    David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007.

**The Stock Repurchase Plan Perpetrated A Securities Fraud Upon Merrill Lynch**

378.    Moreover, the Stock Repurchase Plan caused Merrill Lynch to purchase Merrill Lynch common stock in the open market at artificially inflated prices caused by the Merrill Defendants material false statements and omissions regarding Merrill Lynch's exposure to the subprime market and the company's true financial condition.

379.    As a result of the stock repurchases, Merrill Lynch paid an inflated price for those shares of common stock and the shares were placed in Merrill Lynch's treasury.

380.    When the truth was revealed concerning Merrill Lynch's exposure to the subprime market and its true financial condition, the value of those shares purchased by Merrill Lynch declined precipitously in value.

381.    As a result, Merrill Lynch was damaged by the Merrill Defendants' misrepresentations and omissions, made directly or caused by them to be made by Merrill Lynch, in connection with Merrill Lynch's purchases of Merrill Lynch common stock.

382.    The Merrill Defendants knew or were reckless in making the false and misleading statements alleged above regarding the financial condition of Merrill Lynch before and at the time Merrill Lynch was purchasing, at their direction, Merrill Lynch common stock.  As a result the Merrill Defendants are liable to Merrill Lynch for the damages it incurred in connection with the purchases of those Merrill Lynch shares and could not consider a demand that would necessitate them asserting federal securities law claims against themselves on behalf of Merrill Lynch.

**The Insider Selling Defendants' Illicit Insider Sales**

383.    The Merrill Defendants caused or allowed Merrill Lynch to issue false and misleading press releases and financial reports during the relevant period, and failed to disclose

200

material, nonpublic information necessary to make such press releases and financial reports not false and misleading. As a result of these false and misleading statements and omissions, the price of the company's stock was artificially inflated.

384. The Merrill Officer Defendants were motivated to engage in the wrongdoing herein, resulting in the artificial inflation of Merrill Lynch's stock, in order to allow certain of the Merrill Officer Defendants to profit from their sales of their personal holdings of Merrill Lynch common stock during the relevant period at artificially inflated prices.

385. As detailed above, the Merrill Officer Defendants, as officers of Merrill Lynch, were privy to confidential financial information concerning the company's business, financial condition, future business prospects and outlook. In this capacity, these Merrill Officer Defendants had access to material, nonpublic information concerning Merrill Lynch's true financial condition and the precarious position the company was in as a result of its improper and unsound business and investment practices.

386. Notwithstanding the duty not to sell Merrill Lynch common stock under these circumstances, or to disclose the material, nonpublic information prior to selling the stock, the Insider Selling Defendants sold Merrill Lynch stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

387. Specifically, at the commencement of the relevant period during the week of February 1, 2007 through February 7, 2007, the Insider Selling Defendants, while in possession of material, nonpublic information regarding the Company's true business prospects, improperly sold 717,044 shares of their Merrill Lynch stock for total proceeds of $67,261,348:

| Merrill Lynch Insider Sales | | |
|---|---|---|
| Relevant Period (2/1/07- 2/7/07) | | |
| | | |
| Named Defendant | # of shares | Proceeds |
| | | |
| | | --- |
| | | |
| Ahmass Fakahany | 162,580 | $15,235,050.10 |
| | | |
| Gregory Fleming | 80,109 | $7,485,026.84 |
| | | |
| E. Stanley O'Neal | 474,355 | $44,541,271.31 |
| | | |
| Totals | | $67,261,348 |

388.    These Insider Trading Defendants entered into these illicit insider transactions at a time

when Merrill Lynch's stock price was trading near its relevant period-high, as shown in the chart

below:



202

389.   Based on the foregoing, the Insider Trading Defendants are liable under the federal securities laws and the common law to Merrill Lynch for their ill-gotten trading profits by virtue of their use of confidential, non-public information belonging to Merrill Lynch.

390.   Based on the foregoing, it would have been futile for Plaintiff to make a demand on the Merrill Board to initiate this, or a similar, legal action.  Demand is therefore excused.

391.   As alleged herein, each of the Merrill Defendants had a duty to Merrill Lynch and its shareholders to, among other things, ensure that the company was operated in a diligent, honest and prudent manner.

392.   The Merrill Defendants breached their fiduciary duties of care, loyalty and good faith owed to Merrill Lynch and its stockholders by allowing the Company to assume over $32 million in risky CDOs, which resulted in tens-of-billions of dollars in write downs; and for wasting billions of dollars more of Merrill Lynch assets on unearned severance pay, outlandish bonuses and open-market stock purchases by Merrill Lynch of its own common stock at artificially inflated prices.

393.   Further, each of the Merrill Defendants had actual or constructive knowledge that they had caused Merrill Lynch to improperly misrepresent the financial results of the company and failed to correct their own and/or Merrill Lynch's materially false public statements and omission and Merrill lynch's materially false publicly reported financial results and other operating information.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote Merrill Lynch's corporate interests.

394.   By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

395.    Plaintiff, Merrill Lynch, and Merrill Lynch's parent, BofA, have no adequate remedy of law.

**Demand On The BofA's Board Is Futile**

396.    As discussed above, upon completion of the Merger, Merrill's claims passed by operation of law to BofA, the surviving corporation.

397.    The BofA Board is comprised of the following sixteen individuals, including two from Merrill Lynch's pre-Merger Board:   Massey, Barnet, Bramble, Colbert, Collins, Countryman, Gifford, Lewis, Lozano, May, Rossotti, Ryan, Susan S. Bies ("Bies"), William P. Boardman ("Boardman"), D. Paul Jones ("Jones"), and Donald E. Powell ("Powell").   All of these BofA Director were director of BofA or director of Merrill at the time the Merger was consummated except Bies, Boardman, Jones, and Powell.   Thus, the vast majority of the current members of the BofA Board approved the Merger.

398.    Plaintiffs have not made a demand on the BofA Board to institute this action because such a demand would be futile and useless act.   An overwhelming majority of the BofA Board would not be able to impartially consider the merits of this action without being influenced by improper considerations and thus it could not properly exercise its independent and disinterested business judgment in responding to such a demand for the following reasons.

399.    Pursuant to the Merger Agreement, a majority of the BofA Board caused BofA to agree to indemnify and hold harmless each present and former director and officer of Merrill Lynch from liability for matters arising out of ***or prior to*** the completion of the merger to the fullest extent provided by applicable law.   *See* Merger Agreement, ¶ 6.6 (Attached to Joint Proxy as Appendix A).   BofA also agreed pursuant to the Merger Agreement to maintain in place, for a period of six years after completion of the merger, Merrill Lynch's current directors' and

officers' liability insurance policy or equivalent policies.  In so doing, a majority of the Bof A Board effectively waived on behalf of BofA the ability of BofA to pursue the claims of Merrill Lynhc alleged herein.  Moreover, by agreeing to the directors' insurance provision, a majority of the BofA Board made BofA directly liable for the costs of recovery on any such claims by BofA based on the insured versus insured exclusion contained in typical directors' and officers' insurance polices.  As a result, the cost of any defense of the claims of BofA against the former Merrill Lynch officers and directors would be borne by BofA.

400.    Moreover, a majority of the BofA Board agreed to these broad indemnification provisions of the Merrill Defendants without any consideration of the substance or merits of the claims.  Therefore, in agreeing to these terms, a majority of the BofA Board failed to exercise any business judgment and rendered themselves liable to BofA shareholders for that conduct.  Consequently, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

401.    Also pursuant to the Merger Agreement, a majority of the BofA Board were required to grant "***prior written consent***," for Merrill Lynch to "pay any amounts to [Merrill Lynch] Employees . . . ***other than base salary in the ordinary course of business***."  *See* Merger Agreement, ¶ 5.2(c) (Attached to Joint Proxy as Appendix A).  Nevertheless, a majority of the BofA Board approved this provisions and agreed to $3.6 billion in 2008 bonuses to Merrill lynch officers and employees without determining the amount of such bonuses or to whom they would be awarded before approving them.  In so doing, a majority of the BofA Board is faced with substantial personal liability to BofA shareholders for their breached of their duties of care and loyalty.  Consequently, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

402.    As alleged in detail herein, both the Merrill Defendants and a majority of the BofA Board authorized the issuance of the Joint Proxy pursuant to which Merrill Lynch and BofA sought their respective shareholders' approval of the Merger.  The Joint Proxy failed to disclose material facts concerning the 2008 Merrill bonuses and, consequently, both the Merrill Lynch and BofA face a substantial liability to BofA shareholders based on material omissions in the p[rioxy Statement utilized to solicit their approval of the Merger.  In order to pursue the claims alleged herein, the BofA Board would have to admit to the material omissions in the Proxy Statement used to solicit the approval of BofA shareholders and render BofA and themselves liable for the violations of the federal securities laws.  Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

403.    As alleged in detail herein, both the Merrill Defendants and a majority of the BofA Board authorized the issuance of the Joint Proxy pursuant to which Merrill Lynch and BofA sought their respective shareholders' approval of the Merger.  The Joint Proxy failed to disclose material facts concerning additional losses that Merrill Lynch was suffering in the fourth quarter of 2008.  By virtue of the reckless failure of BofA to conduct a meaningful due diligence of Merrill Lynch before the BofA Board approved the Merger, a majority of the BofA Board face substantial liability for misrepresenting and omitting material information concerning the true financial condition of Merrill Lynch in the Proxy Statement issued in connection with soliciting BofA shareholder approval of the merger.  Moreover, a majority of the BofA Board face substantial liability to BofA for their approval of the Merger in violation of their fiduciary duties of care, loyalty and candor.  In order to pursue the claims alleged herein, the BofA Board would have to admit to the material omissions in the Proxy Statement used to solicit the approval of BofA shareholders or violation of their duties of care and loyalty in failing to conduct a

reasonable due diligence of Merrill Lynch before approving the Merger.  In either event, pursuit of the claims alleged herein would result in a majority of the BofA Board making themselves liable for the violations of their fiduciary duties to BofA shareholders as directors of BofA. Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

404.    Moreover, as Attorney General Cuomo's April 23, 2009 letter to Congress and Secretary Paulson's subsequent testimony to Congress make clear, following the disclosure of the amount of the Merrill Lynch 2008 bonuses that a majority of the BofA Board approved blindly and the growth in losses at Merrill Lynch following approval of the Merger by the BofA Board, but before consummation of the Merger itself, BofA considered terminating the Merger, as permitted by the Merger Agreement, based on a "material change."  As reported in the financial press and during hearings before Congress, BofA was warned by the United States Secretary of the Treasury that if BofA attempted to terminate the acquisition of Merrill Lynch, the U.S. Government would remove then current BofA management, including Lewis and the other members of the BofA Board.

405.    Faced with the choice between exercising their fiduciary duties to BofA and its shareholders by terminating the transaction with a company that had concealed astronomical additional losses in the billions of dollars and the size of proposed bonus payments to Merrill Lynch officers and employees in the billions of dollars, but face the real and immediate threat of termination from the BofA Board, or terminate the Merger as permitted by the Merger Agreement (including all of its liability-protective provisions for the Merrill Defendants arising from their pre-consummation conduct and the payment of billions of dollars in Merrill Lynch assets that would have become the property of BofA), a majority of the current BofA Board

resolved that conflict in their own favor by preserving their positions as directors of BofA and consummated the Merger.

406.    As a result of these machinations (which are the subject of various governmental investigations), and by virtue of failing to disclose these matters before the Merger was consummated, BofA and a majority of the BofA Board face substantial liability to BofA and its shareholders and investors.  Thus, for a majority of the BofA Board, pursuit of the claims alleged herein would result in a majority of the BofA Board making themselves liable for the violations of the federal securities laws and the common law to BofA and its shareholders.  Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

407.    Furthermore, demand on the BofA Board would also be futile because a majority of the BofA Board has already pre-judged the merits of this action, and offered their opinion on the merits of the claims in this action in the Joint Proxy:

> Merrill Lynch and Bank of America believe that the class claims asserted by Merrill Lynch stockholders relating to the merger are without merit and intend to contest them vigorously.  Upon consummation of the merger, the plaintiffs who have asserted derivative claims on behalf of Merrill Lynch may lose standing to assert such claims on behalf of Merrill Lynch because they will no longer be Merrill Lynch stockholders.

408.    Additionally, a majority of the BofA Board was aware that the Merrill Board had already flatly rejected shareholder demands to pursue the claims alleged in this action as those demands, and the rejection of those demands, were the subject of discussion in the Proxy Statement.  Having already reached its conclusions, there is reasonable doubt whether the a majority of the BofA Board is capable of impartially considering a demand to bring suit against the Merrill Defendants based on the allegations contained herein.

409.    Furthermore, having stated its opinion in the Proxy Statement as part of the concerted effort between BofA and Merrill Lynch to obtain shareholder approval of the Merger from both Merrill Lynch and BofA shareholders, for BofA to pursue the claims alleged in this action against the Merrill Defendants would, effectively, be an admission that the above quoted statements in the Proxy Settlement were false and that the proxy statement solicited approval of the Merger through false and misleading statements.   That, in turn, would make BofA and a majority of the BofA Board liable to BofA shareholders for soliciting their proxies through false and misleading statements and make them liable for the losses suffered by BofA resulting from consummation of the Merger. Thus any demand on the BofA Board would be futile.

410.    Importantly, the threat of personal liability of a majority of the BofA Board for its conduct in approving the Merger Agreement and consummating the Merger with Merrill Lynch is not hypothetical.   BofA and a majority of the BoA Board are now defendant-parties in BofA investor securities fraud class actions, BofA shahreholder derivative actions and BofA employee ERISA class actions.   The alleged liability of the BofA defendants in these actions arise out of the majority of the BofA Board approving the terms of the Merger Agreement complained of herein and failing to disclose material information regarding the terms of the Merger, the condition of Merrill Lynch and the involvement of the Treasury Department in the BofA Board's decision to proceed with consummation of the Merger.   These suits seek billions of dollars in compensation from BofA and a majority of the BofA Board.   Given pursuit of the claims in this action would make its nearly impossible for BofA or the BofA officers and directors who are the subjects of those to defend against the claims in those cases, a demand to pursue the claims in this action would certainly be futile as it would expose these individual to ruinous personal liability.

411.    Moreover, demand on the BofA Board is also excused because there is a reasonable doubt as to whether the BofA directors could independently and disinterestedly consider a demand to sue other members of the BofA Board due to disabling personal and professional conflicts of interest, including:

(a)    Former Merrill director, Merrill Defendant Reese, served on the CBS Corporation board of directors (the "CBS Board") with current, non-independent, BofA director, Defendant Gifford.  Defendant Gifford currently also serves on the CBS Board with BofA director, Defendant Countryman;

(b)    BofA director Bramble, served as a senior executive of MBNA Corporation ("MBNA") when it was acquired by BofA and received significant compensation therefrom.  In fact, for both 2006 and 2007, BofA openly conceded that Bramble was not an independent director;[118] and

(c)    BofA directors Countryman, Gifford and May serve as trustees of NSTAR, an energy utility company, where May also serves as Chairman, President and CEO.[119]

412.    Finally, following consummation of the Merger, Ms. Lembrecht made demand upon the BofA Board to pursue the claims in this action.  Upon information and belief, the BofA Board has formally rejected that demand without forming a special litigation committee or excluding the members of the BofA Board who approved the Merger and who did not seek to terminate the Merger Agreement based on threats of their termination as directors of BofA by the

---

[118] See Bank of Am. Corp., Definitive Proxy (Schedule 14A), at 4 (Apr. 25, 2007) ("The Board has determined that Frank P. Bramble, Sr., Charles K. Gifford, [and] Kenneth D. Lewis . . . do not meet the independence standards."); Bank of Am. Corp., Definitive Proxy (Schedule 14A), at 4 (Apr. 26, 2006) ("The Board has determined that Frank P. Bramble, Sr., Charles K. Gifford, [and] Kenneth D. Lewis . . . do not meet Bank of America's independence standards.").

[119] Id.

U.S. Treasury.  Thus, any question that demand -- if it were necessary under the circumstances here -- would have been futile has been resolved.

413.    Plaintiff, Merrill Lynch and BofA have no adequate remedy of law.

414.    Plaintiff did not make a demand on the current Merrill Lynch board of directors because:  (1) all such directors serve at the pleasure of the BofA Board; and (2) such a demand is not required under Delaware law subsequent to the consummation of the Merger.

415.    Plaintiff did not make any demand on shareholders of Merrill Lynch or BofA to institute this action since such demand would have been a futile and useless act for the following reasons:

(a)     Merrill was, and BofA is, a publicly held company with millions of shares outstanding and over thousands of shareholders;

(b)     Making demand on such a number of shareholders would have been impossible for Plaintiff, who had no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would have forced Plaintiff to incur huge expenses, even assuming all shareholders could be individually identified.

### COUNT I

**(Double Derivative Claim on Behalf of BofA and Against the Merrill Defendants for Breach of Fiduciary Duties of Care, Loyalty and Good Faith)**

416.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

417.    Plaintiff brings this count derivatively in the right and for the benefit of BofA to redress damage suffered and to be suffered by BofA as a direct result of the Merrill Defendants'

breaches of fiduciary duty, corporate mismanagement, and abuse of control on behalf of BofA against all Defendants.

418.    This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of BofA and its shareholders, former Merrill shareholders, in enforcing and prosecuting their rights.

## COUNT II

### (Double Derivative Claim on Behalf of BofA and Against Defendant O'Neal and the Merrill Director Defendants for Corporate Waste)

419.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

420.    Plaintiffs allege this count derivatively on behalf of BofA against defendant O'Neal and the Merrill Director Defendants.

421.    O'Neal and each of the Merrill Director Defendants owed to Merrill Lynch the obligation to protect Merrill Lynch's assets from loss or waste.

422.    O'Neal and the Merrill Director Defendants' failure to adequately evaluate and monitor Merrill Lynch's risk in the CDO market constituted a waste of Merrill Lynch's corporate assets and was grossly unfair to Merrill Lynch.  No person of ordinary, sound business judgment could conclude that O'Neal and the Merrill Director Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

423.    Further, the Merrill Director Defendants committed corporate waste by authorizing and approving O'Neal's exorbitant severance package.  There was no consideration for O'Neal's $160 million severance given that O'Neal was subject to termination for cause.

424.    Defendant O'Neal and the Merrill Director Defendants also committed corporate waste by authorizing and approving the acquisitions of First Franklin and First Republic at a time

when they knew such companies' assets were significantly overvalued and needed to be materially written down, and when they knew Merrill itself would shortly need significant infusions of capital.

425.   By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

426.   Plaintiffs and BofA have no adequate remedy at law for the wasteful and wrongful conduct engaged in by O'Neal and the Merrill Director Defendants.

427.   Plaintiffs and BofA are therefore entitled to judgment against O'Neal and the Merrill Director Defendants as specified below.

## COUNT III

### (Double Derivative Claim on Behalf of BofA and Against the Merrill Defendants for Abuse of Control)

428.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

429.   This count is brought derivatively on behalf of BofA against all Defendants except Bank of America.

430.   Defendant O'Neil's and the Merrill Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Merrill Lynch, for which they are legally responsible.

431.   As a direct and proximate result of these defendants' abuse of control, Merrill Lynch has sustained significant damages.

432.   As a result of the misconduct alleged herein, these defendants' are liable to the Merrill Lynch.

## COUNT IV

**(Double Derivative Claim on Behalf of BofA and Against the
Merrill Defendants for Gross Mismanagement)**

433.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

434.    This count is brought derivatively on behalf of BofA and against the Merrill Defendants.

435.    By their allegations alleged herein, the Merrill Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Merrill Lynch in a manner consistent with the operations of a publicly held corporation.

436.    As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Merrill Lynch has sustained significant damages in excess of $15 billion dollars.

437.    As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

## COUNT V

**(Double Derivative Claim on Behalf of BofA and Against the Merrill
Defendants for Contribution, Indemnification and Declaratory Relief)**

438.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

439.    This count is brought derivatively on behalf of BofA and against the Merrill Defendnats.

440.    Merrill Lynch is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to the Merrill

Defendants' liability to Merrill Lynch.  These liabilities include all uninsured payments made by Merrill Lynch to settle litigation from the conduct alleged herein.

441.    Merrill Lynch's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless disloyal and/or bad faith acts or omissions of the Merrill Defendants as alleged above, and Merrill Lynch is entitled to contribution and indemnification from each of the Merrill Defendants in connection with all such claims that have been, are or may in the future be asserted against Merrill Lynch by virtue of the Merrill Defendants' misconduct.

442.    Further, Plaintiff seek a declaration that Merrill Lynch has no duty to advance any legal fees to the Merrill Defendants because they did not act in good faith or in any manner they believed to be in the best interest of Merrill Lynch.

## COUNT VI

### (Double Derivative Claim on Behalf of BofA and Against the Merrill Defendants for Aiding and Abetting Breach of Fiduciary Duty)

443.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

444.    This count is brought derivatively on behalf of BofA and against the Merrill Defendants.

445.    In addition to directly breaching their fiduciary duty to the Company, the Merrill Defendants aided and abetted the other Merrill Defendants' breaches of fiduciary duty in a grossly negligent, willful and reckless manner, as described above.

446.    These Merrill Defendants knowingly gave substantial assistance and encouragement to the other Merrill Defendants and each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

447.    As a result of the misconduct alleged herein, the Merrill Defendants are liable to Merrill Lynch.

448.    By reason of the foregoing, Merrill Lynch was damaged.

449.    Plaintiffs, on behalf of BofA, have no adequate remedy at law.

## COUNT VII

**(Double Derivative Claim on Behalf of BofA and Against the Merrill Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934)**

450.    Plaintiff incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

451.    This count is brought derivatively on behalf of BofA and against the Merrill Defendants.

452.    On April 30, 2007, Merrill Lynch issued a press release announcing that the Merrill Board had authorized the $6 billion Stock Repurchase Plan through which Merrill Lynch would purchase its own outstanding common shares.

453.    The Stock Repurchase Plan was recommended to the Merrill Board by the Finance Committee.  At the time of the $6 billion repurchase authorization, the Finance Committee was comprised of four directors:  Merrill Defendants Rossotti, Reese, Finnegan and Cribiore.  Amongst other things, the Finance Committee was responsible for overseeing Merrill Lynch's credit and market risk management.  As a result, the members of the Finance Committee knew or should have know but for their reckless disregard of facts known to them, that Merrill Lynch shares were artificially inflated due to Merrill Lynch's undisclosed losses and exposure to its subprime portfolio.

454.    In authorizing the Stock Repurchase Plan, the Merrill Director Defendants (in conjunction with the Merrill Officer Defendants who initiated and orchestrated the Stock

Repurchase Plan) knowingly caused Merrill Lynch to purchase Merrill Lynch common stock while they were in possession of material undisclosed information that would have resulted in Merrill paying far less for those shares had the truth been revealed.

455.    The Merrill Director Defendants owed a duty to Merrill Lynch and its shareholders to be reasonably informed about the business and operations of Merrill Lynch.  The Stock Repurchase Plan was not the product of reasonable business judgment and exposed the Merrill Director Defendants' failure to fulfill their oversight responsibilities to Merrill Lynch by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein, and to protect the assets of Merrill Lynch.

456.    Instead, the Merrill Defendants knew, or should have known but for their reckless disregard of facts known to them, that the publicly traded shares of Merrill Lynch common stock were inflated due to their failures to fully and completely disclose Merrill's exposure to its subprime portfolios.  As a result, the Merrill Defendants induced and caused Merrill to purchase Merrill common stock in the open-market at artificially inflated prices which resulted in substantial damage to Merrill Lynch in violation of the federal securities laws and their fiduciary duties to Merrill Lynch and its public shareholders.

457.    By virtue of the foregoing, the Stock Repurchase Plan, Merrill Lynch purchased Merrill Lynch common stock in the open market at artificially inflated prices caused by the Merrill Defendants material false statements and omissions regarding Merrill Lynch's exposure to the subprime market and the company's true financial condition.

458.    As a result of the stock repurchases, Merrill lynch paid an inflated price for those shares of common stock and the shares were placed in Merrill Lynch's treasury.

459.     When the truth was revealed concerning Merrill Lynch's exposure to the subprime market and its true financial condition, the value of those shares purchased by Merrill Lynch declined precipitously in value.

460.     As a result, Merrill Lynch was damaged by the Merrill Defendants' misrepresentations and omissions, made directly or caused by them to be made by Merrill Lynch, in connection with Merrill Lynch's purchases of Merrill Lynch common stock.

461.     The Merrill Defendants knew or were reckless in making the false and misleading statements alleged above regarding the financial condition of Merrill Lynch before and at the time Merrill Lynch was purchasing, at their direction, Merrill Lynch common stock.

462.     As a result, the Merrill Defendants violated Section 10(b) and Rule 10b-5 promulgated thereunder and are liable to Merrill Lynch for the damages it incurred in connection with the purchases of those Merrill Lynch shares.

## COUNT VIII

**(Double Derivative Claim on Behalf of BofA and Against the Merrill Defendants for Breaches of Their Duties of care, Loyalty and candor In Connection With The Purchases of Merrill Lynch Stock By Merrill lynch Under the Stock Repurchase Plan)**

463.     Plaintiff incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

464.     This count is brought derivatively on behalf of BofA and against the Merrill Defendants.

465.     By virtue of orchestrating, approving and effectuating the Stock Repurchase Plan through which Merrill Lynch purchased its own common stock in the open market at artificially inflated prices caused by the Merrill Defendants' misrepresentations and omissions concerning the financial condition of Merrill lynch, Merrill Lynch suffered substantial damage.

466.   The Merrill Defendants knew, or should have known but for their reckless disregard of facts known to them, that the prices of Merrill Lynch's publicly traded common stock was artificially inflated by their misrepresentations and omissions and failure to fully or adequately disclose the true financial condition of Merrill Lynch and its exposure to its subprime portfolio.

467.   As a result, the Merrill defendants breached their duties of care, loyalty and candor by causing Merrill Lynch to pay artificially inflated priced for its common stock and thereby waste Merrill Lynch assets.

## COUNT IX

**(Double Derivative Claim on Behalf of BofA and Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)**

468.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

469.   This count is brought derivatively on behalf of BofA and against the Insider Selling Defendants.

470.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Merrill Lynch common stock on the basis of such information.

471.   The information described above was proprietary non-public information concerning Merrill Lynch's financial condition and future business prospects.  It was a proprietary asset belonging to the company, which the Insider Selling Defendants used for their own benefit when they sold Merrill Lynch common stock.

472.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of Merrill Lynch common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

473.    Since the use of Merrill Lynch's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties and theft of a corporate opportunity, Merrill Lynch is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT X

**(Double Derivative Claim on Behalf of BofA Against the Insider Selling Defendants for Violation of the Exchange Act §10(b) and Rule 10b-5)**

474.    Plaintiff incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

475.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Merrill Lynch common stock on the basis of such information.

476.    The information described above was proprietary non-public information concerning the company's financial condition and future business prospects.  It was a proprietary asset belonging to Merrill Lynch, which the Insider Selling Defendants used for their own benefit when they sold Merrill Lynch common stock.

477.    These Insider Trading Defendants misappropriated Merrill Lynch's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities

laws when they sold Merrill Lynch stock without disclosing the information alleged to have been concealed herein.

478.    At the time of their stock sales, the Insider Selling Defendants knew that Merrill Lynch's assets and revenues were materially overstated and its liabilities understated.

479.    As such, the Insider Selling Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Merrill Lynch and others in connection with their sales of Merrill Lynch common stock during the Relevant Period.

480.    The Insider Selling Defendants' conduct constitutes a manipulative and deceptive devise and contrivance in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

481.    As a direct and proximate result of these defendants' wrongful conduct, Merrill Lynch suffered damages in connection with the Insider Selling Defendants' deceptive practices and contrivances in the sale of Merrill Lynch common stock during the Relevant Period.

482.    By reason of such conduct, the Insider Selling Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT XI

### (Double Derivative Claim on Behalf of BofA and Against the
### Merrill Defendants For Unjust Enrichment)

483.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

484.    This count is brought derivatively on behalf of BofA and against all defendants except Bank of America.

485.    By their wrongful acts and omissions, the Merrill Defendants were unjustly enriched at the expense of and to the detriment of Merrill Lynch.

486.    Plaintiff, as a shareholder and representatives of BofA, seek restitution from these defendants, and each of them, and disgorgement of their profits, benefits and other compensation from the Insider Trading Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT XII

### (Double Derivative Claim on Behalf of BofA and Against Thain, Fleming and the
### Defendants Director Defendants For Corporate Waste)

487.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

488.    Plaintiff alleges this count derivatively on behalf of BofA against the Merrill Director Defendants.

489.    Each of the Merrill Defendants owed to Merrill Lynch the obligation to protect Merrill Lynch's assets from loss or waste.

490.    The Merrill Director Defendants, and in particular the members of the Management Development and Compensation Committee, committed corporate waste by

authorizing and approving the exorbitant $3.62 billion in bonus compensation for Merrill Lynch's senior management just prior to the consummation of the Merger.  The bonuses approved by the Merrill Director Defendants constituted a waste of Merrill Lynch's corporate assets and were grossly unfair to Merrill Lynch.

491.   Furthermore, pursuant to the Merger Agreement, any bonus payments above "base salary in the ordinary course of business," *required* "prior written consent" from BofA. However, Fleming and Thain obtained BofA's approval for these bonuses without disclosing the aggregate amount of the bonuses.  As a result, the BofA Board did not make an informed business judgment with respect to approving these bonuses as part of the merger negotiation.

492.   By reason of the foregoing, Thain and Fleming breached their fiduciary duties to Merrill Lynch by conspiring to obtain BofA's agreement to pay over $3 billion in bonuses (including tens of millions of dollars in bonuses to senior management and themselves) without disclosing the size to shareholders because Thain and Fleming knew if they disclosed the actual size of the bonuses, BofA would not agree to allow Merrill to pay them.

493.   Thus, to reward themselves millions of dollars in bonus compensation, Thain and Fleming breached their fiduciary duties to Merrill Lynch by wasting its assets and Merrill Lynch lost over $3 billion in assets.

494.   Plaintiff, Merrill Lynch and BofA have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Thain, Fleming and the Merrill Director Defendants.

## COUNT XIII

**(Direct Class Claim for Breach of Fiduciary Duty against Defendants Thain, Christ, Codina, Colbert, Finnegan, Jonas, Peters, Prueher, Reese and Rossotti)**

495.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.  This count is alleged on information and belief, said information and belief being based, in part, upon the investigation conducted by and through plaintiff's undersigned counsel.

**Class I Class Action Allegations**

496.   Plaintiff brings this count on behalf of herself and a class, pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, consisting of those persons and entities who held the common stock of Merrill Lynch at the time of consummation of the Merger (the "Class I").  Excluded from Class I are all defendants named herein and any entity or person acting in concert with any defendants named herein or any entity owned or controlled by any defendants named herein.

497.   Plaintiff seeks, *inter alia*: (i) an accounting for all damages caused by defendants to Plaintiff and the members of Class I and the extent of the unjust enrichment of the defendants arising from their wrongful activities, as well as repayment of such unjust enrichment and the earnings thereupon; and (ii) money damages to be paid by the defendants.

**Numerosity**

498.   At all relevant times, Merrill Lynch had approximately 1.5 billion shares of common stock outstanding.

499.   The exact number of members of Class I is not known by plaintiffs, but is within the sole knowledge of the defendants. Upon information and belief, the members of the Class I

are so numerous as to make a class action appropriate as it is composed of hundreds or thousands of members.

500.    On information and belief, the members of the Class I are located in most or all fifty states, and in numerous foreign countries.

**Common Issues of Law and Fact Predominate**

501.    All members of Class I were and are subjected to actual and threatened damage to the value of their Merrill Lynch stock due to defendants' wrongful conduct.  Defendants put their own interests before those of Plaintiff and members of the Class I.

502.    There are common questions of law and fact that relate to and affect the rights of each member of Class I including, *inter alia*:

(a)    whether the defendants breached their fiduciary duties to Plaintiff and the members of Class I by agreeing to sell Merrill Lynch to Bank of America pursuant to an unfair process and at a grossly unfair price;

(b)    whether the defendants fully informed themselves before agreeing to sell Merrill Lynch to Bank of America after less than 24 hours of deliberation;

(c)    whether defendants breached their fiduciary duties to members of Class I by failing to make any attempt to shop the Company after deciding that the Company should be sold;

(d)    what remedies are appropriate compensation for the damages caused to plaintiffs and each member of Class I;

503.    The relief sought is common to all members of Class I including, *inter alia*:

(a)    a declaratory judgment that the defendants violated their fiduciary duties; and

(b)       payment by the defendants of compensatory damages caused by their breaches of fiduciary duties.

**Typicality and Predominance of Plaintiff's Claims**

504.    The interests of plaintiff and each member of Class I have been adversely affected by the wrongdoing of the defendants as described herein.

505.    Plaintiff's claims are typical of those of the other members of Class I, and common factual and legal issues predominate over any individualized issues.

**Plaintiff Will Fairly and Adequately Represent the Class**

506.    Plaintiff can and will fairly and adequately protect the interests of the members of Class I.

507.    Plaintiff's attorneys are experienced and capable of prosecuting complex litigation such as this case.  Plaintiff's attorneys will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

508.    Defendants acted and are acting in the same manner as to all members of Class I and damages are appropriate respecting Class I as a whole.

509.    This count is brought by plaintiffs on behalf of themselves and the members of Class I, and is asserted against defendants Thain, Christ, Codina, Colbert, Finnegan, Jonas, Prueher, Peters, Reese and Rossotti.

510.    By agreeing to sell Merrill Lynch to Bank of America and portraying that sale (which was orchestrated over one weekend, negotiated and deliberated over less than 48 hours as a rescue in order to create a panic among Merrill's shareholders,) the Merrill Director Defendants breached their fiduciary duties to Merrill Lynch shareholders.   By the acts, transactions and courses of conduct alleged herein, defendants individually and as part of a

226

common plan or scheme and/or aiding and abetting one another in disregard of their fiduciary duties, deprived plaintiff and the other members of Class I of the true value of their investment in Merrill Lynch.

511.    The Merger of Merrill Lynch and Bank of America was wrongful, unfair, and harmful to Merrill's public shareholders who are members of Class I, and aggrandized the Merrill Director Defendants' personal and financial positions at the expense of the public shareholders.  The Merger denied plaintiff and the other members of Class I their right to share in the true value of Merrill's assets and future growth and profits while usurping the same for the benefit of Bank of America and its shareholders and an unfair and inadequate price.

512.    As a result of such conduct, the Merrill Director Defendants named in this count breached their fiduciary duties to plaintiffs and the other members of Class I.  The Merrill Director Defendants' fiduciary obligations under these circumstances require them to:

(a)    Fully inform themselves of all information and options, and not rush to agree to a sale of Merrill Lynch in less than 48 hours and engaged in a "panic sale" mentality that blinded them to the proper discharge of their fiduciary duties;

(b)    Undertake an appropriate evaluation of Merrill's worth as a merger candidate or in liquidation;

(c)    Engage in a meaningful auction with third parties in an attempt to obtain the best value;

(d)    Act independently so that the interests of Merrill's public shareholders will be protected;

(e)    Act in the best interests of the Company and its shareholders and not out of any self-interest;

(f)     Disclose fully and completely all material information pertaining to the Merger.

513.    The terms of the Merger were unfair, inadequate, and lack any indicia of a well-reasoned, well-informed, or considered approach to the Bank of America proposal or any attributes of a process intended to generate the highest or best value to Merrill shareholders.  The Merrill Director Defendants owed fiduciary obligations to Merrill's shareholders to take all appropriate measures to maximize the value of Merrill Lynch's stock in any transaction.  The Merrill Defendants also had the responsibility to act independently and to not engage in self-dealing.  Further, the of Merrill Director Defendants were required to adequately ensure that no conflict of interest exists between the defendant's own interests and their fiduciary obligations to maximize shareholder value or, if such conflicts exist, to ensure that all such conflicts will be resolved in the interests of the Company's shareholders.

514.    Because the Merrill Director Defendants dominate and control the business and corporate affairs of Merrill and because they are in possession of private corporate information concerning Merrill's assets, business and future prospects, there existed a disparity of knowledge and economic power between defendants and the public shareholders of Merrill.

515.    The Merrill Director Defendants breached their fiduciary duties of care and loyalty to plaintiff and other members of the Class in that they did not exercise independent business judgment and acted to the detriment of the members of Class I.

516.    The Merrill Director Defendants also breached their duty of loyalty to plaintiff and the members of Class I in connection with the Merger because one of the significant motivations which caused defendants to agree to sell Merrill Lynch to Bank of America was Bank of America's agreement to grant extremely broad indemnification to the defendant

directors.  Paragraph 6.6 of the Merger Agreement contains indemnification provisions which Bank of America is paying for and providing to the Merrill Defendants which are even broader than those provided to such defendants by Merrill Lynch and specifically include indemnification for conduct which is the subject of the derivative claims asserted in this lawsuit. Bank of America agreed to provide these indemnification rights and directors' and officers' liability insurance for the defendants for six years from the effective date of the merger.  The Merrill Director Defendants face significant liability in this lawsuit due to the derivative claims. By agreeing to sell Merrill to Bank of America, the Merrill Director Defendants were motivated to avoid the significant personal liability they face in this action.  In addition to negotiating extremely broad indemnification provisions for themselves (which include new directors and officers liability policies to protect them further), the Merrill Director Defendants were motivated to sell the company because Merrill is a Delaware company and the defendants could avoid derivative liability for the breaches of fiduciary duties once the Merger is consummated. Thus, the Merrill Director Defendants acted out of self-interest in pursuing a sale of Merrill to Bank of America.

## COUNT XIV

**(Class Claim for Aiding and Abetting Breach of Fiduciary Duty Against Defendant Bank of America)**

517.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.  This count is alleged on information and belief, said information and belief being based, in part, upon the investigation conducted by and through plaintiffs' undersigned counsel.

518.    This claim is brought on behalf of plaintiff and the members of Class I and is asserted against defendant Bank of America.

519.     Defendant Bank of America aided and abetted the Merrill Director Defendants in breaching their fiduciary duties owed to the public shareholders of Merrill, including plaintiffs and the members of Class I.

520.     The Merrill Director Defendants owe fiduciary duties as fully set forth herein to plaintiffs and the other members of Class I.

521.     By committing the acts alleged herein, the Merrill Director Defendants have breached their fiduciary duties owed to plaintiffs and the other members of Class I.

522.     Bank of America colluded with or aided and abetted the Merrill Director Defendants' breaches of fiduciary duties, and was an active and knowing participant in the defendants' breaches of fiduciary duties owed to plaintiffs and the other members of Class I. Among other things, Bank of America agreed as part of the merger negotiations to grant extremely broad indemnification rights to the Merrill Director Defendants in order to protect such defendants and hold them not liable for the derivative and other claims asserted in this lawsuit.  Section 6.6 of the Merger Agreement contains indemnification provisions which Bank of America is paying for and providing to the Merrill Defendants which are even broader than those provided to such defendants by Merrill Lynch and specifically include indemnification for conduct which is the subject of the derivative claims asserted in this lawsuit.  Bank of America agreed to provide these indemnification rights and directors' and officers' liability insurance for the defendants for six years from the effective date of the Merger.

523.     In exchange for these benefits, the Merrill Director Defendants agreed to sell Merrill Lynch to Bank of America at a grossly inadequate price.  Thus, Bank of America personally benefited from the Merrill Director Defendants' breaches of fiduciary duty by

acquiring Merrill Lynch for a vastly lower price than what it would have had to pay had defendants complied with their fiduciary duties and/or conducted an auction for the Company.

## COUNT XV

**(Class Claim for Common Law Fraud And Deceit Against Defendant Thain)**

524.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.  This count is alleged on information and belief, said information and belief being based, in part, upon the investigation conducted by and through plaintiff's undersigned counsel.

525.    Plaintiff brings this count on behalf of herself and a class, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, consisting of all holders of the common stock of Merrill Lynch on January 18, 2008, who continued to hold all or some of those shares on September 15, 2008 ("Class II" and the "Class II Period").  Excluded from Class II are all defendants named herein and any entity or person acting in concert with any defendants named herein or any entity owned or controlled by any defendants named herein.

**Class II Class Action Allegations**

**Numerosity**

526.    At all relevant times, Merrill Lynch had approximately 1.5 billion shares of common stock outstanding.

527.    The exact number of members of Class II is not known by plaintiff, but, upon information and belief, the members of Class II are so numerous as to make a class action appropriate as Class II is composed of hundreds or thousands of members.

528.    On information and belief, the members of Class II are located in most or all fifty states, and in numerous foreign countries.

**Common Issues of Law and Fact Predominate**

529.    All members of Class II were and are subjected to actual and threatened damage to the value of their Merrill Lynch stock due to defendant's wrongful conduct.

530.    There are common questions of law and fact that relate to and affect the rights of each member of Class II including, *inter alia*:

(a)    whether Thain made false and misleading statements to the market between January 18, 2008 and September 15, 2008;

(b)    whether such statements were material;

(c)    whether Thain made such statements with the requisite state of mind;

(d)    whether plaintiffs and the other members of Class II continued to hold their Merrill Lynch common stock in reliance on the statements made by Thain;

(e)    whether defendants other than Thain aiding and abetted and conspired with Thain;

(f)    what remedies are appropriate compensation for the damages caused to plaintiffs and each member of Class II.

531.    The relief sought is common to all members of Class II including, *inter alia*, payment by the defendants of compensatory damages caused by his misrepresentations and omissions

**Typicality and Predominance of Plaintiffs' Claims**

532.    The interests of plaintiff and each member of Class II have been injured affected by the wrongdoing of the defendants as described herein.

533.    Plaintiff's claims are typical of those of the other members of Class II, and common factual and legal issues predominate over any individualized issues.

**Plaintiffs Will Fairly and Adequately Represent the Class**

534.   Plaintiff can and will fairly and adequately protect the interests of the Class and their members.

535.   Plaintiff's attorneys are experienced and capable of prosecuting complex litigation such as this case.  Plaintiff's attorneys will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

536.   Defendant acted and is acting in the same or similar manner as to all members of the Class and final relief is appropriate respecting the Class as a whole.

537.   As alleged above, shortly after being named as CEO of Merrill (replacing O'Neal), Thain made numerous materially false statements and omitted to state material facts necessary to make the statements he made not false and misleading to the stock market from January 18, 2008 through September 15, 2008 concerning several key issues facing Merrill Lynch at the time – issues which were critical to Merrill Lynch shareholders in deciding whether to hold or sell their Merrill Lynch stock.

538.   These materially false statements and omissions indicated that (1) Merrill Lynch had turned the corner and did not expect any additional significant write-downs from CDOs or subprime securities; (2) Merrill Lynch did not need to raise more capital; (3) Merrill Lynch was not interested in being acquired by another company and did not need to be acquired; (4) the problems with Merrill's CDOs and subprime securities were isolated to just one part of the Company and would not affect other parts of Merrill's business; (5) Merrill did not expect significant layoffs; (6) Merrill Lynch was not interested in selling its stake in Bloomberg or any other asset; and (7) Merrill Lynch did not need to be acquired.

539.    Plaintiff and the Class relied on these statements, which caused Plaintiff and the Class to retain their Merrill Lynch stock and not sell it when it was trading, at times, during the Class Period, as high as $58 per share.

540.    Thain made these statements at a time when he knew the statements were false or recklessly disregarded facts which demonstrated the statements were false.  By virtue of these false and misleading statements and omissions, Class Members did  not sell their Merrill stock and held such stock on September 15, 2008 when Merrill agreed to the Merger.

541.    As a result of the Merger Agreement, the value of Merrill's shares were, effectively, capped and members of the Class suffered damages.

## COUNT XVI

### (Class Claim for Negligent Misrepresentation Against Defendant Thain)

542.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.  This count is alleged on information and belief, said information and belief being based, in part, upon the investigation conducted by and through plaintiffs' undersigned counsel.

543.    This count is brought on behalf of plaintiffs and the members of Class II, and is asserted against Thain.

544.    As alleged above, shortly after being named as CEO of Merrill (replacing O'Neal), Thain made numerous materially false statements and omitted to state material facts necessary to make the statements he made not false and misleading from January 18, 2008 through September 15, 2008 concerning several key issues facing Merrill Lynch at the time – issues which were critical to Merrill Lynch shareholders in deciding whether to hold or sell their Merrill Lynch stock.

545.    These materially false statements and omissions indicated that (1) Merrill Lynch had turned the corner and did not expect any additional significant write-downs from CDOs or subprime securities; (2) Merrill Lynch did not need to raise more capital; (3) Merrill Lynch was not interested in being acquired by another company and did not need to be acquired; (4) the problems with Merrill's CDOs and subprime securities were isolated to just one part of the Company and would not affect other parts of Merrill's business; (5) Merrill did not expect significant layoffs; (6) Merrill Lynch was not interested in selling its stake in Bloomberg or any other asset; and (7) Merrill Lynch did not need to be acquired.

546.    Plaintiff and the Class relied on these statements, which caused Plaintiff and the Class to retain their Merrill Lynch stock and did not sell it when it was trading, at times, during the Class Period, as high as $58 per share.

547.    Thain made these statements and omissions negligently at a time when he should have known the statements were false and misleading.  By virtue of these false and misleading statements and omissions, Class Members did not sell their Merrill stock and held such stock on September 15, 2008 when Merrill agreed to the Merger.

548.    As a result of the Merger, the value of Merrill's shares were, effectively, capped and members of the Class have suffered damages and will suffer additional damaged.

## COUNT XVII

### (Class Claim for Aiding and Abetting and Conspiracy
### Against Defendants Fakahany and Fleming)

549.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.  This count is alleged on information and belief, said information and belief being based, in part, upon the investigation conducted by and through plaintiff's undersigned counsel.

550.     This count brought by plaintiff on behalf of herself and the members of Class II, and is asserted against Fakahany and Fleming for aiding and abetting and conspiring with Thain with respect to the false and misleading statements and omissions made by Thain and detailed in Counts XV and XVI, above.

551.     As alleged above, shortly after being named as CEO of Merrill (replacing O'Neal), Thain made numerous materially false statements and omitted to state material facts necessary to make the statements he made not false and misleading to the stock market from January 18, 2008 through September 15, 2008 concerning several key issues facing Merrill Lynch at the time – issues which were critical to Merrill Lynch shareholders in deciding whether to hold or sell their Merrill Lynch stock.

552.     These materially false statements and omissions indicated that (1) Merrill Lynch had turned the corner and did not expect any additional significant write-downs from CDOs or subprime securities; (2) Merrill Lynch did not need to raise more capital; (3) Merrill Lynch was not interested in being acquired by another company and did not need to be acquired; (4) the problems with Merrill's CDOs and subprime securities were isolated to just one part of the Company and would not affect other parts of Merrill's business; (5) Merrill did not expect significant layoffs; (6) Merrill Lynch was not interested in selling its stake in Bloomberg or any other asset; and (7) Merrill Lynch did not need to be acquired.

553.     Fakahany oversaw Merrill's market risk management from March 2005 until May 2007, when he was named co-president with Fleming, who was a star investment banker at the company.

554.     Fakahany was forced out of the Company effective February 1, 2008, but before leaving he actively assisted Thain as part of the "transition team."  During this critical time, he

provided vital input to Thain in connection with the materially false and misleading statements that Thain made in January 2008, and Fakahany knew such statements were false and misleading.  Fakahany provided active assistance to Thain with regard to such statements and failed to take any action to prevent Thain from making such statements or, after they were, to correct them.

555.    Indeed, at the time of Fakahany's departure, Merrill Lynch Chief Executive, Thain, issued a statement thanking Fakahany for his assistance in which Thain described Fakahany as a "consummate professional."  Thain further stated: " Upon my arrival, Ahmass informed me of his intention to transition out of Merrill Lynch in the first quarter and pursue other interests.  ***He provided leadership during this challenging period and has transitioned the new team.***"

556.    Both Fakahany and Fleming were particularly knowledgeable about Merrill's capital needs and the risks Merrill faced from CDOs since they served as Co-Presidents and COOs.  In announcing Fakahany's resignation effective February 1, 2008, news reports indicated that "Fakahany will leave the company as the brokerage builds a new management team following a credit implosion that triggered $12 billion in net losses in the second half of 2007. . . Before his promotion in May [2007] to co-president, Fakahany's duties included responsibility for market risk management as Merrill's build-up of risky collateralized debt obligations surged. Exposure to the subprime-laden debt vehicles backfired. Soured CDO positions were mostly to blame for Merrill's $24 billion in write-downs last year and huge net losses.  Company insiders told Reuters in late October [2007] they expected Fakahany to resign as Merrill's CDO problems mushroomed. Inside the company, he was seen as a close ally of ousted Chief Executive Stan O'Neal."

557.    Moreover, Fleming provided equally critical assistance to Thain.  When Merrill's board ousted O'Neal in October 2007, Fakahany's duties for overseeing business segment operations were consolidated under Fleming. At that time, Merrill Lynch insiders expected Fakahany to resign.

558.    Fleming also made the following false statement to support Thain and to lend credibility to the false statements made by Thain:  On May 12, 2008, Merrill President Greg Fleming told *The Times* of London that "***John Thain has been very clear that we have sufficient capital and don't have a need to raise additional common equity for the foreseeable future***."

559.    Fakahany and Fleming knew that the statements made by Thain during the Class II Period were false or recklessly disregarded facts which demonstrated the statements were false.  They also conspired with Thain and provided active assistance to Thain, aided and abetted Thain, and conspired with Thain in connection with Thain's false statements during the Class II Period.  Indeed, as indicated above, since Thain had just taken over O'Neal's position as CEO shortly before the start of the Class II Period, he relied heavily on Fakahany and Fleming to give Thain advice and to help Thain formulate his strategy, which specifically included Thain's scheme to repeatedly issue false statements during the Class II Period to the effect that Merrill Lynch did not require any further capital infusions.

560.    In committing the wrongful acts alleged herein, Thain, Fakahany and Fleming have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Thain, Fakahany and Fleming further aided and abetted and/or assisted each other in breach of their respective duties.

561.    Thain, Fakahany and Fleming engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time the defendants caused Merrill Lynch to conceal the true fact that Merrill needed additional capital, needed and would need to take additional material write-downs in the billions of dollars, and to conceal facts demonstrating that Thain's statements were false and misleading.

562.    The purpose and effect of the defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the true condition of Merrill Lynch and to disguise the defendants' violations of law.

563.    Thain, Fakahany and Fleming accomplished their conspiracy, common enterprise and/or common course of conduct by causing Merrill Lynch to purposefully, recklessly or negligently misrepresent its financial results through, among other things, Thain's false and misleading statements.  Because the actions described herein occurred under the authority of the Merrill Board, each of the Merrill Director Defendants was also a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

564.    Each of these defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of these defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

565.    As a result of these defendants' actions and their refusal to prevent Thain from making the false and misleading statements and omissions, and failure to cause such statements to be corrected after they were made, plaintiffs and the other members of Class II were damaged.

566.    The damages incurred by plaintiffs and the other members of Class II were caused by defendants' wrongful conduct as alleged above.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment in their favor and in favor of Merrill Lynch against all of the Defendants as follows:

I.    Upon Counts I through XII:

A.    Against each defendant and in favor of Merrill Lynch for the amount of damages sustained by Merrill Lynch as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.    Directing Merrill Lynch and BofA to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Merrill Lynch from a repeat of the damaging events described in this complaint, including but not limited to, adopting the following remedial measures:

   i.  strengthening the Merrill Board's supervision and oversight responsibilities and developing a system to ensure the Merrill Board accurately manages Merrill Lynch's risk potential;

   ii. prohibiting and individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board of Directors;

   iii. allowing the Company's shareholders to nominate at least one candidate for election to the Board of Directors; and

   iv. a policy of ensuring the accuracy of the qualifications of Merrill Lynch's directors, executives and other employees;

C.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses;

D.      Awarding compensatory damages against defendants individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law; and

E.      Granting such other and further relief as the Court deems just and proper.

II.     Upon Counts XIII and XIV:

A.      Declaring that this action is properly maintainable as a class action and certifying plaintiff as the representativesof the Class I;

B.      Declaring that the Merger was in breach of the fiduciary duties of the Merrill Defendants and therefore any agreement arising therefrom is unlawful and unenforceable;

C.      Rescinding the Merger and setting it aside;

D.      Awarding compensatory damages against the Merrill Defendants individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

E.      Directing that the Merrill Defendants account to plaintiff and the members of Class I for all damages caused to them and account for all profits and any special benefits obtained by defendants as a result of their unlawful conduct; and

I.      granting such other and further relief as the Court deems just and proper.

III.    Upon Counts XV through XVII:

A.      Declaring that this action is properly maintainable as a class action and certifying plaintiff as the representative of the Class II;

B.   Awarding compensatory damages against defendants Thain, Fakahany and Fleming, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

C.   Awarding plaintiff and the members of Class II consequential, punitive, and exemplary damages against defendants Thain, Fakahany and Fleming for this alleged wrongful conduct;

D.   Directing that Thain, Fakahany and Fleming account to plaintiff and the other members of Class II for all damages caused to them and account for all profits and any special benefits obtained by defendants as a result of their unlawful conduct; and

E.   Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  July 27, 2009

Respectfully submitted,

**BROWER PIVEN**
A Professional Corporation

By: _____
David A.P. Brower
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Derivative Plaintiff's Executive Committee and Liaison Counsel and Counsel for Derivative Plaintiff Miriam Loveman*

242

## VERIFICATION

I, Miriam Loveman, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of Merrill Lynch at the times the misconduct complained of in the Verified Third Amended Shareholder Derivative and Class Action Complaint ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of July 2008 at Baltimore, Maryland.

Miriam Loveman

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (JSR) (DFE) |
| This Document Relates To: Derivative Action, 07cv9696 (JSR) (DFE) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 27, 2009, I electronically mailed a true and correct copy of the Verified Third Amended Shareholder Derivative and Class Action Complaint, filed July 27, 2009 in the United States District Court for the Southern District of New York, to the following defendants' counsel:

Eric M. Roth
Ian Boczko
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile:  (212) 403-2000
EMRoth@wlrk.com
iboczko@wlrk.com

*Counsel for Bank of America Corporation*

Jay B. Kasner
Scott D. Musoff
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com

Stuart Jay Baskin
Adam S. Hakki
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York , NY 10022
Telephone: (212) 848-4000
Facsimile:  (646) 848-4974
sbaskin@shearman.com
ahakki@shearman.com

*Counsel for Merrill Lynch & Co., Inc.*

Dennis J. Block
Gregory A. Markel
Jason M. Halper
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile:  (212) 504-6666
dennis.block@cwt.com
greg.markel@cwt.com
jason.halper@cwt.com

*Counsel for Outside Director Defendants*

Michael Joseph Chepiga
Paul S. Curnin
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2598
Facsimile:  (212) 455-2502
mchepiga@stblaw.com
pcurnin@stblaw.com

*Counsel for E. Stanley O'Neal*

James N. Benedict
George Canellos
MILBANK, TWEED, HADLEY & MCCLOY LLP
601 South Figueroa St.
Los Angeles, CA 90017
Telephone: (212) 530-5000
Facsimile:  (212) 822-5696
jbenedict@milbank.com
gcanellos@milbank.com

*Counsel for Ahmass Fakahany*

Joseph S. Allerhand
Jonathan D. Polkes
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10023
Telephone: (212) 310-8000
Facsimile:  (212) 833-3148
joseph.allerhand@weil.com
jonathan.polkes@weil.com

*Counsel for Gregory Fleming*

Michael R. Young
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8503
Facsimile:  (212) 728-8111
myoung@willkie.com

Richard D. Bernstein
WILLKIE FARR & GALLAGHER LLP
1875 K Street, N.W.
Washington, D.C. 20006-1238, U.S.A.
Telephone: (202) 303-1108
Facsimile:  (202) 303-2108
rbernstein@willkie.com

*Counsel for Jeffrey Edwards*

Executed: July 27, 2009
         New York, New York

Eric C. Love

3